# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FIRSTFIRE GLOBAL OPPORTUNITIES FUND LLC, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>     -v-<br><br>VENTURE GLOBAL, INC., MICHAEL SABEL, ROBERT PENDER, JONATHAN THAYER, SARAH BLAKE, SARI GRANAT, ANDREW OREKAR, THOMAS J. REID, JIMMY STATON, RODERICK CHRISTIE, GOLDMAN SACHS & CO., LLC, J.P. MORGAN SECURITIES LLC, BOFA SECURITIES, INC., ING FINANCIAL MARKET LLC, RBC CAPITAL MARKETS LLC, SCOTIA CAPITAL (USA) INC., MIZUHO SECURITIES USA LLC, SANTANDER US CAPITAL MARKETS LLC, SMBC NIKKO SECURITIES AMERICA, INC., MUFG SECURITIES AMERICAS INC., BBVA SECURITIES INC., LOOP CAPITAL MARKETS LLC, NATIXIS SECURITIES AMERICAS LLC, DEUTSCHE BANK SECURITIES INC., WELLS FARGO SECURITIES, LLC, TRUIST SECURITIES, INC., NATIONAL BANK OF CANADA FINANCIAL INC., RAYMOND JAMES & ASSOCIATES, INC., REGIONS SECURITIES LLC, GUGGENHEIM SECURITIES, LLC, TUOHY BROTHERS INVESTMENT RESEARCH, INC., and VENTURE GLOBAL PARTNERS II, LLC<br><br>          Defendants. | 25-CV-4642 (JAV)<br><br><u>CLASS ACTION</u><br><br>DEMAND FOR JURY TRIAL |

**CORRECTED AMENDED COMPLAINT**
**<u>FOR VIOLATION OF THE FEDERAL SECURITIES LAWS</u>**

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION .................................................................................................. 2

II.  JURISDICTION AND VENUE ........................................................................... 8

III.  PARTIES .............................................................................................................. 9

    A.  Plaintiffs ..................................................................................................... 9

    B.  Defendants ................................................................................................ 10

        1.  The Issuer Defendant ................................................................... 10

        2.  The Individual Defendants ............................................................ 11

        3.  The Underwriter Defendants ......................................................... 12

        4.  Controlling Stockholder Defendant .............................................. 21

IV.  FACTUAL BACKGROUND .............................................................................. 22

    A.  Company Background ............................................................................... 22

        1.  Venture Global and LNG ............................................................. 22

        2.  Monetizing LNG .......................................................................... 24

        3.  Venture Global's Business Model and Value Proposition ........... 25

    B.  Prior to the IPO, Venture Global Experiences Undisclosed Costly Delays and Operational Failures at LNG Plants ........................................................ 27

    C.  Prior to the IPO, Venture Global Expended Substantial Capital in Q4 2024 to Remediate Construction and Operational Failures at Plaquemines ...................... 37

    D.  Prior to the IPO, Venture Global Jeopardized Critical Long-Term Contracts for Short-Term Gain ...................................................................................... 39

    E.  Internal Monitoring of Risks, Trends, and Uncertainties Relating to Venture Global's Operational and Goodwill ................................................................. 50

    F.  The IPO .................................................................................................... 52

V.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................ 53

    A.    The Offering Documents Contained Material Misstatements and Omissions About Operational Issues and Delays Effecting Venture Global's Operating Plants at the Time of the IPO ................................................................................. 54

    B.    The Offering Documents Contained Material Misstatements and Omissions About Venture Global's Expenditures, Costs, and Financial Results, Including Those for Q4 2024 ................................................................................................. 59

    C.    The Offering Documents Contained Material Misstatements and Omissions About the Business and Reputational Harm Cause to Venture Global by its Failure to Live Up to Expectations with its Contractual Counterparties ............. 65

VI.   POST-IPO EVENTS ................................................................................................... 72

    A.    Customer Rejects Long-Term Contracts Revealing Harm to Venture Global's Reputation and Business Due to Pre-IPO Conduct ............................................. 72

    B.    March 6, 2025 Earnings Release ......................................................................... 75

VII.  CLASS ACTION ALLEGATIONS ........................................................................... 78

VIII. CLAIMS .................................................................................................................... 80

    COUNT I: ................................................................................................................... 80

    COUNT II: .................................................................................................................. 83

    COUNT III: ................................................................................................................. 85

IX.   PRAYER FOR RELIEF ............................................................................................ 87

X.    JURY DEMAND ....................................................................................................... 87

Court-appointed Lead Plaintiff Illinois Municipal Retirement Fund ("IMRF") and additional named plaintiff Pompano Beach Police & Firefighters' Retirement System ("Pompano Beach" and, together with IMRF, "Plaintiffs"), individually and on behalf of a class of similarly situated persons and entities, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon their respective personal knowledge. Plaintiffs' information and belief is based upon the investigation undertaken by Lead Counsel Labaton Keller Sucharow LLP, which included, among other things, a review and analysis of: (i) regulatory filings made by Venture Global, Inc. ("Venture," "Venture Global," or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (ii) Company press releases, transcripts of earnings calls, and other public statements issued and disseminated by the Company; (iii) Company websites and marketing materials; (iv) price and volume data for Venture Global's Class A common stock; (v) research reports from securities and financial analysts; (vi) news and media reports concerning the Company and other facts related to this action; (vii) interviews with former employees and contractors of Venture Global;[1] and (viii) other publicly available material and data concerning the Company.

Lead Counsel's investigation into the factual matters alleged herein continues and many of the relevant facts are known only by Defendants (as defined herein) or are exclusively within Defendants' custody or control. Plaintiffs believe that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for discovery.

---

[1]    Former employees and contractors of the Company ("FEs") will be identified herein by number (FE-1, FE-2). All FEs will be described in the masculine to protect their identities.

1

## I.      INTRODUCTION

1.      The claims asserted herein are strict liability claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") relating to Venture Global's initial public offering (the "IPO" or "Offering"), which commenced on or about January 24, 2025, of over 70,000,000 shares of Class A common stock at a price of $25.00 per share. This federal securities class action is brought on behalf of a Class (as defined herein) of all persons and entities who purchased or otherwise acquired the publicly traded Venture Global Class A common stock pursuant and/or traceable to the Offering Documents (as defined herein) issued in connection with the IPO, and were damaged thereby.

2.      Congress passed the Securities Act with the aim of restoring investor confidence after corporate scandals and the stock market crash of 1929. The Securities Act requires that those who sell or promote securities to the investing public do so based on accurate and fulsome disclosure of material facts. The Securities Act creates liability for false, misleading, and incomplete statements or omissions made in connection with public securities offerings to protect investors and maintain confidence in our public markets.

3.      Venture Global produces and distributes liquid natural gas ("LNG"), which is natural gas that has been supercooled and converted into liquid form. When treated this way, the volume of the gas is substantially reduced, which enables the transportation of much bigger quantities. The Company debuted on the New York Stock Exchange ("NYSE") on January 24, 2025. In the IPO, Defendants offered 70,000,000 shares of Venture Global Class A common stock at a price of $25.00 per share, implying an extraordinary market capitalization of approximately $60 billion. This enormous implied market capitalization made Venture Global the largest energy IPO by valuation in United States history. The implied valuation also significantly exceeded its

closest competitor, Cheniere Energy, suggesting that Venture Global was the largest public LNG company listed in the United States by market capitalization.

4.    Unbeknownst to investors, the Offering Documents for the Class A common stock sold to the investing public in Venture Global's IPO contained misstatements and omissions of material fact. Specifically, the Offering Documents contained misleading statements and omissions relating to: (1) operational issues and delays at the Company's operating plants caused by the Company's reliance on duplicated plans and prefabricated parts; (2) Venture Global's expenditures, costs, and financial results for the fourth quarter of 2024 ("Q4 2024"); and (3) Venture Global's evasion of contractual counter-party expectations and the resulting harm to the Company's business and reputation.

5.    *First*, the Offering Documents were materially false and misleading because they failed to disclose systemic delays and operational issues at Venture Global's LNG plants. At the time of the IPO, Venture Global had plans to construct five LNG plants in Louisiana: (1) Calcasieu Pass ("Calcasieu" or "CP1"), (2) Plaquemines, (3) CP2, (4) CP3, and (5) Delta. However, Venture Global was generating revenue almost exclusively from a single plant, Calcasieu. The Company's second plant, Plaquemines, had first commenced its LNG production in December 2024—the month preceding the IPO. Critically, by the time of the IPO, Venture Global's LNG plants were rife with delays and operational problems, as corroborated by numerous former employees of Venture Global and its third-party contractors.

6.    Adequate discussion of the ongoing, systemic construction and operational issues at Venture Global's plants is glaringly absent from the Offering Documents. This omission was misleading and rendered statements in the Offering Documents false. Indeed, numerous former employees of Venture Global and its contractors have independently reported that systemic delays

3

and problems were rampant at the project sites, and these caused Venture Global to incur significant costs. Far from adequately disclosing these problems, Defendants affirmatively touted many of the factors causing the delays and issues as unique strengths.

7.     For example, Defendants claimed that Venture Global offered a unique value proposition to investors because the Company utilizes a "*design one, build many*" approach. Whereas LNG plants are normally constructed on-site and are not monetized until they are fully constructed and commissioned, Venture Global uses a "factory model" through which the Company constructs the primary, modular components of its LNG plants in offsite factories and then ships the prefabricated parts to its project locations. Specifically, Venture Global produces LNG "trains" (liquefaction production units that cool natural gas to a liquid state) and pipes offsite using a uniform, prefabricated design, and then puts the components together onsite. According to the Offering Documents, this "*design one, build many*" approach purportedly "*improv[ed] [the Company's] execution, accelerat[ed] construction timelines, reduc[ed] costs, and expand[ed] production.*"

8.     Despite the Offering Documents' statements touting Venture Global's "*design one, build many*" process, Defendants failed to inform investors that many of the problems and delays existing at the Venture Global plants at the time of the IPO resulted directly from the Company's reliance on prefabricated construction and planning that was not tailored to or optimized for the unique project locations. Multiple former employee accounts corroborate this fact. For example, Venture Global's construction plans from Calcasieu could not be directly adapted for Plaquemines because of geological features unique to Plaquemines, such as proximity to marsh, and the Company's attempts to rely on older plans and designs therefore caused costly mistakes and

4

problems. Similarly, Venture Global's contractor, General Electric ("GE"), failed to apply unique tags to individual LNG trains, causing operational problems.

9.     Moreover, former employee reports show that Defendants' prefabricated modules caused substantial delays at the LNG plants because those parts were often delivered unfinished or with missing pieces. Because many of these problematic parts were shipped from overseas or other distant locations, the unfinished modules and missing components triggered a domino effect, substantially delaying production at the sites. The non-equivocated representation in the Offering Documents that ***"[the Company's] modules are built and assembled off-site at manufacturing and fabrication facilities in Italy and then shipped to [Venture Global's] project sites fully-assembled and packaged for installation, allowing onsite work to progress in parallel***," was therefore materially false and misleading.

10.     ***Second***, the Offering Documents were materially false and misleading because they failed to disclose critical financial information from the fourth fiscal quarter of 2024 ("Q4 2024"), despite the quarter having been complete for nearly a full month by the time of the IPO. In truth, by the time of the IPO, Venture Global had incurred enormous costs in Q4 2024—well beyond market consensus— including increased development costs and costs to remediate existing problems at its LNG plants. Indeed, Venture Global expended significantly more capital in Q4 2024 than in the corresponding quarter in 2023, including approximately $2.1 billion in expenditures for its Plaquemines project. Similarly, CP2 costs were substantially higher than disclosed, reflecting rampant delays and operational problems—many of which tied to Venture Global's failure to optimize planning and construction for CP2's location, as recollections of former employees indicate—that Defendants omitted from the Offering Documents.

11.     To be sure, the Offering Documents were forthcoming on Q4 2024 accomplishments at Venture Global's operative plants. For example, Defendants repeatedly reported in the Offering Documents that Venture Global commenced production at Plaquemines in December 2024, despite the proximity of this occurrence to the IPO. By stark contrast, however, the Offering Documents were silent on Q4 2024 financial results. As such, investors were unaware of Q4 2024 overspend, impacts to margins, or impacts to overall Q4 2024 and Fiscal 2024 earnings.

12.     The omission of Q4 2024 financial metrics was highly material. A mere five weeks after the IPO, the Company disclosed a massive earnings miss for Q4 2024—adjusted EBITDA of $68.8 billion, approximately 50% below street consensus prior to the earnings release, which analysts attributed the unexpected earnings decline to softening margins and higher than expected remediation and completion costs at Venture Global's LNG plants incurred during Q4 2024. The market, unsurprisingly, recoiled from this massive earnings miss, causing huge investor losses.

13.     ***Third***, the Offering Documents were materially false and misleading because they misrepresented the Company's capacity to enter into stable, long-term contracting agreements and omitted the reputational harm the Company had incurred by failing to meet its customers' expectations under existing long-term contracts.

14.     Specifically, the Offering Documents touted that the Company intended to rely on long-term contracts that would yield stable, long-term cash flows, stating, for example, "***our business model will provide us with stable cash flows as a result of our long-term take-or-pay contracts to sell LNG.***" However, as numerous former employees of Venture Global and its contractors recount that, by the time of the IPO, the Company was jeopardizing its reputation as a counterparty to such contracts by avoiding technically triggering its obligations under existing long-term contracts. Specifically, multiple former employees corroborate that the Company was

pushing off the commercial operations date ("COD") on its projects to avoid triggering provisions requiring the Company to sell its LNG to the contracted parties.

15.    The reason for this was simple. The prices the Company could command on the LNG spot market were sometimes three times higher than the prices agreed to under the terms of long-term contracts. Thus, in an effort to maximize short-term revenue, the Company deliberately avoided commissioning its projects and triggering its long-term contract obligations.

16.    But the LNG business is a reputation-based industry with a small number of critical consumers. By failing to live up to its contract customers' expectations under existing long-term contracts, the Company caused substantial harm to its goodwill and reputation, thereby jeopardizing its ability to enter into additional long-term contracts—as would be necessary to ensure stable cash flows—and cannibalizing long-term profits. Indeed, just over a week after the IPO closed, one critical, potential Venture Global customer in a small, close-knit industry, TotalEnergies, publicly announced that it had rejected Venture Global's offer of a long-term contract as a result of Venture Global dodging the expectations of other major customers like Shell and BP. While the Offering Documents did discuss the narrow and hypothetical risk associated with a negative arbitration finding and award against the Company in ongoing arbitration proceedings with such customers, Defendants nevertheless entirely omitted from the Offering Documents the harm to goodwill and its related risks to future contract opportunities.

17.    Subsequent to the IPO, as the facts misrepresented or omitted from the Offering Documents impacted the price of the Company's Class A common stock swiftly. For example, a mere nine days from the close of the IPO, TotalEnergies announced that it had declined to contract long-term with Venture Global, attributing its rejection to the Company's treatment of existing customers under long term contracts. Specifically, TotalEnergies' CEO proclaimed, "I don't want

7

to deal with these guys, because of what they are doing." In response, Venture Global Class A common stock fell 11.2% in a single trading day. Weeks later, when the Company finally released its Q4 2024 earnings that were well below consensus and revealing costs that were well above the market's expectations, the price of Venture Global Class A common stock plummeted a dramatic 36.05% in a single trading day.

18.     In short, as a result of the undisclosed adverse facts, risks, and uncertainties alleged herein that existed at the time of the IPO, Venture Global's stock plummeted, falling from its IPO price of $25.00 per share to close at $8.29 per share on the day this action was commenced—*a decline of over 66% from the Offering price*.

## II.     JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.

20.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

21.     Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District. Furthermore, the allegations contained herein regard representations made in connection with the initial public offering of Venture Global common stock on the New York Stock Exchange ("NYSE"), which is located in this District. Venue was transferred to this District upon Defendants' Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a). *See* ECF No. 55.

22.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

### III.    PARTIES

#### A.    Plaintiffs

23.    Lead Plaintiff IMRF is a public pension fund that administers retirement, disability, and death benefits for employees of local government in Illinois. As set forth in the Certification filed in this action on April 18, 2025 (ECF No. 5-1), IMRF purchased Venture Global Class A common stock in the IPO pursuant and traceable to the Offering Documents. IMRF purchased Venture Global Class A common stock at a time when only shares offered in the IPO were in the market. In particular, IMRF purchased 1,927,399 shares of Venture Global's Class A common stock in the IPO from Defendant Goldman Sachs & Co., LLC ("Goldman Sachs"), at the Offering price of $25.00 per share on January 24, 2025, and without commission because of the underwriting discount paid to Defendant Goldman Sachs as a selling underwriter in connection with the sale. IMRF has suffered damages as a result of the violations of federal securities laws alleged herein. On July 25, 2025, the Court appointed IMRF as Lead Plaintiff. *See* ECF No. 72.

24.    Plaintiff Pompano Beach is a defined benefit public employee retirement system that administers retirement, death, and disability benefits for eligible employees of Pompano Beach Police and Fire Departments in Pompano Beach, Florida. For the benefit of its participants, Pompano Beach oversees an investment portfolio with an aggregate market value of approximately $300 million. As set forth in the Certification filed in this action on April 18, 2025 (ECF No. 9-3), Pompano Beach purchased Venture Global Class A common stock in the IPO pursuant and traceable to the Offering Documents. Pompano Beach purchased Venture Global Class A common stock at a time when only shares offered in the IPO were in the market. In particular, Pompano Beach purchased 17,643 shares of Venture Global's Class A common stock in the IPO from

9

Defendant Goldman Sachs, at the offering price of $25.00 per share on January 24, 2025, and without commission because of the underwriting discount paid to Defendant Goldman Sachs as a selling underwriter in connection with the sale. Pompano Beach has suffered damages as a result of the violations of federal securities laws alleged herein.

     **B.**     **Defendants**

     **1.**     **The Issuer Defendant**

25. Defendant Venture Global is a Delaware corporation founded in 2013 and headquartered at 1001 19th Street North, Arlington, Virginia. The Company engages in the development, construction, and production of natural gas liquefaction and export projects near the U.S. Gulf Coast in Louisiana. Venture Global's Class A common stock is listed under the ticker symbol "VG" on the NYSE.

26. On or about January 24, 2025, Venture Global conducted its IPO, in which it sold 70,000,000 shares of Class A common stock to the public, with an underwriter over-allotment option to sell an additional 10,500,000 shares of Class A common stock. The IPO, which was priced at $25 per share, generated net proceeds for the Company of approximately $1.68 billion. The IPO was conducted pursuant to, and the sale of Venture Global Class A common stock was solicited by, several documents that were filed by Venture Global and the Underwriter Defendants (as defined herein) with the SEC and disseminated to the investing public, including (i) a December 20, 2024 registration statement on Form S-1 that, following amendment, was declared effective by the SEC on January 23, 2025 (the "Registration Statement"), and (ii) a January 23, 2025 final prospectus, which forms part of the Registration Statement, on Form 424(b)(4) (the "Prospectus" and, together with the Registration Statement, the "Offering Documents").

27. The Offering Documents stated that the Defendants were "offering to sell, and seeking offers to buy, shares of [Venture Global] Class A common stock" by means of the Offering

10

Documents. Further, the Offering Documents told investors not to consider information found outside of the Offering Documents and only consider the information therein. The Offering Documents stated that the Defendants had "not authorized anyone to provide any information or to make any representations other than those contained in [the] [P]rospectus" and that there was "no assurance as to the reliability of[] any other information that others may provide."

### 2. The Individual Defendants

28. At the time of the IPO, Venture Global's co-founder, Defendant Michael Sabel ("Sabel"), was the Company's Chief Executive Officer ("CEO") and served as a member of Venture Global's Board of Directors (the "Board") and as the Board's Executive Co-Chairman.

29. At the time of the IPO, Venture Global's co-founder, Defendant Robert Pender ("Pender") served as a member of Venture Global's Board and as the Board's Executive Co-Chairman.

30. At the time of the IPO, Defendant Jonathan Thayer ("Thayer") was Venture Global's Chief Financial Officer ("CFO").

31. At the time of the IPO, Defendant Sarah Blake ("Blake") was Venture Global's Senior Vice President and Chief Accounting Officer ("CAO").

32. At the time of the IPO, Defendant Sari Granat ("Granat") served as a member of Venture Global's Board.

33. At the time of the IPO, Defendant Andrew Orekar ("Orekar") served as a member of Venture Global's Board.

34. At the time of the IPO, Defendant Thomas J. Reid ("Reid") served as a member of Venture Global's Board.

35. At the time of the IPO, Defendant Jimmy Staton ("Staton") served as a member of Venture Global's Board.

36.     At the time of the IPO, Defendant Roderick Christie ("Christie") served as a member of Venture Global's Board.

37.     Defendants Sabel, Pender, Thayer, Blake, Granat, Orekar, Reid, Staton, and Christie are collectively referred to herein as the "Individual Defendants." Defendants Sabel, Pender, Thayer, and Blake are sometimes collectively referred to herein as the "Executive Defendants."

38.     Each of the Individual Defendants participated in the preparation of and signed the Registration Statement and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein. The Individual Defendants signed the Registration Statement, participated in the IPO, and solicited the purchase of Venture Global's Class A common stock in the IPO to serve their financial interests and those of Venture Global.

39.     Each of the Individual Defendants reviewed, edited, and approved the Offering Documents. Each of the Individual Defendants also reviewed, edited, and approved for presentation to investors the IPO's roadshow presentation, talking points, and script.

40.     Each of the Executive Defendants also conducted the roadshow along with the Underwriter Defendants to solicit the purchase of Venture Global's Class A common stock in the IPO and serve their financial interests and those of Venture Global.

41.     The Individual Defendants were each a control person of Venture Global by virtue of their positions as directors and/or senior officers of the Company. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or Venture Global major stockholders.

### 3.     The Underwriter Defendants

42.     Defendant Goldman Sachs was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate,

misleading, and incomplete Offering Documents. Defendant Goldman Sachs acted as a representative of all of the Underwriter Defendants and as a joint lead bookrunning manager in connection with the IPO. Defendant Goldman Sachs also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant Goldman Sachs was allocated 15,875,728 shares in the IPO to sell to the investing public.

43.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant J.P. Morgan acted as a representative of all of the Underwriter Defendants and as a joint lead bookrunning manager in connection with the IPO. Defendant J.P. Morgan also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant J.P. Morgan was allocated 15,875,728 shares in the IPO to sell to the investing public.

44.     Defendant BofA Securities, Inc. ("BofA") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant BofA acted as a representative of all of the Underwriter Defendants and as a joint lead bookrunning manager in connection with the IPO. Defendant BofA also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant BofA was allocated 13,048,544 shares in the IPO to sell to the investing public.

13

45.     Defendant ING Financial Market LLC ("ING") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant ING also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant ING was allocated 2,366,901 shares in the IPO to sell to the investing public.

46.     Defendant RBC Capital Markets LLC ("RBC") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant RBC also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant RBC was allocated 2,225,423 shares in the IPO to sell to the investing public.

47.     Defendant Scotia Capital (USA) Inc. ("Scotia") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Scotia also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant Scotia was allocated 2,223,876 shares in the IPO to sell to the investing public.

48.     Defendant Mizuho Securities USA LLC ("Mizuho") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Mizuho also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the

Executive Defendants who participated in the roadshow. Defendant Mizuho was allocated 2,212,881 shares in the IPO to sell to the investing public.

49.    Defendant Santander US Capital Markets LLC ("Santander") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Santander also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant Santander was allocated 2,185,667 shares in the IPO to sell to the investing public.

50.    Defendant SMBC Nikko Securities America, Inc. ("SMBC") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant SMBC also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant SMBC was allocated 2,046,671 shares in the IPO to sell to the investing public.

51.    Defendant MUFG Securities Americas Inc. ("MUFG") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant MUFG also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant MUFG was allocated 1,921,955 shares in the IPO to sell to the investing public.

52.    Defendant BBVA Securities Inc. ("BBVA") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant BBVA also

participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant BBVA was allocated 1,686,266 shares in the IPO to sell to the investing public.

53.     Defendant Loop Capital Markets LLC ("Loop") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Loop also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant Loop was allocated 1,633,333 shares in the IPO to sell to the investing public.

54.     Defendant Natixis Securities Americas LLC ("Natixis") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Natixis also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant Natixis was allocated 1,608,085 shares in the IPO to sell to the investing public.

55.     Defendant Deutsche Bank Securities Inc. ("DBSI") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant DBSI also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant DBSI was allocated 1,312,019 shares in the IPO to sell to the investing public.

56.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the

16

materially inaccurate, misleading, and incomplete Offering Documents. Defendant Wells Fargo also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant Wells Fargo was allocated 892,588 shares in the IPO to sell to the investing public.

57.    Defendant Truist Securities, Inc. ("Truist") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Truist also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant Truist was allocated 892,588 shares in the IPO to sell to the investing public.

58.    Defendant National Bank of Canada Financial Inc. ("NBCF") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant NBCF also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant NBCF was allocated 748,845 shares in the IPO to sell to the investing public.

59.    Defendant Raymond James & Associates, Inc. ("Raymond James") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Raymond James also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant Raymond James was allocated 570,947 shares in the IPO to sell to the investing public.

17

60.     Defendant Regions Securities LLC ("Regions") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Regions also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant Regions was allocated 319,886 shares in the IPO to sell to the investing public.

61.     Defendant Guggenheim Securities, LLC ("Guggenheim") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Guggenheim also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant Guggenheim was allocated 235,403 shares in the IPO to sell to the investing public.

62.     Defendant Tuohy Brothers Investment Research, Inc. ("Tuohy") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Tuohy also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the roadshow. Defendant Tuohy was allocated 116,666 shares in the IPO to sell to the investing public.

63.     Defendants Goldman Sachs, J.P. Morgan, BofA, ING, RBC, Scotia, Mizuho, Santander, SMBC, MUFG, BBVA, Loop, Natixis, DBSI, Wells Fargo, Truist, NBCF, Raymond James, Regions, Guggenheim, and Tuohy are collectively referred to herein as the "Underwriter Defendants."

18

64.    The Underwriter Defendants are investment banking houses that specialize, among other things, in underwriting public offerings of securities. The Underwriter Defendants' participation in the IPO and their solicitation of purchases of Venture Global's Class A common stock in the IPO was motivated by their financial interests. Collectively, the Underwriter Defendants received over $70,000,000 in fees and "underwriting discounts" in connection with their involvement in the IPO, including the sale of Venture Global's Class A common stock in the IPO.

65.    The Underwriter Defendants determined that, in return for their share of the IPO's proceeds, they were willing to merchandise Venture Global's common stock in the IPO. The Underwriter Defendants arranged for the roadshow prior to the IPO during which they, and the Executive Defendants, met with investors and presented highly favorable information about the Company, its operations, and its financial prospects.

66.    Prior to the IPO, the Underwriter Defendants required that all of Venture Global's pre-IPO stockholders, including the Company, enter into lock-up agreements with them to prohibit shares of Class A common stock, other than those issued pursuant to the Offering Documents and sold into the market through the IPO, from being sold in the public market for 180 days from the date of the Prospectus. These lock-up agreements were not waived by the Underwriter Defendants prior to their expiration.

67.    The Underwriter Defendants also demanded and obtained an agreement from Venture Global that the Company would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Venture Global purchased millions of dollars of directors' and officers' liability insurance.

19

68.     The Underwriter Defendants assisted Venture Global and the Individual Defendants in planning the IPO, and purportedly conducted a pre-IPO investigation into the business and operations of Venture Global in an undertaking known as "due diligence." The purported due diligence investigation was required of the Underwriter Defendants to engage in the IPO. During the course of their purported "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Venture Global's operations and financial prospects.

69.     In addition to availing themselves of virtually unbridled access to internal corporate documents, the Underwriter Defendants had access to the Company's lawyers, management, directors, and top executives (including the Individual Defendants) to determine: (i) the strategy to best accomplish the IPO and ensure adequate investor demand; (ii) the terms of the IPO, including the price at which the Company's common stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosure about the Company would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants and the Company's lawyers, management, directors, and top executives (including the Individual Defendants), at a minimum, the Underwriter Defendants were negligent in not knowing of the materially untrue statements and omissions contained in the Offering Documents as detailed herein.

70.     The Underwriter Defendants caused the Offering Documents to be filed with the SEC and to be declared effective in connection with offers and sales of the Company's Class A common stock pursuant and/or traceable to the IPO and the Offering Documents, including to Plaintiffs and the Class.

20

### 4. Controlling Stockholder Defendant

71.    Defendant Venture Global Partners II, LLC ("VG Partners") owned 1,968,604,458 shares, or 100%, of Venture Global's Class B common stock prior to the IPO. These holdings represented 98.1% of the total voting power of Venture Global equity holders prior to the IPO. After the IPO, VG Partners still owned 1,968,604,458, or 100%, of Venture Global's Class B common stock. As a result, after the IPO, VG Partners still retained 97.7% of the total voting power of Venture Global equity holders. As a result, the Offering Documents disclosed that Venture Global was a "controlled company" controlled by VG Partners.

72.    Venture Global's Class B common stock has ten votes per share while its Class A common stock, the stock sold to investors in the IPO, has one vote per share on all matters on which stockholders are entitled to vote.

73.    As a result, VG Partners had, and has, the power to control all matters requiring approval of Venture Global's stockholders, including the election of directors, approval of mergers, and other corporate transactions. Moreover, VG Partners had, and has, the ability to take many corporate actions by written consent without calling a meeting of stockholders.

74.    Defendants Sabel and Pender are the managing partners of VG Partners, and as such, have voting and dispositive power over the Class B common stock held by VG Partners.

75.    Like Venture Global, VG Partners is headquartered at 1001 19th Street North, Arlington, Virginia.

76.    In addition to Defendants Sabel and Pender, the other Individual Defendants were selected for Venture Global's management and/or the Board by VG Partners and/or maintained their employment and/or served on the Board at the discretion of VG Partners.

77. By virtue of its stock ownership and its designation of management and the Board's members, and as stated in the Offering Documents, VG Partners controlled Venture Global and each of the Individual Defendants at the time of the IPO.

78. As a result, VG Partners was able to, and did, control the contents of the Offering Documents.

79. Defendants Venture Global, the Individual Defendants, the Underwriter Defendants, and VG Global are collectively referred to herein as "Defendants."

## IV. FACTUAL BACKGROUND

### A. Company Background

#### 1. Venture Global and LNG

80. Venture Global was founded in 2013 by Defendants Sabel and Pender with the aim of disrupting the LNG market.

81. Natural gas is a fossil fuel energy source that functions as an alternative to coal and oil in various energy applications. As the global energy market grows, demand for natural gas continues to increase. This is particularly so because natural gas is often perceived to have lesser negative environmental impact than oil or coal.

82. Natural gas is abundant in certain areas, including the United States, but less abundant in other places like Europe and Asia. Access to natural gas in places where it does not naturally occur is challenging, as natural gas is most easily transported via pipeline. To enable more economic and efficient overseas shipping, companies like Venture Global undertake a process known as "liquefication," wherein natural gas—specifically, methane—is supercooled to -260°F and converted into a liquid state. This liquefication reduces the natural gas to 1/600th of its original volume, enabling large quantities of natural gas to be loaded and shipped. After shipping, LNG undergoes "regassification," whereby the liquefied product is transformed back

22

into a gaseous form for use in energy applications. LNG's reduced volume enables the product to be shipped globally, including to areas like Europe and Asia. The LNG market has grown dramatically in the past half-decade as companies capitalized on LNG as an affordable means of supplying natural gas to regions otherwise lacking access to the resource.

83.     Venture Global and its competitors operate multiple LNG projects in the United States. Preparing an LNG plant involves two phases: (1) construction and (2) commissioning. The construction phase principally involves preparing the primary infrastructure for LNG production at an LNG project—LNG "trains" and connected pipes—which are used for gas liquefication and purification. Each LNG plant consists of one or more trains. Traditionally, LNG trains and pipes were constructed on-site, but Venture Global manufactured individual, modular elements offsite and then put them together at the LNG plant. Once the construction phase is complete, the facilities are turned over to the commissioning team and the commissioning phase begins. The commissioning team works with the Federal Energy Registration Commission ("FERC") to commission the facilities, which involves testing to ensure that the LNG plant is operational before full-scale production begins. A project is not considered to have reached its commercial operations date ("COD") until both the construction and commissioning phases are complete.

84.     By the time of its IPO in January 2025, Venture Global had five LNG projects in various stages of planning and operation near the coast of the Gulf of Mexico in Louisiana: (1) Calcasieu, (2) Plaquemines, (3) CP2, (4) CP3, and (5) Delta. At the time of the IPO, the Company was in the process of commissioning the Calcasieu project, constructing and commissioning the Plaquemines project, and planning the CP2, CP3, and Delta projects. According to the Company, none of the Company's five projects were fully operational at the time of the IPO, but Venture Global was already generating revenue from the Calcasieu project beginning in the first quarter of

23

2022. By September 30, 2024, the Company had generated approximately $19.6 billion in gross proceeds from Calcasieu. The remaining projects were all pre-revenue at the time of the IPO.

### 2.    Monetizing LNG

85.    Unlike crude oil, LNG is not traded or sold based on a uniform price or index. Instead, pricing is contractually established between LNG producers and their customers. Thus, LNG producers, like Venture Global, contract directly with purchasers to set prices for the LNG produced. The Offering Documents highlight five factors that impact LNG pricing: contract type, benchmark reference price, price indexation or escalation clauses, commercial structure, and shipping arrangements.

86.    Most LNG pricing in the United States is set pursuant to long-term contracting agreements. Long-term LNG contracts last four to twenty-five years and involve fixed pricing mechanisms. Typically, long-term LNG contracts are priced relative to the "Henry Hub" price for gas, which serves as the reference for natural gas future contracts traded on the New York Mercantile Exchange, or NYMEX.

87.    Long-term contracting creates stability for both buyers and sellers, as well as for investors in LNG producers. LNG buyers benefit from the guarantee of a steady and reliable flow of LNG. On the other hand, sellers like Venture Global, as well as their investors, benefit from stable, long-term cash flows. Indeed, Defendants touted in the Offering Documents that one of the Company's purported "strengths" stemmed from "long-term take-or-pay contracts with highly creditworthy offtakers." Venture Global had numerous long-term contract agreements in place at the time of the IPO. These contracts were set to take effect once the relevant project passed the commissioning phase, or "commercial operations date" ("COD"). However, none of Venture Global's projects had yet reached COD by the time of the IPO.

24

88.    In addition to long-term contracting, LNG is also sold on the spot market pursuant to short-term sales agreements. Pricing for such short-term agreements is set pursuant to prevailing market price for LNG, which may be higher or lower than the pricing included in a long-term agreement. Thus, depending on prevailing market price, spot contracts are potentially more lucrative for producers like Venture Global in the short term. Unlike long-term contracts, however, short-term sales agreements do not provide reliable, stable cash flows.

89.    Because Venture Global had not reached COD on any of its projects by the time of its IPO and, therefore, none of its long-term contracts had yet taken effect, all of Venture Global's pre-IPO revenue came from spot-market sales.

### 3.    Venture Global's Business Model and Value Proposition

90.    Venture Global utilized a unique plant construction model that purportedly offered an innovative value proposition. As Defendants explained in the Offering Documents, "[t]he traditional approach to developing large-scale LNG facilities involves very large, highly customized, stick-built projects consisting of two to three liquefaction trains that are constructed almost entirely onsite by vast workforces." Furthermore, according to the Offering Documents, "many of these large stick-built projects are built in remote locations far from concentrated sources of experienced construction workforces, adding to their execution risks." As a result, constructing an LNG project using the traditional model could often take "well over five years," and sometimes "nearly a decade."

91.    Instead of constructing two to three large trains on-site like other companies, Venture Global constructs its plants using larger numbers of medium-sized trains fabricated at offsite factories and brought to the project. Thus, for example, Calcasieu and Plaquemines utilized eighteen and thirty-six mid-scale factory-fabricated liquefaction trains, respectively. Each train

was built and assembled at an overseas manufacturing facility in Italy and then shipped to the project location in assembled form.

92.     This prefabricated train approach purportedly offered multiple advantages.

93.     *First*, Defendants touted that Venture Global's purported "design one, build many" approach—as compared with the traditional made-to-fit approach—allowed the Company to continually improve execution, accelerate its construction timelines, reduce costs, and expand production. Defendants stated that this approach "significantly reduces construction and installation costs, as well as construction time and schedule risk, thereby allowing [the Company] to be more cost-competitive in the LNG market while also producing substantial amounts of commissioning cargos and related cash proceeds." In addition, Defendants indicated that Venture Global's approach would modulate the risks associated with constructing projects in remote locations. Specifically, the Offering Documents stated that many other projects "are built in remote locations far from concentrated sources of experienced construction workforces, adding to their execution risks," whereas Venture Global constructed its trains in centralized manufacturing facilities.

94.     *Second*, constructing additional trains offsite purportedly allowed Venture Global to begin producing LNG at its plants while construction of additional trains remained ongoing. Thus, both Calcasieu and Plaquemines purportedly began producing LNG approximately two and a half years after the final investment decision ("FID") for each respective location, which was substantially faster than other projects that reached FID at around the same time. Importantly, because the plants were not considered to have reached COD "unless the applicable project company has notified such customer that (i) all of the project's facilities have been completed and commissioned, including any ramp up period, and (ii) the project is capable of delivering LNG in

26

sufficient quantities and necessary quality to perform all of its obligations under such post-COD SPA," long-term contracts did not take effect during this construction period. However, to the extent the Company was already producing LNG, that LNG could be sold on the spot market.

95.     The Defendants touted in the Offering Documents that revenue generated from sales of such "commissioning cargos" on the spot market during the pre-COD period could be used to support remaining construction work or fund future projects. By contrast, according to the Offering Documents, once the projects achieved COD, the majority of each project's nameplate capacity—the operating performance thresholds guaranteed by Venture Global's equipment providers—would be sold under long-term, 20-year post-COD agreements at contract prices, ensuring stable cash flows. Only excess LNG would, according to the Offering Documents, continue to be sold on the spot market at market price. Thus, Defendants represented that Venture Global's business model allowed them to benefit from spot-market revenue during the construction period, helping to fund continuing construction while preserving the benefits of stable long-term contracting.

**B.     Prior to the IPO, Venture Global Experiences Undisclosed Costly Delays and Operational Failures at LNG Plants**

96.     Unbeknownst to investors and contrary to the rosy picture the Defendants painted in the Offering Documents, by the time of the IPO, Venture Global was experiencing costly delays and operational failures at its LNG plants. These issues led to overwhelming remediation costs, which, by the time of the IPO, the Company was aware would be necessary and—to a large extent—had already incurred.

97.     Many of these negative delays and problems at Venture Global's plants directly resulted from the Company's highly touted "design one, build many" approach. Whereas Defendants stressed that the approach would reduce construction costs, as well as construction

27

time and schedule risk, in reality, Venture Global's projects were already experiencing significant delays and operational issues resulting from the use of models and materials that were not designed with the particulars of the project locations appropriately accounted for. Moreover, certain delays were caused by deliveries of LNG modules that were incomplete or otherwise not ready for use, which required Venture Global employees to wait extra time for missing parts and finish the modules on-site, regardless of the Company's purportedly more efficient model.

98. Recollections from numerous former employees of Venture Global and its third-party contractors corroborate these widespread operational problems and delays at Venture Global.

99. FE-1 was employed from March 2023 to September 2024 as an engineer on Venture Global's Plaquemines Completions team through the contractor, Renegade, and worked onsite at the Company's Plaquemines location in Louisiana. FE-1 reported to the head of the Plaquemines Completions team, Brian McDaniel.

100. FE-1 recalled all facets of construction delays and described these delays at Plaquemines as existing from "day one" of his tenure when he arrived on-site at Plaquemines in March 2023. FE-1 recalled that it was a few weeks after his tenure began in March 2023 when it was discovered that the concrete foundation and the quality of the pilings for some of the important structures on the site that had been laid by the contractors was incorrect, poorly done, was rejected by Venture and that all of it had to be removed and subsequently repoured.

101. According to FE-1, a major reason for the various delays experienced at Plaquemines throughout his tenure was that Venture had reused the Calcasieu Pass drawings and specs for Plaquemines, which he suggested was done for cost and efficiency. FE-1 identified the failing concrete and pilings that were initially laid at Plaquemines as just one example of the Calcasieu Pass plans not properly translating to the different natural environment present at

Plaquemines, and stated that there were many other such examples where the Company utilized Calcasieu Pass designs for developing Plaquemines, leading to operational issues, delays, and the need to undo and redo engineering work. FE-1 described Venture as failing to recognize that Plaquemines and Calcasieu were not the same plant, and that the land that Plaquemines is on is different. This included marshier land and local efforts to divert water in the area to reclaim land from hurricanes, as just some examples.

102.    As another example, FE-1 then recalled that GE "did the power," or the electrical, for the nine trains, which are the nine units that the LNG is filtered through. He recalled that GE used the Calcasieu Pass drawings in engineering the electrical for the trains (or modules) at Plaquemines, with minor changes as per Venture's input, but did not provide the tags unique to each unit for the electrical. According to FE-1, everything having to do with the trains—inside and out—is supposed to get their own unique tags and tag numbers but that GE did not do this. The unique tag identifiers should allow the Completions team to review the work post-installation and allow Venture to perform any future required maintenance.

103.    Further, according to FE-1, Venture's modules that convert the LNG into liquid for each of their sites, including Plaquemines, were manufactured offsite in Texas and Italy. He added that everything having to be made and stored off-location and then transported to Plaquemines alone created delays. Additionally, he advised that when the modules are shipped, they were supposed to be shipped completed. He recalled that shipping of the modules for Plaquemines was delayed by a month or two and he described the delay as significant enough where Venture had to accept the modules as is, meaning incomplete modules. Once on-site, the fact that the modules were incomplete caused additional delays because missing parts and materials needed to be

29

ordered for the modules. This in turn led to the modules taking up space, more people and manhours dedicated to finishing the modules, and which overall slowed down the project.

104. According to FE-1, the delivery delays including the modules happened often. FE-1 described the delays as having a "domino effect" that in turn caused additional delays at the plants. One example was that if the modules were not shipped complete, the work to complete them had to be done on-site, which meant that other work could not be started, and personnel needed to be diverted. If all the parts were not on the barge that the module arrived on, the parts had to be procured, or the teams had to wait for the contractors to ship them to Plaquemines. He recalled that modules from both Texas and Italy were incomplete and missing parts. Sometimes, the Company had to wait multiple weeks for missing parts, leading to even longer delays in completing work. FE-1 advised that he once visited the module fabrication facility in Texas, and he witnessed modules loaded onto barges that were "not as complete" as Venture wanted them to be. FE-1 also advised that the modules were supposed to arrive on-site "clean," meaning that the ends of pipes were supposed to be covered so that dirt and other materials would not get in the modules. He described the modules as "shipping dirty," which required cleaning of the inside of the modules when they arrived on-site.

105. Other former employees corroborate FE-1's description of delays at the Plaquemines project. FE-2 was formerly employed by Venture Global from February 2024 to December 2024 as I&E Superintendent at the Company's Plaquemines location. According to FE-2, he reported to Construction Manager George Sherley, who was two steps below Senior Vice President and Project Director Andrew Coombes. FE-2 suggested that Coombes reported to "the co-founders" who he identified as Founder, CEO, Director, and Executive Co-Chairman of the Board Michael Sabel and Executive Co-Chairman, Director and Founder Robert Pender. FE-2

advised that his responsibilities included oversight of all electrical construction at Venture's Plaquemines location. He described Plaquemines as being in a remote location, on a peninsula around 25 miles south of New Orleans, Louisiana.

106. According to FE-2, Venture's development of its Plaquemines location experienced "lots of delays" and cost overruns throughout his entire tenure. He explained that this was due for multiple reasons including "lots of mismanagement" from vendors on-site "to electrical alone." He recalled that "95% of all" electrical wiring was installed and hooked up to the nine trains in phase-1 before his tenure began and that it was in late May or early June 2024 when "Kellog Brown & Root [("KBR")] teams studied" the wiring and realized that all of it was the wrong size. FE-2 advised that this mistake cost the Company "millions of dollars at least" in lost time with all other work at the site halted immediately while it took 4-6 weeks to pull the incorrect wiring, and longer than that to install the correct wiring. He recalled progress on the facility being halted for "months and months" during this work stoppage. He further recalled the mistake as costing the Company $30 million for the incorrect wiring and the labor to remove it, and an additional $10 million for the correct wiring and installing it.

107. FE-3 was employed by Venture Global, Inc as an Engineering Manager from June 2023 to November 2024 on-site at Venture Global, Inc.'s Plaquemines location in Louisiana. FE-3 advised that most of his responsibilities included coordinating on-site engineering with a team of in-house engineers working on the Plaquemines Project. In addition, he handled interface management, coordinating between equipment providers, vendors, and KBR engineering teams to resolve construction and setup issues while also dealing with last- minute changes on the Plaquemines project. According to FE-3, he reported to Vice President of Operations, Bret Shapot, who reported to somebody else who reported to Senior Vice President and Project Director

31

Andrew Coombes. FE-3 advised that Coombes gave the directives and called "the shots" at the Plaquemines site.

108.    FE-3 recalled that there were delays that prevented the Plaquemines project from being completed on time. He indicated that the delays, based on his professional experience, were caused by negligent planning during the construction process.

109.    According to FE-3, Venture Global assumed the Plaquemines project could be managed using the same strategy they used on the Calcasieu project. However, according to FE-3, Plaquemines was a "different beast; different project" than Calcasieu. Moreover, he described Calcasieu as a "cosmic disaster," regardless of COO Brian Cothran publicly stating the opposite, since that location was "not close to making targets." FE-3 added that Venture Global did not realize Plaquemines was different work and not all projects functioned the same way. He went on to recall conversations at Venture Global about the Plaquemines development timeline, Cothran often compared the two locations by asking, "If we did it there (Calcasieu), why can we not do it here (Plaquemines)?"

110.    FE-3 described the Plaquemines project as rushed and poorly planned out. He reiterated that the reporting was confusing and unclear, making it difficult to track Plaquemines' progress. In his view, this made it easier to avoid blame. He reiterated that Cothran was "highly involved" and regularly made decisions and calls with the contractors. FE-3 estimated that the project was delayed about a year and a half, maybe longer, because of these problems.

111.    FE-3 recalled that he and his coworkers had different views regarding the lack of documentation noting that progress updates were often communicated verbally, making it difficult to track the data. He believed that the progress data should not have been difficult to obtain. He stated that he had spoken to senior coworkers who acknowledged that the project had already

32

"passed the line" of "ethical practices" referring to the lack of documentation and dependence on verbal communication for progress updates. FE-3 felt that his coworkers looked past these concerns because they were getting paid, so their goal was to get the job done. He added that peers shared their concerns and told him that they were unsure if the way things were being done at the Venture Global sites was legal or not, but they were getting paid.

112. FE-3 went on to recount how his coworkers openly talked about the misrepresentation of data regarding work progress, inspection completion, and schedule reports that would be considered misconduct, or what he described as "even fraud." He suggested that this "misrepresentation of data" was kept from the public. He stated that the inaccurate reports regarding work progress and scheduling were included in monthly internal reporting updates. He added that anyone on-site that "put together the numbers" knew that the "reports and schedules" were manipulated and that Venture Global changed or "rebased lined" the numbers "every month" to make the project appear successful. He provided examples such as fake schedules and inspection records and stated that this made him question whether any of the reports could be relied upon. He emphasized that any reports that had to do with the word "schedule" were "manipulated" and he was also skeptical of the reports regarding welding completion.

113. Similarly, FE-4 was formerly employed by KBR as a Mechanical Commissioning Specialist from February 2024 to July 2024 onsite at Venture Global's Plaquemines location in Louisiana. FE-4 advised that he and his fellow Mechanical Commissioning team members were responsible for commissioning everything and anything mechanical at the Plaquemines location, including modular turbines as one example. He explained this meant that he and his team were responsible for confirming that anything mechanical on the site passed its testing and met specifications after they were installed.

114. According to FE-4, development at Plaquemines "was 8 to 10 months behind schedule" when his tenure first began, adding that these delays were there prior to his tenure, and described them as growing progressively worse throughout his tenure with "delays compounding and leading to other delays." He further described Plaquemines' development as being at least one year behind schedule, adding that he recently learned from a former colleague of his still at Plaquemines that the facility "only recently fired up" the turbine for one the modules (or trains). FE-4 went on to recall some additional details about these delays. He recalled the original concrete foundation that had been built for the entire facility had to be removed and re-poured. FE-4 also recalled that an electrical subcontractor called MMR had laid down the incorrect electrical for the modules (or trains), which had to be completely removed and replaced with the correct electrical.

115. According to FE-4, it seemed like the Plaquemines development had not been well planned. He added that the site also seemed too small for its 10,000 or so employees it had working on it every day. FE-4 further recalled that there was constant "material delays" as well, in that materials needed to develop the site were constantly late in arriving which further compounded delays.

116. FE-5 was formerly employed by Zachry Group as a Structural Welder from October 2023 to July 2025 at Venture Global' s Plaquemines location. FE-5 advised that there were two sides to the Plaquemines facility, the Power Island which produced power for all eighteen trains and the Marine side which handled the stream of Liquid Natural Gas (LNG) located on the edge of the Mississippi River. According to FE-5, he worked on the "Marine" side of the facility, where his job responsibilities included welding pipes together and placing them on hangers to support the welds from falling. FE-5 reported to Foreman Steven Brower, who reported to General Superintendent, Kerry Stokes, who reported to the Plaquemines Project Manager.

117.    FE-5 explained that during his tenure at the Plaquemines location, he experienced multiple "delays" that disrupted his work on the project. FE-5 indicated that at least once a month, his work was stalled for a "week or two" because materials and machinery were not available at the job site, explaining that shipments often took weeks to arrive at the facility which, in turn, further slowed down their progress. FE-5 explained that scheduling problems also contributed to delays. He indicated that the schedule kept changing because shipments of materials were late, which prevented him from installing the material as planned.

118.    Like at Plaquemines, problems abounded at the Company's CP2 location, as well. And like at Plaquemines, many of these issues were also the result of the Company's cookie-cutter approach to design and construction. Furthermore, problems at CP2 often resulted from Venture Global's purported "owner-led" model. Rather than trusting the judgment of subcontractors with substantially more experience, Venture Global hand-selected "favorite" subcontractors based on who posed the least risk and would tolerate the Company's aggressive work practices intended to rush progress.

119.    FE-6 was formerly employed by Worley as a Director of Subcontracts and Senior Project Manager from January 2021 to June 2024 at Venture Global' s Calcasieu location working on CP2 (Calcasieu Pass Phase 2). He explained that Venture directed Worley, the subcontractor that he worked for, to handle the construction side of the project, while Venture's management assessed the overall work of activities according to schedule and scope.

120.    According to FE-6, Venture attempted to "cookie cut" designs from Calcasieu to Plaquemines and CP2, even though conditions varied per location. FE-6 explained that projects cannot be replicated exactly because of key differences. He stated that gas intakes vary in quality, along with how land and soil conditions differ from one location to another. He commented that

35

subcontractors were aware of these challenges and provided recommendations based on their experience. He explained that Venture believed they knew more than subcontractors, despite subcontractors having broader exposure to similar projects and conditions. According to FE-6, Venture's subcontractor choices were based on who posed the lowest risk and who would tolerate Venture's "aggressive" work practices.

121.    Furthermore, FE-6 stated that Venture awarded bids to vendors who they had previous relationships with regardless of experience or price. According to FE-6, Worley was tasked with finding subcontractors to complete a specific scope in the project. He explained that Worley identified contractors capable of doing a particular "scope," and they were disregarded by Venture even if they offered a lower price. He described Venture as having FE-6 and his Worley colleagues waste hundreds of hours pulling bids together when it seemed obvious that Venture was not going to award it to them. FE-6 recalled that he was directed to award the bid to a specific contractor, which he described as a very unusual, unprofessional, and unethical directive by Venture. FE-6 explained that although Worley submitted recommendations, Venture chose who they wanted. According to FE-6, several workers on the project believed that Venture had "favorites," and these privately owned subcontractors were awarded the work.

122.    Regarding project leadership and workplace conditions, FE-6 indicated that Venture was "steering" the project and was in control of the entire operation. He described Venture as aggressive and, in his view, "unethical." FE-6 added that he was on the Worley team in charge of awarding subcontractors for specific jobs on the project, describing the contractors as like "puppets," doing what Venture Global directed them to do, continuously reworking and making changes on the project.

36

123.    Thus, delays and operational issues abounded at Venture Global's LNG plants by the time of the IPO.

### C.    Prior to the IPO, Venture Global Expended Substantial Capital in Q4 2024 to Remediate Construction and Operational Failures at Plaquemines

124.    As a result of the planning and operational errors and issues described herein, Venture Global incurred substantial remediation costs in Q4 of 2024 and into 2025, thereby drastically reducing Q4 earnings and undermining 2025 earnings projections.

125.    Recollections from former employees confirm significant expenditures before the IPO resulted in cost overruns.

126.    FE-7 was formerly contracted by Venture Global as ICSS Commissioning Manager[2] from May 2023 to March 2025. Throughout his tenure, FE-7 worked at the Company's Plaquemines location in Louisiana where his responsibilities included commissioning a number of aspects of the project such as all control equipment, as one example. FE-7 advised that he reported to Director Mike Riley, who in turn reported to Senior Vice President and Project Director Andrew Coombes, who in turn reported to the C-suite.

127.    According to FE-7, Venture's Plaquemines location experienced "major cost issues and project delays" throughout his entire tenure. He described these higher costs as cost overruns and delays "on everything" and included as some examples of vendor delays, equipment, machinery, parts, and "things that had been built wrong." Also included were the number of employees required as well as having to offer higher wages to work at Plaquemines as opposed to Venture's "CP1" location, which he identified as Calcasieu. FE-7 explained that the remoteness of the Plaquemines location was part of the reason for the many cost overruns and delays, and that

---

[2] ICSS stands for Integrated Control and Safety System.

this included offering higher wages for employees to work in this remote area with little or no access to lodging and food nearby.

128. By the end of Q4 2024, Venture Global had expended approximately $19.8 billion toward Plaquemines project costs alone. This figure was over $2 billion above the $17.7 billion in spend that Defendants disclosed in the Offering Documents. Nevertheless, Defendants did not disclose estimated Q4 expenditures in the Offering Documents despite the fact that they had already occurred. Compounding matters, the Company *did* affirmatively disclose selective, favorable facts specific to Q4, including that the Company placed laterals for the Gator Express Pipeline into service in December 2024, entered "into a liquefaction train system purchase order with Baker Hughes for Phase 2 of the CP2 Project and also issued full NTP thereunder" in December 2024, and completed its initial consultation with FERC for the CP3 project in December 2024. Indeed, Defendants pointedly touted that "[in] December 2024, we began to produce LNG at the Plaquemines Project and announced the successful loading and departure of our first commissioning cargo." The omission of Q4 2024 costs was particularly meaningful because, according to the Offering Documents, cost estimates for CP2, CP3, and Delta were based upon actual costs for Calcasieu and Plaquemines. Thus, the Company's representations about Q4 2024 costs were particularly important not only with respect to Plaquemines, but with respect to cost estimates for Venture Global's earlier-stage projects as well. Venture Global's Q4 2024 costs and expenditures remained unknown to investors at the time of the IPO, despite the material variance between what the Company already incurred at the time and what the Offering Documents disclosed.

129. Indeed, the Company's overall earnings for Q4 2024 and full-year 2024 were ultimately well below expectations, in large part due to outsized costs and spending, which was all

38

complete by the time of the IPO. The Company would reveal barely two months after the IPO that consolidated adjusted EBITDA for the three months ended December 31, 2024, was only $688 million, a decrease of $125 million as compared to the three months ended December 31, 2023. The Company attributed this decline primarily to lower sales volumes and higher costs, the consequence of extensive delay and production issues worsening before the IPO, that required cost outlays to address and remediate. By the time of the IPO, Q4 of 2024 had been complete for nearly a full month.

**D.    Prior to the IPO, Venture Global Jeopardized Critical Long-Term Contracts for Short-Term Gain**

130.    Also unbeknownst to investors, by the time of the IPO, Venture Global was systematically delaying the onset of COD to maximize short-term revenue from spot-market sales. All revenue generated by the date of the IPO was from short-term spot contracts, because the Company had not yet achieved COD at any of its locations. However, by the time of the IPO, the Company already had long-term contracts in place with multiple, highly important end-customers. Such contracts were set to take effect once the applicable projects reached COD. Per the terms of these contracts, COD was set to occur when "the applicable project company has notified such customer that (i) all of the project's facilities have been completed and commissioned, including any ramp up period, and (ii) the project is capable of delivering LNG in sufficient quantities and necessary quality to perform all of its obligations under such post-COD SPA."

131.    Defendants did not disclose that the reason COD had not been achieved was because of Venture Global's actions. At the time of the IPO in January 2025, natural gas prices were rising, in part because of the Russia-Ukraine war and in part because of growing international demand for U.S. LNG. In particular, following Russia's invasion of Ukraine in February 2022,

39

natural gas prices increased by 20%.[3] At the same time, demand for natural gas in Europe rose as Russia's natural gas exports decreased and natural gas consumption for electricity generation increased, causing record levels of U.S. LNG exports.[4] Resultingly, the LNG pricing environment became substantially more favorable for producers like Venture Global. By one estimate, Venture Global earned an additional $3.5 billion by opting to sell LNG on the high-priced spot markets following the Russia-Ukraine invasion rather than sell it under existing long-term contracts.[5]

132.    At the time of the IPO, markets expected gas prices to remain elevated. In a January 23, 2025 article, for example, the U.S. Energy Information Administration ("EIA") observed that "[w]e expect increases in the Henry Hub natural gas price in 2025 and 2026 as demand for natural gas grows faster than supply, driven mainly by more demand from U.S. liquefied natural gas (LNG) export facilities, reducing the natural gas in storage compared with the last two years."[6] Further, the EIA observed that "[i]n 2025, we expect increases in demand, which includes domestic natural gas consumption and exports, will exceed increases in supply, which includes domestic natural gas production and imports."[7] In fact, according to the EIA, nearly all factors impacting

---

[3] U.S. Energy Info. Admin., *Independent Statistics and Analysis: Energy Commodity Prices in 2022 Showed Effects of Russia's Full-Scale Invasion of Ukraine* (January 3, 2023), https://www.eia.gov/todayinenergy/detail.php?id=55059.

[4] *Id.*

[5] Jamie Smyth, *Shell Claims LNG Group 'Wrongfully Earned' $3.5bn on Shipment Arbitrage,* FIN TIMES (Sept. 5, 2024), https://www.ft.com/content/e092e2b0-da76-458c-80e9-6a3e1c5db0f1.

[6] U.S. Energy Info. Admin., *EIA expects higher wholesale U.S. natural gas prices as demand increases* (January 23, 2025), https://www.eia.gov/todayinenergy/detail.php?id=64344.

[7] *Id.*

LNG pricing were expected to increase in 2025 as compared to 2024, as depicted in Figure 1, below:[8]

## Figure 1



133.    Indeed, prices under spot contracts were often three times higher than prices included in long-term contracts. *See infra* ¶146. Given that selling on the spot market was significantly more profitable in the short term, Venture Global avoided pricing agreed to in existing long-term contracts in favor of capitalizing on 2025 spot-market pricing. However, Venture Global's avoidance of customers' expectations under long-term contracts that would have resulted in lower short-term revenue than spot contracts due to prevailing market pricing substantially damaged Venture Global's goodwill in the industry. Potential customers viewed Venture Global as an unreliable business partner, which meaningfully threatened Venture Global's long-term business plan that relied heavily on its ability to enter long-term contracts and generate sustainable cash flow.

134.    Multiple former employees confirm that Venture Global was postponing COD to maximize short-term profits.

---

[8] *Id.*

135.    FE-8 was employed by Venture Global as Supervisor Power Island from March 2023 through August 2024 at the Company's Plaquemines location. According to FE-8, his responsibilities included oversight of the equipment providing power for the entire Plaquemines site. FE-8 advised that in his final reporting structure he reported to Director, Power Island Operations Tim Stafford, who reported to the Plaquemines superintendent, who reported to Senior Vice President Jeff Baillie, who he described as the head of the Calcasieu and Plaquemines sites. FE-8 worked at Plaquemines, which was the location he was hired for, but also spent a few months at Calcasieu from around April to September 2023.

136.    FE-8 stated that at both Plaquemines and Calcasieu, the Company's goal was to trade LNG on the spot market rather than the locations being built with the intent of being commissioned to sell to their contracted partners. He described spot market trading as the internal push at Venture that was given. He said that the moves Venture made were about getting LNG to market instead of going through the process of commissioning properly. FE-8 recalled that when he was at Calcasieu from around April to September 2023, the plant was not fully commissioned, and he estimated that Calcasieu had filled around 200 ships with around $150-$200 million worth of LNG each for the spot market. He explained that this included ships before, during, and after he went back to Plaquemines, adding that this was based on what he saw along with conversations with colleagues at Calcasieu after he left that location.

137.    FE-8 recalled being told by colleagues at Calcasieu while he was working at that location that each ship going out for the spot market was worth around $200 million per ship, while the contract prices were around $50 million per ship. He also recalled that "the talk" at Calcasieu was that the price difference between spot and contract prices was the incentive "to do it," meaning to delay commissioning. He described it as Venture's people at the top saying internally and telling

the market that commissioning was the top focus and they would publicly blame commissioning delays on problems. He described these problems, however and from what he witnessed, as "self-induced" because the Company was building to sell LNG right away instead of following proper commissioning procedure and protocol, which caused mistakes and breakdowns of equipment.

138.    FE-8 described the Calcasieu and Plaquemines locations as seemingly building to reach milestones that the Company's investors required in order to produce LNG and without a focus on building towards commissioning. According to FE-8, the work done on the two sites was not done properly and there was over-usage of the equipment in an effort to keep producing LNG. He described Venture's over-usage of the equipment as "driving that stuff into the dirt."

139.    As one example, he recalled that soon after he arrived at Calcasieu, all of the boilers which were used to provide heat for the LNG purification process "blew at once." He recalled the Company's public explanation for the boilers going down as "welding that blew off," due to poor welding, but that was not what an inspection had revealed. According to FE-8, he and others onsite were asked to inspect why the boilers had blown, which revealed the welding blew out due to over-usage. FE-8 described it as "highly suspect" that the welding on all of the boilers blew simultaneously, adding that it happened because of overuse which led to "thermo-stress" on the boilers. FE-8 recalled that the boilers had been commissioned to be used a certain number of hours a day, but that Venture was working them well beyond their intended usage. This led to the boilers getting too hot and when cold water was used to cool them off as part of the normal process, the cooling down of the boilers occurred too quickly and all of the welding on each of the boilers "blew" at the same time.

140.    According to FE-8, the two locations focused on getting operational but not commissioned and once LNG could be produced, that the focus was to keep producing and then

patch up anything that broke down instead of working towards getting the plants commissioned. He advised this included providing power for the Plaquemines location, which was one of his responsibilities. He described the process of commissioning power as very complicated and recalled that Venture's focus was on getting power, using GE equipment, running to produce but not following the timetable and processes required for commissioning its power generation. He recalled half of Plaquemines' power meters and gauges not working correctly, and that Plaquemines did not follow the Electric Power Research Institute ("EPRI") guidelines on operational handling of power generating equipment and were not keeping documentation on the efficacy of the equipment.

141.    FE-9 was formerly employed by KBR at Venture Global's location at Plaquemines from May 2023 to October 2024 as Principal Specialist, Commissioning. According to FE-9, his responsibilities included working with the FERC group on commissioning areas of Plaquemines. FE-9 advised that in his final reporting structure he reported to Commissioning Simultaneous Operations ("SIMOPS") Manager Shaun Deville.

142.    FE-9 stated that his responsibilities also included closing off areas of the site that were ready for FERC inspection and making sure that nobody accessed those areas who did not need to be there. According to FE-9, once construction was completed in an area of the site, the commissioning team (which FE-9 was part of) took over. He explained that commissioning goes in stages and that FERC has to approve each phase before the commissioning team can move to the next phase.

143.    According to FE-9, the "industry standard" is that once an LNG site is fully constructed and achieves Construction Complete ready for Energization ("CCRFE") status, it takes one year or less to be fully commissioned, while Calcasieu took 3.5 years to be fully commissioned

44

and Plaquemines is not scheduled to be fully commissioned until 2027, based on recent conversations with colleagues still employed at Plaquemines. FE-9 added that he was not aware of any other LNG projects that took longer than around a year. He went on to recount that the Russia-Ukraine War which began in February 2022 caused a spike in LNG pricing that was too enticing, financially, for Venture Global to not take advantage of by holding off on commissioning and continuing to sell on the spot market.

144.    FE-9 further explained that when Venture Global completed construction of Calcasieu and began selling Calcasieu LNG on the spot market, they then used the proceeds from sales of Calcasieu's LNG for construction of Plaquemines rather than for commissioning Calcasieu. Likewise, once construction of Plaquemines was complete, Venture Global used proceeds from sales of Plaquemines' LNG toward construction of CP2, rather than for commissioning Plaquemines.

145.    Regarding his tenure at Plaquemines, FE-3 recalled there was significant concern around the how the Company handled "commercial and commissioning cargo."

146.    He suggested that, under an off-take agreement, if Venture Global agreed to sell their product at a fixed price to a gas company, for example $30 per unit, the agreement would not be activated until the Calcasieu project reached commercial production. By claiming the project was still in the commissioning phase, however, Venture Global could than sell the product on the "spot market" at a higher price such as $90 per unit instead of the original $30 (as examples) without honoring the original contracts they had with the gas companies. He stated that this strategy allowed Venture Global to delay the project by making "excuses," even though they were already commercially operational and selling to the "spot market." He added that if the company was already selling two hundred units of gas on the spot market, then it clearly indicated they had

45

entered commercial production. He recalled that Venture Global still claimed they were in the commissioning phase which led to lawsuits by BP and Shell, claiming 5-7 billion dollars in damages for Venture Global' s breach of contract.

147.    FE-3 recalled one instance where he and his coworkers laughed at a statement given by Cothran who said that the Calcasieu project had not entered commercial production due to "safety and environmental personnel" concerns. FE-3 indicated that these terms were used to further delay the process to justify not "triggering" the off-take agreement, which is the contract that begins once the project reaches commercial production.

148.    Similarly, individuals formerly employed at Calcasieu recalled that the Company delayed repairs essential for commissioning and instead maintained short-term production.

149.    FE-10 was employed by Venture Global, Inc as a Senior Project Manager from January 2024 to July 2024 on-site at Venture Global's Calcasieu Pass location. FE-10 advised that his responsibilities included working on small capital projects to improve the Calcasieu plant during its development. According to FE-10, he reported to Director of Project Management, Construction and Maintenance, Kerry Moody, who reported to Senior Vice President of Operations, Jeff Baillie. FE-10 advised that Baillie held a senior position in the chain of command and was responsible for overseeing the Calcasieu plant.

150.    FE-10 recalled being told that Venture was profiting significantly by selling LNG directly in "storage tankers" to the "spot market," rather than following their long-term contractual agreements with the gas companies. He noted that LNG was sold on the spot market for a higher price compared to the contractual agreement. According to FE-10, the plant had not been "officially commissioned" yet during his tenure due to ongoing warranty issues, such as damage to major pieces of equipment, specifically welded pipes. He explained that when the welded pipes

had been "built," they were not built "properly" by the manufacturer, which is an overseas Vietnamese company. He suggested that if the Company invested "more money" into overseas inspections, these quality issues could have been avoided.

151.    FE-10 reiterated that the plant still dealt with warranty repairs and had not yet been commissioned but was fully operational in terms of LNG production and sales. He reported that he was told that a "storage tanker" arrived every two days, with each one taking approximately 8-12 hours to fill up. FE-10 also recalled being told that each tanker was carrying 100 to 200 million dollars' worth of LNG ready to sell on the spot market. FE-10 provided an example that in all the other plants he had worked at, a plant was not making any product until they were at the commissioning phase, whereas Venture made LNG ready to sell on the spot market while being able to work on other parts of the plant that needed warranty repairs.

152.    FE-11 was employed by Venture Global  as a Production Engineering Manager from June 2023 to May 2024 on-site at Venture Global, Inc.'s Calcasieu location in Louisiana. FE-11 advised that his responsibilities included managing an engineering team focused on optimizing production as well as contributing to certain parts of operational reporting. According to FE-11, he reported to Vice President of Production, who reported to Vice President of Integrated Production Excellence, Ali Hamza.

153.    FE-11 explained the two main stages of LNG production, power generation and pretreatment. In terms of power generation, he stated that the Company maximized production with what was operational instead of addressing maintenance issues and delaying essential repairs. FE-11 explained that regularly scheduled proper maintenance and repairs were necessary to reach maximum output and because this was often delayed, the trains were pushed beyond their limits or capacity to handle production He stated that the Company had the capacity to run 18 trains

47

safely but they were only operating with 15 because of delayed proper maintenance and repairs, which could have enabled a higher output of power.

154.    FE-11 recalled that when he joined the Calcasieu project, the Company had just begun to replace or overhaul the majority of the HRSGs[9] in either September or October of 2023. He estimated that the full replacement process took approximately 18 months to complete. He added that the HRSG exposed weaknesses within the pipes once heated which contributed to excessive leaks. He indicated that one HRSG took two to three months to repair which caused production delays. FE-11 noted that the extended repair significantly reduced production, which forced the Company to operate 15 out of the 18 LNG production trains. He indicated that the Company pushed the trains beyond their "safety" limits to maintain production levels while the HRSGs were repaired.

155.    According to FE-11, to carry out HRSG repairs, the Company needed one turbine to be shut down. He indicated that the Company estimated the repair to take six weeks, but instead it took two to three months. He explained that turning off one turbine reduced overall plant production. FE-11 explained that the "duct burners," which are components used to recover steam supply, compensated for the offline turbine and also increased the power on the remaining 4 turbines. He explained that each turbine included an HRSG that captured heat from exhaust gases. To compensate for the disconnected turbine, the plant needed to also increase their DOC hours (also known as allowable operating hours) to legally run the others at a higher capacity, but the permit was not updated in time to increase those hours. He indicated that this led to the plant reducing output or power which reduced the trains from 18 to 15. He emphasized that each turbine

---

[9] HRSG means heat recovery steam generator.

48

generated heat to convert the gas into steam to pass through the duct exhaust, making this system crucial for LNG production.

156.    FE-11 went on to recount that from December 2023 through February 2024, the Company's peak revenue period, the Company operated all 18 trains to maximize production. In doing so, however, the Company deferred necessary maintenance such as the repair of the other HRSGs, which caused stress or pressure on the trains, which resulted in operations exceeding safety limits.

157.    The LNG business was and remains a reputation-based business. As a result of Venture Global's circumvention of contractual counterparty expectations under pre-existing long-term contracts in favor of short-term profit from spot-market sales, Venture Global's reputation with customers and potential customers was substantially harmed. This created significant risk with respect to the Company's ability to secure additional long-term contracts needed to sustain its purported business model and establish stable, long-term cash flows. Such long-term cash flows were also a prerequisite to securing credit facilities on similar terms to previously existing credit. Thus, Venture Global's failure to meet contractual counterparty expectations also created substantial risk with respect to its ability to secure future credit on favorable terms.

158.    The Offering Documents recounted the Company's involvement in arbitration proceedings with other parties to long-term contracts and warned of the money damages sought by the long-term contract customers in those proceedings. However, Defendants glaringly failed to disclose that the Company's provocative actions with contractual counterparties threatened Venture Global's reputation in the LNG market and its ability to enter future long-term contracts with other customers. Investors were thus left unaware of the significant risks to Venture Global's long-term cash flow and credit access posed by the Company's pre-IPO actions.

49

**E.     Internal Monitoring of Risks, Trends, and Uncertainties Relating to Venture Global's Operational and Goodwill**

159.    FE-7 recalled Defendants Sabel, Thayer, and Blake flying to Plaquemines by helicopter "every other week" and meeting with Coombes and possibly some of the other more senior personnel at the location.

160.    Similarly, FE-1 recounted that delays were well known by Plaquemines' onsite engineering team and senior management because they were given consistent updates in meetings held at least once a month, some of which FE-1 participated in. FE-1 recalled "senior executives" flying in by helicopter "at least once a month" and attending meetings all-day long with Plaquemines' onsite senior management.

161.    Additional former employees also explained the monitoring of delays and issues at Venture Global's project sites. FE-12 was employed by Venture Global at the Company's headquarters in Arlington, Viriginia, from March 2023 to February 2024 as a Business Intelligence Analyst. According to FE-12, his responsibilities included "building dashboards" to provide "visuals" upon stakeholders' requests. FE-12 advised that in his final reporting structure he reported to Director Business Intelligence ("BI"), Patrick Morales, who reported to Vice President, Applications, Michelle Cienfuegos, who reported to Chief Information Officer Ngoni Murandu.

162.    FE-12 explained that he was responsible for building the "visuals" for the stakeholders at corporate, explaining that if someone at headquarters requested specific types of information on one of the projects, including Calcasieu or Plaquemines, that FE-12 created Power BI generated dashboards. He explained that initially he relied on onsite servers at those locations and then later the cloud environment the Company had transitioned to as his tenure was ending. FE-12 recalled that "all types" of information and data could be pulled from those locations, including day-to-day progress, day-to-day-costs, and labor costs. He also recalled that executives

above a certain level could access this information themselves, including accessing the live video feeds from the onsite cameras. FE-12 suggested that Chief Information Officer Ngoni Murandu would have updates from the Calcasieu and Plaquemines locations pulled from dashboards, which he then presented to others in the C-suite.

163.    FE-2 similarly explained that the C-suite was informed and kept up to date on all delays and cost overruns at Plaquemines. According to FE-2, "daily meetings," and "sometimes multiple meetings per day," were attended by FE-2 and around 30 other Plaquemines employees that were led by Senior Vice President and Project Director Andrew Coombes and Director Mike Riley. He recalled Defendants Sabel and Thayer flying to Plaquemines every other week by helicopter and attending these meetings in person. He also recalled Defendants Sabel and Thayer frequently calling into these meetings when they were not on-site. FE-2 further recalled that Defendant Sabel had an office at the Plaquemines location where he worked when he stayed on location for a period of time, adding that Defenadant Sabel's office was near FE-2's. He further described Sabel and Thayer as "often on-site," and frequently in contact with Andrew Coombes when they were not.

164.    FE-11 reported that there was a large 100" dashboard or display outside the offices of Defendant Sabel and COO Brian Cothran's, which were located next to each other. He described the display showing real time statistics on the plant's operations. According to FE-11, Cothran was aware of both the progress and ongoing issues at the plant, recalling one instance when Cothran questioned "why production was not running at full capacity?" as an example.

165.    Similarly, FE-3 recalled that Cothran was "physically" present on-site, suggesting that Cothran was aware of the unethical practices occurring on the Plaquemines project because he was at the site every week "directing orders." FE-3 described Cothran as the culture setter who

took "extreme ownership" of the project by directing contractors to get the outcome that he wanted. He added that Defendants Sabel and Pender would fly down to the construction-site by helicopter, typically once a week, suggesting to FE-3 that both executives would have been made aware of the issues.

166.    He also recalled that when Cothran was not present on the construction-site, he was on videos calls with Andrew Coombes or other Project Managers on a daily, if not hourly basis. FE-3 described Cothran as "aware" of every issue on-site. Cothran also spoke with contractors on the Plaquemines project about what he expected from them in terms of work. FE-3 commented that if you wanted to get fired at Venture Global, the easiest way was not to provide Cothran with information. FE-3 also described Cothran as a "micromanager and key decision maker on every choice."

### F.    The IPO

167.    On January 23, 2025, Venture Global announced the pricing of its 2025 initial public offering of 70,000,000 shares of its Class A common stock, at a public offering price of $25.00 per share. In connection with the Offering, Venture Global granted the underwriters, including the Underwriter Defendants, a 30-day option to purchase up to an additional 10,500,000 shares of Class A common stock. The shares of Class A common stock were set to begin trading on the New York Stock Exchange on January 24, 2025, under the ticker symbol "VG." The Venture Global IPO closed on January 27, 2025. The Company raised $1.75 billion in the IPO. The IPO price of $25 implied a market capitalization of a staggering $60.5 billion.

168.    Venture Global's IPO sales were made pursuant to the Offering Documents, comprising a registration statement and prospectus, as described above.

169.    In the Offering Documents, Defendants made a series of false and misleading representations and failed to disclose material information detailed herein. Plaintiffs and the Class

purchased or otherwise acquired Venture Global Class A common stock pursuant and/or traceable to the Offering Documents, which contained these misrepresentations and omissions. Plaintiffs and the Class suffered losses as a result.

## V.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS

170.    The Offering Documents contained materially misleading statements and omissions concerning Venture Global's condition at the time of the IPO.  Specifically, the Offering Documents misrepresented and failed to disclose the truth about: (i) operational issues and delays at the Company's operating plants that were caused in part by the Company's reliance on duplicated plans and prefabricated parts; (ii) Venture Global's expenditures, costs, and financial results for Q4 2024; and (iii) Venture Global's evasion of contractual counter-party expectations and the resulting harm to the Company's business and reputation.  As a result, the Offering documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements contained in the Offering Documents not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

171.    Sections 11 and 12(a)(2) of the Securities Act create liability against Venture Global, each of the Individual Defendants, and each of the Underwriter Defendants for each (i) misstatement, (ii) omission in contravention of an affirmative legal disclosure obligation, and (iii) omission of information that is necessary to prevent existing disclosures from being misleading, in the Offering Documents.

172.    Additionally, pursuant to SEC Regulation C, the Offering Documents were required to disclose material information necessary to ensure that representations in the Offering Documents were not misleading.  Specifically, Rule 408, 17 C.F.R. § 230.408(a), states that "[i]n addition to the information expressly required to be included in a registration statement, there shall

be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading."

173. Further, the Offering Documents were required to comply with Item 303 of Regulation S-K, 17 C.F.R. § 229.303. Specifically, Item 303, and the SEC's related interpretive releases thereto, require that the Offering Documents disclose events and uncertainties, including any known trends that have had or are reasonably likely to cause Venture Global's financial information not to be indicative of future operating results.

174. Moreover, the Offering Documents were also required to comply with Item 105 (formerly Item 503) of Regulation S-K, 17 C.F.R. § 229.105. Specifically, Item 105 requires that the Offering Documents furnish, among other things, a discussion of material factors that make the Offering speculative or risky.

### A. The Offering Documents Contained Material Misstatements and Omissions About Operational Issues and Delays Effecting Venture Global's Operating Plants at the Time of the IPO

175. The Offering Documents contained untrue statements of material fact and omitted to state other facts necessary to make the statements not misleading under the circumstances in which they were made.

176. The Offering Documents repeatedly touted—yet misrepresented—the purportedly unique value proposition of the Company's "*design one, build many*" approach to constructing LNG plants.

177. For example, the Offering Documents, under the heading "Our Project Development and Construction Approach," touted the purported benefits of the Company's "*design one, build many approach*," claimed that the approach utilized "*proven liquefaction system technology and equipment*," and told investors that the method lead to the Company

"*continuously improving [its] execution, accelerating construction timelines, reducing costs, and expanding production*."  The Offering Documents stated, in pertinent part, as follows:

> The traditional approach to developing large-scale LNG facilities involves very large, highly customized, stick-built projects consisting of two to three liquefaction trains that are constructed almost entirely onsite by vast workforces. In addition, many of these large stick-built projects are built in remote locations far from concentrated sources of experienced construction workforces, adding to their execution risks. Using this traditional approach, construction can last well over five years and in some cases has lasted nearly a decade.
>
> *In contrast, our project development and construction approach utilizes proven liquefaction system technology and equipment in a unique mid-scale, factory-fabricated configuration that we developed. Instead of two or three large, complex liquefaction trains, the Calcasieu Project and the Plaquemines Project utilize 18 and 36 mid-scale factory-fabricated liquefaction trains, respectively…. Our modules are built and assembled off-site at manufacturing and fabrication facilities in Italy and then shipped to our project sites fully-assembled and packaged for installation, allowing onsite work to progress in parallel.* We believe our innovative configuration, long-term equipment contracting strategy and hands-on project management approach significantly reduces construction and installation costs, as well as construction time and schedule risk, thereby allowing us to be more cost-competitive in the LNG market while also producing substantial amounts of commissioning cargos and related cash proceeds….
>
> *While traditional LNG projects often rely on bespoke designs and configurations, our approach, leveraging factory-fabricated equipment manufactured with our "design one, build many" method, allows us to apply the lessons we learn at each project to our subsequent projects, with the goal of continuously improving our execution, accelerating construction timelines, reducing costs, and expanding production. We believe we will continue to benefit from this virtuous cycle as we grow*.

178.    Similarly, the Offering Documents, under the heading "Our Strengths," also made the following statements touting the "*design one, build many approach*," which claimed that liquefaction trains and pre-treatment modules were "*tested and delivered ready to install, reducing on-site labor and potential weather risk while shortening construction timelines*" and touted "[f]abrication and installation efficiencies."  The Offering Documents stated, in pertinent part, as follows:

55

**Accelerated construction schedule and low-cost LNG model:** We believe that our disruptive and innovative configuration and owner-led engineering, procurement and construction approach reduces our construction and installation costs, construction time and construction schedule risk, thereby reducing overall project costs and enabling us to produce and sell LNG on an accelerated basis to our customers, as a result of the following:

*    *    *

**Construction and installation execution**. Manufacturing our mid-scale, factory-fabricated liquefaction trains, power equipment, gas pre-treatment modules and pipe racks off-site at fabrication facilities allows site works to progress in parallel. *Our liquefaction trains and pre-treatment modules are tested and delivered ready to install, reducing on-site labor and potential weather risk while shortening construction timelines and improving overall project safety. Fabrication and installation efficiencies are achieved as the various trains, equipment, and modules are installed on-site and commence production incrementally. Using our "design one, build many" approach, lessons learned from construction, installation, and commissioning work at the Calcasieu Project are being carried over to the Plaquemines Project and our subsequent projects.*

*Further, using our owner-led development model, we actively manage the construction activity and the schedule for certain scopes of work undertaken by our key contractors*. In addition, we have built an internal EPCM capability, securing a team of experienced leaders and professionals from the EPC industry, primarily with prior relevant experience constructing the Calcasieu Project and the Plaquemines Project facilities.

179.    In addition, the Offering Document claimed that future projects would benefit from purportedly "***interchangeable parts***" and "***identical equipment***" from prior projects and told investors that "***[t]he ability to pool resources across our projects will increase our operating leverage***." The Offering Documents stated, in pertinent part, as follows:

*The benefits of our "design one, build many" approach extend further, as our two existing projects can provide our future projects with a source of interchangeable parts and a venue to train personnel on identical equipment. The ability to pool resources across our projects will increase our operating leverage and may augment our earnings through reduced fixed and variable operating expenses*.

180.    The statements referenced above in ¶¶177-179 concerning, *inter alia*, Venture Global's "design one, build many approach" and its purported success and benefits, were each a

56

false and misleading statements of material fact when made because they failed to disclose and misrepresented the following material adverse facts, material adverse trends, material uncertainties, or material risks that existed at the time of the IPO, including:

(a)  At the time of the IPO, Venture Global's "design one, build many" approach was consistently resulting in project delays and increased project costs due to the Company's failure to optimize construction and planning for its specific project locations;

(b)  At the time of the IPO, the Company was already experiencing significant delays and operational problems due to poor planning and failure to account for differences between locations;

(c)  By the time of the IPO, key contractors had made critical errors that delayed construction and commissioning and increased project costs; and

(d)  By the time of the IPO, the Company's "owner-led" model resulted in efficiency losses because the Company was failing to consider feedback from subcontractors who understood that planning and parts needed to be optimized by location.

181.  The Offering Documents also inaccurately described as *potential* certain risks associated with Venture Global's "phased commissioning" of its projects, which "***could***" have an adverse effect on Venture Global's business contracts, financial condition, operating results, cash flow, financing requirements, liquidity and prospects, rather than disclosing the actual events, trends, or uncertainties that had already manifested.  The Offering Documents stated, in pertinent part, as follows:

> ***The phased commissioning start-up of our projects will subject us to additional risks.***
>
> The unique configuration of our LNG projects necessitates a phased commissioning start-up process for each of our projects (and phases thereof) that will generally result in a longer commissioning process. The length of any commissioning process depends on a number of factors related to equipment performance and the ability to

establish reliable and safe operations for that equipment and the facility as a whole…. For example, once we have sufficient power to operate the first pre-treatment unit, and the first LNG storage tank and first gas pre-treatment unit have been installed for a particular project, we plan to begin the commissioning start-up of the relevant equipment on a phased basis. ***This sequential commissioning of the liquefaction blocks, power island system, pre-treatment system, and other equipment for a project is subject to several risks, some of which may be unknown to us.***

For example, the simultaneous construction of a particular LNG facility and production of LNG at that facility could subject us and our third-party contractors to additional safety hazards, as well as additional costs related to the management of those safety hazards during the phased commissioning start-up of a facility. To successfully implement our phased commissioning start-up, our EPC contractors will be required to develop and implement a safe work plan. Furthermore, we will require additional regulatory approvals from FERC, including approval of our EPC contractor's safe work plan, in order to implement our phased commissioning start-up at a facility before construction has been completed. ***Any delays in implementing any of the measures required for the phased start-up of our facilities or in obtaining any necessary regulatory approvals, and any additional costs associated with the phased start-up of our facilities, could have a material adverse effect on our business, contracts, financial condition, operating results, cash flow, financing requirements, liquidity, prospects and the price of our Class A common stock.***

182.    The statements referenced above in ¶181 were each inaccurate statements of material fact when made because, while noting only the potential negative impacts on Venture Global's business, contracts, financial condition, operating results, cash flow, financing requirements, liquidity, and prospects, the Offering Documents failed to disclose and misrepresented the following significant, then existing material events and adverse trends or uncertainties that Venture Global had already been facing at the time of the IPO, including:

(a)    At the time of the IPO, Venture Global's "design one, build many" approach was already consistently resulting in project delays and increased project costs due to the Company's failure to optimize construction and planning for its specific project locations;

(b)     At the time of the IPO, the Company was already experiencing significant delays and operational problems due to poor planning and failure to account for differences between locations;

(c)     By the time of the IPO, key contractors had made critical errors that delayed construction and commissioning and increased project costs; and

(d)     By the time of the IPO, the Company's "owner-led" model resulted in efficiency losses because the Company was failing to consider feedback from subcontractors who understood that planning and parts needed to be optimized by location.

**B.     The Offering Documents Contained Material Misstatements and Omissions About Venture Global's Expenditures, Costs, and Financial Results, Including Those for Q4 2024**

183.    The Offering Documents also contained misstatements of material fact and material omissions regarding total expected costs for Venture Global's projects, which also omitted to disclose material increased costs already incurred in Q4 of 2024—a quarter which had been complete for nearly a month by the time of the IPO.

184.    Specifically, with respect to Plaquemines, the Offering Documents told investors that the total project costs were estimated to be "***$22.5 billion to $23.5 billion***" and that the estimates were based upon "***construction cost experiences with the Calcasieu Project and the Plaquemines Project***."  The Offering Documents stated, in pertinent part, as follows:

> ***We currently estimate that the total project costs for the Plaquemines Project will be approximately $22.5 billion to $23.5 billion, including EPC contractor profit and contingency, owners' costs and financing costs, of which approximately $17.7 billion had been paid for as of September 30, 2024. As of September 30, 2024, we have additional available borrowing capacity of $2.6 billion under the Plaquemines Construction Term Loan. In addition, as of September 30, 2024, we estimate that the total project cost for the CP2 Project, the CP3 Project and the Delta Project will range from approximately $27 billion to $28 billion, $44 billion to $45 billion and $37 billion to $38 billion, respectively***, in each case including EPC contractor profit and contingency, owners' costs and financing costs, substantially all of which have not yet been funded. ***These estimates are based***

59

*primarily upon our construction cost experiences with the Calcasieu Project and the Plaquemines Project* and the pricing included in the CP2 Phase 1 EPC Contract, and reflect the current inflationary environment as well as the fact that the pipelines for the CP2 Project, the CP3 Project and the Delta Project are expected to be longer and more expensive than the pipelines for the Calcasieu Project and the Plaquemines Project.

185.    The Offering Documents were further misleading by omission because they affirmatively touted that "[i]n December 2024," the Company "began to produce LNG at the Plaquemines Project" and "announced the successful loading and departure" of its first commissioning cargo but failed to disclose the Company's outsized capital expenditures in Q4 2024 that significantly lowered Q4 2024 earnings. Specifically, the Offering Documents stated, in pertinent part, as follows:

> *In December 2024, we began to produce LNG at the Plaquemines Project and announced the successful loading and departure of our first commissioning cargo.*

186.    The statements referenced above in ¶¶184-185 concerning cost estimates and the Plaquemines Project were each false and misleading statements of material fact when made because they failed to disclose and misrepresented the following material adverse facts, material adverse trends, material uncertainties, or significant risks that existed at the time of the IPO, including:

(a)    By the time of the IPO, Q4 2024 had already been complete for a full month, and Defendants had already incurred costs well above market expectations for the quarter;

(b)    By the time of the IPO, the Company was already experiencing equipment and operational failures that required undisclosed, costly remediation;

(c)    By the time of the IPO, Defendants had already expended at least $19.8 billion on Plaquemines alone, as later disclosed in Venture Global's 2024 Form 10-K;

60

(d)    By the time of the IPO, Defendants had only $313 million in available borrowing capacity under the Plaquemines Construction Term Loan, as later disclosed in Venture Global's 2024 Form 10-K;

(e)    By the time of the IPO, Defendants' total project costs were regularly exacerbated by lack of planning, mismanagement, and remediation costs that resulted from poor planning and management; and

(f)    By the time of the IPO, Defendants' overuse and/or misuse of equipment in the pursuit of short-term profit from spot-market sales already necessitated high remediation costs.

187.    In addition, the Offering Documents also inaccurately described as ***potential*** certain risks associated with Venture Global's "estimated costs," which "***could***" have an adverse effect on Venture Global's business contracts, financial condition, operating results, cash flow, financing requirements, liquidity and prospects, rather than disclosing the actual events, trends, or uncertainties that had already manifested.  The Offering Documents stated, in pertinent part, as follows:

> ***Our cost estimates for LNG facilities, related equipment and components, natural gas pipelines, LNG tankers, and other natural gas liquefaction and export facilities have been, and continue to be, subject to change due to many factors outside of our control. Such factors include, among other things,*** (i) inflationary factors, (ii) changes in commodity prices (particularly nickel and steel), (iii) escalating labor costs, (iv) supply chain availability, including the availability of critical components and increased costs to locate and procure alternatives, (v) labor disputes, (vi) tariffs, ***(vii) unexpected delays in construction or commissioning, and (viii) unexpected repair, replacement, rectification, or warranty work. Such factors have in the past resulted in, and may in the future result in, among other things, delays in construction or commissioning, repair or warranty work, cost overruns, and/or change orders under or amendments to existing or future construction contracts.*** Further, we may decide or be forced to enter into amendments to construction and/or supply contracts or submit change orders to the applicable contractor that could result in longer construction periods, higher costs or both. ***We may also decide or be forced to expend additional funds in order to maintain construction schedules, complete construction and commissioning, or comply with existing or future environmental or other regulations.*** Additionally,

our estimated costs for our projects do not include estimated costs for any potential bolt-on expansion opportunities that we may pursue in the future. *As a result, costs to achieve completion of LNG facilities, related equipment and components, natural gas pipelines, LNG tankers, and other natural gas liquefaction and export facilities may be higher, potentially materially, than our cost estimates. In the event we experience any such increases in estimated costs, delays or both, the amount of funding needed to complete an LNG facility, a phase thereof, related equipment and components, natural gas pipelines, LNG tankers, and other natural gas liquefaction and export facilities, could exceed our available funds and result in our failure to complete such projects or assets and thereby negatively impact our business and limit our growth prospects.*

\* \* \*

We currently estimate that the total project costs for the Plaquemines Project will be approximately $22.5 billion to $23.5 billion, including EPC contractor profit and contingency, owners' costs and financing costs, of which approximately $17.7 billion had been paid for as of September 30, 2024.  This estimate is based in part on the target cost determined pursuant to the Plaquemines EPC Contracts and reflects increases related to, among other things, inflationary factors and efforts to maintain the project schedule while also reserving additional contingency funds (without giving effect to any commissioning cargo proceeds that may be utilized for project costs). Since FID of Phase 2 of the Plaquemines Project, VGLNG has made several incremental equity contributions to VGPL in an aggregate amount equal to $2.35 billion to address such increases in estimated total project costs, and we may be required to make additional incremental equity contributions to the extent total project costs exceed the low-end of the range of estimated total project costs above and that such costs exceed the available project-level debt and equity financing and net proceeds from the sale of commissioning cargos. Pursuant to the Plaquemines Credit Facilities, if such contributions have been utilized to pay project costs for the Plaquemines Project, they are reimbursable by VGPL to VGLNG at our election upon satisfaction of certain conditions under the Plaquemines Construction Term Loan. *The costs to achieve completion of the Plaquemines Project may be subject to further increases, which could be material, as a result of many factors outside of our control as described above. As a result, we may need to make additional equity contributions or raise additional project-level equity financing or debt financing in the future to fund any such increase in estimated total project costs that exceed our current contingency, and any such additional contributions or funding could be significant.*

\* \* \*

Our cost estimates with respect to any LNG facilities, related equipment and components, natural gas pipelines, LNG tankers, regasification facilities and other natural gas liquefaction and export facilities (including any expansion of an existing facility) we may decide to develop in the future would be subject to similar

uncertainties and potential changes. For example, our cost estimates may continue to increase as we negotiate and finalize agreements with contractors for any such project. ***Any increases in the construction costs for any of our projects could have a material adverse effect on our business, contracts, financial condition, operating results, cash flow, financing requirements, liquidity, prospects and the price of our Class A common stock.***

188.    The Offering Documents inaccurately described as ***potential*** certain risks associated with Venture Global's "overall costs," which "***could***" have an adverse effect on Venture Global's business contracts, financial condition, operating results, cash flow, financing requirements, liquidity and prospects, rather than disclosing the actual events, trends, or uncertainties that had already manifested.  The Offering Documents stated, in pertinent part, as follows:

> ***We will require significant additional capital to construct and complete certain of our projects, and we may not be able to secure such financing on time with acceptable terms, or at all, which could cause delays in our construction, lead to inadequate liquidity and increase overall costs.***
>
> We are in the process of commissioning the Calcasieu Project, constructing and commissioning the Plaquemines Project and developing the CP2 Project, the CP3 Project and the Delta Project. An amount expected to be necessary to complete the Calcasieu Project and achieve COD for the Calcasieu Project is held in cash reserve accounts pursuant to our project financing arrangements and reflected as restricted in our financial statements. While we believe we have sufficient project-level cash, borrowing capacity under our existing project-level debt financing, and access to substantial commissioning cargo proceeds to fund the completion of the Plaquemines Project based on our current estimate of the total project costs, the CP2 Project, the CP3 Project and the Delta Project, as well as any future projects we develop, will require significant additional funding.
>
> We currently estimate that the total project costs for the Plaquemines Project will be approximately $22.5 billion to $23.5 billion, including EPC contractor profit and contingency, owners' costs and financing costs, of which approximately $17.7 billion had been paid for as of September 30, 2024….
>
> *    *    *
>
> ***For example, our cost estimates might change due to factors such as unexpected delays in the construction or commissioning of our projects, the execution of any repair or warranty work and change orders or amendments to certain material construction contracts, including final terms of or amendments to any EPC***

63

*contract for such projects, and/or other construction or supply contracts. Accordingly, we will need to obtain significant additional funding from one or more sources of debt and equity financing before we are able to generate sales and/or revenue for our projects, other than the Calcasieu Project, and, based upon current estimates, the Plaquemines Project.*

\* \* \*

*Delays in the construction of our projects beyond the estimated development period, issues with the commissioning process leading to additional repair and replacement work, as well as change orders to certain material construction contracts and/or other construction or supply contracts, could increase the cost of completion beyond the amounts that we estimate and beyond the then-available proceeds from sales of commissioning cargos we expect to receive, which could require us to obtain additional sources of financing to fund our operations until our projects are fully completed (which could cause further delays).* For example, we have experienced unexpected delays in commissioning the Calcasieu Project related to certain necessary repairs and replacements. As a result, we expect COD for the Calcasieu Project to be delayed while significant work related to commissioning, carryover completions, rectification, and certain other items is being completed, and we are currently targeting a COD for the Calcasieu Project in May 2025. Further, while we are generating commissioning cargo proceeds at the Calcasieu Project and plan to also sell commissioning cargos at each of our other projects, it is possible those commissioning cargo proceeds will be lower, potentially materially, than we currently anticipate, which could also require us to obtain additional sources of capital to fund development, construction and commissioning of our projects.

\* \* \*

*Any delays in construction could prevent us from commencing operations when we anticipate and could prevent us from realizing anticipated cash flows, all of which could have a material adverse effect on our business, contracts, financial condition, operating results, cash flow, financing requirements, liquidity, prospects and the price of our Class A common stock.*

189.    The statements referenced above in ¶¶187-188 were each inaccurate statements of material fact when made because, while noting only the potential negative impacts on Venture Global's business, contracts, financial condition, operating results, cash flow, financing requirements, liquidity, and prospects, the Offering Documents failed to disclose and misrepresented the following significant, then existing material events and adverse trends or uncertainties that Venture Global had already been facing at the time of the IPO, including:

64

(a)    By the time of the IPO, Q4 2024 had already been complete for a full month, and Defendants had already incurred costs well above market expectations for the quarter;

(b)    By the time of the IPO, the Company was already experiencing equipment and operational failures that required undisclosed, costly remediation;

(c)    By the time of the IPO, the Company was already experiencing delays in construction and commissioning that increased cost estimates and prevented commencement of certain operations;

(d)    By the time of the IPO, Defendants had already expended at least $19.8 billion on Plaquemines alone, as later disclosed in Venture Global's 2024 Form 10-K;

(e)    By the time of the IPO, Defendants had only $313 million in available borrowing capacity under the Plaquemines Construction Term Loan, as later disclosed in Venture Global's 2024 Form 10-K;

(f)    By the time of the IPO, Defendants' total project costs were regularly exacerbated by lack of planning, mismanagement, and remediation costs that resulted from poor planning and management; and

(g)    By the time of the IPO, Defendants' overuse and/or misuse of equipment in the pursuit of short-term profit from spot-market sales already necessitated high remediation costs.

### C.    The Offering Documents Contained Material Misstatements and Omissions About the Business and Reputational Harm Cause to Venture Global by its Failure to Live Up to Expectations with its Contractual Counterparties

190.    In addition, the Offering Documents misleadingly touted stable, long-term cash flows as a key strength, while failing to disclose that the Company was jeopardizing such cash flows by failing to live up to its contractual counterparties' expectations. The Offering Documents stated, in pertinent part, the following:

*Long-term take-or-pay contracts with highly creditworthy offtakers. We anticipate that our business model will provide us with stable cash flows as a result of our long-term take-or-pay contracts to sell LNG*. As of September 30, 2024, we have executed 39.25 mtpa of post-COD SPAs with a set of third party customers that we believe constitute one of the strongest portfolios of institutional LNG buyer credits in the world. The entire expected nameplate capacity for the Calcasieu Project (10 mtpa) and the Plaquemines Project (20 mtpa), and 9.25 mtpa of the CP2 Project, have been contracted under such SPAs. Our third-party post-COD SPAs as of September 30, 2024 represent expected total contracted revenue of approximately $107 billion over the life of such SPAs. … *The weighted average life of all of our post-COD SPAs is approximately 19 years, providing a long-term runway of reliable cash flows.*

191.    The Offering Documents also told investors that "*[t]he majority of the Company's nameplate liquefaction capacity produced after an LNG project reaches commercial operations will be sold under long term 20-year SPAs ("post-COD term SPAs").*"

192.    The Offering Documents also falsely claimed that it was the Company's "*intention*" and "*obligation*" to complete its projects "*in a reasonable and prudent manner*."  The Offering Documents stated, in pertinent part, the following:

> *In particular, it is both our intention and our obligation, under our post-COD SPAs, to undertake the construction of and complete our projects or phases thereof in a reasonable and prudent manner, which, depending on the circumstances, could extend or shorten the commissioning period for such projects or phases thereof during which we are able to generate such proceeds.*

193.    The Offering Documents admitted to investors that Venture Global's "*ability to generate revenue and cash flow is partially based on [its] ability to enter into long-term SPAs with customers with respect to the expected nameplate capacity of [its] projects*."

194.    The Offering Documents also falsely described the reasons for delays at Calcasieu as a "*force majeure event*."  The Offering Documents stated, in pertinent part, the following:

> *[W]e notified all of our customers under the Calcasieu Project post-COD SPAs of the anticipated delay to COD, indicating that such delay constitutes a force majeure event. As a result of such designation, the time period within which to achieve COD in such SPAs would be extended and such customers will not be entitled to terminate as a result of failure to designate COD until June 2025, at the earliest. All of such customers have questioned whether, and most have*

66

*disputed in arbitration proceedings that, the delay constitutes a force majeure event, and they could assert that they are entitled to terminate their SPAs because COD did not occur by March 2024.*

195.    The statements referenced above in ¶¶190-194 concerning, *inter alia*, the benefits, stability, and reliability of long-term contracts and cash flows, were each false and misleading statements of material fact when made because they failed to disclose and misrepresented the following material adverse facts, material adverse trends, material uncertainties, or material risks that existed at the time of the IPO, including:

(a)    By the time of the IPO, Venture Global was already experiencing undisclosed damage to its goodwill, reputation, and business as a result of its failure to satisfy the expectations of its contract counterparties;

(b)    By the time of the IPO, Venture Global was already experiencing diminished ability to enter favorable long-term contracts with existing and new customers;

(c)    By the time of the IPO, a public rejection by an important potential customer, TotalEnergies, was critically imminent;

(d)    By the time of the IPO, the Company did not intend to pursue COD in a prudent manner, but was instead postponing COD in pursuit of short-term profits;

(e)    As a result of the damage already caused to Venture Global's goodwill, reputation, and business, the Company's ability to generate revenue and cash flows was already diminished; and

(f)    As a result of the damage already caused to Venture Global's goodwill, reputation, and business by the time of the IPO, the Company's ability to ensure stable cash flows from long-term contracts was already diminished.

196.    The Offering Documents also inaccurately described as *potential* certain risks associated with Venture Global's long-term contract strategy, which "*could*" have an adverse

67

effect on Venture Global's business contracts, financial condition, operating results, cash flow, financing requirements, liquidity and prospects, rather than disclosing the actual events, trends, or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, as follows:

> ***We have not entered into SPAs with customers for the total expected nameplate capacity at the CP2 Project, the CP3 Project or the Delta Project, and our failure to enter into final and binding contracts for an adequate portion of, or to otherwise sell, the expected nameplate capacity of any of our projects, could have a material adverse effect on our prospects***.

> ***Our ability to generate revenue and cash flow is partially based on our ability to enter into long-term SPAs with customers with respect to the expected nameplate capacity of our projects.*** Changes in market conditions relating to, among other factors, the price of natural gas in the United States and the price of LNG in international markets could adversely affect the competitiveness of our projects and our ability to enter into such SPAs, which could adversely impact our potential revenues.

> \*       \*       \*

> ***If we are unable to enter into long-term contracts with customers for an adequate portion of the expected nameplate capacity at our future development projects, we may not be able to develop such project, raise adequate financing for such project, or realize sufficient cash flows for our business to remain profitable, which would have a material adverse effect on our business, contracts, financial condition, operating results, cash flow, financing requirements, liquidity, prospects and the price of our Class A common stock.***

197.    The Offering Documents also inaccurately described as ***potential*** certain risks associated with project commissioning delays and Venture Global's long-term contracts, which "***could***" have an adverse effect on Venture Global's business contracts, financial condition, operating results, cash flow, financing requirements, liquidity and prospects, rather than disclosing the actual events, trends, or uncertainties that had already manifested as well as the material risk that such delays and Venture Global's actions would have on its ability to enter into future long-term contracts. The Offering Documents stated, in pertinent part, as follows:

68

*Any delay in a project's ability to produce and load LNG for sale or delay in the completion of our projects could cause a delay in the receipt of proceeds projected from sales of LNG commissioning cargos and/or from post-COD SPAs or lead to a loss of one or more customers in the event of significant delays. In particular, each of our post-COD SPAs provides that the counterparty may terminate that SPA in the event that such project has not achieved COD by the relevant deadlines, and such counterparties could also bring claims for contractual damages.*

198.    The Offering Documents also misrepresented the risks of the disputes the Company was having with its long-term contract counter-parties. The Offering Documents stated, in pertinent part, as follows:

*If we are unsuccessful in our current and any potential future arbitration proceedings with our customers, the amounts that we are required to pay may be substantial and certain of our post-COD SPAs may be terminated, which may lead to an acceleration of all our debt for the relevant project.*

We are involved and may in the future become involved in disputes and arbitration proceedings with the customers under our SPAs. For example, in December 2022, a long-term customer of the Calcasieu Project submitted a request for arbitration to the International Chamber of Commerce, International Court of Arbitration, in accordance with the dispute resolution procedures of the post-COD SPA between us and that customer, asserting that we had failed to provide sufficient information or access to the Calcasieu Project and are delayed in achieving COD under the post-COD SPA. The remedies sought by the long-term customer are contract damages in excess of $1 billion (which is potentially subject to increase with the passage of time until COD occurs), rather than the termination of the post-COD SPA. The initial merits hearing for this arbitration proceeding occurred in September 2024.

In May 2023, two additional long-term customers of the Calcasieu Project submitted separate requests for arbitration to the London Court of International Arbitration and the International Chamber of Commerce, International Court of Arbitration, respectively, in accordance with the dispute resolution procedures of the relevant post-COD SPAs with such customers, asserting, among other claims, that we are delayed in achieving COD under the post-COD SPA. The remedies sought by such long-term customers are (a) orders requiring us to immediately notify the relevant long-term customer of the occurrence of COD of the Calcasieu Project or otherwise deliver LNG cargos to the relevant long-term customer at the contract price set forth in the applicable post-COD SPA; and (b) contract damages of approximately $1.5 billion and $1.7 billion (each of which is potentially subject to increase with the passage of time until COD occurs), respectively, rather than the termination of the relevant post-COD SPAs. The hearings for such two arbitration proceedings occurred in October 2024 and November 2024, respectively.

69

In August 2023, two additional long-term customers of the Calcasieu Project submitted separate requests for arbitration to the International Chamber of Commerce, International Court of Arbitration in accordance with the dispute resolution procedures of the relevant post-COD SPAs with such customers, asserting, among other claims, that we are delayed in achieving COD under the relevant post-COD SPA. The hearings for such two arbitration proceedings have been scheduled for June 2025 and July 2025, respectively. In December 2023, one additional long-term customer of the Calcasieu Project submitted a request for arbitration to the International Chamber of Commerce, International Court of Arbitration in accordance with the dispute resolution procedures of the post-COD SPA between us and that customer, asserting among other claims that we are delayed in achieving COD under the relevant post-COD SPA. The remedies sought by each of the second group of three long-term customers are (a) orders requiring us to immediately notify the relevant long-term customer of the occurrence of COD of the Calcasieu Project or otherwise deliver LNG cargos to the relevant long-term customer at the contract price set forth in the applicable post-COD SPA; and (b) contract damages in an amount to be determined in excess of $250 million (in the case of one such customer) or $400 million (in the case of two such customers), rather than the termination of the relevant post-COD SPAs.

Further, in March 2024, a short-term customer of the Calcasieu Project submitted a request for arbitration to the International Chamber of Commerce, International Court of Arbitration in accordance with the dispute resolution procedures of the post-COD SPA between us and that customer. Such customer has raised substantially the same assertions as the arbitration proceedings described above and is seeking contract damages of $200 million (which is potentially subject to increase with the passage of time until COD occurs), as well as an additional claim relating to an undelivered commissioning cargo. Additionally, all such customers who have asserted that we are delayed in achieving COD have also disputed that the delay to COD constitutes a force majeure event in the context of their arbitration proceedings. *We disagree with the assertions in each of these requests for arbitration, and are defending ourselves in the arbitration proceedings in accordance with each underlying post-COD SPA. We also note that, while we believe that the foregoing assertions in each request for arbitration are unsubstantiated, we further believe that any award of contract damages would be subject to the relevant seller aggregate liability cap under the relevant post-COD SPA. However, there can be no assurance that we will be successful in defending such claims or establishing that any such claim is subject to the liability cap under the relevant post-COD SPA.*

In addition, although none of the post-COD SPA customers who have commenced the arbitration proceedings described above has sought termination of the underlying post-COD SPA as a remedy in the relevant arbitration, two of those long-term post-COD SPA customers have notified the collateral agent for the Calcasieu Project's project financing that a potential termination event under their long-term post-COD SPA has occurred or may occur, and that remedies could include termination of, or suspension under, the relevant long-term post-COD SPA.

*If we are unsuccessful in defending ourselves against any of the claims mentioned above, the amounts we could be required to pay could be substantial, which could have a material adverse effect on our business, contracts, financial condition, operating results, cash flow, liquidity and prospects. Further, a termination of, or suspension under, any of the relevant long-term post-COD SPAs that are subject to these claims could, subject to our ability to replace such long-term post-COD SPAs, lead to an acceleration of our outstanding debt under the Calcasieu Project and foreclosure against all collateral that secures such debt, representing substantially all assets of the Calcasieu Project, which could have a material adverse effect on our business, contracts, financial condition, operating results, cash flow, financing requirements, liquidity, prospects and the price of our Class A common stock.*

We have also notified all of our customers under the Calcasieu Foundation SPAs of the anticipated delay to COD, indicating that such delay is due to a force majeure event. As a result of such designation, the deadline for COD in such post-COD SPAs would be extended and such customers will not be entitled to terminate their respective post-COD SPAs as a result of failure to designate COD until June 2025. All of such customers have questioned (including, as applicable, in the post-COD SPA arbitration proceedings described above) whether the delay constitutes a force majeure event and they could assert that, notwithstanding our declaration of force majeure, they are entitled to terminate their post-COD SPAs. *Discussions with such customers with respect to this force majeure event remain ongoing. Such customers may also seek contract damages, and several such customers have already sought contractual damages in connection with the alleged delay in achieving COD for the Calcasieu Project as described above. Any such claims could be substantial, and there can be no assurance that we will be successful in defending any such claims.*

*If any of our customers were to successfully terminate their post-COD SPAs with us for the Calcasieu Project, we would need to replace those customers and/or amend our existing post-COD SPAs, which could take time and there can be no assurance we would be able to enter into new post-COD SPAs on a timely basis and on comparable or better terms*…. A delay in COD of the Calcasieu Project or Phase 1 or 2 of the Plaquemines Project beyond a certain deadline could also result in an event of default under the Calcasieu Pass Credit Facilities or the Plaquemines Credit Facilities, respectively, and/or certain investors exercising step-in rights to control, directly or indirectly, certain of our subsidiaries and the Calcasieu Project."

199.    The statements referenced above in ¶¶196-198 were each inaccurate statements of material fact when made because, while noting only the potential negative impacts on Venture Global's business, contracts, financial condition, operating results, cash flow, financing requirements, liquidity, and prospects, the Offering Documents failed to disclose and

71

misrepresented the following significant, then existing material events and adverse trends or uncertainties that Venture Global had already been facing at the time of the IPO, including:

(a)    By the time of the IPO, Venture Global was already experiencing undisclosed damage to its goodwill, reputation, and business as a result of its failure to satisfy the expectations of its contract counterparties;

(b)    By the time of the IPO, Venture Global was already experiencing diminished ability to enter favorable long-term contracts with existing and new customers;

(c)    By the time of the IPO, a public rejection by an important potential customer, TotalEnergies, was critically imminent; and

(d)    As a result of the damage already caused to Venture Global's goodwill, reputation, and business and the imminent rejection by TotalEnergies, risks to the Company's ability to secure customers and contracts were not hypothetical.

## VI.    POST-IPO EVENTS

### A.    Customer Rejects Long-Term Contracts Revealing Harm to Venture Global's Reputation and Business Due to Pre-IPO Conduct

200.    On February 5, 2025—a mere nine days after the IPO—TotalEnergies, a key customer of Venture Global, publicly announced it had refused a long-term contract with Venture Global, citing a lack of trust. In particular, TotalEnergies CEO, Patrick Pouyanne, stated that he was approached by Venture Global to see if his company would be interested in a long-term supply contract for LNG from Calcasieu. Pouyanne rejected the offer, stating "I don't want to deal with these guys, because of what they are doing," namely, taking advantage of a loophole in Venture Global's long-term contracts that allowed Venture Global to delay performance on existing long-term contracts pending its "commercial operations date" while monetizing its facilities via spot

contracts for short-term gain. Pouyanne further stated that TotalEnergies declined cargoes from Plaquemines because of the controversy around slow commissioning at Calcasieu.

201. TotalEnergies' rejection of long-term contracts with Venture Global exposed the substantial business and reputational harm that Venture Global suffered as a result of its avoidance of long-term contract expectations to enable short-term profit from spot contracts. This information shocked the energy market and received extensive press coverage, including from *Reuters*, *EconoTimes*, and *OilPrice.com*.

202. The disclosure of Venture Global's jeopardization of long-term contracts in favor of short-term spot contracts was directly contrary to the Company's representations in its Offering Documents. Specifically, the Offering Documents had touted the Company's reliance on long-term contracts, emphasizing that they provided protection to Venture Global from LNG price volatility. For example, Defendants stated in the Offering Documents that "[u]nder [the Company's] long-term supply agreements, [it] seek[s] to contract natural gas for basis discounts to the Henry Hub index which can help secure natural gas availability and reduce our long-term exposure to volatility in natural gas prices." Likewise, in discussing risks associated with seasonality, Defendants emphasized the Company's reliance on long-term contracts as a protective factor shielding it from the risks of seasonal price fluctuations. In particular, the Offering Documents stated that "[s]easonal weather can affect the need for [the Company's] LNG sales. While we expect that a substantial amount of [its] LNG will be sold under long-term, post-COD SPAs, due to the commissioning activities at the Calcasieu Project, including the marketing, loading and shipping of [the Company's] cargos of LNG, [the Company] ha[s] already begun experiencing, and we expect to experience for [its] other projects as we begin commissioning

73

activities for such projects, the effects of market volatility and fluctuation in seasonal demand for LNG in [the Company's] existing markets."

203.    In response to the news, Venture Global Class A common stock fell 11.2% from a close of $19.63 on February 5, 2025, to a close of $17.43 per share on February 6, 2025, on extremely heavy volume of over 18.9 million shares traded.

204.    Market analysts directly linked this drop in the price of Venture Global Class A common stock on February 5, 2025, to the news about customers rejecting long-term contracts due to the Company's failure to perform on customer contractual expectations in favor of lucrative spot contracts, highlighting the substantial business and reputational harm to Venture Global resulting from its breaching of customer trust. For example, *Seeking Alpha* reported on February 6, 2025, that "Venture Global plunges after TotalEnergies rejects as LNG supplier on lack of trust."

205.    Similarly, in a February 18, 2025 report, Citibank analysts cited the reputational harm of Venture Global's failure to perform on its long-term contracts as a long-term risk, separate and apart from the specific financial risks associated with arbitration resulting from that contract manipulation. In particular, Citibank researchers stated that "[w]hile $5bln in damages would be a near-term risk; the inability to commercialize future projects would be a long-term risk. Specifically, some customers have publicly expressed their reluctance to enter into long-term contracts with Venture Global as a result of CP's prolonged commissioning and ensuing arbitration."

206.    Likewise, in a February 13, 2025 report, Morningstar analysts observed that "Venture's decision to sell volumes to the spot market for more than three years, while financially beneficial and a contractual stretch, appears to have caused immense reputational damage with its small pool of substantial LNG buyers." Morningstar analysts further observed that "[t]he company

74

has benefited from [] disregarding the spirit of its customer agreements[,]" and that "Venture has shown itself to be an unreliable counterparty in what remains a reputational business."

207.    Compounding the market impact, the news that Venture Global had been jeopardizing long-term contracting in favor of short-term spot contracts exposed the Company's heightened vulnerability to price fluctuations. Indeed, whereas competitor companies were shielded from LNG price volatility by long-term contracts, Venture Global's reliance on spot contracts and its willingness to endanger long-term contract opportunities in favor of short-term spot contracts left it dangerously exposed to falling international LNG prices.

208.    Following TotalEnergies' high-profile rejection of long-term Venture Global contracts on February 5, 2025, analysts recognized the financial harm of Venture Global's heightened susceptibility to LNG price fluctuations. Thus, in Morningstar's February 13, 2025 report, analysts noted that Venture Global's spot-contract model "fundamentally" produces "extremely volatile performance." Likewise, in Citibank's February 18, 2025 report, Citi analysts assigned Venture Global stock a target price of $18, implying a 9.6x 2026 EBITDA, "which is below peers due to its less contracted position which exposes earnings to commodity volatility." Moreover, Citi analysts rated Venture Global "High Risk," citing Venture Global's "significantly higher exposure to spot prices relative to peers," and observing that "[c]ommodity price is the key risk to our thesis." In the same vein, a March 10, 2025 Bernstein Research report analyzing both Venture Global and its competitor, Cheniere, observed that "Cheniere's highly contracted structure shields them from this [LNG price] volatility, while VG's comparatively larger share of uncontracted volumes leaves them exposed to falling international gas price."

**B.    March 6, 2025 Earnings Release**

209.    On March 6, 2025, Venture Global filed a Form 10-K with the SEC detailing its earnings for fourth quarter and full-year 2024. The Company revealed net income for FY 2024 of

75

$1.7 billion, a $1.9 billion decline from FY 2023. In a press release accompanying the Form 10-K, the Company attributed this decline, in part, to "higher costs to remediate and commission the Calcasieu Project and to develop the CP2 Project." At the same time, the Company revealed consolidated adjusted EBITDA for the three months ended December 31, 2024, of $688 million, a decrease of $125 million as compared to the three months ended December 31, 2023. The Company attributed this decline primarily to lower sales volumes and higher costs. Moreover, the Company revised its EBITDA guidance for 2025 to a range of $6.8 billion to $7.4 billion, well below Wall Street's $9.3 billion consensus estimates.

210.    That same day, Venture Global held an earnings conference to discuss Q4 and FY 2024 results. In that call, Defendant Thayer explained:

> "Our net income attributable to common stockholders was $871 million for the fourth quarter of 2024 and $1.5 billion for the full year, a $921 million increase and a $1.2 billion decrease from a loss of $50 million and net income of $2.7 billion during the fourth quarter and full year of 2023, respectively. These shifts were driven by the stabilization of international LNG prices, resulting in lower total margin for LNG sold and higher costs to remediate and commission the Calcasieu project, personnel expenses reflecting higher headcounts, and costs to develop the CP2 project. … [W]e realized $688 million during the fourth quarter of 2024 and $2.1 billion for the full year, a $125 million and $3.1 billion decrease for a 15% and 59% decline, respectively, from $813 million to $5.2 billion during the equivalent periods of 2023. This decrease in consolidated adjusted EBITDA year-over-year was driven chiefly by the stabilization of international LNG prices, resulting in lower total margin for LNG sold and higher O&M, G&A, and development expenses, including costs to remediate and commission Calcasieu, costs associated with personnel growth to support our growing business, and design and development costs for CP2, among other development projects."

211.    This information was contrary to Defendants' representations in the Offering Documents, which wholly omitted Q4 2024 financial results. Indeed, in the Offering Documents, Defendants drastically understated the costs that would be associated with remediating and developing their LNG plants. For example, the Offering Documents had repeatedly touted the Company's "design one, build many approach" as a competitive advantage, enabling the

76

Company, among other things, to "increase our operating leverage and [] augment our earnings through reduced fixed and variable operating expenses." In fact, as multiple former Venture Global employees and contractors recount and as discussed herein, the Company's adoption of supposed one-size-fits-all designs not tailored to specific projects to led to numerous operational issues and required substantial and costly remediation efforts.

212. Similarly, on March 6, 2025, Venture Global projected the Plaquemines plant to cost between $23.3 billion to $23.8 billion, compared to the range of $22.5 billion to $23.5 billion slated in the Offering Documents. Critically, Venture Global had already spent approximately $19.8 billion on Plaquemines development as of December 31, 2024—prior to the IPO.

213. In response to the March 6, 2025 announcements, Venture Global Class A common stock shares fell 36.05% from a close of $14.19 on March 5, 2025 to a close of $9.07 per share on March 6, 2025 on exceedingly high volume of over 44.5 million shares trading.

214. Analysts specifically noted Venture Global's announced decreases in net income and net EBITDA, highlighting the impact of remediation and development costs at its LNG plants.

215. In a March 6, 2025 report, Morningstar expressly attributed the decline in Venture Global's stock price to higher-than-expected project costs and declining sales volumes, stating that "the market has punished shares, with an intraday loss of 30% driven by upward revisions to project costs and 18% decline in volumes sold in the fourth quarter." Morningstar further stressed the impact of Venture Global's reliance on spot contracts to the detriment of long-term contracts on the Company's solvency, observing that the lack of uptake agreements made it "unlikely financing could be secured on similar terms" to earlier contracts.

216. Similarly, in a March 7, 2025 report, Guggenheim reduced its price target for Venture Global common stock from $27 to $20, highlighting a "surprise" on development risk and

"ominous language" around cost increases. Guggenheim analysts stressed "higher capex estimates for the Plaquemines project," as well as an earnings miss resulting from "CP remediation costs and CP2 development costs, as well as lower sales volumes vs. our expectations." Guggenheim called the price escalation for Plaquemines a "disappointment" and increased the development risk premium in its valuation accordingly.

217. By March 6, 2025, the price of Venture Global Class A common stock shares had fallen 62% from the IPO price of $25 per share to the March 6, 2025 closing price of $9.07 per share. This dramatic decline wiped out hundreds of millions of dollars in shareholder value and caused substantial damage to Plaintiffs and the Class.

## VII.    CLASS ACTION ALLEGATIONS

218. Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired Venture Global's publicly traded Class A common stock pursuant and/or traceable to the Offering Documents for Venture Global's IPO, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate families of any Defendant who is an individual; (iii) any person who was an officer, director, or control person of Venture Global or the Underwriter Defendants, at all relevant times; (iv) any firm, trust, corporation, or other entity in which any excluded person or entity has or had a controlling interest and/or beneficial interest provided, however, that any "Investment Vehicle" shall not be excluded from the Class; (v) parents, affiliates, or subsidiaries of Venture Global or the Underwriter Defendants; (vi) the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases or acquisitions of Venture Global's publicly traded

78

Class A common stock through such plans; and (vii) the legal representatives, heirs, successors-in-interest, or assigns of any excluded person or entity, in their respective capacity as such.[10]

219.    The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery. Plaintiffs believe there are at least thousands of members in the proposed Class as the Company offered over 70 million shares of Class A common stock in the IPO. Record owners and other members of the Class may be identified from records maintained by Venture Global or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

220.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Securities Act as set forth herein.

221.    Plaintiffs will fairly and adequately protect the interests of members of the Class and have retained counsel competent and experienced in class and securities litigation.

222.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common the Class are:

(a)    whether Defendants violated the Securities Act;

---

[10] "Investment Vehicle" means any investment company or pooled investment fund, including but not limited to mutual fund families, exchange traded funds, funds of funds and hedge funds, in which the Underwriter Defendants, or any of them, have, has, or may have a direct or indirect interest, or as to which their respective affiliates may act as an investment advisor, but in which any Underwriter Defendant alone or together with its respective affiliates is not a majority owner or does not hold a majority beneficial interest.

(b)    whether the Offering Documents contained inaccurate statements of material fact and/or omitted material information required to be stated therein; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

223.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII.   CLAIMS

**COUNT I:**
**FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT**
**Against Venture Global, the Individual Defendants, and the Underwriter Defendants**

224.    Plaintiffs repeat and reallege each and every allegation above as though fully set forth herein.

225.    This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against Defendant Venture Global, each of the Individual Defendants, and each of the Underwriter Defendants.

226.    This claim does not sound in fraud. Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This claim is based solely on strict liability as to Venture Global and negligence as to the other Defendants. Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in this non-fraud claim, except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

80

227. Venture Global is the issuer of the Class A common stock sold pursuant to the Registration Statement. As such, the Company is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate. By virtue of the Registration Statement containing material misrepresentations and omissions of material fact required to be stated therein or necessary to make the statements therein not false and misleading, Venture Global is liable under Section 11 of the Securities Act to Plaintiffs and the Class.

228. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omission of any material facts and were not misleading.

229. The Individual Defendants each signed the Registration Statement and caused its issuance. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Individual Defendants' failure to exercise reasonable care, the Offering Documents contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, each of the Individual Defendants is liable under Section 11 of the Securities Act to Plaintiffs and the Class.

230. Each of the Underwriter Defendants served as the underwriters for the IPO and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. §77b(a)(11). As such, they participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Offering Documents. Each of the Underwriter Defendants,

as an underwriter of the securities offered in the IPO pursuant to the Offering Documents, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Underwriter Defendants' failure to exercise reasonable care, the Offering Documents contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, each of the Underwriter Defendants is liable under Section 11 of the Securities Act to Plaintiffs and the Class.

231.    None of the untrue statements or omissions of material fact in the Registration Statement alleged herein was a forward-looking statement. Rather, each such statement concerned existing facts. Moreover, the Registration Statement did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

232.    Each of the Defendants named in this claim issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the Registration Statement, which misrepresented and failed to disclose, *inter alia*, the facts set forth above. By reasons of the conduct herein alleged, each such Defendant violated Section 11 of the Securities Act.

233.    Plaintiffs and the Class have sustained damages. The value of Venture Global Class A common stock has declined substantially subsequent to and due to violations by Defendants named in this claim.

234.    At the time of their purchases of Venture Global Class A common stock, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein. Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time that this action was commenced. Less than three years elapsed between the time that the securities upon which this cause of action is brought were offered to the public and the time that this action commenced.

## COUNT II:
## FOR VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT
### Against Venture Global, the Individual Defendants, and the Underwriter Defendants

235.    Plaintiffs repeat and reallege each and every allegation above as though fully set forth herein.

236.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against Venture Global, the Individual Defendants, and the Underwriter Defendants.

237.    This claim does not sound in fraud. Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This claim is based solely on strict liability as to Venture Global and negligence as to the other Defendants. Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in this non-fraud claim except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

238.    Each of the Defendants named in this claim were sellers, offerors, and/or solicitors of purchases of the Company's Class A common stock pursuant to the defective Prospectus. The actions of solicitation by the Defendants named in this claim included participating in the preparation of the false and misleading Prospectus, roadshow, and marketing of Venture Global's Class A common stock to investors, such as Plaintiffs and other members of the Class. Each of the Defendants named in this Claim solicited the purchase of the Company's Class A common stock motivated in part by a desire to serve their own financial interests and those of the Company.

239.    Defendant Venture Global also qualifies as a statutory seller under SEC Rule 159A, 17 C.F.R. §230.159A, because, among other things, the Class A common stock offered in the IPO were sold by means of a prospectus.

240.    The Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make statements made therein not misleading, and omitted to state material facts required to be stated therein.

241.    Each of the Defendants named in this claim owed to the purchasers of Venture Global's Class A common stock, including Plaintiffs and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. By virtue of each of these Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading.

242.    Plaintiffs did not know, nor in the exercise of reasonable diligence could Plaintiffs have known, of the untruths and omissions contained in the Prospectus at the time Plaintiffs purchased Venture Global's Class A common stock.

243.    By reason of the conduct alleged herein, the Defendants named in this claim violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violation, Plaintiffs and other members of the Class who purchased Venture Global's Class A common stock pursuant to the Offering Documents sustained substantial damages in connection with their share purchases. Accordingly, Plaintiffs and other members of the Class who hold shares issued pursuant to the Offering Documents have the right to rescind and recover the consideration paid for the shares with interest thereon or damages as allowed by law or in equity. Class members who have sold their Venture Global Class A common stock seek damages to the extent permitted by law.

**COUNT III:**
**FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT**
<u>**Against the Individual Defendants and VG Partners**</u>

244.    Plaintiffs repeat and reallege each and every allegation above as though fully set forth herein.

245.    This claim is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against each of the Individual Defendants and VG Partners.

246.    This claim does not sound in fraud. Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This claim is based solely on strict liability and/or negligence. Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in this non-fraud claim except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

247.    The Individual Defendants each were control persons of Venture Global by virtue of their positions as directors and/or senior officers of Venture Global. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and or major shareholders, including VG Partners, of Venture Global.

248.    Each of the Individual Defendants participated in the preparation and dissemination of the Offering Documents and otherwise participated in the process necessary to conduct the IPO. Because of their positions of control and authority as senior officers and/or directors, each of the Individual Defendants were able to, and did, control the contents of the Offering Documents, which contained material misrepresentations and omissions of material fact required to be stated therein or necessary to make the statements therein not false and misleading.

249.    By virtue of its stock ownership and its designation of Venture Global's management and the members of the Board, and as stated in the Offering Documents, VG Partners controlled Venture Global and each of the Individual Defendants at the time of the IPO.  As a result, VG Partners was able to, and did, control the contents of the Offering Documents, which contained material misrepresentations and omissions of material fact required to be stated therein or necessary to make the statements therein not false and misleading.

250.    As control persons of Venture Global, each of the Individual Defendants is liable jointly and severally with and to the same extent as Venture Global for its violation of Sections 11 and 12(a)(2) of the Securities Act.

251.    As a control person of Venture Global and controller of each of the Individual Defendants, VG Partners is liable jointly and severally with and to the same extent as Venture Global and each of the Individual Defendants for their respective violations of Sections 11 and 12(a)(2) of the Securities Act.

86

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and other members of the Class, pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding all damages and other remedies set forth in the Securities Act in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, accountants' fees, and expert fees, and other costs and disbursements; and

D.    Awarding such equitable, injunctive or other relief as deemed appropriate by the Court.

## X.    JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: October 24, 2025

Respectfully submitted,

*/s/ Alfred L. Fatale III*
**LABATON KELLER SUCHAROW LLP**
Alfred L. Fatale III
Rachel A. Berger
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
afatale@labaton.com
rberger@labaton.com

*Lead Counsel for Plaintiffs and the Class*

87

**ROBBINS GELLER RUDMAN**
  **& DOWD LLP**
Samuel H. Rudman
Joseph Russello
58 South Service Road, Suite 200
Melville, NY 11747
Telephone:  (631) 367-7100
Facsimile: (631 ) 367-1173
srudman@rgrdlaw.com
jrussello@rgrdlaw.com

**ROSSMAN LEGAL**
Gregg Rossman
6840 Griffin Road
Davie, FL 33314
Telephone:  (954) 440-0908
gregg@rossmanlegal.com

*Additional Counsel for Plaintiff Pompano Beach Police & Firefighters' Retirement System*

**COHEN MILSTEIN SELLERS**
  **& TOLL PLLC**
Steven J. Toll
1100 New York Avenue, N.W., Suite 800
Washington, D.C. 20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
stoll@cohenmilstein.com
dbunch@cohenmilstein.com

*Liaison Counsel for the Class*

88