**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FIRSTFIRE GLOBAL OPPORTUNITIES FUND LLC, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> -v- <br><br> VENTURE GLOBAL, INC., *et al.*, <br><br> Defendants. | Case No. 1:25-cv-4642-JLR-RWL <br><br> [rel. Case No. 25-cv-01364-JLR-RWL] <br><br> <u>**ORAL ARGUMENT REQUESTED**</u> |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CORRECTED AMENDED CLASS ACTION COMPLAINT**

**LATHAM & WATKINS LLP**
Jeff G. Hammel
Jason C. Hegt
Corey A. Calabrese
1271 Avenue of the Americas
New York, New York 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
jeff.hammel@lw.com
jason.hegt@lw.com
corey.calabrese@lw.com

*Attorneys for Venture Global, Inc., Michael Sabel, Robert Pender, Jonathan Thayer, Sarah Blake, Sari Granat, Andrew Orekar, Thomas J. Reid, Jimmy Staton, Roderick Christie, and Venture Global Partners, II, LLC*

*[Additional Counsel On Signature Page]*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .......................................................................................................4

    A.    Venture Global's Innovative Methods Of Building LNG Facilities.......................4

    B.    Venture Global's IPO ...............................................................................5

    C.    This Litigation .......................................................................................7

LEGAL STANDARDS ..............................................................................................8

ARGUMENT ...........................................................................................................9

I.    PLAINTIFFS FAIL TO PLEAD A MATERIALLY FALSE OR MISLEADING
STATEMENT .....................................................................................................9

    A.    Category 1: VG's "Design One, Build Many" Approach....................................9

        1.    The AC Fails To Plead A Contemporaneous False or Misleading
Statement.................................................................................9

        2.    Allegations Attributed To Former Employees Add Nothing....................12

        3.    VG's Forward-Looking Or Opinion Statements Are Not
Actionable ...............................................................................14

    B.    Category 2: VG's 4Q24 Financial Information .................................................16

        1.    The AC Fails To Plead Facts Establishing That VG's Financial
Disclosures Were False Or Misleading.......................................16

        2.    The Category 2 Forward-Looking Estimates Are Protected By The
Bespeaks Caution Doctrine.......................................................18

        3.    The Increased Estimates Were Not Material As A Matter of Law...........19

    C.    Category 3: VG's Ability To Enter Long-Term Contracts ...................................20

    D.    The AC Fails To Allege A Violation Of Item 303 Or Item 105 ..........................23

II.    THE AC MAKES CLEAR THAT THE ALLEGED MISREPRESENTATIONS
AND OMISSIONS DID NOT CAUSE PLAINTIFFS' LOSSES...................................25

III.    PLAINTIFFS HAVE FAILED TO PLEAD A SECTION 15 CLAIM ...........................26

CONCLUSION.......................................................................................................26

## **TABLE OF AUTHORITIES**

### **CASES**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................................................... 8

*Barilli v. Sky Solar Holdings, Ltd.,*
    389 F. Supp. 3d 232 (S.D.N.Y. 2019) ...................................................................... 8, 16, 23

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................................................... 8

*Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.,*
    2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ...................................................................... 11

*Boluka Garment Co., Ltd. v. Canaan Inc.,*
    547 F. Supp. 3d 439 (S.D.N.Y. 2021) ............................................................................... 26

*Bowes v. Venture Global, Inc., et al.,*
    No. 1:25-cv-01364 (S.D.N.Y. Feb. 17, 2025) ..................................................................... 7

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,*
    752 F.3d 173 (2d Cir. 2014) ................................................................................................ 8

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009) .............................................................................................. 20

*FirstFire Global Opportunities Fund, LLC v. Venture Global, Inc., et al.,*
    No. 1:25-cv-00633 (E.D. Va. April 5, 2025) ...................................................................... 7

*Fogel v. Wal-Mart de MéxicoSAB de CV,*
    2017 WL 751155 (S.D.N.Y. Feb. 27, 2017) ....................................................................... 9

*Garber v. Legg Mason, Inc.,*
    537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009) .............. 20, 21

*Hutchison v. Deutsche Bank Sec. Inc.,*
    647 F.3d 479 (2d Cir. 2011) ......................................................................................... 23, 24

*In re China Mobile Games & Ent. Grp., Ltd Sec. Litig.,*
    2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) ...................................................................... 13

*In re FuboTV Inc. Sec. Litig.,*
    2023 WL 2711826 (S.D.N.Y. Mar. 30, 2023) .............................................................. 12, 21

*In re HEXO Corp. Sec. Litig.,*
    524 F. Supp. 3d 283 (S.D.N.Y. 2021) ............................................................................... 18

*In re IAC/InterActiveCorp Sec. Litig.*,
  478 F. Supp. 2d 574 (S.D.N.Y. 2007) .................................................................. 21

*In re Initial Pub. Offering Sec. Litig.*,
  399 F. Supp. 2d 261 (S.D.N.Y. 2005) .................................................................. 26

*In re Lehman Bros. Sec. & Erisa Litig.*,
  2013 WL 3989066 (S.D.N.Y. July 31, 2013) ................................................. 13, 14

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010) ......................................................................... 2, 8, 25

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
  2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ................................................ 24, 25

*In re NovaGold Res. Inc. Sec. Litig.*,
  629 F. Supp. 2d 272 (S.D.N.Y. 2009) .................................................................. 19

*In re ProShares Tr. Sec. Litig.*,
  728 F.3d 96 (2d Cir. 2013) ................................................................... 10, 11, 22

*In re Qudian Inc. Sec. Litig.*,
  2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019) ............................................... 12, 21

*In re Sec. Cap. Assur. Ltd. Sec. Litig.*,
  2011 WL 4444206 (S.D.N.Y. Sept. 23, 2011) ...................................................... 26

*In re State St. Bank and Tr. Co. Fixed Income Funds Investment Litig.*,
  774 F. Supp.2d 584 (S.D.N.Y. 2011) ............................................................... 4, 25

*In re Vroom, Inc. Sec. Litig.*,
  2025 WL 862125 (S.D.N.Y. Mar. 18, 2025) ............................................ 15, 16, 23

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
  504 F. Supp. 3d 224 (S.D.N.Y. 2020) ..................................................... 8, 10, 12, 14

*Lowinger v. Pzena Inv. Mgmt., Inc.*,
  341 F. App'x 717 (2d Cir. 2009) ......................................................................... 24

*Marquez v. Bright Health Grp., Inc.*,
  755 F. Supp. 3d 266 (E.D.N.Y. 2024) ...................................................... 12, 13, 21

*Nguyen v. MaxPoint Interactive, Inc.*,
  234 F. Supp. 3d 540 (S.D.N.Y. 2017) .................................................................. 11

*Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc.*,
  715 F. Supp. 3d 483 (S.D.N.Y. 2024), *aff'd*, 2024 WL 4647131 (2d Cir. Nov.
  1, 2024) ............................................................................................................ 17, 18

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
   98 F.3d 2 (2d Cir. 1996)...................................................................................... 11

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)................................................................................... 15, 16

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
   538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009)................... 12

*Pearlstein v. BlackBerry Ltd.*,
   93 F. Supp. 3d 233 (S.D.N.Y. 2015), *aff'd*, 660 F. App'x 23 (2d Cir. 2016)...................... 24

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)..................................................................... 11, 14, 18, 23

*Rubinstein v. Credit Suisse Grp. AG*,
   457 F. Supp. 3d 289 (S.D.N.Y. 2020)........................................................ 11, 14, 15

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*,
   75 F.3d 801 (2d Cir. 1996)................................................................................... 12

*Scott v. Gen. Motors Co.*,
   46 F. Supp. 3d 387 (S.D.N.Y. 2014)................................................... 17, 18, 24, 26

*Stadnick v. Vivint Solar, Inc.*,
   861 F.3d 31 (2d Cir. 2017)..................................................................... 17, 19, 20

*Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*,
   412 F. Supp. 3d 353 (S.D.N.Y. 2019), *aff'd*, 826 F. App'x 111 (2d Cir. 2020)................... 24

*Steinberg v. PRT Grp., Inc.*,
   88 F. Supp. 2d 294 (S.D.N.Y. 2000)........................................................... 15, 21

*Tabak v. Canadian Solar Inc.*,
   549 F. App'x 24 (2d Cir. 2013) ............................................................................ 20

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016)................................................................................. 15

*Willard v. UP Fintech Holding Ltd.*,
   527 F. Supp. 3d 609 (S.D.N.Y. 2021).................................................................. 25

*Zirkin v. Quanta Capital Holdings, Ltd.*,
   2009 WL 185940 (S.D.N.Y. Jan. 23, 2009) ................................................... 19, 23

## STATUTES

15 U.S.C. § 12(a)(2)............................................................................................ passim

15 U.S.C. § 77k ............................................................................................... passim

15 U.S.C. § 77k(a) ................................................................................................... 8

15 U.S.C. § 77l(a)(2) ............................................................................................... 8

15 U.S.C. § 77o .......................................................................................... 1, 7, 26

15 U.S.C. § 77z-2(i)(1)(A) .............................................................................. 18, 19

## REGULATIONS

17 C.F.R. § 210.3-12(a) ................................................................................... 7, 17

17 C.F.R. § 210.3-12(b) ................................................................................... 3, 17

17 C.F.R. § 210.3-12(g) .............................................................................. 3, 7, 17

17 C.F.R. § 229.105(a) ................................................................................. 23, 24

17 C.F.R. § 229.303(a)(3)(ii) ............................................................................. 23

Defendants submit this memorandum of law in support of their motion to dismiss Plaintiffs' Corrected Amended Class Action Complaint (the "AC," cited as ¶_) (ECF No. 89).

## PRELIMINARY STATEMENT

This securities case attempts to allege that the registration statement and prospectus (the "Offering Documents") for Venture Global Inc.'s ("VG") initial public offering ("IPO") contained material misstatements and omissions. It should be dismissed because, under the well-established law of the Second Circuit and this District, Plaintiffs have failed to plead the facts required to support their claims.

In just over 10 years, VG has grown from a start-up to one of the country's leading producers and exporters of liquefied natural gas ("LNG"), a global commodity critical to energy security and the clean energy transition. Through its innovative approach to developing and constructing LNG production facilities, VG has been able to bring LNG to international markets far more quickly, and at lower cost, than its industry peers.

On January 24, 2025, VG conducted its IPO on the New York Stock Exchange. VG's stock price subsequently declined and this lawsuit followed, asserting claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.

According to Plaintiffs, VG's Offering Documents contained material misstatements and omissions concerning three categories of statements. Plaintiffs contend that (1) VG's statements regarding its "design one, build many" approach to construction were materially false and misleading because of allegedly undisclosed "operational issues and delays"; (2) VG supposedly omitted expenditures and purported cost overruns for the quarter ending December 31, 2024—*i.e.*, 24 days before the IPO; and (3) VG allegedly misstated risks concerning its ability to enter into and maintain long-term contracts with customers. These claims fail as a matter of law.

**Plaintiffs Have Not Pled An Actionable Misstatement Or Omission**.  Sections 11 and 12(a)(2) require Plaintiffs to allege facts establishing, among other things, that the Offering Documents did not contain required disclosures, or that the disclosures VG did make were materially false or misleading at the time they were made.  *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).  The AC fails to do so as to any of the three categories of alleged misstatements and omissions.

*First*, Plaintiffs plead no facts establishing that the "Category 1" statements regarding VG's "design one, build many" construction approach were false.  VG disclosed that the approach enabled it to start producing LNG in just half the time of its peers.  Plaintiffs do not challenge that disclosure at all.  Rather, Plaintiffs miscast it as somehow promising a process free from any and all operational issues, delays, and cost overruns (the disclosures do no such thing) and then attack this strawman with allegations about delays or cost overruns ***pre-dating*** the IPO.  But VG repeatedly disclosed that its projects had been delayed (and, indeed, could be further delayed in the future)—disclosures the AC entirely ignores.  And Plaintiffs do not offer any factual allegations showing that VG misrepresented the status of its projects at the time of the IPO.  Plaintiffs' only allegations in this regard come from 12 former employees, 10 of whom left VG (or its contractors) months before the IPO, so they could not possibly offer facts about the status of any VG projects at the time of the IPO.  And all 12 merely repeat what VG itself disclosed about certain delays and cost overruns in any event.  It is black-letter law that no claim is stated where a company disclosed what plaintiffs contend was omitted.

*Second*, with respect to "Category 2," asserting that the Offering Documents should have, but did not, disclose VG's fourth quarter 2024 ("4Q24") financial results, Plaintiffs cite no law requiring the Offering Documents to include preliminary, in-process financial results from a

quarter that had closed just 24 days prior to the IPO on December 31, 2024.  Nor could they.  The relevant U.S. Securities and Exchange Commission ("SEC") rule, Regulation S-X, is clear that offering documents "***need not include*** financial statements more current than as of the end of the third fiscal quarter of the most recently completed fiscal year unless the audited financial statements for such fiscal year are available."  17 C.F.R. § 210.3-12(b), (g) (emphasis added).  Plaintiffs also offer no explanation for how the absence of this data could have rendered VG's Offering Documents materially misleading—indeed, the 4Q24 financial results showed costs consistent with VG's then-disclosed estimates.  And Plaintiffs' argument that the 1.2% increase in estimated costs that VG announced in March 2025 somehow shows that its earlier estimates were false when made runs directly counter to a long line of Second Circuit case law holding that neither forward-looking estimates like these nor minor revisions to such estimates are actionable.

*Third*, Plaintiffs fail to allege any facts showing the "Category 3" statements regarding VG's ability to enter into or maintain its long-term contracts were false or misleading.  Plaintiffs point to arbitrations brought against VG by certain long-term customers, ¶ 16, and a post-IPO statement by another company's (TotalEnergies) CEO that he would not enter into a long-term contract with VG, ¶ 200.  But the Offering Documents contain 12 pages of detailed disclosures about the arbitrations (none of which Plaintiffs quote in the AC).  A single statement, post-dating the IPO, from one company that VG never said or even suggested (in the Offering Documents or otherwise) would become a long-term customer does not show that any statement in any Offering Document was false at the time of the IPO.

**Lack of Causation Also Requires Dismissal.**  Plaintiffs' claims also fail for an independent reason:  the AC itself makes clear that the alleged losses were not caused by any of the misstatements or omissions Plaintiffs attempt to allege.

Stock prices rise and fall for countless reasons and not every price decline supports a securities lawsuit. "Negative causation"—a showing that a decline was not caused by the alleged misstatements or omissions in the Offering Documents—is an affirmative defense to Sections 11 and 12(a)(2) claims that supports dismissal where, as here, it is apparent on the face of the complaint. *See In re State St. Bank and Tr. Co. Fixed Income Funds Investment Litig.*, 774 F. Supp. 2d 584, 588 (S.D.N.Y. 2011). Plaintiffs allege that VG's stock price declined because of a February 5, 2025 statement from TotalEnergies' CEO that he would not enter a long-term contract with VG and VG's March 6, 2025 disclosure of earnings guidance that fell "below street consensus," rather than anything VG itself previously disclosed. ¶¶ 12, 200, 209. But neither of these revealed that anything in VG's Offering Documents' statements was false and misleading, so any stock price declines that followed these statements cannot have been caused by the alleged misstatements and omissions. This is another basis for dismissal.

Plaintiffs' claims are fundamentally and fatally flawed and should be dismissed.

## BACKGROUND

### A.    Venture Global's Innovative Methods Of Building LNG Facilities

VG develops, constructs, owns, and operates plants that produce LNG, a fuel that can displace more "carbon intensive" energy sources such as diesel, oil, and coal, thus supporting a cleaner energy future. Ex. 1,[1] S-1 at 1; *see also* ¶¶ 3, 25, 80-82. Converting natural gas into a liquid is a costly and time-intensive endeavor. Gas must be sourced, purified, and then piped through processing units called "trains," where it is "supercooled" to negative 260°F. ¶¶ 82-83;

---

[1] All exhibits cited herein are attached to the accompanying Declaration of Jason C. Hegt. VG's Registration Statement on Form S-1 (the "S-1") became effective on January 23, 2025 after the stock market closed. *See* Decl. of Jason C. Hegt, filed herewith, ¶ 2. The next day, VG began selling securities in connection with its IPO.

*see also* S-1 at 185.  Traditionally, LNG plants have used large liquefaction trains constructed onsite by vast workforces according to bespoke plans, often in remote locations.  ¶¶ 7, 83, 90; S-1 at 2.  This is known as the "stick-built" approach.  With this process, it often takes five years, and sometimes "nearly a decade" for the plants to even begin producing LNG.  ¶ 90; S-1 at 2.

However, VG developed a groundbreaking alternative strategy, of which "design one, build many" is one part.  S-1 at 176.  Instead of building liquefaction trains onsite, VG fabricates certain key, standardized, modular components of its LNG plants in factories, which are then shipped to project sites for installation.  *See* ¶¶ 7, 80, 83; *see also* S-1 at 185.  This approach aims to improve execution, accelerate construction timelines, reduce costs, and expand production of LNG ***as compared to the stick-built approach***.  ¶¶ 7, 90, 93.

VG has multiple projects, all along the U.S. Gulf Coast, in various phases of development.  VG's "Calcasieu Project" began full construction in August 2019, started producing LNG in January 2022, and was still commissioning at the time of the IPO.  S-1 at 187-88.  The "Plaquemines Project" began full construction in May 2022, started producing LNG in December 2024, and is still in construction and commissioning.  *Id.* at 192-93.  VG also has other projects in construction or early development.  *Id.* at 200-03.

### B.    Venture Global's IPO

On January 24, 2025, VG conducted its IPO on the New York Stock Exchange based on the Offering Documents that were filed with the SEC.  ¶ 3.  The IPO stock price was $25 per share.  ¶¶ 26, 167.

The Offering Documents included robust disclosures regarding VG's business and financial condition and the associated risks.  Although they explained VG's innovations, including its "design one, build many" philosophy, and the comparative advantages these confer over the

traditional "stick-built" approach, they also made clear that VG's process was not immune from cost or scheduling risks.  For example:

- "*[W]e have experienced unexpected delays in commissioning the Calcasieu Project related to certain necessary repairs and replacements*.  As a result, we expect [the commercial operations date ("COD")] for the Calcasieu Project *to be later than originally* forecasted while significant work related to commissioning, carryover completions, rectification, and certain other items is being completed." S-1 at 47 (emphases added).

- At Calcasieu, "*[s]ignificant work* related to commissioning, carryover completions, rectification, including *remedying unexpected challenges* with equipment reliability identified during the first-time implementation of our innovative design and configuration, and reliability testing, *is ongoing*."  *Id.* at 108 (emphases added).

- At Plaquemines, "the costs to complete the Plaquemines Project *have increased in the past*…"  *Id.* at 194 (emphasis added). VG had invested *$2.35 billion* in additional equity to address "increases in estimated total project costs" resulting from, "among other things … *efforts to maintain the project schedule*"—i.e., to mitigate delays.  *Id.* at 45 (emphases added).

- As to all VG projects, "[o]ur cost estimates for LNG facilities … *have been, and continue to be, subject to* change due to many factors outside of our control.  Such factors include, among other things, … (vii) *unexpected delays in construction or commissioning*, and (viii) unexpected repair, replacement, rectification, or warranty work.  Such factors *have in the past resulted in* … delays in construction or commissioning, repair or warranty work, cost overruns, and/or change orders under or amendments to existing or future construction contracts."  *Id.* at 44-45 (emphases added).

VG also cautioned that it could experience similar issues in the future:

- "*[U]nexpected delays in construction or commissioning* … may in the future result in, among other things, delays in construction or commissioning, repair or warranty work, cost overruns, and/or change orders under or amendments to existing or future construction contracts."  *Id.* at 44-45 (emphasis added).

- "The costs to complete the Plaquemines Project … may increase further in the future, potentially materially, compared to our current estimates as a result of many factors."  *Id.* at 194.

- VG "may be required to make additional incremental equity contributions to the extent total project costs exceed the low-end of the range of estimated total project costs."  *Id.* at 45.

In addition, and as required by SEC rules for public stock offerings (Regulation S-X), VG provided extensive financial and business performance data, including VG's financial results for the past three years and through the third quarter of 2024. *See, e.g.*, *id.* at 103, 120, 144.  Regulation S-X did ***not*** require disclosure of financial data from the fourth quarter of 2024, which ended just 24 days before the IPO.  *See* 17 C.F.R. § 210.3-12(a), (g).

Finally, the Offering Documents included more than 12 pages of disclosures about arbitration proceedings between VG and all six of its long-term customers at the Calcasieu Project, including that "all such customers" had initiated arbitration proceedings concerning commissioning-related delays to COD, that if unsuccessful for VG, could require VG to pay "substantial [amounts], which could have a material adverse effect on [its] business" or "prospects," S-1 at 80; and "[i]f any of our customers were to successfully terminate . . . there can be no assurance we would be able to enter into new [long-term contracts] on a timely basis and on comparable or better terms," *id.*; *see also id.* at 13, 22, 28, 45, 79-80, 98, 228-29, F-10, F-19, F-44, F-58.

### C.    This Litigation

VG's stock price declined after the IPO and securities lawsuits were filed, first in the Southern District of New York, and then in the Eastern District of Virginia.  *See Bowes v. Venture Global, Inc., et al.*, No. 1:25-cv-01364 (S.D.N.Y. Feb. 17, 2025); *FirstFire Global Opportunities Fund, LLC v. Venture Global, Inc., et al.*, No. 1:25-cv-00633 (E.D. Va. Apr. 5, 2025).  Defendants successfully moved to transfer the proceedings to the SDNY, over Lead Plaintiff's opposition and efforts to keep these proceedings in the E.D. Va.  *See* ECF Nos. 26, 55.

The AC was filed on September 16, 2025 (and corrected on November 13, 2025).  It seeks to bring claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.  The AC fails to state a claim as a matter of law and should be dismissed.

## LEGAL STANDARDS

Section 11 requires a plaintiff to establish that a registration statement filed with the SEC (1) "'contained an untrue statement of a material fact,'" (2) "'omitted to state a material fact required [by law] to be stated therein,'" or (3) "'omitted to state a material fact . . . necessary to make the statements therein not misleading.'" *Morgan Stanley*, 592 F.3d at 359 (quoting 15 U.S.C. § 77k(a)).    For a statement to be actionable, the plaintiff must allege facts showing contemporaneous falsity, *i.e.*, that the registration statement contained a material misstatement "'when such part [of the registration statement] became effective.'" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 182 (2d Cir. 2014) (quoting 15 U.S.C. § 77k(a)); *see also In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 247 (S.D.N.Y. 2020) ("A violation of securities laws premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made.").    Section 12(a)(2) is similar to Section 11, and applies to alleged material misstatements or omissions in prospectuses and accompanying oral communications. *Morgan Stanley*, 592 F.3d at 359 (quoting 15 U.S.C. § 77l(a)(2)).

To plead these claims, a "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[L]egal conclusion[s] couched as [] factual allegation[s]" or "naked assertion[s]" devoid of "further factual enhancement" do not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007). "A court need not . . . accept as truth conflicting pleadings that . . . are contradicted by statements in . . . documents upon which [the] pleadings rely." *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 253 n.18 (S.D.N.Y. 2019) (quotation omitted).  Plaintiffs fail to meet these standards here.[2]

---

[2] The AC does not identify the particular statements it contends were misleading, relying instead on multi-paragraph block quotations of VG's statements with scattered bold and italic emphasis

## ARGUMENT

### I.    PLAINTIFFS FAIL TO PLEAD A MATERIALLY FALSE OR MISLEADING STATEMENT

#### A.    Category 1: VG's "Design One, Build Many" Approach

Plaintiffs contend that VG's statements about the benefits of its "design one, build many" approach were false or misleading because, they say, at the time of the IPO, VG was consistently experiencing: "project delays and increased project costs" due to the Company's failure to optimize construction and planning for each specific project location, "key contractors" making "critical errors that delayed construction and commissioning and increased project costs," and "efficiency losses" from VG's purported failure to consider feedback from subcontractors. ¶¶ 180, 182; *see also* ¶¶ 177-79, 181; App'x A.[3]  None of these allegations states a claim.

##### 1.    The AC Fails To Plead Contemporaneous Falsity

As an initial matter, the AC's allegations regarding VG's touting of its "design one, build many" approach mischaracterize the Offering Documents by suggesting that VG promised a process free from any and all operational issues, delays, and cost overruns. *See, e.g.*, ¶¶ 177-79, 181.  VG said no such thing.  Rather, as Plaintiffs acknowledge elsewhere, VG disclosed the advantages of its process "as ***compared*** with the traditional made-to-fit approach." ¶ 93; *see also* S-1 at 2-3 (emphasis added).  This comparative statement does not promise a flawless process.

---

added, but without identifying which part Plaintiffs contend are misleading. *See, e.g.*, ¶¶ 177-79, 181, 184-85, 187-88.  Defendants have done their best to discern the specific statements Plaintiffs challenge, and reserve their rights to address others on reply should Plaintiffs try to argue differently.

[3] A chart containing the alleged misstatements and corresponding categories from the AC can be found in **Appendix A.** *See Fogel v. Wal-Mart de MéxicoSAB de CV*, 2017 WL 751155, at *18 (S.D.N.Y. Feb. 27, 2017) (collecting cases accepting appendices that serve as "organizational tools").

Plaintiffs similarly quote a snippet of the Offering Documents as claiming "design one, build many" had "improv[ed] [VG's] execution, accelerat[ed] construction timelines, reduc[ed] costs, and expand[ed] production." ¶ 7 (emphases and alterations in original). But the full quoted passage actually describes the "design one, build many" as a means for applying "the *lessons we learn*" with "*the goal* of continuously improving our execution, accelerating construction timelines, reducing costs, and expanding production" S-1 at 2 (emphases added)—which is a very different statement. Plaintiffs do not assert that VG's statements about these "lessons" and "goals" were incorrect. Nor do they allege facts showing how the cost and timeline of VG's projects compared to traditional "stick-built" or "made-to-fit" projects were false. Plaintiffs simply set up a strawman that bears little relation to VG's actual disclosures. Such pleading tactics do not state a claim. *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 106 (2d Cir. 2013) (rejecting attempt to "isolate and construe a single element of [Defendant's] prospectuses" and finding that the challenged statements, "placed in context, would not [mislead] a reasonable investor").

Plaintiffs also contend that VG's statements about the potential benefits of "design one, build many" were false or misleading because unspecified "delays and operational issues" had occurred at VG's LNG plants. ¶¶ 5, 97. But none of these supposed delays establish that VG's descriptions of the status of its projects were inaccurate at the time of the IPO. *See Weight Watchers*, 504 F. Supp. 3d at 247. Plaintiffs ignore (and omit entirely from the AC) the Offering Documents' pages of disclosures about the delays and cost overruns at its projects—including the two projects in construction at the time of the IPO (Calcasieu and Plaquemines), such as:

- as to all projects, VG's "cost estimates. . . *have been* . . . *subject to change due to*," among other things, "*unexpected delays* in construction or commissioning," and "*unexpected repair, replacement, rectification, or warranty work*."

- VG "*experienced unexpected delays in commissioning the Calcasieu Project* related to certain necessary repairs and replacements,"

10

- commercial operations at the Calcasieu Project would be "***later than originally forecasted***,"

- the Calcasieu Project would "***be delayed*** while significant work related to commissioning, carryover completions, rectification, and certain other items [wa]s being completed,"

- "***[s]ignificant work*** related to commissioning, carryover completions, rectification, including ***remedying unexpected challenges*** with equipment reliability identified during the first-time implementation of our innovative design and configuration, and reliability testing, ***is ongoing***" at the Calcasieu Project, and

- VG experienced ***$2.35 billion in project cost*** increases related to "efforts to maintain the [Plaquemines] project schedule."

*See* S-1 at 39, 44, 45, 47 and 108 (emphases added).

"[P]rospectuses must be read as a whole." *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996). There is no question that VG's Offering Documents extensively disclosed that its projects, all built with the "design one, build many" approach, had experienced delays and cost overruns. A "[c]omplaint [is] insufficient as a matter of law" where the challenged filing includes the "disclosure of information alleged in the Complaint to have been withheld." *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *8 (S.D.N.Y. Jan. 14, 2010). Courts routinely dismiss Securities Act claims on this basis. *See, e.g., Olkey*, 98 F.3d at 6-9 (affirming dismissal of Sections 11 and 12(a)(2) claims where prospectus "unequivocally" disclosed allegedly omitted information); *ProShares*, 728 F.3d at 102 (same); *Rombach v. Chang*, 355 F.3d 164, 175 (2d Cir. 2004) (same); *Nguyen v. MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540, 547 (S.D.N.Y. 2017) (dismissing Sections 11 and 12(a)(2) claims where "disclosures put investors on clear notice" of the information allegedly omitted); *Rubinstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 297 (S.D.N.Y. 2020) (same). The same result is appropriate here.

## 2.    Allegations Attributed To Former Employees Add Nothing

Plaintiffs rely on 12 former employees ("FEs") to try to establish a claim, although even as alleged these FEs are a collection of individuals who—by period of employment and nature of the job—were not in a position to know anything about the statements in the Offering Documents. To survive dismissal, Plaintiffs must allege facts that "an alleged material misstatement was false at the time it was made." *See Weight Watchers*, 504 F. Supp. 3d at 247 (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812–13 (2d Cir. 1996)). "Put another way, without contemporaneous falsity, there can be no [claim]." *Id.*; *see also Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008) ("The allegations with regard to what [Defendant] knew, and when they knew it, lack the specificity and detail needed to rise above the "speculative" level and into the realm of a 'plausible' pleading.'"), *aff'd*, 347 F. App'x 617 (2d Cir. 2009).  Nothing about the FEs' allegations shows that VG's statements about the status of its projects, including those about delays and cost overruns, were materially false or misleading when made.

*First*, 10 of the 12 FEs had departed VG or its contractors by the time of the IPO, most having left months prior.[4]  Because these witnesses could not possibly speak to conditions that existed at the time of the IPO, their allegations should be disregarded.  *In re FuboTV Inc. Sec. Litig.*, 2023 WL 2711826, at *11 (S.D.N.Y. Mar. 30, 2023) (rejecting allegations of FEs that left company prior to class period); *In re Qudian Inc. Sec. Litig.*, 2019 WL 4735376, at *6 (S.D.N.Y. Sept. 27, 2019) (rejecting CW allegations that concerned an "earlier period"); *Marquez v. Bright*

---

[4] FE 1 left September 2024 (¶ 99), FE 2 left December 2024 (¶ 105), FE 3 left November 2024 (¶ 107), FE 4 left July 2024 (¶ 113), FE 6 left June 2024 (¶ 119), FE 8 left August 2024 (¶ 135); FE 9 left October 2024 (¶ 151), FE 10 left July 2024 (¶ 149), FE 11 left May 2024 (¶ 152), and FE 12 left February 2024 (¶ 161).

*Health Grp., Inc.*, 755 F. Supp. 3d 266, 278-80 (E.D.N.Y. 2024) (rejecting FE allegations regarding operational issues that existed "prior to the IPO").

*Second*, only half the FEs were ever VG employees; the rest worked for third-party contractors.[5]  Only one of the FEs actually worked at VG's corporate headquarters in Virginia, in the IT department; he left almost a full year before the IPO.  The rest worked at VG's project sites in Louisiana, in technical positions such as structural welding, engineering, process supervisor, and commissioning manager.  No FE claims to have prepared, contributed to, or had any involvement with VG's project timelines or budgets, or to have conversed directly with VG executives on any topic.  The only two FEs working on a VG project at the time of the IPO, FE 5 and FE 7, had limited scope roles on a single project and worked for third-party contractors, not VG.  ¶¶ 116, 126.  The AC offers no basis to conclude that they had knowledge beyond their specific roles about how VG as a whole (or even particular projects) was performing with respect to time and budget as of January 24, 2025.  A long line of authority in this District holds that statements from similarly situated individuals are insufficient to state a claim.[6]

*Third*, in light of VG's disclosure that its projects had experienced delays and cost overruns, the AC offers no basis to conclude that any of the FEs observed or can offer anything

---

[5] FEs 2, 3, 8, 10, 11, and 12 are alleged to have worked for VG, ¶¶ 105, 107, 135, 149, 152, 161, while FEs 1, 4, 5, 6, 7, and 9 are alleged to have worked for contractors, ¶¶ 99, 113, 116, 119, 126, 141.

[6] *See In re China Mobile Games & Ent. Grp., Ltd Sec. Litig.*, 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016) (allegation from CW who worked at "subsidiary, not the company itself" cannot show "contemporaneous falsity"); *In re Lehman Bros. Sec. & Erisa Litig.*, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) (discrediting allegations from "loan level underwriters, not managers or corporate officers who could have spoken to the company's practices broadly"); *see also Marquez*, 755 F. Supp. 3d at 280 (discrediting CW allegations because they "fall short of adequately pleading that [] operational problems were 'wide-spread' and 'well-known' by the June 2021 IPO").

inconsistent with VG's disclosures.  Indeed, the 10 of 12 FEs who departed before the IPO have provided no new information given that VG itself repeatedly disclosed that it encountered operational issues, delays, and cost overruns before the IPO.  *E.g.*, S-1 at 47, 194.  Likewise, FE 5 and FE 7 allege only that "Plaquemines had delays at least once a month," ¶ 117, and that "Plaquemines experienced major cost issues and project delays, stemming from vendor delays, equipment, machinery, parts, and others," ¶ 127.  *See Lehman,* 2013 WL 3989066, at *4 (CW allegations "insufficient to allege adequately that the offering documents contained misrepresentations" where they provide "no basis" to contradict the disclosures); *Weight Watchers*, 504 F. Supp. 3d at 252 (FEs "not compelling when viewed through the lens of [company's] multiple disclosures").

For these reasons, the FEs are inadequate as a matter of law to establish a claim.

### 3.    VG's Forward-Looking Or Opinion Statements Are Not Actionable

Certain of the Category 1 statements Plaintiffs challenge are inactionable forward-looking statements or opinions.  *See* App'x A.  Under the bespeaks caution doctrine, forward-looking statements are not actionable if they are "accompanied by . . . adequate cautionary language set out in the same offering."  *Rombach*, 355 F.3d at 173.  Several of the statements Plaintiffs challenge are plainly forward-looking.  *See* ¶ 181 ("***we plan*** to begin the commissioning start-up . . .") (emphasis added); ¶ 179 ("our two existing projects can provide our ***future projects*** with a source of interchangeable parts") (emphasis added); ¶ 177 ("[we] apply the lessons we learn at each project ***to our subsequent projects***, with the ***goal*** of continuously improving our execution") (emphasis added); *see also* ¶ 178.  These predictions about future projects were accompanied by extensive cautionary language, *see supra* Section I.A.1, and are therefore not actionable under the bespeaks caution doctrine.  *See Weight Watchers*, 504 F. Supp. 3d at 255 (S.D.N.Y. 2020) (dismissing Section 11 claims that "disclose the exact risk of which Plaintiffs complain");

*Rubinstein*, 457 F. Supp. 3d at 298 n.8 (S.D.N.Y. 2020) (same); *Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 309 (S.D.N.Y. 2000) (failure to disclose unsuccessful project bids "tempered by numerous specific risk disclosures about the potential pitfalls" in the business).

Likewise, several of the Category 1 statements are expressly framed as statements of opinions that are not actionable on these allegations. *See, e.g.*, ¶ 177 (VG "***believe[s]***" it will "continue to benefit from [the 'design one, build many approach'] as we grow"); ¶ 178 (VG "***believe[s]*** that [its] disruptive and innovative configuration and owner-led engineering, procurement and construction approach reduces our construction and installation costs, construction time and construction schedule risk"); *see also* ¶ 179.  As to these opinion statements, Plaintiffs must allege either (1) that VG did not honestly believe these statements at the time they were made, or that the statements contained an embedded untrue fact, or (2) "'particular (and material facts) going to the basis" for the opinions "'whose omission makes the opinion statement at issue misleading to a reasonable'" investor.  *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015)).

This showing "is no small task for an investor," *Tongue*, 816 F.3d at 210, and Plaintiffs do not make it here.  The AC contains only conclusory allegations that "any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made," ¶ 226, and that "none of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omission of any material facts and were not misleading," ¶ 228; *see also* ¶¶ 229-30, 237, 241-42, 246 (same).  Those are insufficient. *See In re Vroom, Inc. Sec. Litig.*, 2025 WL 862125, at *24 (S.D.N.Y. Mar. 18, 2025) (holding that

the complaint "pleads no facts suggesting that [defendant] subjectively disbelieved" his statements of opinion at the time they were made); *Barilli*, 389 F. Supp. 3d at 256 (holding that "Plaintiffs have offered no factual allegations" that would "support an inference that [company] did not actually believe the opinions, nor ha[ve] Plaintiffs shown that they were misleading."). The AC also alleges only that three of the Individual Defendants, *see* ¶ 37 (defining "Individual Defendants"), visited the Plaquemines project site "every other week" or "at least once a month", ¶¶ 159-60, 163, or that some non-defendant executives "received updates" from, or were very involved in, VG's projects, ¶¶ 110, 162, 165-66. But not one of these allegations indicates what was discussed in these meetings, much less how it purportedly undermines the basis for VG's opinions—*i.e.*, they say nothing about the "'inquiry [VG] did or did not conduct or the knowledge it did or did not have.'" *Barilli*, 389 F. Supp. 3d at 256 (quoting *Omnicare*, 575 U.S. at 176).

For these reasons, all claims related to the Category 1 statements must be dismissed.

**B.    Category 2: VG's 4Q24 Financial Information**

Plaintiffs next allege that "the Offering Documents were materially false and misleading because they failed to disclose critical financial information from" 4Q24, including concerning VG's costs for the Plaquemines Project. ¶ 10; *see also* ¶¶ 184-85, 187-88; App'x A. These claims fail as a matter of law.

**1.    The AC Fails To Plead Facts Establishing That VG's Financial Disclosures Were False Or Misleading**

VG's IPO occurred on January 24, 2025. ¶ 26. Plaintiffs' Category 2 theory is predicated on the notion that the Offering Documents should have included interim, unaudited 4Q24 financials even though that period ended just 24 days earlier, on December 31, 2024. ¶¶ 184-85, 187-88. That is not the law.

16

The relevant SEC disclosure regulation, Regulation S-X, is clear that, for IPOs occurring within 90 days of the end of a fiscal year, offering documents "***need not include*** financial statements more current than as of the end of the third fiscal quarter of the most recently completed fiscal year unless the audited financial statements for such fiscal year are available."  17 C.F.R. § 210.3-12(b), (g) (emphasis added).  Similarly, Regulation S-X only requires an issuer to provide more recent financial statements if those in the registration statement are more than 135 days old at the time of the IPO, which was not the case for VG.  17 C.F.R. § 210.3-12(a), (g).  VG simply was not required to disclose its 4Q24 financials in the Offering Documents and the AC does not allege that the 2024 audited financials were available as of the date of the IPO.  *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 36 (2d Cir. 2017) (noting that plaintiff "concedes, as he must, that [defendant] did not violate SEC Regulation S-X" by not disclosing financial statements for period immediately prior to IPO).

Plaintiffs also have not shown that not disclosing the 4Q24 information rendered some other statement materially misleading.  Plaintiffs' chief complaint is that VG's estimate of total costs to complete the Plaquemines Project increased from $22.5—$23.5 billion in the Offering Documents to $23.3—$23.8 billion in its 4Q24 financials.  ¶ 212.  But this increase—in which the new estimated range ***overlaps*** with the original estimated range—does not show that the estimates in the Offering Documents were false when presented, or even that it was "knowable" at the time of the IPO that the estimates would need to increase.  *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014) ("Plaintiffs must, at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering.") (quotation omitted).  Instead, it simply shows that ***later*** costs increased very slightly.  This cannot sufficiently plead falsity as a matter of law.  *See Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc.*, 715

F. Supp. 3d 483, 504-05 (S.D.N.Y. 2024) (finding that subsequent change to EBITDA projections did not mean earlier guidance was false when issued), *aff'd*, 2024 WL 4647131 (2d Cir. Nov. 1, 2024); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 300–01 (S.D.N.Y. 2021) (failed purchase obligation that led to 40% lower than expected revenue post-IPO did not show earlier guidance was false).

The same is true for Plaintiffs' allegations that the current costs for the Plaquemines Project increased from the $17.7 billion disclosed in the Offering Documents for 3Q24 to the $19.8 billion disclosed in the 4Q24 results or that VG's borrowing capacity correspondingly decreased during that same period.  ¶¶ 128, 186, 189.  VG disclosed that construction for the Plaquemines Project was ongoing, S-1 at 192-95, so the continued accumulation of costs and drawing down on loans (which is all Plaintiffs allege) is unremarkable, particularly here where the total cost even as of 4Q24 (*i.e.*, $19.8 billion) was well below the estimated total cost in the Offering Documents ($22.5 to $23.5 billion).  *Gen. Motors*, 46 F. Supp. 3d at 395 (company's statements need only be "consistent with reasonably available data" and "need not present an overly . . . cautio[us] picture of . . . future prospects").

### 2.    The Category 2 Forward-Looking Estimates Are Protected By The Bespeaks Caution Doctrine

In addition, as noted, under the bespeaks caution doctrine, forward-looking statements—like VG's estimate of total costs at completion at Plaquemines—are not actionable if they are accompanied by cautionary language.  *See* ¶¶ 184, 187-88; *Rombach*, 355 F.3d at 173.

Here, estimates of total costs for an ongoing project necessarily include an estimate of future costs and are, therefore, forward-looking statements.  *See* S-1 at 96 ("these forward-looking statements . . . include . . . estimates of the cost of our projects and schedule to construct and commission our projects"); *cf.* 15 U.S.C. § 77z-2(i)(1)(A) (defining forward-looking statement to

include "a statement containing a [financial] projection"). VG made extensive disclosures about the factors that could cause actual results to differ, potentially meaningfully. *See* S-1 at 45 ("The costs to achieve completion of the Plaquemines Project may be subject to ***further increases***, which could be material . . . .") (emphasis added). These statements are therefore inactionable. *See In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 292 (S.D.N.Y. 2009) ("prediction about [a project's] ultimate costs," characterized as an "estimate" protected by bespeaks caution doctrine); *Zirkin v. Quanta Capital Holdings, Ltd.*, 2009 WL 185940, at *10, 13 (S.D.N.Y. Jan. 23, 2009) ("loss estimate" protected by bespeaks caution doctrine, even though the estimate was later "revised [] upward").

### 3.    The Increased Estimates Were Not Material As A Matter of Law

Even if Plaintiffs could somehow show that the increase in estimated completion costs for the Plaquemines Project was known or knowable and should have been disclosed (which they cannot), and that they were not protected forward-looking statements (which they are), the claims based on increased costs would still fail because the increase was immaterial as a matter of law. *See* ¶¶ 184, 187-88.

The lower end of VG's 4Q24 estimate for the Plaquemines Project ($23.3 billion) was within the $22.5 to $23.5 billion range disclosed in the Offering Documents, and the upper end of VG's 4Q24 estimate ($23.8 billion) was $300 million higher than the top end of its previously disclosed range. The increase of $300 million was 1.2% of the total costs for this project and an even smaller percentage of VG's business as a whole, which reported $4.972 billion of revenue and $1.475 billion in net income during 2024. Ex. 2, Mar. 6, 2025 10-K at 116. This did not "significantly alter[] the 'total mix' of information made available in the public domain." *Stadnick*, 861 F.3d at 38. The Second Circuit has repeatedly held—on motions to dismiss—that variations of this magnitude are not material as a matter of law. *See id.* at 38-39 (finding "not material"

financial results for fiscal quarter prior to IPO that included a net loss of $28.6 million, missing analysts' expectations by 143%); *Tabak v. Canadian Solar Inc.*, 549 F. App'x 24, 27 (2d Cir. 2013) (finding "immaterial as a matter of law" challenged amounts of 2.7% of quarterly overall revenue and 0.9% of annual revenue); *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) (affirming dismissal and noting that a $2 billion revision "may sound staggering" but "must be placed in context" of defendant's "total assets of $715 billion").

C.    <u>Category 3</u>: **VG's Ability To Enter Long-Term Contracts**

Plaintiffs' final theory of falsity is that the Offering Documents "misrepresented [VG's] capacity to enter into stable, long-term contracting agreements and omitted the reputational harm [VG] had incurred by failing to meet its customers' expectations under existing long-term contracts." ¶ 13. Plaintiffs contend that because VG was engaged in arbitrations with certain of its existing customers, ¶¶ 130-58, 195, 199, and the CEO of a different company said (post-IPO) he would not enter a long-term contract with VG, ¶¶ 16, 195, 199, 200-04, VG's statements about its long-term contracts must all be false, ¶¶ 190-94, 196-98; *see also* App'x A. This also fails to support a claim.

*First*, Plaintiffs do not (and cannot) allege facts establishing that VG has ***actually*** had difficulty signing long-term contracts with new customers. The statement by the TotalEnergies' CEO adds nothing to the analysis. VG never stated or even suggested that TotalEnergies was, would be, or could even potentially be a long-term customer. *See Yaroni*, 600 F. Supp. 3d at 401 ("Plaintiff 'cannot base a Section 11 claim on implicit promises read into' the offering materials."). And one statement from one non-customer says nothing about whether there was any material decrease in the number of customers VG was signing. *See Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) (dismissing Section 11 claim premised on non-disclosure of

"customer withdrawals" where complaint "allege[d] no specific facts regarding the volume of customer withdrawals . . . at the time of the Secondary Offering"), *aff'd*, 347 F. App'x 665 (2d Cir. 2009); *Steinberg*, 88 F. Supp. 2d at 309 (dismissing Sections 11 and 12(a)(2) claims that company was "unable to gain . . . business from certain preferred vendor clients" where prospectus made "no representations" regarding future clients); *see also In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 591-92 (S.D.N.Y. 2007) (defendant not "obligat[ed] to disclose negative information about . . . customer dissatisfaction" where the complaint alleges only "[t]he discontent of one [customer]"). And although not necessary for resolving this motion, the public record—which Plaintiffs strategically omit from the AC—is clear: since the IPO, VG has announced multiple long-term contracts with new customers.[7]

*Second*, the FEs again add nothing to this analysis. The FEs on which Plaintiffs rely (FE 3, FE 8, FE 9, FE 10, and FE 11) with regard to these Category 3 statements, ¶¶ 136-37, 144, 146-147, 150, 153-56, were involved in various aspects of construction work, not sales or customer-facing operations, ¶¶ 107, 135, 141, 149, 152, and ***all*** left VG months—and in some cases more than a year—before the IPO, so they have no basis to allege any loss of goodwill or reputation at the time of the IPO. *See FuboTV*, 2023 WL 2711826, at *11; *Qudian*, 2019 WL 4735376, at *6; *Marquez*, 755 F. Supp. 3d at 278-80. Indeed, these FEs do little more than explain in general terms VG's sales of LNG on the "spot market," a fact that VG itself disclosed in the Offering Documents.

---

[7] *See, e.g.*, Ex. 3, Press Release, Venture Global Announces 20-Year Sales and Purchase Agreement with Petronas (July 3, 2025); Ex. 4, Press Release, Venture Global and SEFE Announce Expansion of LNG Partnership (July 9, 2025); Ex. 5, Press Release, Venture Global and Eni Announce 20-Year LNG Sales and Purchase Agreement (July 16, 2025); Ex. 6, Press Release, Venture Global Announces New Long-Term LNG Sales and Purchase Agreement With Greece (November 7, 2025); Ex. 7, Press Release, Venture Global Announces Long-term Sales and Purchase Agreement With Naturgy of Spain (November 10, 2025); Ex. 8, Press Release, Venture Global and Mitsui Announce 20-Year LNG Sales and Purchase Agreement (November 11, 2025).

*Compare, e.g.*, ¶ 136 (FE 8 alleging that VG's "goal was to trade LNG on the spot market") *and* ¶ 143 (FE 9 alleging that the Russia-Ukraine war "caused a spike in LNG pricing" that drove VG's spot market sales) *with* S-1 at 26 ("In particular, production capacity from our projects that is not otherwise committed can be sold on a short-, medium- or long-term basis, including on a spot basis, which can provide flexibility to optimize the pricing for such capacity and can help us balance profit, duration and risk").

*Third*, Plaintiffs' claim that the "Offering Documents misrepresented the risks of the disputes [VG] was having with its long-term contract counterparties" is unfounded. ¶ 198. The Offering Documents contained more than a dozen pages of disclosures explaining that "all such customers" were initiating disputes in arbitration proceedings that if unsuccessful for VG, could require VG to pay "substantial [amounts], which could have a material adverse effect on [its] business" or "prospects," S-1 at 80; and "[i]f any of our customers were to successfully terminate . . . there can be no assurance we would be able to enter into new [long-term contracts] on a timely basis and on comparable or better terms," *id.*; *see also id.* at 13, 28, 45, 78-80, 98, 228-29, F-10, F-19, F-44, F-58 (additional disclosures). The AC never explains how, if at all, the "risks of the disputes" were different from what VG disclosed. Accordingly, this cannot serve as the basis for any claim. *ProShares*, 728 F.3d at 102 ("the relevant prospectuses adequately warned the reasonable investor of the allegedly omitted risks"); *Yaroni*, 600 F. Supp. 3d at 398-99 (Section 11 claims "fail as a matter of law because [company] disclosed the risk at issue").

*Fourth*, several of the Category 3 statements are also inactionable forward-looking and opinion statements. The forward-looking statements were accompanied by cautionary language

concerning the very topics Plaintiffs contend were omitted.[8]  As a result, statements like "[w]e **anticipate** that our business model **will provide** us with stable cash flows as a result of our long-term take-or-pay contracts to sell LNG," ¶ 190 (emphasis added), and "[w]e **expect** the majority of the Company's nameplate liquefaction capacity produced after an LNG project reaches commercial operations **will be sold** under long term 20-year SPAs," ¶ 191 (emphasis added); *see also* ¶¶ 192, 196-98, are not actionable as a matter of law pursuant to the bespeaks caution doctrine. *See Rombach,* 355 F.3d at 173; *Zirkin,* 2009 WL 185940, at *10, 13.  Additionally, statements that VG "believe[d]" that customer assertions regarding the post-COD SPA disputes are "unsubstantiated," ¶ 198; *see* ¶ 190, are inactionable because they are opinion statements, and Plaintiffs "plead[] no facts suggesting that [VG] subjectively disbelieved" its opinions at the time they were made.  *Vroom,* 2025 WL 862125, at *24; *Barilli,* 389 F. Supp. 3d at 256.  The AC fails to plead any actionable misstatement or omission.

### D.    The AC Fails To Allege A Violation Of Item 303 Or Item 105

Plaintiffs make a passing reference to Items 303 and 105 of SEC Regulation S-K, without actually alleging a violation of these Regulations.  ¶¶ 173-74.  There is no such violation.  Item 303 requires registrants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011) (quoting 17 C.F.R. § 229.303(a)(3)(ii)).  Item 105 requires a "discussion

---

[8] *See* S-1 at 96-99 (listing as risks "the potential that counterparties in certain of [VG's] contractual arrangements . . . may exercise their existing termination rights"; VG's "potential inability to enter into post-COD SPAs with customers for, or to otherwise sell, an adequate portion of the total expected nameplate capacity" at future projects; and VG's "current and potential involvement in disputes and legal proceedings, including the arbitrations and other proceedings currently pending against" it and the possibility of a negative outcome and the potential impact thereof on VG's "results of operations, liquidity and . . . existing contracts").

of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a).  Even if Plaintiffs had tried to allege a violation of Items 303 or 105 (they have not), the AC fails to plead the facts needed to support such claims.

An Item 303 claim would fail for the reasons discussed above:  (1) Plaintiffs have not shown that any of the alleged conditions (*i.e.*, delays, cost overruns, or customer challenges) existed at the time of the IPO, and (2) VG disclosed the information that Plaintiffs allege was omitted.  *See, supra*, Section I.A-C; *Lowinger v. Pzena Inv. Mgmt., Inc.*, 341 F. App'x 717, 720 (2d Cir. 2009) (dismissing Item 303 claim where the "prospectus fulfilled this obligation by disclosing" the claimed adverse trend and "warning that this development could be expected"); *Gen. Motors*, 46 F. Supp. 3d at 397 (no Item 303 violation where "GM had disclosed its increasing inventories and relatively slower growth in sales" and did not need to characterize this as a "trend").  Moreover, Plaintiffs cannot premise an Item 303 claim on the absence of the in-process 4Q24 financials because a single quarter's worth of financial information cannot constitute a known trend as a matter of law.  *See Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 368 (S.D.N.Y. 2019) ("[T]hese alleged effects on a single quarter's revenues do not constitute 'trends' under Item 303."), *aff'd*, 826 F. App'x 111 (2d Cir. 2020); *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 245 (S.D.N.Y. 2015) ("The two- and five-month periods preceding defendants' public filings were insufficient to establish a reportable trend in device performance . . . ."), *aff'd*, 660 F. App'x 23 (2d Cir. 2016).

Likewise, Plaintiffs' assertions about a single potential customer, TotalEnergies, who declined to contract with VG on a long-term basis, ¶ 200, fall far short of establishing a known trend under Item 303.  *See In re Noah Educ. Holdings, Ltd. Sec. Litig.*, 2010 WL 1372709, at *6 (S.D.N.Y. Mar. 31, 2010) ("Item 303 does not require companies to disclose isolated occurrences

that affect their financial performance."). Any claim based on Item 105 fails for similar reasons. *See Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619 n.4 (S.D.N.Y. 2021) (dismissing Item 105 claim premised on the "same facts underlying [the] [I]tem 303 violation").

## II. THE AC MAKES CLEAR THAT THE ALLEGED MISREPRESENTATIONS AND OMISSIONS DID NOT CAUSE PLAINTIFFS' LOSSES

Although "plaintiffs bringing claims under [S]ections 11 and 12(a)(2) need not allege . . . loss causation" (*i.e.*, that the alleged misstatements or omissions caused their losses), *Morgan Stanley*, 592. F.3d. at 359, the absence of causation is fatal to these claims, *State St. Bank*, 774 F. Supp. 2d at 588. This absence, known as "negative causation," may be the basis for dismissal even on a motion to dismiss where "it is apparent ***on the face of the complaint*** that the alleged loss is not causally connected to the [alleged] misrepresentations at issue." *Id.* (dismissing Sections 11 and 12(a)(2) claims based on facial absence of loss causation) (emphasis added). Here, Plaintiffs themselves pled that the stock price declines were due to things ***other than*** correction of the relevant statements. In particular, Plaintiffs contend that two post-IPO events caused the declines in VG's stock price: (1) a February 5, 2025 news article quoting the TotalEnergies' CEO saying that he would not enter into a long-term contract with VG, and (2) VG's March 6, 2025 disclosure of "Q4 2024 earnings that were well below consensus" estimates. ¶¶ 200, 209. But neither of these corrects any statement in the earlier Offering Documents.

As to the February 2025 news article, the Offering Documents did not state, or even suggest, that TotalEnergies was or might become a long-term customer. The stock price decline that Plaintiffs say was caused by the TotalEnergies CEO's comments therefore was unrelated to any alleged misstatement or omission in the Offering Documents.

Likewise, VG's 4Q24 financials did not (for the reasons explained above) show that any earlier financials were false and Plaintiffs themselves allege that the March 2025 stock decline was

because VG announced results below "street consensus" and market analysts' "expectations." ¶¶ 12, 17, 209, 216. A "failure to meet earnings forecasts has a *negative* effect on stock prices, but not a *corrective* effect." *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (emphasis in original). And, absent a corrective effect, there is no causal link between the alleged misstatements and the stock price decline.

Indeed, courts in this District routinely dismiss Securities Act claims where, as here, it is plain on the face of the complaint that the claimed loss was caused by factors other than the statements at issue. *See, e.g.*, *id.*; *Boluka Garment Co., Ltd. v. Canaan Inc.*, 547 F. Supp. 3d 439, 447 (S.D.N.Y. 2021) (dismissing Section 11 claim where disclosure alleged to have caused stock price decline did not discuss the facts plaintiff alleged were omitted from the registration statement); *In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 2011 WL 4444206, at *6-8 (S.D.N.Y. Sept. 23, 2011) (dismissing Section 11 claim where "it is apparent from the face of the complaint" that the "corrective disclosures" did not "reveal[] facts concealed by the[] misstatements during the relevant time period"). The same result is warranted here.

## III.    PLAINTIFFS HAVE FAILED TO PLEAD A SECTION 15 CLAIM

Section 15 creates secondary liability for persons who control any person liable under Sections 11 and 12(a)(2). *See* 15 U.S.C. § 77o. Here, because Plaintiffs fail to plead primary violations of the Securities Act, Plaintiffs' Section 15 claims must also be dismissed. *Gen. Motors*, 46 F. Supp. 3d at 398.

## CONCLUSION

For the foregoing reasons, Defendants request that the Court dismiss the Corrected Amended Complaint with prejudice.

Dated: November 14, 2025
    New York, New York

Respectfully submitted,

**LATHAM & WATKINS LLP**

*/s/ Jeff G. Hammel*
Jeff G. Hammel
Jason C. Hegt
Corey A. Calabrese
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
jeff.hammel@lw.com
jason.hegt@lw.com
corey.calabrese@lw.com

*Attorneys for Venture Global, Inc., Michael Sabel,
Robert Pender, Jonathan Thayer, Sarah Blake,
Sari Granat, Andrew Orekar, Thomas J. Reid,
Jimmy Staton, Roderick Christie, and Venture
Global Partners, II, LLC*

**GIBSON, DUNN & CRUTCHER LLP**

*/s/ Lissa M. Percopo*
Robert F. Serio[9]
Mary Beth Maloney
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
rserio@gibsondunn.com
mmaloney@gibsondunn.com

Lissa M. Percopo (admitted *pro hac vice*)
1700 M Street, N.W.
Washington, D.C. 20036-4504
Telephone: (202) 955-8500
lpercopo@gibsondunn.com

*Attorneys for Defendants Goldman Sachs & Co.
LLC, J.P. Morgan Securities LLC, BofA Securities,
Inc., ING Financial Markets LLC, RBC Capital
Markets, LLC, Scotia Capital (USA) Inc., Mizuho
Securities USA LLC, Santander US Capital*

---

[9] Electronic signatures are used with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

*Markets LLC, SMBC Nikko Securities America, Inc., MUFG Securities Americas Inc., BBVA Securities Inc., Loop Capital Markets LLC, Natixis Securities Americas LLC, Deutsche Bank Securities Inc., Wells Fargo Securities, LLC, Truist Securities, Inc., National Bank of Canada Financial Inc., Raymond James & Associates, Inc., Regions Securities LLC, Guggenheim Securities, LLC, and Tuohy Brothers Investment Research, Inc.*

## CERTIFICATE OF WORD COUNT

I, Jeff G. Hammel, an attorney duly admitted to practice before this Court hereby certify that pursuant to Local Rules 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules") and Rule 3.C. of Judge Jennifer Rochon's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 8,698 words in accordance with the Local Rules. In making this calculation, I have relied on the word and page counts of the word-processing system used to prepare the document.

Dated: November 14, 2025                        */s/ Jeff G. Hammel*
                                                 Jeff G. Hammel