*FirstFire Global Opportunities Fund LLC v. Venture Global, Inc. et al.*,
Civil Action No.: 1:25-cv-04642-JLR

**APPENDIX A**

**ALLEGED MISSTATEMENTS IN PLAINTIFF'S CORRECTED AMENDED CLASS ACTION COMPLAINT[1]**

| No. | Challenged Statement(s)[2] | AC ¶ & Source[3] | Category of Statement[4] | Reason(s) Not Actionable |
|---|---|---|---|---|
| 1. | The traditional approach to developing large-scale LNG facilities involves very large, highly customized, stick-built projects consisting of two to three liquefaction trains that are constructed almost entirely onsite by vast workforces. In addition, many of these large stick-built projects are built in remote locations far from concentrated sources of experienced construction workforces, adding to their execution risks. Using this traditional approach, construction can last well over five years and in some cases has lasted nearly a decade.<br><br>***In contrast, our project development and construction approach utilizes proven liquefaction system technology and equipment in a unique mid-scale, factory-fabricated configuration that we developed. Instead of two or three large, complex liquefaction trains, the Calcasieu*** | ¶ 177<br><br>S-1 at 176 | Category 1 – Operational Delay Statements | • Not false or misleading. § I.A.1.<br><br>• Forward Looking § I.A.3. |

---

[1] The statements and sources above are drawn from Plaintiffs' Corrected Amended Class Action Complaint, filed November 13, 2025. *See* ECF No. 89 (the "AC"). Section references are to the "Argument" in the Memorandum of Law in Support of Defendants' Motion to Dismiss the AC.

[2] Text that has been bolded and italicized copies the emphasis given to the language in the AC. Red text denotes surrounding context that is omitted from the AC. Bracketed text in the Challenged Statement(s) column copies the brackets that appear in the AC.

[3] "S-1" refers to the Form S-1 Registration Statement that Venture Global, Inc. filed with the U.S. Securities and Exchange Commission on January 22, 2025 and is attached as Ex. 1 to the Declaration of Jason C. Hegt.

[4] **Category 1**: Alleged misstatements or omissions regarding "operational issues and delays affecting Venture Global's operating plants," ¶¶ 4, 170; **Category 2**: Alleged misstatements or omissions regarding "Venture Global's expenditures, costs, and financial results for Q4 2024," *id.*; **Category 3**: Alleged misstatements or omissions regarding "Venture Global's evasion of contractual counter-party expectations and the resulting harm to the Company's business and reputation." *id.*

| No. | Challenged Statement(s)[2] | AC ¶ & Source[3] | Category of Statement[4] | Reason(s) Not Actionable |
|---|---|---|---|---|
| | *Project and the Plaquemines Project utilize 18 and 36 mid-scale factory-fabricated liquefaction trains, respectively…. Our modules are built and assembled off-site at manufacturing and fabrication facilities in Italy and then shipped to our project sites fully-assembled and packaged for installation, allowing onsite work to progress in parallel.* We believe our innovative configuration, long-term equipment contracting strategy and hands-on project management approach significantly reduces construction and installation costs, as well as construction time and schedule risk, thereby allowing us to be more cost-competitive in the LNG market while also producing substantial amounts of commissioning cargos and related cash proceeds.  For example, our initial two projects, the Calcasieu Project and the Plaquemines Project, in each case, began producing LNG approximately two and a half years after its final investment decision, while significant construction work remained ongoing. The chart below illustrates the length of time the Calcasieu Project and the Plaquemines Project took to achieve first production of LNG after achieving FID relative to other projects that also achieved FID substantially contemporaneously.<br><br>*While traditional LNG projects often rely on bespoke designs and configurations, our approach, leveraging factory-fabricated equipment manufactured with our "design one, build many" method, allows us to apply the lessons we learn at each project to our subsequent projects, with the goal of continuously improving our execution, accelerating construction timelines, reducing costs, and expanding production. We believe we will continue to benefit from this virtuous cycle as we grow.* | | | • Opinion. § I.A.3. |
| 2. | **Accelerated construction schedule and low-cost LNG model:** We believe that our disruptive and innovative configuration and owner-led engineering, procurement and construction approach reduces our construction and installation costs, construction time and construction schedule risk, thereby reducing overall project costs and enabling us to produce and sell LNG on an accelerated basis to our customers, as a result of the following:<br><br>*          *          * | ¶ 178<br><br>S-1 at 179-80 | Category 1 – Operational Delay Statements | • Not false or misleading. § I.A.1.<br><br>• Forward Looking § I.A.3. |

| No. | Challenged Statement(s)[2] | AC ¶ & Source[3] | Category of Statement[4] | Reason(s) Not Actionable |
|---|---|---|---|---|
| | **Construction and installation execution**. Manufacturing our mid-scale, factory-fabricated liquefaction trains, power equipment, gas pre-treatment modules and pipe racks off-site at fabrication facilities allows site works to progress in parallel. ***Our liquefaction trains and pre-treatment modules are tested and delivered ready to install, reducing on-site labor and potential weather risk while shortening construction timelines and improving overall project safety. Fabrication and installation efficiencies are achieved as the various trains, equipment, and modules are installed on-site and commence production incrementally. Using our "design one, build many" approach, lessons learned from construction, installation, and commissioning work at the Calcasieu Project are being carried over to the Plaquemines Project and our subsequent projects.*** <br><br> ***Further, using our owner-led development model, we actively manage the construction activity and the schedule for certain scopes of work undertaken by our key contractors.*** In addition, we have built an internal EPCM capability, securing a team of experienced leaders and professionals from the EPC industry, primarily with prior relevant experience constructing the Calcasieu Project and the Plaquemines Project facilities. | | | • Opinion. § I.A.3. |
| 3. | We design our facilities to incorporate supplemental capacity throughout the facility to safeguard the availability of our mid-scale train configuration with a goal of achieving high levels of redundancy and flexibility, which we believe will increase our availability and production. For example, redundancy is present in our gas pre-treatment systems, as each pre-treatment unit is designed to meet approximately 50% of our production requirements – for every 10 mtpa of nameplate capacity, we have approximately 15 mtpa of pre-treatment capacity. Further, we build enough 200,000 m3 LNG storage tanks at each of our projects to service up to 150% of its nameplate capacity. We combine this redundancy with interoperability that allows us to load LNG from any individual liquefaction train into any LNG storage tank for the relevant facility. Each tank in turn can load a cargo via any jetty. Once complete, we believe this equipment and our "design-one, build-many" facility design has the potential to provide greater operational redundancy and availability, reducing planned and unplanned downtime and enabling us more to reliably deliver LNG to our customers, and | ¶ 179 <br><br> S-1 at 185 | Category 1 – Operational Delay Statements | • Not false or misleading. § I.A.1. <br><br> • Forward Looking § I.A.3. <br><br> • Opinion. § I.A.3. |

| No. | Challenged Statement(s)[2] | AC ¶ & Source[3] | Category of Statement[4] | Reason(s) Not Actionable |
|---|---|---|---|---|
| | to increase production from our existing equipment. *The benefits of our "design one, build many" approach extend further, as our two existing projects can provide our future projects with a source of interchangeable parts and a venue to train personnel on identical equipment. The ability to pool resources across our projects will increase our operating leverage and may augment our earnings through reduced fixed and variable operating expenses.* | | | |
| 4. | *The phased commissioning start-up of our projects will subject us to additional risks.*<br><br>The unique configuration of our LNG projects necessitates a phased commissioning start-up process for each of our projects (and phases thereof) that will generally result in a longer commissioning process. The length of any commissioning process depends on a number of factors related to equipment performance and the ability to establish reliable and safe operations for that equipment and the facility as a whole. Our ability to generate proceeds from sales of commissioning cargos is subject to significant uncertainty and volatility in such proceeds. Historical proceeds from such sales at the Calcasieu Project, which has had an extended commissioning period due to unanticipated challenges with equipment reliability that we are in the process of remediating, may not be indicative of the duration of the commissioning period or the amount of the proceeds for any future period or for any of our other projects".  For example, once we have sufficient power to operate the first pre-treatment unit, and the first LNG storage tank and first gas pre-treatment unit have been installed for a particular project, we plan to begin the commissioning start-up of the relevant equipment on a phased basis. *This sequential commissioning of the liquefaction blocks, power island system, pre-treatment system, and other equipment for a project is subject to several risks, some of which may be unknown to us.*<br><br>For example, the simultaneous construction of a particular LNG facility and production of LNG at that facility could subject us and our third-party contractors to additional safety hazards, as well as additional costs related to the management of those safety hazards during the phased commissioning start-up of a facility. To successfully implement our phased commissioning start-up, our EPC contractors will be required to develop and implement a safe | ¶ 181<br><br>S-1 at 52 | Category 1 – Operational Delay Statements | • Not false or misleading. § I.A.1.<br><br>• Forward Looking § I.A.3. |

| No. | Challenged Statement(s)[2] | AC ¶ & Source[3] | Category of Statement[4] | Reason(s) Not Actionable |
|---|---|---|---|---|
| | work plan. Furthermore, we will require additional regulatory approvals from FERC, including approval of our EPC contractor's safe work plan, in order to implement our phased commissioning start-up at a facility before construction has been completed. ***Any delays in implementing any of the measures required for the phased start-up of our facilities or in obtaining any necessary regulatory approvals, and any additional costs associated with the phased start-up of our facilities, could have a material adverse effect on our business, contracts, financial condition, operating results, cash flow, financing requirements, liquidity, prospects and the price of our Class A common stock.*** | | | |
| 5. | *We currently estimate that the total project costs for the Plaquemines Project will be approximately $22.5 billion to $23.5 billion, including EPC contractor profit and contingency, owners' costs and financing costs, of which approximately $17.7 billion had been paid for as of September 30, 2024. As of September 30, 2024, we have additional available borrowing capacity of $2.6 billion under the Plaquemines Construction Term Loan. In addition, as of September 30, 2024, we estimate that the total project cost for the CP2 Project, the CP3 Project and the Delta Project will range from approximately $27 billion to $28 billion, $44 billion to $45 billion and $37 billion to $38 billion, respectively,* in each case including EPC contractor profit and contingency, owners' costs and financing costs, substantially all of which have not yet been funded. *These estimates are based primarily upon our construction cost experiences with the Calcasieu Project and the Plaquemines Projec*t and the pricing included in the CP2 Phase 1 EPC Contract, and reflect the current inflationary environment as well as the fact that the pipelines for the CP2 Project, the CP3 Project and the Delta Project are expected to be longer and more expensive than the pipelines for the Calcasieu Project and the Plaquemines Project. <span style="color:red">The CP3 Project and the Delta Project are also expected to be larger in scale than our first three projects, with expected nameplate capacity of 30.0 mtpa and 24.4 mtpa, respectively.</span> | ¶ 184 S-1 at 37-38 | Category 2 – Q4 Financials Statements | • Not false or misleading. § I.B.1. • Forward-looking. § I.B.2. |
| 6. | <span style="color:red">Although designed to be twice as large as the Calcasieu Project on a nameplate basis, the Plaquemines Project utilizes a similar project configuration and development approach to the Calcasieu Project. In contrast to traditional LNG facilities that are constructed by a single EPC</span> | ¶ 185 | Category 2 – Q4 | • Not false or misleading. § I.B.1. |

| No. | Challenged Statement(s)[2] | AC ¶ & Source[3] | Category of Statement[4] | Reason(s) Not Actionable |
|---|---|---|---|---|
| | contractor and include substantially fewer, larger-size liquefaction trains, our project design and configuration utilizes pioneering, mid-scale, factory made liquefaction trains and other discrete systems and equipment, which require an extended commissioning period. Given this longer and gradual commissioning period, which starts with addressing identified operational deficiencies, testing individual components and eventually extends to encompass testing and tuning our entire fully-integrated facilities, we expect to produce a substantial number of commissioning cargos. This production occurs during the period in which additional components of the relevant phase are brought into operation, completed and tested (including, if necessary, performing completion and rectification work to address unexpected performance deficiencies), to ensure the project is completed and achieves the performance levels necessary for stable, reliable long-term operations to supply LNG under the project's post-COD SPAs. *In December 2024, we began to produce LNG at the Plaquemines Project and announced the successful loading and departure of our first commissioning cargo.* | S-1 at 194 | Financials Statements | |
| 7. | *Our cost estimates for LNG facilities, related equipment and components, natural gas pipelines, LNG tankers, and other natural gas liquefaction and export facilities have been, and continue to be, subject to change due to many factors outside of our control. Such factors include, among other things*, (i) inflationary factors, (ii) changes in commodity prices (particularly nickel and steel), (iii) escalating labor costs, (iv) supply chain availability, including the availability of critical components and increased costs to locate and procure alternatives, (v) labor disputes, (vi) tariffs, (vii) unexpected delays in construction or commissioning, and *(viii) unexpected repair, replacement, rectification, or warranty work. Such factors have in the past resulted in, and may in the future result in, among other things, delays in construction or commissioning, repair or warranty work, cost overruns, and/or change orders under or amendments to existing or future construction contracts.* Further, we may decide or be forced to enter into amendments to construction and/or supply contracts or submit change orders to the applicable contractor that could result in longer construction periods, higher costs or both. *We may also decide or be forced to expend additional funds in order to maintain construction schedules, complete construction and commissioning, or comply with existing or future environmental or other regulations.* Additionally, our estimated costs for our projects do not include estimated costs for any | ¶ 187 S-1 at 44-46 | Category 2 – Q4 Financials Statements | • Not false or misleading. § I.B.1. • Forward-looking. § I.B.2. |

A-6

| No. | Challenged Statement(s)[2] | AC ¶ & Source[3] | Category of Statement[4] | Reason(s) Not Actionable |
|---|---|---|---|---|
| | potential bolt-on expansion opportunities that we may pursue in the future. *As a result, costs to achieve completion of LNG facilities, related equipment and components, natural gas pipelines, LNG tankers, and other natural gas liquefaction and export facilities may be higher, potentially materially, than our cost estimates. In the event we experience any such increases in estimated costs, delays or both, the amount of funding needed to complete an LNG facility, a phase thereof, related equipment and components, natural gas pipelines, LNG tankers, and other natural gas liquefaction and export facilities, could exceed our available funds and result in our failure to complete such projects or assets and thereby negatively impact our business and limit our growth prospects.*<br><br>*        *        *<br><br>We currently estimate that the total project costs for the Plaquemines Project will be approximately $22.5 billion to $23.5 billion, including EPC contractor profit and contingency, owners' costs and financing costs, of which approximately $17.7 billion had been paid for as of September 30, 2024. This estimate is based in part on the target cost determined pursuant to the Plaquemines EPC Contracts and reflects increases related to, among other things, inflationary factors and efforts to maintain the project schedule while also reserving additional contingency funds (without giving effect to any commissioning cargo proceeds that may be utilized for project costs). Since FID of Phase 2 of the Plaquemines Project, VGLNG has made several incremental equity contributions to VGPL in an aggregate amount equal to $2.35 billion to address such increases in estimated total project costs, and we may be required to make additional incremental equity contributions to the extent total project costs exceed the low-end of the range of estimated total project costs above and that such costs exceed the available project-level debt and equity financing and net proceeds from the sale of commissioning cargos. Pursuant to the Plaquemines Credit Facilities, if such contributions have been utilized to pay project costs for the Plaquemines Project, they are reimbursable by VGPL to VGLNG at our election upon satisfaction of certain conditions under the Plaquemines Construction Term Loan. *The costs to achieve completion of the Plaquemines Project may be subject to further increases, which could be material, as a result of many factors outside of our control as described above. As a result, we may need to make* | | | |

| No. | Challenged Statement(s)[2] | AC ¶ & Source[3] | Category of Statement[4] | Reason(s) Not Actionable |
|---|---|---|---|---|
| | *additional equity contributions or raise additional project-level equity financing or debt financing in the future to fund any such increase in estimated total project costs that exceed our current contingency, and any such additional contributions or funding could be significant.*<br><br>\*    \*    \*<br><br>Our cost estimates with respect to any LNG facilities, related equipment and components, natural gas pipelines, LNG tankers, regasification facilities and other natural gas liquefaction and export facilities (including any expansion of an existing facility) we may decide to develop in the future would be subject to similar uncertainties and potential changes. For example, our cost estimates may continue to increase as we negotiate and finalize agreements with contractors for any such project. *Any increases in the construction costs for any of our projects could have a material adverse effect on our business, contracts, financial condition, operating results, cash flow, financing requirements, liquidity, prospects and the price of our Class A common stock.* | | | |
| 8. | *We will require significant additional capital to construct and complete certain of our projects, and we may not be able to secure such financing on time with acceptable terms, or at all, which could cause delays in our construction, lead to inadequate liquidity and increase overall costs.*<br><br>We are in the process of commissioning the Calcasieu Project, constructing and commissioning the Plaquemines Project and developing the CP2 Project, the CP3 Project and the Delta Project. An amount expected to be necessary to complete the Calcasieu Project and achieve COD for the Calcasieu Project is held in cash reserve accounts pursuant to our project financing arrangements and reflected as restricted in our financial statements. While we believe we have sufficient project-level cash, borrowing capacity under our existing project-level debt financing, and access to substantial commissioning cargo proceeds to fund the completion of the Plaquemines Project based on our current estimate of the total project costs, the CP2 Project, the CP3 Project and the Delta Project, as well as any future projects we develop, will require significant additional funding. | ¶ 188<br><br>S-1 at 37-39 | Category 2 – Q4<br><br>Financials Statements | • Not false or misleading. § I.B.1.<br><br>• Forward-looking. § I.B.2. |

| No. | Challenged Statement(s)[2] | AC ¶ & Source[3] | Category of Statement[4] | Reason(s) Not Actionable |
|---|---|---|---|---|
| | We currently estimate that the total project costs for the Plaquemines Project will be approximately $22.5 billion to $23.5 billion, including EPC contractor profit and contingency, owners' costs and financing costs, of which approximately $17.7 billion had been paid for as of September 30, 2024. As of September 30, 2024, we have additional available borrowing capacity of $2.6 billion under the Plaquemines Construction Term Loan. In addition, as of September 30, 2024, we estimate that the total project cost for the CP2 Project, the CP3 Project and the Delta Project will range from approximately $27 billion to $28 billion, $44 billion to $45 billion and $37 billion to $38 billion, respectively, in each case including EPC contractor profit and contingency, owners' costs and financing costs, substantially all of which have not yet been funded. These estimates are based primarily upon our construction cost experiences with the Calcasieu Project and the Plaquemines Project and the pricing included in the CP2 Phase 1 EPC Contract, and reflect the current inflationary environment as well as the fact that the pipelines for the CP2 Project, the CP3 Project and the Delta Project are expected to be longer and more expensive than the pipelines for the Calcasieu Project and the Plaquemines Project. The CP3 Project and the Delta Project are also expected to be larger in scale than our first three projects, with expected nameplate capacity of 30.0 mtpa and 24.4 mtpa, respectively.<br><br>*    *    *<br><br>Moreover, no substantial construction work has been undertaken on either the CP3 Project or the Delta Project to date, we have not yet entered into a number of material contracts (including an EPC contract for Phase 2 of the CP2 Project, or any portion of the CP3 Project or the Delta Project) for the CP2 Project, the CP3 Project or the Delta Project, and our actual costs could vary significantly from our preliminary estimates depending on the terms we may agree to for those contracts. There is no guarantee that we will be able to enter into the necessary contracts to construct the CP2 Project, the CP3 Project, the Delta Project, or any other natural gas liquefaction and export facility we may decide to develop in the future, on the same or substantially similar terms as the Calcasieu EPC Contract, the Plaquemines EPC Contracts or the CP2 Phase 1 EPC Contract. As a result, our cost estimates are only an | | | |

A-9

| No. | Challenged Statement(s)[2] | AC ¶ & Source[3] | Category of Statement[4] | Reason(s) Not Actionable |
|---|---|---|---|---|
| | <span style="color:red">approximation of the actual costs of construction and financing for the CP2 Project, the CP3 Project and the Delta Project. Our actual project costs may be higher, potentially materially, compared to our current estimates as a result of many factors as described under "—Our estimated costs for our projects have been, and continue to be, subject to change due to various factors."</span> *For example, our cost estimates might change due to factors such as unexpected delays in the construction or commissioning of our projects, the execution of any repair or warranty work and change orders or amendments to certain material construction contracts, including final terms of or amendments to any EPC contract for such projects, and/or other construction or supply contracts. Accordingly, we will need to obtain significant additional funding from one or more sources of debt and equity financing before we are able to generate sales and/or revenue for our projects, other than the Calcasieu Project, and, based upon current estimates, the Plaquemines Project.*<br><br>\* \* \*<br><br>*Delays in the construction of our projects beyond the estimated development period, issues with the commissioning process leading to additional repair and replacement work, as well as change orders to certain material construction contracts and/or other construction or supply contracts, could increase the cost of completion beyond the amounts that we estimate and beyond the then-available proceeds from sales of commissioning cargos we expect to receive, which could require us to obtain additional sources of financing to fund our operations until our projects are fully completed (which could cause further delays).* For example, we have experienced unexpected delays in commissioning the Calcasieu Project related to certain necessary repairs and replacements. As a result, we expect COD for the Calcasieu Project to be delayed while significant work related to commissioning, carryover completions, rectification, and certain other items is being completed, and we are currently targeting a COD for the Calcasieu Project in May 2025. Further, while we are generating commissioning cargo proceeds at the Calcasieu Project and plan to also sell commissioning cargos at each of our other projects, it is possible those commissioning cargo proceeds will be lower, potentially materially, than we currently anticipate, which could also require us to obtain additional sources of capital to fund development, construction and commissioning of | | | |

| No. | Challenged Statement(s)[2] | AC ¶ & Source[3] | Category of Statement[4] | Reason(s) Not Actionable |
|---|---|---|---|---|
| | our projects. Our ability to generate proceeds from sales of commissioning cargos is subject to significant uncertainty and volatility in such proceeds. Historical proceeds from such sales at the Calcasieu Project, which has had an extended commissioning period due to unanticipated challenges with equipment reliability that we are in the process of remediating, may not be indicative of the duration of the commissioning period or the amount of proceeds for any future period or for any of our other projects." <br><br>        \*     \*     \* <br><br> Our ability to obtain financing that may be needed to provide additional funding will depend, in part, on factors beyond our control and there can be no assurances that funding will be available to us on commercial terms or at all. For example, capital providers or their applicable regulators may elect to cease funding LNG projects or certain related businesses. Accordingly, we may not be able to obtain financing on terms that are acceptable to us, or at all. Even if we are able to obtain financing, we may have to accept terms that are disadvantageous to us or that may have an adverse impact on our business plan and the viability of the relevant project. The failure to obtain any necessary additional funding could cause any or all of our projects to be delayed or not be completed. *Any delays in construction could prevent us from commencing operations when we anticipate and could prevent us from realizing anticipated cash flows, all of which could have a material adverse effect on our business, contracts, financial condition, operating results, cash flow, financing requirements, liquidity, prospects and the price of our Class A common stock.* | | | |
| 9. | *Long-term take-or-pay contracts with highly creditworthy offtakers. We anticipate that our business model will provide us with stable cash flows as a result of our long-term take-or-pay contracts to sell LNG.* As of September 30, 2024, we have executed 39.25 mtpa of post-COD SPAs with a set of third party customers that we believe constitute one of the strongest portfolios of institutional LNG buyer credits in the world. The entire expected nameplate capacity for the Calcasieu Project (10 mtpa) and the Plaquemines Project (20 mtpa), and 9.25 mtpa of the CP2 Project, have been contracted under such SPAs. Our third-party post-COD SPAs as of September 30, 2024 represent expected total contracted revenue of approximately | ¶ 190 <br><br> S-1 at 180 | Category 3 – Long-Term Contract Statements | • Not false or misleading. § I.C. <br><br> • Forward looking. § I.C. |

| No. | Challenged Statement(s)[2] | AC ¶ & Source[3] | Category of Statement[4] | Reason(s) Not Actionable |
|---|---|---|---|---|
| | $107 billion over the life of such SPAs. Our total contracted revenue is illustrative only and is based on a number of important assumptions. Total contracted revenue is based on certain assumptions and is presented for illustrative purposes only and actual sales under our SPAs may differ materially from such illustrative operating results." *The weighted average life of all of our post-COD SPAs is approximately 19 years, providing a long-term runway of reliable cash flows.* | | | • Opinion. § I.C. |
| 10. | *The majority of the Company's nameplate liquefaction capacity produced after an LNG project reaches commercial operations will be sold under long term 20-year SPAs ("post-COD term SPAs").* In this context, "commercial operations" represents the production period commencing after the occurrence of the commercial operations date ("COD") of the relevant project or phase thereof as specifically defined in the relevant SPAs. Under each post-COD term SPA, COD does not occur unless and until: (i) all of the facilities comprising the relevant project or phase thereof, have been completed and commissioned, including any ramp up period, (ii) the project or phase thereof is capable of delivering LNG in sufficient quantities and necessary quality to perform all of its obligations under the post-COD term SPA, and (iii) the applicable project company has notified the customer. | ¶ 191 S-1 at F-37 | Category 3 – Long-Term Contract Statements | • Not false or misleading. § I.C.  • Forward looking. § I.C. |
| 11. | The duration of the commissioning period and our ability to generate such proceeds is subject to significant risks and uncertainties relating to the development, construction and commissioning of our projects as discussed in these "Risk Factors." *In particular, it is both our intention and our obligation, under our post-COD SPAs, to undertake the construction of and complete our projects or phases thereof in a reasonable and prudent manner, which, depending on the circumstances, could extend or shorten the commissioning period for such projects or phases thereof during which we are able to generate such proceeds.* Further, certain delays in the development of or construction of our projects, and any issues with the construction of our projects could delay or otherwise adversely impact our ability to generate such proceeds during the commissioning of the relevant projects. At any of our projects or phases thereof, if the commissioning of certain equipment or integrated facilities is delayed or if COD occurs earlier than expected, the duration of time when we are able to generate proceeds from the sale of commissioning cargos may be shortened, which could adversely | ¶ 192 S-1 at 24 | Category 3 – Long-Term Contract Statements | • Not false or misleading. § I.C.  • Forward looking. § I.C. |

A-12

| No. | Challenged Statement(s)[2] | AC ¶ & Source[3] | Category of Statement[4] | Reason(s) Not Actionable |
|---|---|---|---|---|
| | impact the volume of LNG produced during commissioning and our ability to generate proceeds from the sale of commissioning cargos. | | | |
| 12. | Our *ability to generate revenue and cash flow is partially based on [its] ability to enter into long-term SPAs with customers with respect to the expected nameplate capacity of [its] projects*. Changes in market conditions relating to, among other factors, the price of natural gas in the United States and the price of LNG in international markets could adversely affect the competitiveness of our projects and our ability to enter into such SPAs, which could adversely impact our potential revenues. | ¶ 193<br><br>S-1 at 26 | Category 3 – Long-Term Contract Statements | • Not false or misleading. § I.C. |
| 13. | For example, *we notified all of our customers under the Calcasieu Project post-COD SPAs of the anticipated delay to COD, indicating that such delay constitutes a force majeure event. As a result of such designation, the time period within which to achieve COD in such SPAs would be extended and such customers will not be entitled to terminate as a result of failure to designate COD until June 2025, at the earliest. All of such customers have questioned whether, and most have disputed in arbitration proceedings that, the delay constitutes a force majeure event, and they could assert that they are entitled to terminate their SPAs because COD did not occur by March 2024.* | ¶ 194<br><br>S-1 at 28 | Category 3 – Long-Term Contract Statements | • Not false or misleading. § I.C. |
| 14. | *We have not entered into SPAs with customers for the total expected nameplate capacity at the CP2 Project, the CP3 Project or the Delta Project, and our failure to enter into final and binding contracts for an adequate portion of, or to otherwise sell, the expected nameplate capacity of any of our projects, could have a material adverse effect on our prospects.*<br><br>*Our ability to generate revenue and cash flow is partially based on our ability to enter into long-term SPAs with customers with respect to the expected nameplate capacity of our projects.* Changes in market conditions relating to, among other factors, the price of natural gas in the United States and the price of LNG in international markets could adversely affect the competitiveness of our projects and our ability to enter into such SPAs, which could adversely impact our potential revenues. | ¶ 196<br><br>S-1 at 26-27 | Category 3 – Long-Term Contract Statements | • Not false or misleading. § I.C.<br><br>• Forward looking. § I.C. |

| No. | Challenged Statement(s)[2] | AC ¶ & Source[3] | Category of Statement[4] | Reason(s) Not Actionable |
|---|---|---|---|---|
| | *     *     * <br><br> We are actively marketing a portion of the remaining expected nameplate capacity of the CP2 Project to leading international oil and gas companies, national and multinational utilities and LNG portfolio trading companies. As of September 30, 2024, the CP2 Project has contracted to sell 9.25 mtpa of LNG under eight 20-year SPAs. The obligation to make LNG available under these post-COD SPAs commences from the occurrence of COD for Phase 1 of the CP2 Project. As of this date, we have not entered into any SPAs for the expected nameplate capacity for the CP3 Project and the Delta Project and have not yet begun actively marketing the expected nameplate capacity for such projects. While taking FID for a given project is subject to numerous factors, we may elect to proceed with FID for the CP2 Project, the CP3 Project or the Delta Project or any other future projects only after we execute binding SPAs for such projects that cover a targeted portion of the applicable nameplate capacity that we consider adequate to support the development and financing of such project. At such projects, we may also choose to retain certain nameplate capacity on a temporarily uncontracted basis, while proceeding with construction activities, which would leave us more exposed to prevailing spot, short-, and medium-term prices during the life of the LNG facilities. To the extent we are unable to sell the targeted portion of the applicable nameplate capacity of any of our projects on a long-term basis and prevailing spot, short-, and medium-term prices are below current projections, our revenues may be adversely impacted, and any such impact could be significant. In addition, we will likely still be required to pay certain of our operating expenses related to the anticipated production of such remaining LNG (such as pipeline transportation costs) without generating any corresponding revenue. *If we are unable to enter into long-term contracts with customers for an adequate portion of the expected nameplate capacity at our future development projects, we may not be able to develop such project, raise adequate financing for such project, or realize sufficient cash flows for our business to remain profitable, which would have a material adverse effect on our business, contracts, financial condition, operating results, cash flow, financing requirements, liquidity, prospects and the price of our Class A common stock.* | | | |

| No. | Challenged Statement(s)[2] | AC ¶ & Source[3] | Category of Statement[4] | Reason(s) Not Actionable |
|---|---|---|---|---|
| 15. | *Any delay in a project's ability to produce and load LNG for sale or delay in the completion of our projects could cause a delay in the receipt of proceeds projected from sales of LNG commissioning cargos and/or from post-COD SPAs or lead to a loss of one or more customers in the event of significant delays. In particular, each of our post-COD SPAs provides that the counterparty may terminate that SPA in the event that such project has not achieved COD by the relevant deadlines, and such counterparties could also bring claims for contractual damages.* | ¶ 197 <br><br> S-1 at 47 | Category 3 – Long-Term Contract Statements | • Not false or misleading. § I.C. <br><br> • Forward looking. § I.C. |
| 16. | *If we are unsuccessful in our current and any potential future arbitration proceedings with our customers, the amounts that we are required to pay may be substantial and certain of our post-COD SPAs may be terminated, which may lead to an acceleration of all our debt for the relevant project.* <br><br> We are involved and may in the future become involved in disputes and arbitration proceedings with the customers under our SPAs. For example, in December 2022, a long-term customer of the Calcasieu Project submitted a request for arbitration to the International Chamber of Commerce, International Court of Arbitration, in accordance with the dispute resolution procedures of the post-COD SPA between us and that customer, asserting that we had failed to provide sufficient information or access to the Calcasieu Project and are delayed in achieving COD under the post-COD SPA. The remedies sought by the long-term customer are contract damages in excess of $1 billion (which is potentially subject to increase with the passage of time until COD occurs), rather than the termination of the post-COD SPA. The initial merits hearing for this arbitration proceeding occurred in September 2024. <br><br> In May 2023, two additional long-term customers of the Calcasieu Project submitted separate requests for arbitration to the London Court of International Arbitration and the International Chamber of Commerce, International Court of Arbitration, respectively, in accordance with the dispute resolution procedures of the relevant post-COD SPAs with such customers, asserting, among other claims, that we are delayed in achieving COD under the post-COD SPA. The remedies sought by such long-term customers are (a) orders requiring us to | ¶ 198 <br><br> S-1 at 78-80 | Category 3 – Long-Term Contract Statements | • Not false or misleading. § I.C. <br><br> • Forward looking. § I.C. <br><br> • Opinion. § I.C. |

| No. | Challenged Statement(s)[2] | AC ¶ & Source[3] | Category of Statement[4] | Reason(s) Not Actionable |
|---|---|---|---|---|
| | immediately notify the relevant long-term customer of the occurrence of COD of the Calcasieu Project or otherwise deliver LNG cargos to the relevant long-term customer at the contract price set forth in the applicable post-COD SPA; and (b) contract damages of approximately $1.5 billion and $1.7 billion (each of which is potentially subject to increase with the passage of time until COD occurs), respectively, rather than the termination of the relevant post-COD SPAs. The hearings for such two arbitration proceedings occurred in October 2024 and November 2024, respectively.<br><br>In August 2023, two additional long-term customers of the Calcasieu Project submitted separate requests for arbitration to the International Chamber of Commerce, International Court of Arbitration in accordance with the dispute resolution procedures of the relevant post-COD SPAs with such customers, asserting, among other claims, that we are delayed in achieving COD under the relevant post-COD SPA. The hearings for such two arbitration proceedings have been scheduled for June 2025 and July 2025, respectively. In December 2023, one additional long-term customer of the Calcasieu Project submitted a request for arbitration to the International Chamber of Commerce, International Court of Arbitration in accordance with the dispute resolution procedures of the post-COD SPA between us and that customer, asserting among other claims that we are delayed in achieving COD under the relevant post-COD SPA. The remedies sought by each of the second group of three long-term customers are (a) orders requiring us to immediately notify the relevant long-term customer of the occurrence of COD of the Calcasieu Project or otherwise deliver LNG cargos to the relevant long-term customer at the contract price set forth in the applicable post-COD SPA; and (b) contract damages in an amount to be determined in excess of $250 million (in the case of one such customer) or $400 million (in the case of two such customers), rather than the termination of the relevant post-COD SPAs.<br><br>Further, in March 2024, a short-term customer of the Calcasieu Project submitted a request for arbitration to the International Chamber of Commerce, International Court of Arbitration in accordance with the dispute resolution procedures of the post-COD SPA between us and that customer. Such customer has raised substantially the same assertions as the arbitration | | | |

| No. | Challenged Statement(s)[2] | AC ¶ & Source[3] | Category of Statement[4] | Reason(s) Not Actionable |
|---|---|---|---|---|
| | proceedings described above and is seeking contract damages of $200 million (which is potentially subject to increase with the passage of time until COD occurs), as well as an additional claim relating to an undelivered commissioning cargo. Additionally, all such customers who have asserted that we are delayed in achieving COD have also disputed that the delay to COD constitutes a force majeure event in the context of their arbitration proceedings. *We disagree with the assertions in each of these requests for arbitration, and are defending ourselves in the arbitration proceedings in accordance with each underlying post-COD SPA. We also note that, while we believe that the foregoing assertions in each request for arbitration are unsubstantiated, we further believe that any award of contract damages would be subject to the relevant seller aggregate liability cap under the relevant post-COD SPA. However, there can be no assurance that we will be successful in defending such claims or establishing that any such claim is subject to the liability cap under the relevant post-COD SPA.* <br><br> In addition, although none of the post-COD SPA customers who have commenced the arbitration proceedings described above has sought termination of the underlying post-COD SPA as a remedy in the relevant arbitration, two of those long-term post-COD SPA customers have notified the collateral agent for the Calcasieu Project's project financing that a potential termination event under their long-term post-COD SPA has occurred or may occur, and that remedies could include termination of, or suspension under, the relevant long-term post-COD SPA. *If we are unsuccessful in defending ourselves against any of the claims mentioned above, the amounts we could be required to pay could be substantial, which could have a material adverse effect on our business, contracts, financial condition, operating results, cash flow, liquidity and prospects. Further, a termination of, or suspension under, any of the relevant long-term post-COD SPAs that are subject to these claims could, subject to our ability to replace such long-term post-COD SPAs, lead to an acceleration of our outstanding debt under the Calcasieu Project and foreclosure against all collateral that secures such debt, representing substantially all assets of the Calcasieu Project, which could have a material adverse effect on our business, contracts, financial condition, operating results,* | | | |

A-17

| No. | Challenged Statement(s)[2] | AC ¶ & Source[3] | Category of Statement[4] | Reason(s) Not Actionable |
|---|---|---|---|---|
| | *cash flow, financing requirements, liquidity, prospects and the price of our Class A common stock.*<br><br>We have also notified all of our customers under the Calcasieu Foundation SPAs of the anticipated delay to COD, indicating that such delay is due to a force majeure event. As a result of such designation, the deadline for COD in such post-COD SPAs would be extended and such customers will not be entitled to terminate their respective post-COD SPAs as a result of failure to designate COD until June 2025. All of such customers have questioned (including, as applicable, in the post-COD SPA arbitration proceedings described above) whether the delay constitutes a force majeure event and they could assert that, notwithstanding our declaration of force majeure, they are entitled to terminate their post-COD SPAs. *Discussions with such customers with respect to this force majeure event remain ongoing. Such customers may also seek contract damages, and several such customers have already sought contractual damages in connection with the alleged delay in achieving COD for the Calcasieu Project as described above. Any such claims could be substantial, and there can be no assurance that we will be successful in defending any such claims.*<br><br>*If any of our customers were to successfully terminate their post-COD SPAs with us for the Calcasieu Project, we would need to replace those customers and/or amend our existing post-COD SPAs, which could take time and there can be no assurance we would be able to enter into new post-COD SPAs on a timely basis and on comparable or better terms.* See "—Risks Relating to Our Business—Our customers or we may terminate our SPAs if certain conditions are not met or for other reasons." See also "—Risks Relating to Our Indebtedness and Financing—Upon the occurrence of an event of default under our existing and future indebtedness, our lenders and the holders of our debt securities could elect to accelerate all or a portion of our debt. A delay in COD of the Calcasieu Project or Phase 1 or 2 of the Plaquemines Project beyond a certain deadline could also result in an event of default under the Calcasieu Pass Credit Facilities or the Plaquemines Credit Facilities, respectively, and/or certain investors exercising step-in rights to control, directly or indirectly, certain of our subsidiaries and the Calcasieu Project." | | | |