**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FIRSTFIRE GLOBAL OPPORTUNITIES FUND LLC, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> -v- <br><br> VENTURE GLOBAL, INC., *et al.*, <br><br> Defendants. | Case No. 1:25-cv-4642-JLR-RWL <br><br> [rel. Case No. 25-cv-01364-JLR-RWL] |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**THE SECOND AMENDED COMPLAINT**

**LATHAM & WATKINS LLP**
Jeff G. Hammel
Jason C. Hegt
Corey A. Calabrese
1271 Avenue of the Americas
New York, New York 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
jeff.hammel@lw.com
jason.hegt@lw.com
corey.calabrese@lw.com

*Attorneys for Venture Global, Inc., Michael Sabel, Robert Pender, Jonathan Thayer, Sarah Blake, Sari Granat, Andrew Orekar, Thomas J. Reid, Jimmy Staton, Roderick Christie, and Venture Global Partners, II, LLC*

*[Additional Counsel On Signature Page]*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ......................................................................................................1

BACKGROUND ..........................................................................................................................4

      A.    Venture Global's Innovative Methods Of Building LNG Facilities........................4

      B.    Venture Global's IPO .............................................................................................5

      C.    This Litigation........................................................................................................7

LEGAL STANDARDS ................................................................................................................7

ARGUMENT ................................................................................................................................9

I.     PLAINTIFFS FAIL TO PLEAD A MATERIALLY FALSE OR MISLEADING STATEMENT ........................................................................................................................9

      A.    Category 1:  VG's Construction Management Approach.........................................9

           1.    The SAC Fails To Plead Contemporaneous Falsity .....................................9

           2.    Allegations Attributed To Former Employees Add Nothing.....................12

           3.    VG's Forward-Looking Or Opinion Statements Are Not Actionable ........................................................................................................15

      B.    Category 2:  VG's 4Q24 Financial Information .......................................................17

           1.    The SAC Fails To Plead Facts Establishing That VG's Financial Disclosures Were False Or Misleading.......................................................17

                a.    Plaquemines Project Costs................................................17

                b.    CP2 Project Costs ............................................................19

                c.    2025 EBITDA Forecast ....................................................20

           2.    The Category 2 Forward-Looking Estimates Are Protected By The Bespeaks Caution Doctrine.......................................................................21

      C.    Category 3:  VG's Ability To Enter Long-Term Contracts...................................22

      D.    The SAC Fails To Allege A Violation Of Item 303 Or Item 105..........................27

II.    THE SAC MAKES CLEAR THAT THE ALLEGED MISREPRESENTATIONS AND OMISSIONS DID NOT CAUSE PLAINTIFFS' LOSSES...................................29

III.    PLAINTIFFS HAVE FAILED TO PLEAD A SECTION 15 CLAIM ..............................30

CONCLUSION.................................................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)................................................................................................8

*Barilli v. Sky Solar Holdings, Ltd.*,
 389 F. Supp. 3d 232 (S.D.N.Y. 2019)..........................................................8, 16, 24

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)................................................................................................8

*Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*,
 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ...........................................................11

*Boluka Garment Co., Ltd. v. Canaan Inc.*,
 547 F. Supp. 3d 439 (S.D.N.Y. 2021)....................................................................30

*C.D.T.S. No. 1 v. UBS AG*,
 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013), *aff'd*, 604 F. App'x 5 (2d Cir.
 2015) .....................................................................................................................25

*China Mobile Games & Ent. Grp., Ltd Sec. Litig.*,
 2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) ......................................................14, 25

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
 752 F.3d 173 (2d Cir. 2014)....................................................................................8

*Coty Inc. Sec. Litig.*,
 2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ...................................................21, 28

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
 553 F.3d 187 (2d Cir. 2009)...................................................................................19

*Fogel v. Wal-Mart de México SAB de CV*,
 2017 WL 751155 (S.D.N.Y. Feb. 27, 2017)............................................................9

*FuboTV Inc. Sec. Litig.*,
 2023 WL 2711826 (S.D.N.Y. Mar. 30, 2023) ...................................................13, 26

*FuBoTV Inc. Sec. Litig.*,
 2024 WL 1330001 (S.D.N.Y. Mar. 28, 2024) ...................................................25, 26

*Garber v. Legg Mason, Inc.*,
 537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009).....................25

*HEXO Corp. Sec. Litig.*,
    524 F. Supp. 3d 283 (S.D.N.Y. 2021)...............................................................................19, 20

*Hutchison v. Deutsche Bank Sec. Inc.*,
    647 F.3d 479 (2d Cir. 2011)...........................................................................................27

*IAC/InterActiveCorp Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007)............................................................................25

*Initial Pub. Offering Sec. Litig.*,
    399 F. Supp. 2d 261 (S.D.N.Y. 2005)......................................................................29, 30

*Lehman Bros. Sec. & Erisa Litig.*,
    2013 WL 3989066 (S.D.N.Y. July 31, 2013) .................................................................14

*Lowinger v. Pzena Inv. Mgmt., Inc.*,
    341 F. App'x 717 (2d Cir. 2009) ...................................................................................27

*Marquez v. Bright Health Grp., Inc.*,
    755 F. Supp. 3d 266 (E.D.N.Y. 2024) ...............................................................13, 14, 26

*Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010).............................................................................2, 8, 21, 29

*Nguyen v. MaxPoint Interactive, Inc.*,
    234 F. Supp. 3d 540 (S.D.N.Y. 2017)............................................................................11

*Noah Educ. Holdings, Ltd. Sec. Litig.*,
    2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ................................................................28

*NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009)............................................................................22

*Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc.*,
    715 F. Supp. 3d 483 (S.D.N.Y. 2024), *aff'd*, 2024 WL 4647131 (2d Cir. Nov.
    1, 2024) ................................................................................................................ passim

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
    98 F.3d 2 (2d Cir. 1996).................................................................................................11

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)........................................................................................................16

*Pearlstein v. BlackBerry Ltd.*,
    93 F. Supp. 3d 233 (S.D.N.Y. 2015), *aff'd*, 660 F. App'x 23 (2d Cir. 2016).........................28

*ProShares Tr. Sec. Litig.*,
    728 F.3d 96 (2d Cir. 2013).................................................................................10, 11, 24

*Qudian Inc. Sec. Litig.*,
2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019)...................................................................13, 26

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)..........................................................................11, 15, 21, 27

*Rubinstein v. Credit Suisse Grp. AG*,
457 F. Supp. 3d 289 (S.D.N.Y. 2020)................................................................................11, 15

*Scott v. Gen. Motors Co.*,
46 F. Supp. 3d 387 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015).................. *passim*

*Sec. Cap. Assur. Ltd. Sec. Litig.*,
2011 WL 4444206 (S.D.N.Y. Sept. 23, 2011)........................................................................30

*Stadnick v. Vivint Solar, Inc.*,
861 F.3d 31 (2d Cir. 2017).........................................................................................17, 18, 19

*State St. Bank and Tr. Co. Fixed Income Funds Inv. Litig.*,
774 F. Supp. 2d 584 (S.D.N.Y. 2011)..................................................................................4, 29

*Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*,
412 F. Supp. 3d 353 (S.D.N.Y. 2019), *aff'd*, 826 F. App'x 111 (2d Cir. 2020)................27, 28

*Steinberg v. PRT Grp., Inc.*,
88 F. Supp. 2d 294 (S.D.N.Y. 2000)...................................................................................15, 25

*Tabak v. Canadian Solar Inc.*,
549 F. App'x 24 (2d Cir. 2013) ...............................................................................................19

*Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993) .........................................................................................................21

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016).....................................................................................................16

*Vroom, Inc. Sec. Litig.*,
2025 WL 862125 (S.D.N.Y. Mar. 18, 2025) .....................................................................16, 24

*Weight Watchers Int'l Inc. Sec. Litig.*,
504 F. Supp. 3d 224 (S.D.N.Y. 2020)............................................................................. *passim*

*Willard v. UP Fintech Holding Ltd.*,
527 F. Supp. 3d 609 (S.D.N.Y. 2021).....................................................................................28

*Yaroni v. Pintech Tech. Holdings, Ltd.*,
600 F. Supp. 3d 385 (S.D.N.Y. 2022).....................................................................................24

*Zirkin v. Quanta Cap. Holdings Ltd.*,
    2009 WL 185940 (S.D.N.Y. Jan. 23, 2009) ...........................................................20, 22, 27

## STATUTES

15 U.S.C.
    § 11................................................................................................................................ *passim*
    § 12(a)(2) ..................................................................................................................... *passim*
    § 15.........................................................................................................................................1
    § 77k(a) .............................................................................................................................8, 20
    § 77l(a)...................................................................................................................................20
    § 77l(a)(2) .................................................................................................................................8
    § 77o.......................................................................................................................................30
    § 77z-2(i)(1)(A) ......................................................................................................................22

## REGULATIONS

17 C.F.R.
    § 210.3-12(a)......................................................................................................................7, 17
    § 210.3-12(b)......................................................................................................................3, 17
    § 229.105(a) ...........................................................................................................................27
    § 229.303(a)(3)(ii)..................................................................................................................27

Defendants submit this memorandum of law in support of their motion to dismiss Plaintiffs' Second Amended Complaint (the "SAC," cited as ¶_) (ECF No. 101).

## PRELIMINARY STATEMENT

This securities case attempts to allege that the registration statement and prospectus (the "Offering Documents") for Venture Global Inc.'s ("VG") initial public offering ("IPO") contained material misstatements and omissions. It should be dismissed because Plaintiffs have failed to plead the facts required to support their claims under long-established Second Circuit law.

In little more than a decade since its founding, VG has grown from a start-up to one of the country's leading producers and exporters of liquefied natural gas ("LNG"), a global commodity critical to energy security and the clean energy transition. Through its innovative approach to developing and constructing LNG production facilities, VG has been able to bring LNG to international markets far more quickly, and at lower cost, than its competitors.

On January 24, 2025, VG conducted its IPO on the New York Stock Exchange. VG's stock price subsequently declined and this lawsuit followed, asserting claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933. Plaintiffs contend that the Offering Documents contained three categories of alleged misstatements and omissions: (1) VG's statements regarding its approach to construction were allegedly false and misleading due to undisclosed operational issues, cost overruns, and delays; (2) VG supposedly omitted various financial metrics from the quarter ending December 31, 2024—*i.e.*, 24 days before the IPO; and (3) VG allegedly misstated risks concerning its ability to enter into long-term contracts with customers. Plaintiffs also assert that VG omitted "known trends," "uncertainties," and "risks" regarding the foregoing categories in violation of SEC regulations. Each claim fails as a matter of law.

**Plaintiffs Have Not Pled An Actionable Misstatement Or Omission**. Sections 11 and 12(a)(2) require Plaintiffs to allege facts establishing, among other things, that the Offering

1

Documents did not contain required disclosures, or that the disclosures they did make were materially false or misleading when made. *See Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010). The SAC does not do so.

*First*, Plaintiffs plead no facts establishing that the "Category 1" statements regarding VG's approach to construction management, particularly its "design one, build many" strategy, were false. *See* ¶¶ 178, 180, 182, 184, 186. VG disclosed that its approach enabled it to start producing LNG in half the time of its competitors. Plaintiffs do not challenge that disclosure at all. Rather, Plaintiffs miscast VG as somehow promising a process free from all operational issues, delays, and cost overruns, and then attack this strawman with confidential witnesses who departed long before the IPO making allegations about circumstances VG already disclosed. VG repeatedly disclosed that its projects had been delayed and estimated costs had increased (and that both could happen again in the future)—disclosures the SAC entirely ignores. Plaintiffs offer no facts showing that VG misrepresented the status of its projects at the time of the IPO. Plaintiffs' allegations come from 12 former employees, 10 of whom left VG (or its contractors) months before the IPO, and all who simply repeat what VG itself disclosed. No claim exists where a company disclosed what plaintiffs contend was omitted.

*Second*, with respect to "Category 2," asserting that the Offering Documents should have, but did not, disclose VG's fourth quarter 2024 ("4Q24") financial results, ¶¶ 129, 187, 189, 190 194, Plaintiffs cite no law requiring the Offering Documents to include preliminary, in-process financial results from a quarter that had closed just 24 days prior to the IPO on December 31, 2024. Nor could they. The relevant U.S. Securities and Exchange Commission ("SEC") rule, Regulation S-X, is clear that offering documents "need not include financial statements more current than as of the end of the third fiscal quarter of the most recently completed fiscal year unless the audited

2

financial statements for such fiscal year are available." 17 C.F.R. § 210.3-12(b), (g). Plaintiffs do not explain how the absence of 4Q24 financial results could have rendered VG's Offering Documents materially misleading, particularly given that those 4Q24 results, once disclosed, showed costs *consistent* with the Offering Documents. Plaintiffs' complaint of increases to cost estimates, like the 1.2% increase at VG's Plaquemines Project, ignores a long line of Second Circuit cases holding that neither forward-looking estimates nor minor revisions to such estimates are actionable. Plaintiffs' complaint that VG announced in March 2025 that its forecasted EBITDA would be lower than "investor expectations," due in part to increased costs, fares no better. The Offering Documents never disclosed any EBITDA estimates (nor do Plaintiffs allege they were required to), and merely missing "market consensus" does not support a Securities Act claim as a matter of law.

*Third*, Plaintiffs do not allege any facts showing the "Category 3" statements regarding goodwill or VG's ability to enter into long-term contracts were false or misleading. *See* ¶¶ 201, 203, 205, 207, 209, 211-12. Plaintiffs point to post-IPO rulings in arbitrations brought against VG by certain long-term customers, ¶ 16, a post-IPO statement by the CEO of a competitor (TotalEnergies) that he would not enter into a long-term contract with VG, ¶ 218, and speculation about VG's customer relationships in one post-IPO analyst report, ¶ 233. But the Offering Documents contain 12 pages of detailed disclosures about the arbitrations and the impact they could have on VG's business. The fact that VG won two of these customer arbitrations and not the other, ¶¶ 236-37, is entirely consistent with those disclosures. Likewise, neither the unsourced post-IPO musings of a single analyst nor the comment by a competitor (who VG never said or even suggested might become a long-term customer) show that any statement in the Offering Documents was false at all, much less at the time of the IPO.

3

**Lack of Causation Also Requires Dismissal.**  Plaintiffs' claims also independently fail because  the SAC itself makes clear that the purported losses were not caused by any misstatements or omissions that Plaintiffs assert.

Stock prices rise and fall for countless reasons and not every price decline supports a securities lawsuit.  "Negative causation"—a showing that a decline was not caused by the alleged misstatements or omissions—is an affirmative defense to Sections 11 and 12(a)(2) claims and supports dismissal where, as here, it is apparent on the face of the complaint.  *See State St. Bank and Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 588 (S.D.N.Y. 2011).  Plaintiffs contend that VG's stock price declined not due to a correction of anything VG itself previously disclosed, but because of a February 5, 2025 statement from TotalEnergies' CEO that he would not enter a long-term contract with VG and VG's March 6, 2025 disclosure of earnings guidance that fell "below street consensus."  ¶¶ 12, 218, 227.  Neither of these revealed anything in VG's Offering Documents' to be false or misleading, so any stock price declines that followed cannot have been caused by the alleged misstatements and omissions.

Plaintiffs' claims are fundamentally flawed and should be dismissed, with prejudice.

## BACKGROUND

### A.     Venture Global's Innovative Methods Of Building LNG Facilities

VG develops, constructs, owns, and operates plants that produce LNG, a fuel that can displace more "carbon intensive" energy sources such as diesel, oil, and coal, thus supporting a cleaner energy future.  Ex. 1,[1] S-1 at 1; *see also* ¶¶ 2-3, 108.  Converting natural gas into a liquid

---

[1] All exhibits cited herein are attached to the accompanying Declaration of Jason C. Hegt. VG's Registration Statement on Form S-1 (the "S-1") became effective on January 23, 2025, after the stock market closed.  *See* Hegt Decl. ¶ 2.  The next day, VG began selling securities in connection with its IPO.

is a costly and time-intensive endeavor.  Gas must be sourced, purified, and then piped through processing units called "trains," where it is "superchilled" to negative 260°F.  ¶¶ 82-83; *see also* S-1 at 185.  Traditionally, LNG plants have used large liquefaction trains constructed onsite by vast workforces according to bespoke plans, often in remote locations.  ¶¶ 7, 83, 90; S-1 at 2.  This is known as the "stick-built" approach.  With this process, it often takes five years, and sometimes "nearly a decade" for plants to begin producing LNG.  ¶ 90; S-1 at 2.

VG developed a groundbreaking alternative using, among other techniques, a "design one, build many" approach.  S-1 at 176.  Instead of building liquefaction trains onsite, VG fabricates key, standardized, modular components of its LNG plants in factories, which are then shipped to project sites for installation.  *See* ¶¶ 7, 80, 83; *see also* S-1 at 185.  This approach aims to improve execution, accelerate construction timelines, reduce costs, and expand production of LNG *as compared to the stick-built approach*.  ¶¶ 7, 90, 93.

VG has multiple projects, all along the U.S. Gulf Coast, in various phases of development, construction, and operations.  VG's Calcasieu Project commenced full construction in August 2019, started producing LNG in January 2022, and was still commissioning at the time of the IPO. S-1 at 187-88.  VG's Plaquemines Project began full construction in May 2022, started producing LNG in December 2024, and is still in its commissioning phase.  *Id.* at 192-93.  At the time of the IPO, VG also had three other projects in development—CP2, CP3, and Delta.  *Id.* at 196-98, 200-03.

### B.    Venture Global's IPO

On January 24, 2025, VG conducted its IPO.  ¶ 3.  The Offering Documents included robust disclosures regarding VG's business and financial condition and the associated risks.  The Offering Documents explained VG's innovations and the comparative advantages these confer over the

traditional "stick-built" approach, alongside clear disclosures that VG was not immune from cost

or scheduling risks.  For example:

- "*[W]e have experienced unexpected delays in commissioning the Calcasieu Project related to certain necessary repairs and replacements*.  As a result, we expect [the commercial operations date ('COD')] for the Calcasieu Project *to be later than originally* forecasted while significant work related to commissioning, carryover completions, rectification, and certain other items is being completed."

- At Calcasieu, "*[s]ignificant work* related to commissioning, carryover completions, rectification, including *remedying unexpected challenges* with equipment reliability identified during the first-time implementation of our innovative design and configuration, and reliability testing, *is ongoing*."

- "[T]he costs to complete the Plaquemines Project *have increased in the past and may increase further in the future* …."

- VG had invested *$2.35 billion* in additional equity [at Plaquemines] to address "increases in estimated total project costs" resulting from, "among other things … *efforts to maintain the project schedule*"—*i.e.*, to mitigate delays.

- "[T]he actual project costs for the CP2 Project *may be materially higher than [VG] estimate[s]*.  Moreover, the anticipated costs to achieve completion of the CP2 Project have *increased in the past* and *may increase further in the future*, potentially materially, compared to our current estimates as a result of many factors, including delays in construction or commissioning of the project .…"

- As to all VG projects, "[o]ur cost estimates for LNG facilities … *have been, and continue to be, subject to* change due to many factors outside of our control.  Such factors include, among other things, … (vii) *unexpected delays in construction or commissioning*, and (viii) unexpected repair, replacement, rectification, or warranty work.  Such factors *have in the past resulted in, and may in the future result in* … delays in construction or commissioning, repair or warranty work, cost overruns, and/or change orders under or amendments to existing or future construction contracts."

- VG "*may be required* to make additional incremental equity contributions to the extent total project costs exceed the low-end of the range of estimated total project costs."

S-1 at 45, 47, 108, 194, 198 (emphases added).

In addition, and as required by SEC Regulation S-X, VG provided extensive financial and

business performance data, including VG's financial results for the past three years and through

3Q24.  *See, e.g.*, *id.* at 103, 120, 144.  Regulation S-X did ***not*** require disclosure of financial data from 4Q24, which ended just 24 days before the IPO.  *See* 17 C.F.R. § 210.3-12(a), (g).

Finally, the Offering Documents included more than 12 pages of disclosures about arbitration proceedings between VG and all of its long-term customers at the Calcasieu Project, including that "all such customers" had initiated arbitration proceedings concerning commissioning-related delays to COD, that if unsuccessful for VG, could require VG to pay "substantial [amounts], which could have a material adverse effect on [its] business" or "prospects," S-1 at 80; and "[i]f any of our customers were to successfully terminate … there can be no assurance we would be able to enter into new [long-term contracts] on a timely basis and on comparable or better terms," *id.*; *see also id.* at 13, 22, 28, 44-45, 79-80, 98-99, 228-29, F-10, F-19, F-44, F-58.

### C.    This Litigation

VG's stock price declined after the IPO and securities lawsuits followed.  Plaintiffs filed an Amended Complaint on September 16, 2025 (and corrected complaint on November 13, 2025).  Defendants filed a motion to dismiss on November 14, 2025.  ECF No. 94.  Rather than respond, Plaintiffs filed the SAC on December 5, 2025.

The SAC does not add any new allegations from any former employees of VG or its contractors or any other allegations about facts that existed at the time of VG's IPO.  Rather, the SAC simply adds several assertions regarding events that occurred weeks and months after VG's IPO and a series of conclusory statements directed at deficiencies VG noted in its previous motion to dismiss.  These new assertions do nothing to save Plaintiffs' claims.

### LEGAL STANDARDS

Section 11 requires Plaintiffs to establish that a registration statement filed with the SEC (1) "'contained an untrue statement of a material fact,'" (2) "'omitted to state a material fact

required [by law] to be stated therein,'" or (3) "'omitted to state a material fact … necessary to make the statements therein not misleading.'" *Morgan Stanley*, 592 F.3d at 359 (quoting 15 U.S.C. § 77k(a)). Section 12(a)(2) is similar to Section 11, and applies to alleged material misstatements or omissions in prospectuses and accompanying oral communications. *Morgan Stanley*, 592 F.3d at 359 (quoting 15 U.S.C. § 77l(a)(2)). To survive dismissal, Plaintiffs must allege facts showing that the registration statement contained a material misstatement "'when such part [of the registration statement] became effective'" in the case of Section 11 claims, or at the time a prospectus was distributed or oral communication made, in the case of Section 12(a)(2) claims. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 182 (2d Cir. 2014) (quoting 15 U.S.C. § 77k(a)); *see also Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 247 (S.D.N.Y. 2020) (plaintiff must show statement "was false at the time it was made").

In alleging these elements, a "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[L]egal conclusion[s] couched as [] factual allegation[s]" or "naked assertion[s]" devoid of "further factual enhancement" do not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007). "A court need not … accept as truth conflicting pleadings that … are contradicted by statements in … documents upon which [the] pleadings rely." *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 253 n.18 (S.D.N.Y. 2019) (quotation omitted). Plaintiffs fail to meet these standards.[2]

---

[2] The SAC does not identify the particular statements that Plaintiffs contend were misleading, relying instead on multi-paragraph block quotations of VG's statements with scattered bold and italic emphasis added. *See, e.g.*, ¶¶ 177-81, 183, 188, 190, 193. Defendants have attempted to discern the specific statements Plaintiffs challenge, and reserve their rights to address others on reply.

## ARGUMENT

### I. PLAINTIFFS FAIL TO PLEAD A MATERIALLY FALSE OR MISLEADING STATEMENT

#### A. Category 1: VG's Construction Management Approach

Plaintiffs contend that VG's statements about its construction management approach, including the benefits of its "design one, build many" approach, were false or misleading because at the time of the IPO, VG was allegedly experiencing: "project delays, operational issues, and increased project costs" due to the Company's supposed failure to optimize construction and planning for each specific project location, "key contractors" making "critical errors that delayed construction and commissioning and increased project costs," and "efficiency losses" from VG's purported "poor construction management" stemming from its "owner-led model." ¶¶ 182, 184; *see also* ¶¶ 177, 179, 181, 183, 185; App'x A.[3] None of these allegations states a claim.

#### 1. The SAC Fails To Plead Contemporaneous Falsity

The SAC's claims regarding VG's construction management approach mischaracterize the Offering Documents by suggesting that VG promised a process free from all operational issues, delays, efficiency losses, and cost overruns. *See, e.g.*, ¶¶ 177-81, 183. VG said no such thing. Rather, as Plaintiffs acknowledge elsewhere, VG disclosed the advantages of its process "as *compared* with the traditional made-to-fit approach." ¶ 93 (emphasis added); *see also* S-1 at 2-3. Plaintiffs similarly purport to quote the Offering Documents as claiming that VG's "design one, build many" approach had "improv[ed] … execution, accelerat[ed] construction timelines, reduc[ed] costs, and expand[ed] production." ¶ 7 (alterations in original). But the quoted passage

---

[3] **Appendix A** is a chart containing the alleged misstatements and corresponding categories from the SAC. *See Fogel v. Wal-Mart de México SAB de CV*, 2017 WL 751155, at *18 (S.D.N.Y. Feb. 27, 2017) (collecting cases accepting appendices that serve as "organizational tools").

actually describes "design one, build many" as a means for applying "*the lessons we learn*" with "*the goal* of continuously improving our execution, accelerating construction timelines, reducing costs, and expanding production."  S-1 at 2 (emphases added).  This does not promise perfection; it acknowledges that VG continues to work on improving performance with each successive project.  Plaintiffs cannot mischaracterize VG's disclosures for purposes of alleging them to be false or misleading.  *ProShares Tr. Sec. Litig.*, 728 F.3d 96, 106 (2d Cir. 2013) (rejecting attempt to "isolate and construe a single element of [Defendant's] prospectuses" and finding that the challenged statements, "placed in context, would not [mislead] a reasonable investor").

The SAC also adds, for the first time, conclusory assertions that the Offering Documents failed to disclose that "operating and maintenance expenses, as well as development expenses, were higher than expected *for LNG projects*, as later disclosed in Venture Global's 2024 Form 10-K."  ¶¶ 178(c), 180(c), 182(c) (emphases added).  Plaintiffs cite nothing in the 10-K as the source of such disclosure (because no such disclosure was made), *see generally* Ex. 2, Mar. 6, 2025 10-K, or any other basis to conclude that the expenses disclosed in the Offering Documents were "higher than expected for LNG projects" generally.  Such conclusory assertions necessarily fail as a matter of law.  *See Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 396 (S.D.N.Y. 2014) (dismissal warranted where plaintiff "proffers no non-conclusory factual allegations" regarding claims that defendant's registration statement violated Section 11), *aff'd*, 605 F. App'x 52 (2d Cir. 2015).

Plaintiffs next contend the Offering Documents failed to disclose that "delays, operational issues, and increased project costs" had occurred at VG's LNG plants, some purportedly due to VG's "poor construction management" and "owner-led model."  ¶¶ 5, 97, 170, 175-86, 215, 217. Here, Plaintiffs ignore pages of disclosures about the delays and cost overruns at Calcasieu, Plaquemines, and CP2.  Plaintiffs' repeated assertion that these disclosures improperly

10

characterized as "potential" risks that had already materialized, ¶ 184, ignores extensive discussion

of delays and cost overruns that had already occurred:

- VG's "cost estimates … *have been* … *subject to change due to*," among other things, "*unexpected delays* in construction or commissioning," and "*unexpected repair, replacement, rectification, or warranty work*,"

- VG "*experienced unexpected delays in commissioning the Calcasieu Project* related to certain necessary repairs and replacements,"

- VG experienced *$2.35 billion in project cost* increases related to "efforts to maintain the [Plaquemines] project schedule," and

- "[T]he anticipated costs to achieve completion of the CP2 Project "*have increased in the past* and may increase further in the future."

*See* S-1 at 44-45, 47, 198 (emphases added).

"[P]rospectuses must be read as a whole." *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d

2, 5 (2d Cir. 1996). Plaintiffs therefore state no claim because VG's Offering Documents

extensively disclosed that VG's projects—all built with the "design one, build many" approach—

had experienced delays and cost overruns. A "[c]omplaint [is] insufficient as a matter of law"

where the challenged filing includes the "disclosure of information alleged in the Complaint to

have been withheld." *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *8

(S.D.N.Y. Jan. 14, 2010); *see also Olkey*, 98 F.3d at 6-9 (affirming dismissal where prospectus

"unequivocally" disclosed allegedly omitted information); *ProShares*, 728 F.3d at 102 (same);

*Rombach v. Chang*, 355 F.3d 164, 175 (2d Cir. 2004) (same); *Nguyen v. MaxPoint Interactive,*

*Inc.*, 234 F. Supp. 3d 540, 547 (S.D.N.Y. 2017) (dismissing Sections 11 and 12(a)(2) claims

where "disclosures put investors on clear notice" of information allegedly omitted); *Rubinstein v.*

*Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 297 (S.D.N.Y. 2020) (same). The same result is

appropriate here.

11

Plaintiffs' assertions attributing some unspecified portion of project delays or overruns to VG's "owner-led" model are entirely conclusory.  Plaintiffs contend only that VG's owners persisted in a "cookie cutter" approach, ignoring "feedback" that "planning and parts needed to be optimized by location" and selected "subcontractors based on who posed the least risk" and could move the quickest.  ¶¶ 118, 178(b), 180(b), 182(b).  But the SAC fails to allege any facts supporting these assertions.  It identifies no "feedback" that was ignored or decisions that should have been made differently or any facts at all about how VG managed these projects one way or the other.  *See Gen. Motors*, 46 F. Supp. 3d at 394 (no facts alleged that "if true, would demonstrate that the [disclosures] contained a material misstatement or omission at the time it became effective").  "[C]orporate mismanagement" or "fundamental disagreements with Defendants' business judgments" are in any event "not actionable under securities laws."  *Weight Watchers*, 504 F. Supp. 3d at 248 (collecting cases).

The SAC's new claims that undisclosed construction delays and overruns also occurred at projects still in development stages at the time of the IPO—*i.e.*, the CP2, CP3, and Delta Projects— fare no better.  ¶¶ 185; *see also* ¶¶ 193, 196, 198.  The SAC concedes none were under construction at the time of the IPO.  ¶ 84 ("[a]t the time of the IPO, the Company was in the process of … *planning* the CP2, CP3, and Delta projects") (emphasis added); *see also* S-1 at 192, 200, 202.  Aside from conclusory assertions that "operational risks" at the CP2, CP3, and Delta Project sites had "already manifested," ¶ 185, the SAC does not allege a single fact supporting this claim.  This claim should therefore also be dismissed.  *See Gen. Motors*, 46 F. Supp. 3d at 394.

### 2.    Allegations Attributed To Former Employees Add Nothing

Plaintiffs' allegations from 12 former employees ("FEs") add nothing.  As alleged, these FEs are a collection of individuals who—by period of employment and nature of their jobs—were not in a position to know anything about whether statements in the Offering Documents were

12

accurate when made.  To survive dismissal, Plaintiffs must allege facts that "an alleged material misstatement was false at the time it was made."  *See Weight Watchers*, 504 F. Supp. 3d at 247.  "[W]ithout contemporaneous falsity, there can be no [claim]."  *Id.*  The FEs' allegations fall far short of this standard.

*First*, 10 of the 12 FEs had departed VG or its contractors by the time of the IPO, most having left months prior.[4]  Because these witnesses do not speak to conditions ***at the time of the IPO***, their allegations should be disregarded.  *FuboTV Inc. Sec. Litig.*, 2023 WL 2711826, at *11 (S.D.N.Y. Mar. 30, 2023) (*FuboTV I*) (rejecting allegations of FEs who left company before class period); *Qudian Inc. Sec. Litig.*, 2019 WL 4735376, at *6 (S.D.N.Y. Sept. 27, 2019) (rejecting confidential witness allegations concerning an "earlier period"); *Marquez v. Bright Health Grp., Inc.*, 755 F. Supp. 3d 266, 278-80 (E.D.N.Y. 2024) (rejecting FE allegations regarding operational issues existing "prior to the IPO").

*Second*, only half the FEs were VG employees at all; the rest worked for third-party contractors.[5]  Only one worked at VG's corporate headquarters in Virginia, in the IT department, leaving almost a year before the IPO.  The rest worked at VG's project sites in Louisiana, in technical positions such as structural welding, engineering, process supervisor, and commissioning manager.  No FE claims to have prepared, contributed to, or had any involvement with VG's project schedules, budgets, or disclosures, or to have conversed directly with VG executives on

---

[4] FE 1 left September 2024 (¶ 99), FE 2 left December 2024 (¶ 105), FE 3 left November 2024 (¶ 107), FE 4 left July 2024 (¶ 113), FE 6 left June 2024 (¶ 119), FE 8 left August 2024 (¶ 135); FE 9 left October 2024 (¶ 151), FE 10 left July 2024 (¶ 149), FE 11 left May 2024 (¶ 152), and FE 12 left February 2024 (¶ 161).

[5] FEs 2, 3, 8, 10, 11, and 12 are alleged to have worked for VG, ¶¶ 105, 107, 135, 149, 152, 161, while FEs 1, 4, 5, 6, 7, and 9 are alleged to have worked for contractors, ¶¶ 99, 113, 116, 119, 126, 141.

13

any topic. The only two FEs working on a VG project at the time of the IPO, FE 5 and FE 7, had limited roles on a single project and worked for third-party contractors, not VG. ¶¶ 116, 126. The SAC offers no basis to conclude that they had knowledge beyond their specific roles about how VG or its projects were performing with respect to time and budget as of January 24, 2025. A long line of authority in this District holds that statements from similarly situated individuals are insufficient to state a claim.[6]

*Third*, the SAC offers no basis to conclude that any of the FEs observed anything inconsistent with VG's disclosures of delays and cost overruns. The 10 of 12 FEs who departed before the IPO provide no new information given that VG itself repeatedly disclosed that it encountered operational issues, delays, and cost overruns before the IPO. *E.g.*, S-1 at 44-45, 198. Likewise, FE 5 and FE 7 allege only that "Plaquemines had delays at least once a month," ¶ 117, and that "Plaquemines experienced major cost issues and project delays, stemming from vendor delays, equipment, machinery, parts, and others," ¶ 127—disclosures consistent with the Offering Documents' disclosures of cost increases and delays on that project. *See Lehman,* 2013 WL 3989066, at *4 (confidential witness allegations "insufficient to allege adequately that the offering documents contained misrepresentations" where they provide "no basis" to contradict the disclosures); *Weight Watchers*, 504 F. Supp. 3d at 252 (FEs "not compelling when viewed through the lens of [company's] multiple disclosures").

---

[6] *See China Mobile Games & Ent. Grp., Ltd Sec. Litig.*, 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016) (allegation from confidential witness who worked at "subsidiary, not the company itself" cannot show "contemporaneous falsity"); *Lehman Bros. Sec. & Erisa Litig.*, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) (discrediting allegations from "loan level underwriters, not managers or corporate officers who could have spoken to the company's practices broadly"); *see also Marquez*, 755 F. Supp. 3d at 280 (discrediting confidential witness allegations because they "fall short of adequately pleading that [] operational problems were 'wide-spread' and 'well-known' by the June 2021 IPO").

For these reasons, the FEs' allegations do not establish a claim as a matter of law.

### 3.    VG's Forward-Looking Or Opinion Statements Are Not Actionable

Certain of the Category 1 statements Plaintiffs challenge are inactionable forward-looking statements or opinions.  *See* App'x A.  Under the bespeaks caution doctrine, forward-looking statements are not actionable if they are "accompanied by … adequate cautionary language set out in the same offering."  *Rombach*, 355 F.3d at 173.  Several of the statements Plaintiffs challenge are plainly forward-looking.  *See* ¶ 183 ("***we plan*** to begin the commissioning start-up ….") (emphasis added); ¶ 177 ("[we] apply the lessons we learn at each project ***to our subsequent projects***, with the ***goal*** of continuously improving our execution") (emphasis added); *see also* ¶¶ 179, 181, 185.  These predictions about future projects were accompanied by extensive cautionary language, *see supra* Section I.A.1, and are therefore not actionable under the bespeaks caution doctrine.  *See Weight Watchers*, 504 F. Supp. 3d at 255 (S.D.N.Y. 2020) (dismissing Section 11 claims that "disclose the exact risk of which Plaintiffs complain"); *Rubinstein*, 457 F. Supp. 3d at 298 n.8 (S.D.N.Y. 2020) (same); *Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 309 (S.D.N.Y. 2000) (failure to disclose unsuccessful project bids "tempered by numerous specific risk disclosures about the potential pitfalls").

Likewise, several of the Category 1 statements are statements of opinion that are not actionable.  *See, e.g.*, ¶ 177 (VG "***believe[s]***" it will "continue to benefit from [the 'design one, build many approach'] as we grow"); ¶ 179 (VG "***believe[s]*** that [its] disruptive and innovative configuration and owner-led engineering, procurement and construction approach reduces our construction and installation costs, construction time and construction schedule risk"); *see also* ¶ 181.  For such opinion statements to be actionable, Plaintiffs would need to plausibly allege either (1) that VG did not honestly believe these statements at the time they were made, or that the statements contained an embedded untrue fact, or (2) "'particular (and material facts) going to the

15

basis'" for the opinions "'whose omission makes the opinion statement at issue misleading to a reasonable'" investor. *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015)).

This showing "is no small task," *Tongue*, 816 F.3d at 210, and Plaintiffs do not make it here. The SAC contains only conclusory assertions that "any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made," ¶ 246, and that "none of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omission of any material facts and were not misleading," ¶ 248; *see also* ¶¶ 249-50, 257, 261-62, 266 (same). These conclusory assertions are insufficient. *See Vroom, Inc. Sec. Litig.*, 2025 WL 862125, at \*24 (S.D.N.Y. Mar. 18, 2025) (complaint "pleads no facts suggesting that [defendant] subjectively disbelieved" his statements of opinion at the time they were made); *Barilli*, 389 F. Supp. 3d at 256 ("Plaintiffs have offered no factual allegations" that would "support an inference that [company] did not actually believe the opinions"). The SAC also asserts only that three of the Individual Defendants, *see* ¶ 37 (defining "Individual Defendants"), visited the Plaquemines project site "every other week" or "at least once a month," ¶¶ 159-60, 163, or that some non-defendant executives "received updates" from, or were very involved in, VG's projects, ¶¶ 110, 162, 165-66. None of these allegations indicates what was discussed in these meetings, much less how it purportedly undermines the basis for VG's opinions—*i.e.*, they say nothing about the "'inquiry [VG] did or did not conduct or the knowledge it did or did not have.'" *Barilli*, 389 F. Supp. 3d at 256 (quoting *Omnicare*, 575 U.S. at 176).

All claims related to the Category 1 statements must be dismissed.

16

**B.    Category 2:  VG's 4Q24 Financial Information**

Plaintiffs next assert that "the Offering Documents were materially false and misleading because they failed to disclose: (i) "critical financial information from" 4Q24 specifically focused on VG's costs for the Plaquemines Project, (ii) "higher than expected" costs for VG's CP2 Project, and (iii) higher operating, maintenance, development, and remediation expenses for VG's projects generally that led to a lower than expected EBITDA forecast for 2025.  ¶¶ 10, 129; *see also* ¶¶ 188, 190, 193, 196, 198; App'x A.  These claims fail as a matter of law.

**1.    The SAC Fails To Plead Facts Establishing That VG's Financial Disclosures Were False Or Misleading**

**a.    Plaquemines Project Costs**

VG's IPO occurred on January 24, 2025.  ¶ 26.  Plaintiffs argue that the Offering Documents should have included interim, unaudited 4Q24 financials disclosing actual costs for the Plaquemines Project for this period even though it ended just 24 days earlier, on December 31, 2024.  ¶¶ 189, 191, 194.  That is not the law.

Regulation S-X is clear that, for IPOs occurring within 90 days of the end of a fiscal year, offering documents "***need not include*** financial statements more current than as of the end of the third fiscal quarter of the most recently completed fiscal year unless the audited financial statements for such fiscal year are available."  17 C.F.R. § 210.3-12(b), (g) (emphasis added). Similarly, Regulation S-X only requires an issuer to provide more recent financial statements if those in the registration statement are more than 135 days old at the time of the IPO, which was not the case for VG.  17 C.F.R. § 210.3-12(a), (g).  VG was not required to disclose its 4Q24 financials in the Offering Documents and the SAC does not allege that the 2024 audited financials were even available as of the date of the IPO.  *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 36

17

(2d Cir. 2017) (plaintiff "concedes, as he must, that [defendant] did not violate SEC Regulation S-X" by not disclosing financial statements for period immediately prior to IPO).

Plaintiffs also fail to show that not disclosing the 4Q24 information rendered some other statement materially misleading. Plaintiffs contend that (i) the Offering Documents disclosed that costs for the Plaquemines Project were $17.7 billion as of 3Q24, (ii) this cost had increased to $19.8 billion as of 4Q24, and (iii) VG's borrowing capacity correspondingly decreased during that same period. ¶¶ 128, 189, 194. This states no claim. VG disclosed that construction for the Plaquemines Project was ongoing, S-1 at 192-95, so the continued accumulation of costs and drawing down on loans (which is all Plaintiffs allege) is unremarkable, particularly here, where the cost to date as of 4Q24 (*i.e.*, $19.8 billion) was well below the estimated total cost in the Offering Documents ($22.5 to $23.5 billion). *Gen. Motors*, 46 F. Supp. 3d at 395 (company's statements need only be "consistent with reasonably available data" and "need not present an overly … cautio[us] picture of … future prospects").

Plaintiffs next complain that VG's *estimate* of total costs to complete Plaquemines increased from $22.5 to $23.5 billion in the Offering Documents to $23.3 to $23.8 billion when VG released its 4Q24 financials. ¶ 230. But this increase—in which the new estimated range *overlaps* with the original estimated range—does not show that the estimates in the Offering Documents were false when presented, or even that it was "knowable" at the time of the IPO that the estimates would increase. *Gen. Motors*, 46 F. Supp. 3d at 394 ("Plaintiffs must, at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering.") (quotation omitted). Instead, it simply shows that *later* estimates increased slightly. This cannot sufficiently plead falsity as a matter of law. *See Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc.*, 715 F. Supp. 3d 483, 504-05 (S.D.N.Y. 2024) (subsequent change to

18

EBITDA projections did not mean earlier guidance was false when issued), *aff'd*, 2024 WL 4647131 (2d Cir. Nov. 1, 2024); *HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 300-01 (S.D.N.Y. 2021) (lower than expected revenue post-IPO did not show earlier guidance was false).

Finally, the upper end of VG's 4Q24 estimate for Plaquemines was $300 million higher than the top end of its previously disclosed range, which is equal to just 1.2% of the total estimated costs for that project. This increase did not "significantly alter[] the 'total mix' of information made available in the public domain." *Stadnick*, 861 F.3d at 38. The Second Circuit has repeatedly held—on motions to dismiss—that similar variations are not material as a matter of law. *See id.* at 38-39 (finding "not material" financial results for fiscal quarter prior to IPO, but reported after IPO, that included a net loss of $28.6 million and missed analysts' expectations by 143%, in light of company's past losses); *Tabak v. Canadian Solar Inc.*, 549 F. App'x 24, 27 (2d Cir. 2013) (finding "immaterial as a matter of law" challenged amounts that caused company to overreport 2.7% of quarterly and 0.9% of annual revenue); *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) ($2 billion revision "may sound staggering" but "must be placed in context" of defendant's "total assets of $715 billion").

### b.    CP2 Project Costs

The SAC asserts that at the IPO, "the CP2 [p]roject[] costs were already higher than expected based on the prior quarter results" and that it was "already" having "a material effect on the Company's financial results," ¶ 198, but provides no basis for this conclusory assertion. In the Offering Documents, VG projected that total costs for the CP2 Project would "range between approximately $27.0 billion and $28.0 billion." S-1 at 198. That estimate did not change until August 2025 (eight months later) when VG announced that it was increasing its cost estimate to $28.5 to $29.5 billion due to, among other things, higher interest rates and recently announced tariffs. Ex. 3, 2Q25 Earnings Call Tr. at 12-13. When VG provided its initial estimate in the

Offering Documents in January 2025, it explained that "actual project costs for the CP2 Project may be materially higher than this estimate." S-1 at 198. The fact that estimated costs increased by little more than 5 percent eight months after the IPO due to new tariffs says nothing about whether VG's earlier estimates were false when made. *See Zirkin v. Quanta Cap. Holdings Ltd.*, 2009 WL 185940, at *11 (S.D.N.Y. Jan. 23, 2009) (15% upward revision two months after IPO "insufficient … to suggest that the disclosure in the registration statement was false at the time it was made") (collecting cases); *see also Discovery*, 715 F. Supp. at 504-05 (S.D.N.Y. 2024); *HEXO*, 524 F. Supp. 3d at 300-01.

### c.    2025 EBITDA Forecast

The SAC also asserts that supposedly higher-than-expected operating, maintenance, development, and remediation expenses and correspondingly lower "EBITDA forecast for 2025," ¶¶ 129, 189, 234, should have been disclosed in the Offering Materials. This claim fails for two simple reasons: (1) VG did not provide—and Plaintiffs do not allege it was required to provide—any EBITDA forecast for 2025 in its Offering Documents; and (2) Plaintiffs do not allege VG knew at the time of the IPO that its 2025 EBITDA forecast would be lower than anticipated by certain market analysts.

Plaintiffs must premise their Securities Act claims on alleged misstatements or omissions in a registration statement (Section 11) or a prospectus (Section 12). *See* 15 U.S.C. § 77k(a)); 15 U.S.C. § 77l(a)). Here, there is no dispute that the Offering Documents did not—and were not required to—include any EBITDA forecast for 2025 and that the first time VG disclosed one was on March 6, 2025. *See* ¶¶ 17, 227, 234 (stating that VG disclosed 2025 adjusted EBITDA with its 4Q24 earnings); Ex. 4, Mar. 6, 2025 8-K at 3.[7] Such claims are actionable only if the information

---

[7] Plaintiffs' supposition that "consensus forecasts" published by third-party analysts "would have been derived" from information provided by VG (¶ 129) concedes that these are not statements

was "an omission in contravention of an affirmative legal disclosure obligation" or "an omission of information that is necessary to prevent existing disclosures from being misleading." *See Morgan Stanley*, 592 F.3d at 361. Here, the EBITDA forecast was neither. There is no allegation that VG was required to disclose its 2025 EBITDA estimate in the Offering Documents. Nor do Plaintiffs identify a statement in the Offering Documents rendered misleading by failure to disclose this information. That is fatal. *See id.* (dismissing claim based on omission theory where there was no legal duty to disclose).

Regardless of who made the statement, Plaintiffs' conclusory assertion that, "[b]y the time of the IPO, the Company's EBITDA forecast for 2025 already deviated from investor expectations," ¶189(h), is also insufficient because it alleges no facts to suggest that the forecast released in March 2025 was known or knowable months earlier. *See Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016) (dismissing Section 11 claim where "Plaintiffs allege no facts that actually support their assertions that sales … were declining at the time of the IPO."); *Discovery*, 715 F. Supp. 3d at 505 ("engineer[ing] Securities Act claims" based on "downward adjustment of [company's] projected EBITDA" is the "type of 'hindsight'" pleading" that "falls short") (collecting cases).

### 2.    The Category 2 Forward-Looking Estimates Are Protected By The Bespeaks Caution Doctrine

In addition, as noted, under the bespeaks caution doctrine, forward-looking statements—like VG's costs estimates for Plaquemines and CP2—are not actionable if they are accompanied by cautionary language. *See* ¶¶ 188, 190, 193, 196, 198; App'x A; *Rombach*, 355 F.3d at 173.

---

that appear in the Offering Documents and, therefore, are not actionable. *See Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 265 (2d Cir. 1993) (affirming dismissal of securities claims based on unattributed statements "even when the plaintiff alleges on information and belief that the unattributed statement was made by an agent of the defendant").

Here, estimates of total costs for ongoing projects necessarily include an estimate of future costs and are, therefore, forward-looking statements. *See* S-1 at 96 ("these forward-looking statements … include … estimates of the cost of our projects and schedule to construct and commission our projects"); *cf.* 15 U.S.C. § 77z-2(i)(1)(A) (defining forward-looking statement to include "a statement containing a [financial] projection"). VG made extensive disclosures about the factors that could cause actual results to differ, potentially meaningfully. *See* S-1 at 45 ("The costs to achieve completion of the Plaquemines Project may be subject to *further increases*, which could be material ….") (emphasis added); S-1 at 198 ("[T]he actual project costs for the CP2 Project *may be materially higher* than [VG] estimate[s].") (emphasis added). These statements are therefore inactionable. *See NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 292 (S.D.N.Y. 2009) ("prediction about [a project's] ultimate costs," characterized as an "estimate" protected by bespeaks caution doctrine); *Zirkin*, 2009 WL 185940, at *10, 13 ("loss estimate" protected by bespeaks caution doctrine).

### C.    <u>Category 3</u>:  VG's Ability To Enter Long-Term Contracts

Plaintiffs' final theory of falsity is that the Offering Documents "misrepresented [VG's] capacity to enter into stable, long-term contracting agreements and omitted the reputational harm [VG] had incurred by failing to meet its customers' expectations under existing long-term contracts." ¶ 13; *see also* ¶¶ 200, 202, 204, 206, 208, 210; *see also* App'x A. Plaintiffs contend that VG's statements about its long-term contracts must be false because: (i) VG was engaged in arbitrations with certain of its existing customers, which have resulted (post-IPO) in two awards in favor of VG and one award against VG, ¶¶ 130-58, 205, 211, 236-37[8]; (ii) the CEO of a

---

[8] *See also* Ex. 5, Jan. 21, 2026 8-K at 2 (announcing that a separate arbitration tribunal ruled in favor of VG in the third of these arbitrations to reach a decision).

competitor said post-IPO he would not enter a long-term contract with VG, ¶¶ 16, 205, 211, 218-22; and (iii) a single post-IPO analyst report that offered no new facts but speculated based on the existence of the arbitrations that VG must have sustained "reputational damage" with certain customers, ¶ 233.  These arguments fail as a matter of law for multiple independent reasons.

*First*, Plaintiffs do not (and cannot) allege facts establishing that VG has ***actually*** had difficulty signing long-term contracts with new customers, relying instead on conclusory statements.  *See, e.g.*, ¶ 201 (stating that "[b]y the time of the IPO," VG was "already experiencing undisclosed damage to its goodwill, reputation, and business" and "already experiencing diminished ability" to enter into long-term contracts).  And although not necessary for resolving this motion, the public record—which Plaintiffs strategically omit from the SAC—is clear:  since the IPO, VG has announced eight new long-term contracts, three ***after*** the arbitration loss Plaintiffs cite.[9]

*Second,* Plaintiffs' claim that the "Offering Documents misrepresented the risks of the disputes [VG] was having with its long-term contract counterparties" is unfounded.  *See, e.g.*, ¶ 210.  The Offering Documents contained more than a dozen pages disclosing that "all such [long-term] customers" were initiating arbitration proceedings regarding VG's assertion that its continuation of spot sales and corresponding delay in commencing shipments pursuant to long-term contracts was due to a "*force majeure* event."  VG also disclosed that if it was unsuccessful

---

[9] *See, e.g.*, Ex. 6, Press Release, Venture Global Announces 20-Year Sales and Purchase Agreement with Petronas (July 3, 2025); Ex. 7, Press Release, Venture Global and SEFE Announce Expansion of LNG Partnership (July 9, 2025); Ex. 8, Press Release, Venture Global and Eni Announce 20-Year LNG Sales and Purchase Agreement (July 16, 2025); Ex. 9, Press Release, Venture Global Announces New Long-Term LNG Sales and Purchase Agreement With Greece (November 7, 2025); Ex. 10, Press Release, Venture Global Announces Long-term Sales and Purchase Agreement With Naturgy of Spain (November 10, 2025); Ex. 11, Press Release, Venture Global and Mitsui Announce 20-Year LNG Sales and Purchase Agreement (November 11, 2025).

in these arbitrations, it could be obligated to pay "substantial [amounts], which could have a material adverse effect on [its] business" or "prospects," S-1 at 80; and that "[i]f any of our customers were to successfully terminate … there can be no assurance we would be able to enter into new [long-term contracts] on a timely basis and on comparable or better terms," *id.*; *see also id.* at 13, 28, 44-45, 78-80, 97-98, 228-29, F-10, F-19, F-44, F-58 (additional disclosures).

In other words, VG expressly warned of both the risks of negative arbitration awards and the potential impact the existence of the disputes could have on its business and engagement of new long-term contracts. *ProShares*, 728 F.3d at 102 ("the relevant prospectuses adequately warned the reasonable investor of the allegedly omitted risks"); *Yaroni v. Pintech Tech. Holdings, Ltd.*, 600 F. Supp. 3d 385, 398-99 (S.D.N.Y. 2022) (Section 11 claims "fail as a matter of law because [company] disclosed the risk at issue"). That many months after the IPO one of the arbitrations subsequently resulted in an award against VG and two others resulted in favorable rulings for VG (one of which is being challenged), ¶¶ 236-37,[10] does not somehow make VG's disclosures regarding the "risks of the disputes" at the time of the IPO misleading. *See Discovery*, 715 F. Supp. 3d at 505.[11]

*Third*, the statement by the TotalEnergies' CEO adds nothing. VG never stated or even suggested in its Offering Documents that TotalEnergies was, would be, or could even potentially be a long-term customer. *See Yaroni*, 600 F. Supp. 3d at 401. The only references to TotalEnergies

---

[10] *See also* Ex. 5, Jan. 21, 2026 8-K at 2.

[11] Similarly, statements that VG "believe[d]" that customer assertions regarding the post-COD SPA disputes are "unsubstantiated," ¶ 210, are inactionable because they are opinion statements, and Plaintiffs "plead[] no facts suggesting that [VG] subjectively disbelieved" its opinions at the time they were made. *Vroom*, 2025 WL 862125, at *24; *Barilli*, 389 F. Supp. 3d at 256. Indeed, at least one arbitration panel sided with VG. ¶ 237. The SAC fails to plead any actionable misstatement or omission.

in the Offering Documents are that TotalEnergies was constructing competing LNG facilities.  S-1 at 166-68.  One statement from one company says nothing about any material decrease in the number of customers VG was signing.  *See Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) (dismissing Section 11 claim where complaint "allege[d] no specific facts regarding the volume of customer withdrawals"), *aff'd*, 347 F. App'x 665 (2d Cir. 2009); *Steinberg*, 88 F. Supp. 2d at 309 (dismissing Sections 11 and 12(a)(2) claims that company was "unable to gain … business from certain preferred vendor clients" where prospectus made "no representations" regarding future clients); *IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 591-92 (S.D.N.Y. 2007) (defendant not "obligat[ed] to disclose negative information about … customer dissatisfaction" where the complaint alleges only "[t]he discontent of one [customer]").

*Fourth,* Plaintiffs add to the SAC a quotation from a Morningstar analyst report published in March 2025, ¶ 233, but this does nothing to save Plaintiffs' claims.  The report provides no facts supporting the analyst's speculation that VG must have suffered reputational harm with unspecified customers as a result of the disclosed arbitrations.  *See* Ex. 12, Morningstar Rep., at 2. Where a "report[] provide[s] no basis on which a reader could possibly evaluate the reliability of [its] factual claims"—especially one that is published weeks after the IPO—it does not "plausibly establish" contemporaneous falsity.  *FuBoTV Inc. Sec. Litig.*, 2024 WL 1330001, at *6 (S.D.N.Y. Mar. 28, 2024) (*FuboTV II*) (quotation omitted); *see also China Mobile,* 2016 WL 922711, at *4 (no contemporaneous falsity where plaintiffs rely on news articles published after filing of SEC forms containing alleged misstatements); *C.D.T.S. No. 1 v. UBS AG*, 2013 WL 6576031, at *4 (S.D.N.Y. Dec. 13, 2013) (finding "ex post facto" media reports "insufficient to support an inference of falsity at the time the alleged statements were made"), *aff'd*, 604 F. App'x 5 (2d Cir. 2015).  The Morningstar report merely discusses VG's well-disclosed customer arbitrations and

theorizes about the impact they were having on customer relationships.  This is insufficient.  *FuBoTV II*, 2024 WL 1330001, at \*6 (discounting "unadorned opinions of purported market experts") (quotations omitted).

*Fifth*, the FEs again add nothing.  The FEs on which Plaintiffs rely (FE 3, FE 8, FE 9, FE 10, and FE 11) with regard to these Category 3 statements, ¶¶ 136-37, 144, 146-147, 150, 153-56, were involved in various aspects of construction work, not sales or customer-facing operations, ¶¶ 107, 135, 141, 149, 152, and *all* left VG months—and in some cases more than a year—before the IPO, so they have no basis to allege any loss of goodwill or reputation at the time of the IPO.  *See FuboTV I*, 2023 WL 2711826, at \*11; *Qudian*, 2019 WL 4735376, at \*6; *Marquez*, 755 F. Supp. 3d at 278-80.  These FEs simply explain in general terms VG's sales of LNG on the "spot market," which was a fact that VG itself disclosed in the Offering Documents.  *Compare, e.g.*, ¶ 136 (FE 8 alleging that VG's "goal was to trade LNG on the spot market") *and* ¶ 143 (FE 9 alleging that "a spike in LNG pricing" drove VG's spot market sales) *with* S-1 at 26 ("In particular, production capacity from our projects that is not otherwise committed can be sold on a short-, medium- or long-term basis, including on a spot basis, which can provide flexibility to optimize the pricing for such capacity and can help us balance profit, duration and risk").

*Sixth*, several of the Category 3 statements are also inactionable forward-looking and opinion statements.  The forward-looking statements were accompanied by cautionary language concerning the very topics Plaintiffs contend were omitted.[12]  As a result, statements like "we

---

[12] *See* S-1 at 96-99 (listing as risks "the potential that counterparties in certain of [VG's] contractual arrangements … may exercise their existing termination rights"; VG's "potential inability to enter into post-COD SPAs with customers for, or to otherwise sell, an adequate portion of the total expected nameplate capacity" at future projects; and VG's "current and potential involvement in disputes and legal proceedings, including the arbitrations and other proceedings currently pending against" it and the possibility of a negative outcome and the potential impact thereof on VG's "results of operations, liquidity and … existing contracts").

*believe* that the foregoing assertions in each request for arbitration are unsubstantiated, we *further believe* that any award of contract damages would be subject to the relevant seller aggregate liability cap under the relevant post-COD SPA" ¶ 210 (emphasis added); *see also* ¶¶ 200, 202, 204, 206, 208, 210; App'x A, are not actionable as a matter of law.  *See Rombach,* 355 F.3d at 173; *Zirkin*, 2009 WL 185940, at *10, 13.

### D.        The SAC Fails To Allege A Violation Of Item 303 Or Item 105

The SAC also contends that VG violated Items 303 and 105 of SEC Regulation S-K by failing to disclose all the foregoing information.  ¶¶ 213-17.  There is no such violation.  Item 303 requires registrants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011) (quoting 17 C.F.R. § 229.303(a)(3)(ii)).  Item 105 requires a "discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a).  The SAC fails to plead the facts needed to support such claims.

Plaintiffs' Item 303 claim fails for the reasons discussed above:  (1) Plaintiffs have not shown that any of the purported conditions (*i.e.*, project delays, cost overruns, or customer challenges) existed at the time of the IPO, and (2) VG disclosed the information that Plaintiffs claim was omitted.  *See, supra*, Section I.A-C; *Lowinger v. Pzena Inv. Mgmt., Inc.*, 341 F. App'x 717, 720 (2d Cir. 2009) (dismissing Item 303 claim where the "prospectus fulfilled this obligation by disclosing" the claimed adverse trend and "warning that this development could be expected"); *Gen. Motors*, 46 F. Supp. 3d at 397 (no Item 303 violation where "GM had disclosed its increasing inventories and relatively slower growth in sales" and did not need to characterize this as a "trend").  Moreover, Plaintiffs cannot premise an Item 303 claim on the absence of the in-process 4Q24 financials because a single quarter's worth of financial information cannot constitute a

known trend as a matter of law.  *See Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 368 (S.D.N.Y. 2019) ("[T]hese alleged effects on a single quarter's revenues do not constitute 'trends' under Item 303."), *aff'd*, 826 F. App'x 111 (2d Cir. 2020); *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 245 (S.D.N.Y. 2015) ("The two- and five-month periods preceding defendants' public filings were insufficient to establish a reportable trend …."), *aff'd*, 660 F. App'x 23 (2d Cir. 2016).

Likewise, Plaintiffs' assertions about TotalEnergies, whose CEO purportedly declined to contract with VG on a long-term basis, ¶ 215, fall far short of establishing a known trend under Item 303.  The statement from TotalEnergies came *after* the IPO and thus could not have constituted a known trend at the time of the IPO.  *See Coty*, 2016 WL 1271065, at *10 (no Item 303 violation where plaintiff alleged that Defendants lost a customer "after the IPO").  Moreover, the loss of a single potential customer is not enough to constitute a "known trend" under Item 303. *Id.* at *9 (allegation that a company lost a single product line was insufficient to establish an Item 303 violation); *see also Noah Educ. Holdings, Ltd. Sec. Litig.*, 2010 WL 1372709, at *6 (S.D.N.Y. Mar. 31, 2010) ("Item 303 does not require companies to disclose isolated occurrences that affect their financial performance.")  The same analysis applies to arbitration decisions that post-date the IPO decisions.  That two have come out favorably and one unfavorably, despite being based on similar facts, only underscores the extent to which the one loss could not have been a "known trend" at the IPO.  Plaintiffs' Item 303 claim therefore fails and any claim based on Item 105 fails for similar reasons.  *See Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619 n.4 (S.D.N.Y. 2021) (dismissing Item 105 claim premised on the "same facts underlying [the] [I]tem 303 violation").

28

## II.    THE SAC MAKES CLEAR THAT THE ALLEGED MISREPRESENTATIONS AND OMISSIONS DID NOT CAUSE PLAINTIFFS' LOSSES

Although "plaintiffs bringing claims under [S]ections 11 and 12(a)(2) need not allege … loss causation" (*i.e.*, that the alleged misstatements or omissions caused their losses), *Morgan Stanley*, 592. F.3d. at 359, the absence of causation is fatal to these claims, *State St. Bank*, 774 F. Supp. 2d at 588.  This absence, known as "negative causation," may be the basis for dismissal even on a motion to dismiss where "it is apparent ***on the face of the complaint*** that the alleged loss is not causally connected to the [alleged] misrepresentations at issue." *Id.* (dismissing Sections 11 and 12(a)(2) claims based on facial absence of loss causation) (emphasis added).  Here, Plaintiffs themselves pled that the stock price declines were due to things ***other than*** correction of the challenged statements.  In particular, Plaintiffs assert two post-IPO events caused the declines in VG's stock price:  (1) a February 5, 2025 news article quoting the TotalEnergies' CEO saying that he would not enter into a long-term contract with VG, and (2) VG's March 6, 2025 disclosure of "Q4 2024 earnings that were well below consensus" estimates.  ¶¶ 17, 218, 227.  Neither of these corrected any statement in the Offering Documents.

As to the February 2025 news article, the Offering Documents did not state, or even suggest, that TotalEnergies was or might become a long-term customer.  The stock price decline that Plaintiffs say was caused by the TotalEnergies CEO's comments, therefore was unrelated to any alleged misstatement or omission in the Offering Documents.

Likewise, VG's 4Q24 financials did not correct any financial disclosures in the Offering Documents.  Plaintiffs themselves contend that the March 2025 stock decline was because VG announced results below "street consensus" and market analysts' "expectations."  ¶¶ 12, 17, 227, 234.  A "failure to meet earnings forecasts has a *negative* effect on stock prices, but not a *corrective* effect." *Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (emphasis in

29

original).  Absent a corrective effect, there is no causal link between the alleged misstatements and the stock price decline.

Courts in this district routinely dismiss Securities Act claims where, as here, it is plain on the face of the complaint that the claimed loss was caused by factors other than the statements at issue.  *See, e.g.*, *id.*; *Boluka Garment Co., Ltd. v. Canaan Inc.*, 547 F. Supp. 3d 439, 447 (S.D.N.Y. 2021) (dismissing Section 11 claim where disclosure alleged to have caused stock price decline did not discuss the facts plaintiff claimed were omitted from the registration statement); *Sec. Cap. Assur. Ltd. Sec. Litig.*, 2011 WL 4444206, at *6-8 (S.D.N.Y. Sept. 23, 2011) (dismissing Section 11 claim where "it is apparent from the face of the complaint" that the "corrective disclosures" did not "reveal[] facts concealed by the[] misstatements during the relevant time period").  The same result is warranted here.

## III.    PLAINTIFFS HAVE FAILED TO PLEAD A SECTION 15 CLAIM

Section 15 creates secondary liability for persons who control any person liable under Sections 11 and 12(a)(2).  *See* 15 U.S.C. § 77o.  Here, because Plaintiffs fail to plead primary violations of the Securities Act, Plaintiffs' Section 15 claims must also be dismissed.  *Gen. Motors*, 46 F. Supp. 3d at 398.

## CONCLUSION

For the foregoing reasons, Defendants request that the Court dismiss the SAC with prejudice.

Dated: January 28, 2026                      Respectfully submitted,
      New York, New York

                                      **LATHAM & WATKINS LLP**

                                      */s/ Jeff G. Hammel*
                                      Jeff G. Hammel
                                      Jason C. Hegt
                                      Corey A. Calabrese

1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
jeff.hammel@lw.com
jason.hegt@lw.com
corey.calabrese@lw.com

*Attorneys for Venture Global, Inc., Michael Sabel,*
*Robert Pender, Jonathan Thayer, Sarah Blake,*
*Sari Granat, Andrew Orekar, Thomas J. Reid,*
*Jimmy Staton, Roderick Christie, and Venture*
*Global Partners, II, LLC*

**GIBSON, DUNN & CRUTCHER LLP**

*/s/ Lissa M. Percopo*
Robert F. Serio[13]
Mary Beth Maloney
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
rserio@gibsondunn.com
mmaloney@gibsondunn.com

Lissa M. Percopo (admitted *pro hac vice*)
1700 M Street, N.W.
Washington, D.C. 20036-4504
Telephone: (202) 955-8500
lpercopo@gibsondunn.com

*Attorneys for Defendants Goldman Sachs & Co.*
*LLC, J.P. Morgan Securities LLC, BofA Securities,*
*Inc., ING Financial Markets LLC, RBC Capital*
*Markets, LLC, Scotia Capital (USA) Inc., Mizuho*
*Securities USA LLC, Santander US Capital*
*Markets LLC, SMBC Nikko Securities America,*
*Inc., MUFG Securities Americas Inc., BBVA*
*Securities Inc., Loop Capital Markets LLC, Natixis*
*Securities Americas LLC, Deutsche Bank*
*Securities Inc., Wells Fargo Securities, LLC, Truist*
*Securities, Inc., National Bank of Canada*
*Financial Inc., Raymond James & Associates, Inc.,*
*Regions Securities LLC, Guggenheim Securities,*

---

[13] Electronic signatures are used with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

31

*LLC, and Tuohy Brothers Investment Research, Inc.*

32

**CERTIFICATION OF WORD COUNT**

I, Jeff G. Hammel, an attorney duly admitted to practice before this Court hereby certify that pursuant to Local Rules 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York and Rule 3.C. of Judge Jennifer Rochon's Individual Practices in Civil Cases, that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 9,907 words, which accords with the Scheduling Order entered on December 23, 2025 (ECF No. 113) under which the parties stipulated to an expanded count of 10,000 words.  In making this calculation, I have relied on the word and page counts of the word-processing system used to prepare the document.


Dated: January 28, 2026                              */s/ Jeff G. Hammel*
                                                     Jeff G. Hammel