UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FIRSTFIRE GLOBAL OPPORTUNITIES
FUND LLC, Individually and on Behalf of
All Others Similarly Situated,

                  Plaintiff,

        v.

VENTURE GLOBAL, INC., *et al.*,

                  Defendants.

Case No. 1:25-CV-4642 (JSR)

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**LABATON KELLER SUCHAROW LLP**
Alfred L. Fatale III
Joseph N. Cotilletta
Beth C. Khinchuk
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: afatale@labaton.com
jcotilletta@labaton.com
bkhinchuk@labaton.com

*Lead Counsel for Lead Plaintiff and the Class*

*[Additional Counsel on Signature Page]*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

I.     INTRODUCTION ..................................................................................................... 1

II.    PROCEDURAL BACKGROUND.............................................................................. 3

III.   FACTUAL BACKGROUND...................................................................................... 4

IV.    LEGAL STANDARD................................................................................................. 6

V.     DEFENDANTS' ATTEMPTS TO UNDERMINE THE FE ALLEGATIONS FAIL....... 8

VI.    THE SAC ADEQUATELY PLEADS MATERIAL MISSTATEMENTS AND
       OMISSIONS ............................................................................................................ 12

       A.    Category 1: The "Design One, Build Many" Statements were False and
             Misleading................................................................................................. 12

             1.    The Offering Documents Touted the Approach While Failing to Disclose
                   Systemic Failures ............................................................................. 12

             2.    The SAC Pleads Contemporaneous Falsity ............................................ 14

             3.    The Forward-Looking and Opinion Statement Defenses Do Not Apply . 15

       B.    Category 2: The SAC Adequately Pleads the Omission of Critical Q4 2024
             Financial Information................................................................................. 17

             1.    VG Selectively Disclosed Favorable Information While Concealing
                   Material Adverse Data ...................................................................... 17

             2.    The Plaquemines Cost Increase Was Material......................................... 19

             3.    Defendants Had a Duty to Disclose the EBITDA Forecast Deviation ..... 21

             4.    The Bespeaks Caution Doctrine Does Not Apply ................................... 21

       C.    Category 3: The SAC Adequately Alleges Misrepresentations Regarding Long-
             Term Contracts and Reputational Harm .............................................. 22

             1.    VG Touted Its Long-Term Contracts While Omitting Its Avoidance of
                   Contractual Obligations .................................................................... 22

             2.    The Harm to VG's Reputation Was Material and Undisclosed................ 22

i

3.      The FEs and the Morningstar Report Further Support Category 3........... 24

VII.    THE SAC ADEQUATELY ALLEGES VIOLATIONS OF ITEMS 303 AND 105 ....... 25

A.      Item 303 ....................................................................................................... 25

B.      Item 105 ....................................................................................................... 26

VIII.   DEFENDANTS' NEGATIVE CAUSATION DEFENSE FAILS ................................. 27

IX.     THE SAC ADEQUATELY PLEADS SECTION 15 CLAIMS..................................... 29

X.      CONCLUSION...................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................................6

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012)...............................................................................8

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
  2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020) .................................................................15

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002).............................................................................................6

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
  450 F. Supp. 3d 379 (S.D.N.Y. 2020).............................................................................8

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991).............................................................................................30

*In re CPI Card Grp. Inc. Sec. Litig.*,
  2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017) ..................................................................6

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013)........................................................................7, 17

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)..........................................................................................................7

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011).............................................................................................8

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
  601 U.S. 257 (2024)........................................................................................................25

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013)............................................................................14

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010).............................................................................................7

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013).......................................................................................7, 10

iii

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012)................................................................................8

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)..............................................................................13, 16

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
  538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd,* 347 F. App'x 617 (2d Cir. 2009).....................25

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
  2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020)........................................................26

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)...............................................................................8

*Scott v. Gen. Motors Co.*,
  46 F. Supp. 3d 387 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015)............................7

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021)..............................................................................14, 22

*Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*,
  2018 WL 1587457 (D. Conn. Mar. 31, 2018) .........................................................8

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)...............................................................................21

## Other Authorities

17 C.F.R. § 229.105(a).......................................................................................26

Fed. R. Civ. P. 8(a)(2)........................................................................................8

Fed. R. Civ. P. 15.............................................................................................30

Lead Plaintiff Illinois Municipal Retirement Fund ("IMRF" or "Lead Plaintiff") and additional named Plaintiff Pompano Beach Police & Firefighters' Retirement System ("Pompano Beach" and, together with IMRF, "Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss the Second Amended Complaint (the "Motion" or "MTD") filed by Defendants (i) Venture Global, Inc. ("Venture Global," "VG," or the "Company"); (ii) Michael Sabel, Robert Pender, Jonathan Thayer, Sarah Blake, Sari Granat, Andrew Orekar, Thomas J. Reid, Jimmy Staton, and Roderick Christie (the "Individual Defendants" and, together with Venture Global, the "VG Defendants"); (iii) Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, BofA Securities, Inc., ING Financial Markets LLC, RBC Capital Markets, LLC, Scotia Capital (USA) Inc., Mizuho Securities USA LLC, Santander US Capital Markets LLC, SMBC Nikko Securities America, Inc., MUFG Securities Americas Inc., BBVA Securities Inc., Loop Capital Markets LLC, Natixis Securities Americas LLC, Deutsche Bank Securities Inc., Wells Fargo Securities, LLC, Truist Securities, Inc., National Bank of Canada Financial Inc., Raymond James & Associates, Inc., Regions Securities LLC, Guggenheim Securities, LLC, and Tuohy Brothers Investment Research, Inc. (the "Underwriter Defendants"); and (iv) Venture Global Partners II, LLC ("VG Partners" and, together with the VG Defendants and the Underwriter Defendants, the "Defendants").

I.    INTRODUCTION

This strict liability securities class action, brought solely under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, arises from Venture Global's January 24, 2025 initial public offering (the "IPO"), which was the largest energy IPO by valuation in United States history at the time. The Defendants used this historic offering to sell over 70,000,000 shares of Class A common stock at $25.00 per share, raising

1

approximately $1.75 billion from the investing public on the strength of Offering Documents that painted a rosy picture of the Company's operations, finances, and business relationships. But that picture was false. As set forth in the Second Amended Complaint (the "SAC"), the Offering Documents were materially false and misleading and omitted material facts in three critical ways at the time of the IPO, as corroborated by, *inter alia*, detailed firsthand allegations from twelve former employees and contractors ("FEs") who witnessed the Company's operational problems, cost overruns, and contractual violations leading up to and at the time of the IPO.[1]

**First**, the Offering Documents affirmatively touted VG's "design one, build many" construction approach as a crown-jewel competitive advantage that "significantly reduces construction and installation costs, as well as construction time and schedule risk" (¶¶90-95, 176-182), while failing to disclose to investors the systemic delays, operational failures, and massive cost overruns that were, in reality, plaguing its facilities as a result of this approach. ¶¶96-123, 183-186.

**Second**, the Defendants conducted the IPO nearly a month after the close of Q4 2024 (¶¶10-12, 167), however, while touting positive developments from the quarter, the Offering Documents omitted critical, then existing Q4 2024 financial information that would have shown investors that substantial additional costs had been incurred by the Company, including approximately $2.1 billion in additional expenditures for the Plaquemines Project (bringing total costs from $17.7 billion to $19.8 billion in that quarter alone), and failed to disclose that VG's 2025 EBITDA forecast would fall short of expectations by about $2 billion. ¶¶124-129,187-199.

---

[1] Citations to paragraphs ("¶") are to paragraphs in the SAC. ECF No. 101. Unless otherwise noted, emphasis is added and internal citations and quotation marks are omitted throughout.

***Third***, while the Offering Documents held VG out as a trustworthy contractual counterparty with a robust portfolio of long-term contracts, VG was in fact flouting those commitments. ¶¶13-17, 130-158, 200-212. Rather than honor its obligations to major counterparties including Shell and BP, VG chose to sell liquefied natural gas ("LNG") on the spot market for short-term profits at the expense of long-term relationships. *Id.* This strategy pushed the Company into several different arbitration proceedings, some of which were pending by the time of the IPO. Although the Offering Documents disclosed the existence of these arbitrations, they failed to disclose that the claims were not routine commercial disputes or the product of force majeure events, but rather VG had purposefully breached its obligations to declare its projects completed in a timely manner and failed to act as a "Reasonable and Prudent Operator." ¶¶236-237. Likewise, the Company's conduct towards its counterparties ruined VG's reputation and business prospects. ¶¶218-226

Defendants now ask this Court to dismiss the case by rewriting history. Their Motion mischaracterizes both the allegations in the SAC and the applicable legal standards and goes as far as relying on case law overturned by the Second Circuit. As set forth below, the SAC adequately pleads each of its claims.

## II.    PROCEDURAL BACKGROUND

This action was commenced on April 15, 2025, when VG's stock was trading at $8.29 per share. ECF No. 1; *see also* ¶18. After the Court appointed IMRF as Lead Plaintiff (ECF No. 72), on September 15, 2025, IMRF and additional plaintiff Pompano Beach filed their first amended complaint. ECF Nos. 75, 77. On November 13, 2025, Plaintiffs filed a corrected first amended complaint to correct certain scrivener's errors. ECF No. 89. On November 14, 2025, Defendants filed a motion to dismiss the corrected first amended complaint ("First MTD"). ECF Nos. 94-97.

On December 5, 2025, Plaintiffs filed the SAC, pursuant to the Court's individual rules and as a "matter of course" under FRCP 15(a)(1)(B). ECF No. 101. After a dispute amongst the parties regarding whether Plaintiffs properly filed the SAC, the Court ruled on December 17, 2025 that it would accept the SAC under Rule 15(a)(2) and mooted the First MTD. Exhibit 1 at 17:21-18:6, 20:2-3.[2] Moreover, the Court refused to prohibit future amendment after ruling on a motion to dismiss. *Id.* at 18:7-19:18. On January 28, 2026, Defendants filed the MTD now at issue. ECF Nos. 116-119.

## III.    FACTUAL BACKGROUND

Venture Global was founded in 2013 by Defendants Sabel and Pender to "disrupt" the production and distribution of LNG. ¶80. The Company's pitch to investors was simple: VG had invented a better way to build LNG plants. Rather than constructing two or three large liquefaction trains on-site like their competitors did, VG fabricated larger numbers of medium-sized trains at offsite factories in Italy and shipped them to Louisiana in assembled form. ¶¶90-91. VG called this its "design one, build many" approach and told investors it "significantly reduces construction and installation costs, as well as construction time and schedule risk." ¶93. On the strength of that representation, VG conducted its IPO on January 24, 2025, selling 70,000,000 shares of Class A common stock at $25.00 per share, raising approximately $1.75 billion and implying a market capitalization of roughly $60 billion—the largest energy IPO by valuation in United States history at the time. ¶¶3, 26, 167. Goldman Sachs, J.P. Morgan, BofA Securities, and eighteen other investment banks underwrote the Offering. ¶¶42-63. Each of the nine Individual Defendants participated in the preparation of and signing of the Registration Statement. ¶38.

---

[2] Exhibit 1 is filed herewith under the Declaration of Beth C. Khinchuk in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss the Second Amended Complaint.

The reality behind the curtain, however, was grim. By the time of the IPO, VG had five LNG projects in various stages: Calcasieu Pass ("Calcasieu"), Plaquemines, CP2, CP3, and Delta. ¶84. None were fully operational. *Id*. Calcasieu had been producing LNG since early 2022 but still had not achieved its Commercial Operation Date ("COD") by the time of the IPO—nearly three years later—because of ongoing "significant work related to commissioning, carryover completions, rectification, and certain other items being completed." ¶¶87, 193-195. At Plaquemines, the Company's flagship construction project, prefabricated modules arrived unfinished or with missing pieces, causing substantial delays. ¶9. As twelve former employees describe in detail, VG attempted to copy and paste designs from Calcasieu to Plaquemines despite significant differences in geological conditions, gas intake quality, and soil composition— replicating known defects rather than correcting them. ¶¶101, 109, 120. Defendants Sabel and Thayer were not in the dark. They visited the Plaquemines construction site "every other week" by helicopter and attended daily status meetings where these problems were discussed. ¶¶159-160.

The financial picture was equally misleading. The Defendants timed VG's IPO to fall just 24 days after the close of Q4 2024 but presented investors with financial data that omitted Q4 2024, as if the quarter had never happened. ¶¶10-12, 124-129. But it had. In fact, during Q4 2024, VG burned through approximately $2.1 billion in additional Plaquemines related expenditures alone, bringing total costs paid from $17.7 billion to approximately $19.8 billion. ¶¶10, 128. The Offering Documents failed to disclose this. VG also failed to disclose that its 2025 EBITDA forecast would fall approximately $2 billion short of Wall Street consensus expectations of approximately $9.3 billion. ¶¶129, 227.

Meanwhile, VG was busy destroying its most valuable business relationships. Unknown to investors, VG was not acting as a "Reasonable and Prudent Operator" and was deliberately

preventing its plants from obtaining COD in order to sell LNG on the spot market at prices up to three times higher than the long-term contract prices it had agreed to with major counterparties like Shell and BP. ¶¶133, 146, 236-237. By the time of the IPO, this strategy already provoked multiple arbitration proceedings and inflicted severe reputational damage on the Company. *See, e.g.*, ¶¶ 236-237.

Just nine days after the IPO, on February 5, 2025, TotalEnergies' CEO publicly refused to enter a long-term contract with VG, declaring: "I don't want to deal with these guys, because of what they are doing." ¶¶ 17, 218. VG's stock price dropped 11.2%. ¶17, 221. On March 6, 2025, VG filed its 10-K, revealing a $1.9 billion decline from FY 2023, projecting the Plaquemines plant to cost between $23.3 to $23.8 billion, and issuing 2025 EBITDA guidance of $6.8–$7.4 billion, down from the market consensus of $9.3 billion. ¶¶12, 227-230. The stock collapsed 36.05%. ¶¶17, 231. Then, in October 2025 post-IPO, BP won a billion-dollar arbitration award after a tribunal found that "Venture Global had breached its obligations to declare the commercial operation date of the Calcasieu project in a timely manner." ¶236. VG shares fell another 13% in after-hours trading. *Id*.

## IV.    LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must allege sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

"[T]he Securities Act impose[s] liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions." *In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597 at *2

(S.D.N.Y. Oct. 30, 2017). The statute is "designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). Under Sections 11 and 12(a)(2), issuers of securities are strictly liable for any misstatement or omission, and all others are held to a negligence standard. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) ("Issuers are subject to 'virtually absolute' liability under [S]ection 11, while the remaining potential defendants under [S]ections 11 and 12(a)(2) may be held liable for mere negligence.").

Liability can arise from "(1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 506 (S.D.N.Y. 2013). "Materiality is an inherently fact-specific finding." *Facebook*, 986 F. Supp. 2d at 508. An omission is material where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Id.* Because materiality "presents 'a mixed question of law and fact,' it will rarely be dispositive in a motion to dismiss." *Morgan Stanley*, 592 F.3d at 360.

A plaintiff need only "plausibly allege that [the registrant] omitted material information that it was required to disclose or made material misstatements in its offering documents, [to] meet the relatively minimal burden of stating a claim . . . under which, should plaintiffs' claims be substantiated, [a defendant's] liability as an issuer is absolute." *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 397 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015) (quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011)); *see N.J. Carpenters Health Fund v.*

7

*Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013) ("Because claims under §§ 11 & 12(a)(2) of the [Securities] Act need not include allegations of fraud, this is an ordinary notice pleading case, subject only to the short and plain statement requirements of Federal Rule of Civil Procedure 8(a)."). "Fraud is not an element," the complaint "need allege no more than negligence," *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004), and thus the SAC need only plead "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2); *see also Litwin*, 634 F.3d at 715. "Nor do the heightened pleading standards of the [PSLRA] apply to such non-fraud claims." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 157 (2d Cir. 2012).

## V.    DEFENDANTS' ATTEMPTS TO UNDERMINE THE FE ALLEGATIONS FAIL

Defendants' broad attack on the twelve FE witnesses, which pervades their Motion, mischaracterizes the SAC, relies on cases assessed under the PSLRA's heightened pleading standard inapplicable in this case, and puts before this Court case law overturned by the Second Circuit on this exact point. "It is well-established that confidential sources may be relied upon in a complaint so long as plaintiffs also rely on other facts [that] provide an adequate basis for believing the allegations in the complaint." *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 767-68 n.23 (S.D.N.Y. 2012). A complaint satisfies this requirement where it describes the confidential witness "by job title, office location, and duration of employment." *Bear Stearns*, 851 F. Supp. 2d at 767-68 n.23; *see also N.J. Carpenters Health Fund*, 709 F.3d at 124 (expressly applying Rule 8 plausibility and reasonable inference standard—not particularity—to confidential witness statements in a Securities Act action)

The SAC satisfies this requirement for each FE. Each is identified by job title, facility location, duration of employment, and specific responsibilities. ¶¶99, 105, 107, 113, 116, 119, 126, 135, 141, 149, 152, 161. For example, FE-1 was an engineer on VG's Plaquemines Completions

8

team who described systemic delays and equipment problems such as missing components (¶¶99-104, 160); FE-3 was an Engineering Manager at the Plaquemines Project who observed misrepresentation of data (¶¶107-112, 145-147, 165-166); and FE-5 was a Structural Welder at the Plaquemines Project from October 2023 through July 2025 who described ongoing schedule delays throughout the IPO period (¶¶116-117). Taken together, the twelve FEs provide a comprehensive, ground-level picture of the operational failures that the Offering Documents omitted.

Moreover, Defendants' argument that certain FEs departed before the IPO misses the mark for four reasons.

*First*, Defendants relied on *Marquez v. Bright Health Grp., Inc.* for the following propositions: (1) "FE allegations regarding operational issues existing prior to the IPO" should be rejected; and (2) that confidential witness allegations that "fall short of adequately pleading that [] operational problems were 'wide-spread' and 'wellknown'" by the time of the IPO should be discredited. 755 F. Supp. 3d 266, 278-80 (E.D.N.Y. 2024); MTD at 13-14. Unfortunately for Defendant, ***Marquez was vacated by the Second Circuit more than two months before Defendants filed their Motion***. *See Van v. Bright Health Grp., Inc.,* 2025 WL 3171688, at *2 (2d Cir. Nov. 13, 2025) ("*Bright Health II*") (Summary Order) ("the district court erred in dismissing the Securities Act claims based upon its determination that the Complaint did not contain sufficient allegations to plausibly support an inference that the Offering Documents contained false and misleading statements when made and that were knowable to Defendants"). In fact, *Bright Health II* held the opposite of Defendants' inaccurate argument:

> [w]e must draw the reasonable inference that these factual allegations support, namely, that the unnamed employees described widespread practices at [BHG] . . . Given the sufficiency of those allegations, the Complaint plausibly alleges material misrepresentations or omissions in BHG's Offering Documents . . . The Complaint

alleges that those issues were already known, and therefore BHG limiting their description to issues that "may" and "can" occur is plausibly a material misrepresentation or omission. . . we conclude that the Complaint plausibly alleges that at least some of the risks identified in the Offering Documents had already materialized at the time of the IPO and were knowable to Defendants.

*Id.* at \*4. That is precisely what is alleged in the SAC, and under the rational of *Bright Health II* Defendant's Motion should be denied.

***Second***, the departure of a witness before the IPO does not render their observations irrelevant where, as here, the SAC alleges ongoing, systemic conditions, not discrete events, that persisted through the IPO date. *See N.J. Carpenters Health Fund*, 709 F.3d at 123-24 (allegations of former employees are sufficient where the complaint pleads "company-wide practices" and the Court "must draw the reasonable inference that these factual allegations support, namely, that the unnamed employees describe widespread practices"). Defendants' reliance on *FuboTV* and *Qudian* is therefore misplaced because those cases mainly involved discrete, time-limited events—not ongoing, systemic conditions that persisted through the IPO. *See FuboTV Inc. Sec. Litig.*, 2023 WL 2711826, at \*11 (S.D.N.Y. Mar. 30, 2023); *Qudian Inc. Sec. Litig.*, 2019 WL 4735376, at \*6 (S.D.N.Y. Sept. 27, 2019); Here, by contrast and as in *Bright Health II*, the SAC alleges ongoing, company-wide systemic failures such as delays and cost overruns that persisted for years. ¶¶99-127, 134-166. The same problems that FE-1 observed beginning in March 2023 were still causing delays when FE-5 and FE-7 left in 2025. ¶¶116-117, 126-127. The SAC also alleges that Defendants Sabel and Thayer personally visited the sites "every other week" by helicopter and attended daily status meetings where these issues were discussed—establishing that the issues were widespread and well-known. ¶¶159-163.

***Third***, FE-5 (October 2023 through July 2025) and FE-7 (May 2023 through March 2025) were employed through and after the IPO date, and their accounts corroborate the same conditions

10

described by earlier-departing FEs. ¶¶116-117, 126-127, 159. In fact, VG's own 2024 10-K and earnings disclosures confirmed that the conditions described by all twelve FEs continued through and beyond the IPO, including massive remediation costs and reduced EBITDA guidance. The corroborative nature of the accounts further supports their sufficiency and the falsity of Defendants' statements. *See Bright Health II,* 2025 WL 3171688, at *2 (holding that confidential witness allegations need only "plausibly support an inference that the Offering Documents contained false and misleading statements when made and that were knowable to Defendants").

*Fourth*, Defendants' contention that half the FEs worked for third-party contractors, rather than VG directly (MTD at 13-14), is equally unavailing because their position ignores both the structure of VG's operations and VG's own disclosures—distinguishing this situation from the cases on which they rely. *See China Mobile Games & Ent. Grp., Ltd Sec. Litig.,* 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016); *Lehman Bros. Sec. & Erisa Litig.*, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013).[3] As the SAC alleges, VG touted an "owner-led development model" in which it "actively manage[d] the construction activity and the schedule for certain scopes of work undertaken by [its] key contractors." ¶¶179-180. Having held itself out as exercising control and oversight over every aspect of construction—including contractor performance—VG cannot now argue that its contractors lack knowledge of conditions at its facilities. Moreover, unlike the "loan level underwriters" in *In re Lehman* who "could [not] have spoken to the company's practices broadly," the FEs here describe company-wide practices that affected many aspects of VG's

---

[3] Each of these cases, as well as *FuboTV*, were decided under Rule 9(b) and the heightened pleading standard of the PSLRA. *New Jersey Carpenters*, the seminal Second Circuit case on pleading former employee statements under the Securities Act, and the recent decision in *Bright Health II*, quells any notion that the sufficient particularity standard found in 15 USC § 78u-4(b)(1)—a provision that exists only in the Exchange Act—applies to Securities Act claims. *New Jersey Carpenters* 709 F.3d at 120, 123-124, *Bright Health II,* 2025 WL 3171688, at *2, 4.

operations. 2013 WL 3989066 at *4. And the FE accounts are independently corroborated by VG's own post-IPO disclosures confirming massive cost overruns and operational failures.

## VI.  THE SAC ADEQUATELY PLEADS MATERIAL MISSTATEMENTS AND OMISSIONS

### A.  Category 1: The "Design One, Build Many" Statements were False and Misleading

#### 1.  The Offering Documents Touted the Approach While Failing to Disclose Systemic Failures

Defendants argue that the SAC merely alleges that the Offering Documents failed to disclose "potential" risks. MTD at 10-11. To the contrary, the SAC alleges that Defendants affirmatively touted the "design one, build many" approach as a competitive advantage that "significantly reduces construction and installation costs, as well as construction time and schedule risk." ¶¶93, 177-178. These were not aspirational statements about the future—they were affirmative representations about the current state of VG's operations. And these statements were materially false because, at the time of the IPO, VG's approach was producing the opposite of what was promised: systemic delays, operational failures, and massive cost overruns. Prefabricated parts arrived unfinished or with missing pieces. ¶¶9, 97, 103-104. VG duplicated plans with known defects rather than correcting them. ¶¶4, 118, 120, 170. The Calcasieu Project had been producing LNG since early 2022, but still had not achieved COD by the time of the January 2025 IPO. ¶87. These were not minor hiccups—they were fundamental failures of the very approach that VG was holding out to investors as its core competitive advantage.

Defendants also claim that the SAC's allegations amount to just gripes about "corporate mismanagement" or "fundamental disagreements with Defendants' business judgments" that are not actionable under securities laws. MTD at 12. This mischaracterizes the SAC which does not allege that VG just made poor business decision, rather the SAC alleges that the Defendants

12

affirmatively misrepresented VG's operational performance by failing to disclose VG's systemic failures. Thus, Defendants' reliance on *Weight Watchers* is inapposite because there the court found that plaintiffs challenged management's strategic decisions. 504 F. Supp. 3d 224, 247 (S.D.N.Y. 2020). Here, Plaintiffs challenge the accuracy of factual representations about VG's operations. The securities laws most certainly prohibit misleading investors about a company's actual condition, regardless of the reasonableness of the underlying management decisions were reasonable.

Defendants' isolation of individual statements to argue each was literally true ignores that literal truth is not the standard for falsity. *See Morgan Stanley.*, 592 F.3d at 366 ("The literal truth of an isolated statement is insufficient; the proper inquiry requires examination of defendants' representation, taken together and in context."). The inquiry is whether the registration statement, "taken together and in context," would mislead a reasonable investor—not whether each individual statement was technically accurate. *Rombach*, 355 F.3d at 172 n.7. Accordingly, "[a]n issuer must as well desist from misleading investors by saying one thing and holding back another." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015).

Also, the bespeaks caution doctrine does not protect statements where, as here, the cautionary language failed to disclose that the risk had *already* materialized. The Offering Documents warned of ***potential*** delays and cost overruns when they were already systemic, ongoing, and worsening. The "design one, build many" approach that Defendants billed as "significantly reduc[ing] construction and installation costs, as well as construction time and schedule risk" was, at that very moment, ***causing*** precisely the opposite impact. ¶¶93, 177-178.

Just because the Offering Documents included general cautionary language about potential risks does not insulate Defendants from liability where, as here, the risks had already materialized.

13

"[C]autionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has" transpired. *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021). "[B]y superficially warning of possible risks while failing to disclose critical facts, [VG] was akin to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013). That is precisely what Defendants did here: Defendants walked investors right over the Grand Canyon's edge. *Id.* For example, the total estimated Plaquemines costs had already increased by $2.35 billion from initial estimates and VG's own internal data showed $2.1 billion in Q4 2024 expenditures that it chose not to disclose. ¶¶10, 187. Under these circumstances, VG's cautionary language was not a meaningful warning to investors.

### 2.    The SAC Pleads Contemporaneous Falsity

Defendants' argument that FE-5 and FE-7—who were employed until after the IPO—had "limited roles on a single project" and allege nothing "inconsistent with VG's disclosures" should be rejected. MTD at 14. FE-5 worked at Plaquemines from October 2023 through July 2025 and described ongoing delays and equipment problems at the time of the IPO—the exact type of problem that VG's "design one, build many" approach was supposed to eliminate. ¶¶116-117. FE-7 worked at Plaquemines from May 2023 through March 2025 and corroborated these same conditions, which were well known to VG management. ¶¶126-127, 159. Their firsthand observations shatter the sanitized picture Defendants presented in the Offering Documents.

Moreover, VG's own post-IPO disclosures confirm that the conditions the FEs described existed at the time of the IPO. When VG filed its March 2025 10-K and earnings release, it disclosed that total estimated costs for Plaquemines had increased to $23.3–$23.8 billion (from $22.5–$23.5 billion in the Offering Documents, and that 2025 EBITDA guidance was $6.8–$7.4

14

billion—well below the $9.3 billion analysts had expected based on the Offering Documents. ¶¶227-230. This constitutes powerful evidence that the conditions described by the FEs were not hypothetical risks that might materialize in the future—they were real, ongoing, and known or knowable to Defendants at the very moment they were selling $1.75 billion in stock to the public. *See In re Blue Apron Holdings, Inc. Sec. Litig.*, 2020 WL 1950783, at *9 (E.D.N.Y. Apr. 22, 2020) (post-IPO disclosures corroborate FE allegations of conditions existing at the time of the IPO).

The SAC further alleges that Defendants Sabel and Thayer had direct, personal knowledge of these conditions. These Defendants visited the Plaquemines construction site "every other week" and attended daily status meetings about the project. ¶¶159-160, 163. Defendant Pender was also intimately involved in overseeing VG's operations. ¶29. These allegations of personal knowledge further support contemporaneous falsity and establish that the Company's principals were not merely aware of the problems the Offering Documents omitted—they had seen them with their own eyes. Thus, VG's principals lacked any reasonable basis for the optimistic statements expressed in the Offering Documents.

### 3.    The Forward-Looking and Opinion Statement Defenses Do Not Apply

Defendants incorrectly characterize many of the challenged statements as "forward-looking" or "opinions." This defense fails for several reasons. First, the bespeaks caution doctrine does not protect statements of present or historical fact. *See Set Cap.*, 996 F.3d at 85 ("[C]autionary words about future risk cannot insulate from liability . . . [the] failure to disclose that the risk has, in fact, materialized in the past and is virtually certain to materialize again."). Many of the challenged statements are statements of present fact about VG's existing operations. For example, that the "design one, build many" approach "significantly reduces construction and installation costs, as well as construction time and schedule risk." ¶¶93, 177. This is a representation about the current state of VG's construction methodology, not a projection about future events. ¶¶177-178.

Second, assuming *arguendo*, that a few statements may be characterized as opinions—such as VG's statement that it "believe[s]" it will "continue to benefit" from its approach (¶177)—the SAC adequately alleges that Defendants did not have a reasonable basis for their opinions given the problems they knew or should have known about. *See Omnicare*, 575 U.S. at 188-89 ("If a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then [Section] 11's omissions clause creates liability."). The allegations that Defendants Sabel and Thayer personally visited the construction sites biweekly and attended daily status meetings, combined with the FE accounts of systemic operational failures, plausibly allege that Defendants lacked a reasonable basis for any purported opinions.

Defendants cite *Vroom* and *Barilli* for the proposition that Plaintiffs must allege VG "subjectively disbelieved" its opinions. MTD at 15-16; *see Vroom, Inc. Sec. Litig.*, 2025 WL 862125 (S.D.N.Y. Mar. 18, 2025); *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232 (S.D.N.Y. 2019). But the law does not require allegations of subjective disbelief—only that the speaker lacked a reasonable basis for the opinion or omitted material facts about the basis. *See Omnicare,* 575 U.S. at 188-89 n.6 ("under [Section] 11's omission provision, that subjective belief, in the absence of the expected inquiry or in the fact of known contradictory evidence, would not insulate her from liability"). The allegations here more than satisfy *Omnicare*'s standard by showing Defendants knew or should have known the facts that undermined their purported opinions. ¶¶159-163.

16

**B.    Category 2: The SAC Adequately Pleads the Omission of Critical Q4 2024 Financial Information**

**1.    VG Selectively Disclosed Favorable Information While Concealing Material Adverse Data**

Defendants argue that Regulation S-X did not require VG to include Q4 2024 financial statements because the IPO occurred within 90 days of the end of the fiscal year and audited annual financials were not yet available. This argument fundamentally misapprehends Plaintiffs' claims. Plaintiffs do not allege that VG was required to include audited Q4 2024 financial statements in its Offering Documents. Rather, Plaintiffs allege that VG's existing disclosures—which included specific cost estimates, project progress descriptions, and representations about VG's financial condition as of September 30, 2024—were rendered materially misleading by the omission of Q4 2024 data that was known to VG at the time of the IPO and that contradicted those disclosures. ¶¶10-12, 124, 128-29, 187-189. By the time of the IPO, *i.e.*, after Q4 2024 ended, VG knew that the figures it reported in its Offering Documents had changed dramatically. *Id*. Yet VG presented only the Q3 2024 figures, as if nothing had changed but at the same time chose to disclose favorable facts about Q4 2024.

Sections 11 and 12(a)(2) impose an independent obligation on Defendants that statements in a registration statement are not misleading. *See Facebook*, 986 F. Supp. 2d at 505-506. Where, as here, an issuer includes specific financial metrics and cost estimates in its offering documents while possessing material information that renders those metrics misleading, the issuer has a duty to disclose that information. *See id.* at 516 ("[E]ven apparently specific risk disclosures like those in [a defendant company's] prospectus are misleading if the risks are professionally stamped in internal undisclosed analyses . . . as significantly greater or more certain than those portrayed in the prospectus.").

17

At the time of the IPO, VG was sitting on Q4 2024 financial data that told a dramatically different story than the story presented to investors. VG had incurred approximately $2.1 billion in additional Plaquemines expenditures during Q4 2024, bringing total costs paid to approximately $19.8 billion (from $17.7 billion as of Q3 2024 as reported in the Offering Documents). ¶¶10, 128. The Offering Documents disclosed only the Q3 2024 figures creating a materially incomplete and misleading picture that failed to disclose billions of dollars in costs and a dramatically deteriorated financial position from investors. Defendants did not, however, shy away from talking about Q4 2024 developments in the Offering Documents when that information was favorable. For example, the Defendants happily disclosed that the Company placed laterals for the Gator Express Pipeline into service in December 2024, entered "into a liquefaction train system purchase order with Baker Hughes for Phase 2 of the CP2 Project and also issued full NTP thereunder" in December 2024, and completed its initial consultation with FERC for the CP3 project in December 2024. ¶128. Indeed, Defendants pointedly touted that in "December 2024, [VG] began to produce LNG at the Plaquemines Project and announced the successful loading and departure of our first commissioning cargo." *Id.* Having chosen to discuss the positive developments in 4Q 2024, including the positive developments at Plaquemines, Defendants were under an obligation to not hold back the negative. *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.").

Finally, the Ninth Circuit's recent decision in *Sodha v. Golubowski*, which relies on Second Circuit law, undermines Defendants' Regulation S-X argument. 154 F.4th 1019, 1034-35 (9th Cir. 2025); MTD at 2-3, 17-21. In *Sodha*, Robinhood presented only Q1 2021 financial data while the company possessed adverse intra-quarter results at the time of its July 2021 IPO. *Sodha,* 154 F.4th

at 1034. The court rejected Robinhood's argument that it was not required to disclose of the more recent data, holding that "Robinhood was required to disclose "material" interim information." *Id.* at 1035. The Court further held that "[l]ike the Second Circuit, we find it difficult to imagine a circumstance where [a] prior statement would not be rendered misleading in light of an undisclosed event if the undisclosed information is material." *Id.* at 1034 (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)); *see also id.* at 1036 ("the Second Circuit holds that 'the long-standing test for assessing the materiality of an omission of interim financial information' is the same as the test for the 'duty to disclose such information.'") (quoting *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 36 (2d Cir. 2017)). The facts here are even stronger. Unlike *Sodha*, where the quarter was still underway at the time of the IPO, here, Q4 2024 had fully closed almost a month before the offering and VG was sitting on completed quarterly results. ¶¶10-12, 128. The market's reaction—a 36.05% single-day collapse and over 66% decline from the Offering price—powerfully confirms what any reasonable investor would conclude: VG's Q3 2024 financial snapshot was not just stale, it was false. ¶¶18, 231.

### 2.     The Plaquemines Cost Increase Was Material

Defendants argue that the Plaquemines cost increase—from an estimated range of $22.5–$23.5 billion in the Offering Documents to $23.3–$23.8 billion disclosed in the 10-K—represents merely "overlap[ping] . . . range[s]" reflecting a "1.2% increase" that is immaterial as a matter of law. MTD at 18-19. Yet they disregard the more significant $2.1 billion in expenditures actually incurred in Q4 2024 for the Plaquemines Project alone—a massive quarterly burn rate not disclosed to investors. ¶¶ 10, 128.

Defendants' reliance on *Discovery*, *HEXO* and *Stadnick* fundamentally mischaracterizes Plaintiffs' claims. MTD at 18-19; *see Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc.*, 715 F. Supp. 3d 483, 504-05 (S.D.N.Y. 2024); *HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 300-01 (S.D.N.Y.

19

2021); *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 36 (2d Cir. 2017). The SAC does not allege that VG's forward-looking cost estimates were false simply because they later increased, but that VG omitted already-incurred costs—$2.1 billion in Q4 2024 Plaquemines expenditures that VG possessed at the time of the IPO—that rendered its existing disclosures materially misleading. ¶¶10, 128. In *Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc.*, the court found falsity lacking where plaintiffs challenged subsequent downward adjustments to EBITDA projections without alleging that the company knew the projections were false when made. 715 F. Supp. 3d 483, 504-05 (S.D.N.Y. 2024), *aff'd,* 2024 WL 4647131 (2d Cir. Nov. 1, 2024). Here, by contrast, Q4 2024 had already closed 24 days before the IPO, and VG was sitting on actual cost data—not projections—showing it had already spent $19.8 billion (vs. the $17.7 billion disclosed), had only $313 million in remaining borrowing capacity, and faced a ~$2 billion EBITDA shortfall. ¶¶10, 128, 189. Similarly, in *Stadnick v. Vivint Solar, Inc.*, the Second Circuit found immateriality where the company's post-IPO results were "consistent with a pattern of fluctuation" and its past losses and within the range of expectations for a shareholder. 861 F.3d 31, 38-39 (2d Cir. 2017). Here, VG's Q4 2024 costs were *not* consistent with its past disclosures. Whether this information was material "presents a mixed question of law and fact" that "will rarely be dispositive in a motion to dismiss." *Morgan Stanley*, 592 F.3d at 360.

Defendants also argue that VG's CP2 cost estimate did not change until August 2025—eight months after the IPO—and that the increase was due to newly announced tariffs and higher interest rates. MTD at 19-20. This argument is merely a distraction. The SAC's Category 2 claims focus primarily on Plaquemines and expenditures that had occurred by the time of the IPO. Moreover, the fact that VG later attributed CP2 cost increases to tariffs does not establish that the original estimates were accurate or that VG lacked knowledge of this at the time of the IPO. The

20

SAC alleges that systemic cost overruns were plaguing VG's "design one, build many" approach across all projects, not just Plaquemines. ¶¶175-182.

### 3. Defendants Had a Duty to Disclose the EBITDA Forecast Deviation

Defendants argue that because they never included an EBITDA forecast in VG's Offering Documents, it was not required to disclose the Q4 2024 material deviation. But Defendants' duty here did not arise from a specific obligation to publish a forecast. It arose from their obligation to ensure that the statements made to the public were not misleading in light of information the Company possessed. When the books closed in Q4 2024 prior to the IPO and as a result, VG's 2025 EBITDA forecast would be significantly below public expectations, which were shaped by the Defendants' representations in the Offering Documents, the Defendants had a duty to ensure its public disclosures were not misleading. *See Vivendi*, 838 F.3d at 249 (jury found that "statement conflicted with internal forecasts . . . and thus was misleading").

Defendants' reliance on *In re Coty Inc. Sec. Litig.* is misplaced. In *Coty*, the court dismissed because plaintiffs alleged only that sales were declining post-IPO, without alleging facts showing they were declining at the time of the IPO. 2016 WL 1271065, at *6 (SDNY Mar. 29, 2016). Here, by contrast, the SAC alleges that VG possessed the actual Q4 2024 data at the time of the IPO showing its financial condition had already materially deteriorated. The $2.1 billion Q4 2024 expenditure on Plaquemines and the corresponding ~$2 billion EBITDA shortfall were not speculative—they were known or knowable at the time of the IPO. ¶¶128-129, 189. When VG finally disclosed its Q4 2024 results on March 6, 2025 and the previously undisclosed financial deterioration, the stock collapsed by 36.05%. ¶¶ 231.

### 4. The Bespeaks Caution Doctrine Does Not Apply

Defendants' assertion of the bespeaks caution doctrine fails for the same reason it fails with respect to Category 1. The Offering Documents warned only of hypothetical future risks while

21

concealing present conditions. The SAC does not challenge VG's cost projections as imprudent estimates. Rather, it alleges that VG possessed financial data—Q4 2024 costs already incurred—that rendered its existing cost disclosures materially misleading. "[C]autionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized in the past and is virtually certain to materialize again." *Set Cap.*, 996 F.3d at 85.

### C. Category 3: The SAC Adequately Alleges Misrepresentations Regarding Long-Term Contracts and Reputational Harm

#### 1. VG Touted Its Long-Term Contracts While Omitting Its Avoidance of Contractual Obligations

The SAC alleges that the Offering Documents touted VG's portfolio of long-term contracts as a core competitive advantage while simultaneously evading the obligations of those contracts by selling LNG on the "spot-market," rather than honoring commitments to major customers like Shell and BP. *See, e.g.,* ¶¶143-146. The Offering Documents devoted extensive attention to describing VG's contracted volumes and long-term customer relationships, creating the impression that VG was a reliable counterparty with a stable revenue base. *See, e.g.,* ¶¶206. This impression was misleading. Behind the scenes, VG was purposefully avoiding its contractual obligations to maximize short-term profits from the spot-market at the expense of long-term stability. *See, e.g.,* ¶¶143-146. This strategy provoked major arbitration disputes with its counterparties and inflicted severe reputational damage on VG. As a Morningstar analyst observed, had VG sold under its long-term agreements rather than on the spot-market, "operating margins would have been closer to 25% rather than the realized 60%-plus." Hegt Decl. Ex. 12 at 4.

#### 2. The Harm to VG's Reputation Was Material and Undisclosed

Defendants argue that VG's ability to enter into long-term contracts was never impaired, pointing to eight post-IPO contract announcements. MTD at 23. That the Company eventually

22

found willing counterparties does not retroactively erase the reputational harm it was suffering at the time of its IPO. The question is whether the Offering Documents accurately described VG's reputation and business relationships as of the IPO date; the answer, derived from the allegations, is that they did not. Nor have Defendants shown that the post-IPO contracts were on comparable terms to pre-existing agreements. That three of eight contracts were announced *after* the adverse BP arbitration ruling merely shows that some counterparties were willing to do business with VG despite the controversy, but does not establish that the reputational damage was absent at the time of the IPO.

Defendants also emphasize that VG won two of three customer arbitrations. MTD at 22-24. But the issue is not whether VG ultimately prevailed in some arbitrations, but whether VG adequately disclosed the reputational damage and business disruption the disputes were causing at the time of the IPO. Moreover, VG's loss in the BP arbitration showed that VG purposefully breached its obligations to declare the COD of the Calcasieu Project and did not act as a "Reasonable and Prudent Operator." ¶¶236-237.

Additional post-IPO events confirm the materiality of the omitted information. TotalEnergies' CEO publicly stated on February 6, 2025—just nine days after the IPO—that he declined to contract long-term with VG because of its treatment of existing customers: "I don't want to deal with these guys, because of what they are doing." ¶¶17, 218. This statement, from the CEO of a major energy company, caused an 11.2% decline in VG's stock price and directly corroborated the reputational harm the SAC alleges was already present at the time of the IPO. *Id.* Despite the importance of this event, Defendants dismiss TotalEnergies merely as a "competitor" referenced in the Offering Documents. MTD at 22-23. What matters here is that the CEO of one of the world's largest energy companies publicly declared that he would not do business with VG

because of how VG treats its contractual partners. That extraordinary public rebuke, delivered just nine days after the IPO, confirmed the very reputational damage that Plaintiffs allege VG concealed from investors. *See Blue Apron*, 2020 WL 1950783 at *9 (holding that post-IPO disclosures can corroborate allegations of conditions existing at the time of the IPO).

### 3.    The FEs and the Morningstar Report Further Support Category 3

Defendants argue that the FEs who support Category 3 worked in construction and lacked knowledge of VG's commercial relationships. MTD at 26. But the SAC's allegations about the FEs' construction-related observations, such as VG's practice of selling spot-market LNG rather than delivering to long-term customers, are directly relevant to the contractual issue that underlies this claim of reputational harm. ¶¶136-140, 142-151, 153-156. Those observations corroborate VG's strategy of prioritizing short-term profit over long-term contractual compliance. ¶157.

Moreover, while the Offering Document disclosed that VG sold commissioning cargos on the spot-market, they failed to disclose the reputational consequences of this strategy. *See, e.g.* ¶¶188-190. The March 6, 2025 Morningstar report also explained that VG's spot-market strategy "appears to have caused immense reputational damage." Hegt Decl. Ex. 12 at 2. While Defendants dismiss this as "speculation" (MTD at 25), the Morningstar report corroborates what the FEs and TotalEnergies' CEO confirmed—that VG's contractual practices had severely damaged its reputation in the industry.

Defendants dismiss the Morningstar report as post-IPO speculation, citing *FuboTV II* and *China Mobile*. MTD at 25-26; *see FuBoTV Inc. Sec. Litig.,* 2024 WL 1330001, at *6 (S.D.N.Y. Mar. 28, 2024) (*FuboTV II*); *China Mobile Games & Ent. Grp., Ltd Sec. Litig.,* 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016). These cases are distinguishable. First, unlike *FuboTV II*, the SAC does not rely solely on analyst speculation. It relies on FE accounts of pre-IPO conditions and the TotalEnergies CEO statement. The Morningstar report bolsters the SAC, but does not provide the

24

foundation for the allegations. Second, unlike *China Mobile*, where the post-IPO news articles and confidential witness statement were the *only* evidence of falsity, here the Morningstar report corroborates what twelve FEs and a major energy company CEO also confirmed.

## VII.    THE SAC ADEQUATELY ALLEGES VIOLATIONS OF ITEMS 303 AND 105

In another attempt to justify the Offering Documents failure to be correct and complete, Defendants repeat each of their arguments to rebut the SAC's claim that they violated Items 303 and 105 of Regulation S-K. MTD at 27-28. But Items 303 and 105 "give[] rise to specific duties to disclose" and a "[f]ailure to make the requisite disclosures under Regulation S-K will generally produce liability under the Securities Act." *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008), *aff'd,* 347 F. App'x 617 (2d Cir. 2009).

### A.    Item 303

Pursuant to Item 303, a company must disclose "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations in periodic filings with the SEC." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 257 (2024); *see also CPI Card,* 2017 WL 4941597 at *4 (holding the Complaint need only allege an inference of "pre-IPO knowledge").

Defendants argue that a single quarter's data cannot constitute a "known trend" and that arbitration outcomes were mixed. MTD at 27-28. But the systemic construction delays and cost overruns were not a single quarter phenomenon; they were ongoing and persisted for months. The SAC also does not allege that the arbitration results constituted the "trend." It alleges the trend was the reputational damage arising from VG's contractual practices and represented trends or uncertainties reasonably likely to have material effects on VG's financial condition.

For these reasons, Defendants' reliance on *Steamfitters* and *Pearlstein* for the proposition that a single quarter's data cannot constitute a "known trend" is misplaced. MTD at 27-28; *see*

25

*Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 368 (S.D.N.Y. 2019); *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 245 (S.D.N.Y. 2015). The SAC does not allege that Q4 2024 data alone constituted a trend. Rather, the SAC alleges ongoing, systemic conditions that persisted for months before the IPO, as corroborated by twelve FEs and confirmed by VG's own post-IPO disclosures. The Q4 2024 data just quantified the financial impact of conditions that VG knew had been ongoing since at least 2023. Unlike *Steamfitters*, where plaintiffs pointed only to a single quarter's decline, here the SAC alleges a years-long pattern of systemic failures. *Steamfitters*, 412 F. Supp. 3d at 368. Unlike *Pearlstein*, where plaintiffs failed to allege that defendants were aware of any trend, here the SAC alleges that Sabel and Thayer personally visited the construction sites biweekly and attended daily status meetings where these issues were discussed. ¶¶159-160, 163; *see Pearlstein*, 93 F. Supp. 3d at 245. Furthermore, "whether a pattern or occurrence is sufficiently lengthy to constitute a trend is a question that should not be resolved at the motion to dismiss stage." *CPI Card,* 2017 WL 4941597 at *3.

### B.      Item 105

Item 105 of Regulation S-K requires "a discussion of the most significant factors that make the offering speculative or risky," "courts typically analyze the sufficiency of Item [105] disclosures with the familiar materiality standard." 17 C.F.R. § 229.105(a). Plaintiffs "need not allege Defendants' knowledge … to plead an Item [105] violation." *Panther Partners*, 2020 WL 5757628, at *10. The Offering Documents violated Item 105 by failing to disclose the material factors that made the investment speculative or risky—namely, the systemic construction problems already plaguing VG's facilities, the massive costs already incurred, and the reputational damage already suffered as a result of VG's contractual practices. While VG included pages of generic risk factor disclosures, these disclosures characterized the identified risks as potential when, as alleged in the SAC and confirmed by post-IPO events, those risks had already materialized. By framing

26

already-materialized risks as merely possible future developments, VG violated Item 105's requirement to provide investors with an accurate picture of the most significant factors making the offering speculative or risky.

## VIII.   DEFENDANTS' NEGATIVE CAUSATION DEFENSE FAILS

Although Defendants concede, as they must, that loss causation is not an element of a Securities Act claim (MTD at 29), they nevertheless seek to have the SAC dismissed for a purported failure to allege a "causal link between the alleged misstatements and the stock price decline." MTD at 29-30.  That is not the law.

The damages prescribed under the formula found in Section 11(e) may only be reduced when and if Defendants meet the "heavy" burden of proving a negative causation defense "conclusively." *Adair v. Kay Kotts Assocs. Inc.*, 1998 WL 142353, at *3, 6-8 (S.D.N.Y. Mar. 27, 1998) (Sotomayor, D.J.); *see also Chen v. Missfresh Ltd.*, 701 F. Supp. 3d 236, 250 (S.D.N.Y. 2023) (holding that defendant "must prove not the mere possibility that some other factor caused the plaintiff's loss but rather that all or an identified portion of plaintiff's loss was caused by that other factor").[4]

To meet that heavy burden, Defendants are required to affirmatively disprove causation for *every* decline in value of the Company's stock after the IPO.  *Adair*, 1998 WL 142353, at *7 (Defendants must "prove that other factors caused the decline in price of the plaintiffs' stock."); *see also McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044, 1048-49 (2d Cir. 1995) (Under Section 11, "any decline in value is presumed to be caused by the misrepresentation," and the

---

[4] Because the SAC does not allege loss causation or "corrective disclosures," Defendants reliance on *Boluka Garment Co., Ltd v. Canaan Inc.*, 547 F. Supp. 3d 439, 445-446 (S.D.N.Y. 2021), and *Sec. Cap. Assur. Ltd. Sec. Litig.*, 2011 WL 4444206, at *6-8 (S.D.N.Y. Sept. 23, 2011), is misplaced since in those cases the complaints affirmatively plead loss causation because they also asserted Exchange Act claims.

"defendants . . . bears the burden of proving that the price decline was not related to the misrepresentation."); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35-36 (2d Cir. 2009) (same, and noting that defendants' burden is a "heavy" one). As then Judge Sotomayor made clear, the mere "presence or absence of price movement immediately after disclosure is not per se dispositive under Section 11(e)." *Adair*, 1998 WL 142353, at *6. In other words, Defendants do not prove negative causation, *i.e.*, disprove presumed loss causation, by claiming that only price declines on certain days could have a causal connection. *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 2015 WL 685159, at *4 (S.D.N.Y. Feb. 18, 2015) ("to make out a successful [negative causation] defense [the defendant] must prove not the mere possibility that some other factor caused the plaintiffs' loss but rather that all or an identified portion of plaintiff's loss was caused by that other factor"). Yet, that is all Defendants have done here.

Defendants isolate two post-IPO events: TotalEnergies CEO's February 5, 2025 comments, and VG's March 6, 2025 fourth-quarter financial disclosure. MTD at 29. Rather than proving that *something else* caused the stock price to decline, however, Defendants merely deny that these disclosures revealed any previously concealed information and offer no evidence to meet the burden of showing what did cause the price declines on these dates. Moreover, Defendants denial of any connection between the news on these dates and the allegations in the SAC as to the Offering Documents' misrepresentation is contrary to the SAC's actual allegations. As the SAC alleges, TotalEnergies refused to broker a long-term contract with VG, with its CEO explaining that VG purposely delayed long-term contracts in favor of monetizing spot contracts for short-term gain. ¶218. This news, contrary to the Offering Documents' emphasis on the importance of its long-term contractual relationships, was so material to investors that the stock price feel over 11%. ¶¶17, 219-226.

28

The SAC further alleges that VG's March 6, 2025 financial disclosures revealed a $1.9 billion decline in year-over-year net income due, in part, to "higher costs to remediate and commission the Calcasieu Project and to develop the CP2 Project" and lower sales volume—issues that required a 20% downward revision to EBITDA guidance, with the new range falling nearly $2 billion below Wall Street's consensus estimates.  ¶¶17, 227-228. The Offering Documents, however, as discussed above omitted Q4 2024 financial results, including (1) the ~$2.1 billion Q4 2024 cost overrun at Plaquemines; (2) the ~$2 billion EBITDA shortfall; and (3) higher-than-expected remediation and development costs. ¶¶227-230. The 36.05% stock price following these disclosures likewise illustrates the materiality of these issues for investors.

In sum, Defendants have come woefully short of their burden.  In the rare cases where defendants have been able to prove a negative causation defense at summary judgment or trial, "they have not only submitted expert testimony, but have provided and discussed evidence attributing the decline to factors other than their own disclosure of financial results." *Adair*, 1998 WL 142353, at *7; *see also Chen*, 701 F. Supp. 3d at 250 ("This typically requires expert testimony disaggregating the various causes of stock price movement.").  Defendants have not done so. There is no event study or other evidence yet in the record discussing the causes of the stock's price movements.  Until Defendants present such evidence, "any decline in value is presumed to be caused by the misrepresentation in the registration statement." *In re WRT Energy Sec. Litig.*, 2005 WL 2088406, at *1 (S.D.N.Y. Aug. 30, 2005).

## IX.    THE SAC ADEQUATELY PLEADS SECTION 15 CLAIMS

Section 15 of the Securities Act imposes liability on "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under sections 77k or 77l." 15 U.S.C. § 77o(a). Because, as set forth above, the SAC adequately pleads primary violations

under Sections 11 and 12(a)(2), the Section 15 claims against the Individual Defendants and VG

Partners are also adequately pled.

## X.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in full.[5]

Dated: March 23, 2026

LABATON KELLER SUCHAROW LLP

/s/ Alfred L. Fatale III
Alfred L. Fatale III
Joseph N. Cotilletta
Beth C. Khinchuk
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: afatale@labaton.com
jcotilletta@labaton.com
bkhinchuk@labaton.com

*Lead Counsel for Lead Plaintiff and the Class*

ROBBINS GELLER RUDMAN
& DOWD LLP
Samuel H. Rudman
Joseph Russello
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173
srudman@rgrdlaw.com
jrussello@rgrdlaw.com

ROSSMAN LEGAL
Gregg Rossman
6840 Griffin Road

---

[5] If the Court dismisses any or all of the Complaint, Plaintiffs respectfully request leave to amend pursuant to Rule 15 of the Federal Rules of Civil Procedure. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("usual practice upon granting a motion to dismiss to allow leave to replead"); *see also* Exhibit 1 at 18:7-19:18.

Davie, FL 33314
Telephone: (954) 440-0908
gregg@rossmanlegal.com

*Additional Counsel for Plaintiff Pompano Beach
Police & Firefighters' Retirement System*

## CERTIFICATION OF WORD COUNT

I, Alfred L. Fatale III, an attorney duly admitted to practice before this Court hereby certify that pursuant to Local Rules 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York and Rule 2(e) of Judge Jed S. Rakoff's Individual Rules of Practice, that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 9364 words, which accords with the Scheduling Order entered on December 23, 2025 (ECF No. 113) under which the parties stipulated to an expanded count of 10,000 words. In making this calculation, I have relied on the word and page counts of the word-processing system used to prepare the document.

Dated: March 23, 2026                                    /s/ *Alfred L. Fatale III*
                                                          Alfred L. Fatale III

# CERTIFICATION OF SERVICE

I, Alfred L. Fatale III, an attorney duly admitted to practice before this Court, hereby certify that pursuant to the Scheduling Order entered on December 23, 2025 (ECF No. 113), Plaintiffs attempted to file the forgoing Opposition to Defendants' Motion to Dismiss the Second Amended Complaint (the "Opposition") and accompanying Declaration of Beth C. Khinchuk in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss the Second Amended Complaint (the "Declaration") via PACER on March 23, 2026. PACER, however, was experiencing technical issues at the time and Plaintiffs were unable to file these documents. As an alternative, Plaintiffs served the Opposition and Declaration on the following counsel for Defendants via email at 11:52 p.m ET and 11:56 p.m. ET on March 23, 2026:

**LATHAM & WATKINS LLP**
Jeff G. Hammel
Jason C. Hegt
Corey A. Calabrese
1271 Avenue of the Americas
New York, NY 10020
jeff.hammel@lw.com
jason.hegt@lw.com
corey.calabrese@lw.com

*Counsel for Defendant Venture Global, Inc., the Individual Defendants, and Defendant Venture Global Partners, II, LLC*

**GIBSON, DUNN & CRUTCHER LLP**
Robert F. Serio
Mary Beth Maloney
200 Park Avenue
New York, NY 10166
rserio@gibsondunn.com
mmaloney@gibsondunn.com

Lissa M. Percopo
1700 M Street, N.W.
Washington, D.C. 20036
lpercopo@gibsondunn.com

*Counsel for the Underwriter Defendants*

Dated: March 24, 2026

*/s/ Alfred L. Fatale III*
Alfred L. Fatale III