**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FIRSTFIRE GLOBAL OPPORTUNITIES
FUND LLC, Individually and on Behalf of
All Others Similarly Situated,

                Plaintiff,

        -v-

VENTURE GLOBAL, INC., *et al.*,

                Defendants.

---

Case No. 1:25-cv-4642-JSR

[rel. Case No. 25-cv-01364-JSR]

 

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'**
**<u>MOTION TO DISMISS THE SECOND AMENDED COMPLAINT</u>**

**LATHAM & WATKINS LLP**

Jeff G. Hammel
Jason C. Hegt
Corey A. Calabrese
1271 Avenue of the Americas
New York, New York 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
jeff.hammel@lw.com
jason.hegt@lw.com
corey.calabrese@lw.com

*Attorneys for Venture Global, Inc., Michael
Sabel, Robert Pender, Jonathan Thayer, Sarah
Blake, Sari Granat, Andrew Orekar, Thomas J.
Reid, Jimmy Staton, Roderick Christie, and
Venture Global Partners, II, LLC*

*[Additional Counsel On Signature Page]*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ..............................................................................................................................3

I.     PLAINTIFFS FAIL TO PLEAD MATERIAL FALSITY ..................................................3

     A.     No Category 1 Statement Supports A Claim ...........................................................3

          1.     No Allegations Establish An Actionable Misstatement Or Omission ...................................................................................................3

          2.     The Former Employees Do Not Salvage A Claim.......................................4

     B.     No Category 2 Statement Supports A Claim ...........................................................6

     C.     No Category 3 Statement Supports A Claim .........................................................10

     D.     Item 303/105 Claims Fail.....................................................................................11

II.     AN ABSENCE OF CAUSATION IS APPARENT ON THE FACE OF THE SAC........12

III.     PLAINTIFFS SHOULD NOT BE PERMITTED LEAVE TO AMEND .........................12

CONCLUSION..........................................................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Chen v. Missfresh Ltd.*,
  701 F. Supp. 3d 236 (S.D.N.Y. 2023) (Rakoff, J.) ........................................................3, 4, 12

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)........................................................................................10, 11

*FuboTV Inc. Sec. Litig.*,
  2023 WL 2711826 (S.D.N.Y. Mar. 30, 2023) ..................................................................11

*Hubiack v. Li-Cycle Holdings Corp.*,
  2024 WL 2943959 (S.D.N.Y. June 10, 2024) (Rakoff, J.) ............................................6, 10

*In re Duke Energy Corp. Sec. Litig.,*
  282 F. Supp. 2d 158 (S.D.N.Y. 2003), *aff'd*, 113 Fed. App'x 427 (2d Cir.
  2004) ....................................................................................................................................9

*In re Eastman Kodak Co. Sec. Litig.*,
  632 F. Supp. 3d 169 (W.D.N.Y. 2022) ...............................................................................8

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*
  986 F. Supp. 2d 487 (S.D.N.Y. 2013)..................................................................................8

*In re HEXO Corp. Sec. Litig.*,
  524 F. Supp. 3d 283 (S.D.N.Y. 2021).............................................................................9, 10

*In re IAC/InterActiveCorp Sec. Litig.*,
  695 F. Supp. 2d 109 (S.D.N.Y. 2010)................................................................................10

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)...........................................................................................8, 10

*In re ProShares Tr. Sec. Litig.*,
  728 F.3d 96 (2d Cir. 2013)...................................................................................................3

*In re Qudian Inc. Sec. Litig.*,
  2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019)................................................................3, 11

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016).................................................................................................9

*In re Vroom, Inc. Sec. Litig.*,
  2025 WL 862125 (S.D.N.Y. Mar. 18, 2025) .....................................................................10

*Marquez v. Bright Health Grp., Inc.*,
  755 F. Supp. 3d 266 (E.D.N.Y. 2024), *vacated and remanded sub nom. Van v. Bright Health Grp., Inc.*, 2025 WL 3171688 (2d Cir. Nov. 13, 2025) ................................... 4, 5

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ................................................................................................ 6

*Scott v. Gen. Motors Co.*,
  46 F. Supp. 3d 387 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015) ........................ 7, 9

*Sherman v. Abengoa, S.A.*,
  156 F.4th 152 (2d Cir. 2025) .............................................................................................. 6

*Sodha v. Golubowski*,
  154 F.4th 1019 (9th Cir. 2025) ........................................................................................... 8

*Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*,
  704 F. Supp. 3d 429 (S.D.N.Y. 2023) ................................................................................. 11

*Van v. Bright Health Grp., Inc.*,
  2025 WL 3171688 (2d Cir. Nov. 13, 2025) ....................................................................... 4, 5

*Yaroni v. Pintec Tech. Holdings Ltd.*,
  600 F. Supp. 3d 385 (S.D.N.Y. 2022) .................................................................................. 4

*Zappia v. Myovant Sciences Ltd.*,
  708 F. Supp. 3d 486 (S.D.N.Y. 2023), *aff'd*, 2025 WL 338351 (2d Cir. Jan. 30, 2025) ................................................................................................................... 13

**GLOSSARY OF TERMS**[1]

| Term | Definition |
| --- | --- |
| 4Q24 | Fourth Quarter 2024 |
| COD | Commercial Operations Date |
| CP2 | CP2 LNG Project |
| CP3 | CP3 LNG Project |
| CW | Confidential Witness |
| EBITDA | Earnings Before Interest, Taxes, Depreciation, and Amortization |
| FE | Former Employee |
| FERC | Federal Energy Regulatory Commission |
| Individual Defendants | Michael Sabel, Robert Pender, Jonathan Thayer, Sarah Blake, Sari Granat, Andrew Orekar, Thomas J. Reid, Jimmy Staton, and Roderick Christie |
| IPO | Initial Public Offering |
| LNG | Liquefied Natural Gas |
| Mot. | Memorandum of Law in Support of Defendants' Motion to Dismiss the Second Amended Complaint (ECF No. 117) |
| Names of VG's LNG Projects in S-1 | Calcasieu, Plaquemines, CP2, CP3, and Delta |
| Offering Documents | VG's Registration Statement and Prospectus for its IPO (Ex. 1 to Hegt Decl., ECF No. 119-1) |
| Opp. | Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint (ECF No. 120) |
| S-1 | VG's Registration Statement on SEC Form S-1 for its IPO (Ex. 1 to Hegt Decl., ECF No. 119-1) |

---

[1] This Glossary includes terms used both in Defendants' Memorandum of Law In Support of Defendants' Motion to Dismiss the Second Amended Complaint (ECF No. 117) and in this Reply brief.

| Term | Definition |
|------|-----------|
| SAC | Plaintiffs' Second Amended Complaint (ECF No. 101) |
| SEC | U.S. Securities and Exchange Commission |
| Underwriter Defendants | Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, BofA Securities, Inc., ING Financial Markets LLC, RBC Capital Markets, LLC, Scotia Capital (USA) Inc., Mizuho Securities USA LLC, Santander US Capital Markets LLC, SMBC Nikko Securities America, Inc., MUFG Securities Americas Inc., BBVA Securities Inc., Loop Capital Markets LLC, Natixis Securities Americas LLC, Deutsche Bank Securities Inc., Wells Fargo Securities, LLC, Truist Securities, Inc., National Bank of Canada Financial Inc., Raymond James & Associates, Inc., Regions Securities LLC, Guggenheim Securities, LLC, and Tuohy Brothers Investment Research, Inc. |
| VG | Venture Global, Inc. |

**PRELIMINARY STATEMENT**

Plaintiffs' Opposition brief takes a novel approach:  in seeking to salvage a claim that VG's IPO Offering Documents contained materially false and misleading disclosures, Plaintiffs avoid, almost entirely, quoting any of the disclosures in the Offering Documents.  Instead, Plaintiffs repeat their own (mis)characterizations of some disclosures and continue to ignore others in an effort to create an actionable misstatement or omission where none exists.  This is not the law and Plaintiffs cite no case allowing a claim to proceed based on similar allegations.  The SAC should be dismissed.

**Category 1 (Project Status):**  Plaintiffs assert that VG "promised" to "eliminate" delays or cost overruns, Opp. 12-14, but the actual words in the Offering Documents said the opposite. VG explained that its innovative "design one, build many" approach for constructing LNG facilities had advantages compared to the traditional approach, but was still subject to challenges inherent in any large construction project and that VG's current cost and timeline estimates were the product of prior and ongoing delays.  ¶¶ 7, 90, 93; S-1 at 176 (Ex. 1 to Hegt Decl., ECF No. 119-1).  Plaintiffs' allegations about prior and existing delays and cost overruns do little more than rehash VG's disclosures.  The absence of any factual allegations contradicting these statements is underscored by Plaintiffs' heavy (but misplaced) reliance on 12 FEs.  Not one claims to have spoken to management or to have been knowledgeable about the disclosed project-wide cost and timeline estimates, much less whether what they observed was inconsistent with those disclosed estimates; and 10 of the FEs left months before the IPO—their allegations, individually or collectively, add nothing to what VG itself disclosed.

**Category 2 (Financial Data):**  The Opposition concedes that SEC regulations did not require VG to disclose the financial data cited in the SAC, Opp. 17, 21, but instead argues that the data was nevertheless needed to make other statements not misleading.  Not so.  As to construction

1

costs, the Opposition does not (and could not) contend that the 4Q24 costs were inconsistent with the prior costs and future estimated costs disclosed in the Offering Documents. As to the 2025 EBITDA forecast, Plaintiffs argue that disclosure was needed to address "public expectations," Opp. 21, but cite no law requiring a public company that has not spoken on a particular subject to disclose data simply because it might differ from someone's expectations. As to Plaintiffs' complaints about CP2 costs, raised for the first time in the SAC, Plaintiffs appear to abandon that theory altogether. Opp. 20.

Category 3 (Goodwill): Plaintiffs assert that VG failed to disclose so-called "reputational harm" stemming from disputes with certain customers, but continue to ignore the 12-plus pages of disclosures in the Offering Documents expressly informing investors of these exact disputes and associated risks. Opp. 22-24. Plaintiffs cite no law suggesting VG had another obligation to speculate about reputational harm relating to these same disputes; nor do Plaintiffs plausibly allege that there *was* any reputational harm. The sum of these assertions—claims by FEs who never spoke to a single customer, a single reported statement (after the IPO) from a VG competitor that it would not become a long-term customer, and analyst speculation—do not suffice. Plaintiffs' selective recitation of post-IPO events likewise ignores that VG ***won*** two of its customer arbitrations and (as of January 2026) entered into eight new long-term contracts. Hardly the "grim" "reality behind the curtain," Opp. 5, that Plaintiffs seek to construct.

Finally, Plaintiffs' allegations about what caused the decline in VG's stock make it apparent on the face of the complaint that they cannot establish causation as a matter of law.

Plaintiffs have had three tries to plead a claim and cannot do so. The allegations added in their last iteration are largely abandoned in the Opposition. The SAC should be dismissed with prejudice.

## ARGUMENT

### I.    PLAINTIFFS FAIL TO PLEAD MATERIAL FALSITY

#### A.    No Category 1 Statement Supports A Claim

##### 1.    No Allegations Establish An Actionable Misstatement Or Omission

Plaintiffs insist the Offering Documents said VG "promised" its construction approach would "eliminate" delays. Opp. 12, 14. But the Offering Documents—which they do not quote—said no such thing. Rather, VG explained that its "design one, build many," S-1 at 2, approach had advantages "*as compared* with the traditional made-to-fit approach." ¶ 93 (emphasis added). That Plaintiffs omit this language from the SAC and their Opposition and do not even try to allege that this comparison was false is dispositive. *See In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 106 (2d Cir. 2013) (affirming dismissal where plaintiffs "isolate and construe a single element of [defendants'] prospectuses" out of context); *In re Qudian Inc. Sec. Litig.*, 2019 WL 4735376, at *6 (S.D.N.Y. Sept. 27, 2019) (dismissing Section 11 claims because the "offering materials do not actually contain [the] representation" plaintiffs claimed).

Plaintiffs likewise ignore VG's extensive disclosures that its then-current cost and timeline estimates resulted from prior and ongoing delays. *See* Mot. 6, 11 (quoting Offering Documents). The Offering Documents made clear, among other things, that (i) VG "experienced unexpected delays" and its "cost estimates … have been, *and continue to be*, subject to change due to … unexpected delays in construction," S-1 at 44-47 (emphasis added), (ii) the additional work that created those circumstances was "*ongoing*," S-1 at 108 (emphasis added), and (iii) these delays and cost overruns were substantial—necessitating equity infusions like the disclosed $2.35 billion infusion for Plaquemines, S-1 at 45. These disclosures, which Plaintiffs ignore entirely, are similarly dispositive. As this Court reasoned in *Chen v. Missfresh Ltd.*, 701 F. Supp. 3d 236 (S.D.N.Y. 2023) (Rakoff, J.), no claim is stated when a plaintiff "ignore[s]" disclosures bearing "a

3

striking resemblance to" the allegedly omitted information. *Id.* at 254; *see also* Mot.11 (citing cases).

Plaintiffs' arguments that VG's forward-looking statements and risk disclosures are not protected by the bespeaks caution doctrine, because they characterize as "potential" risks that had already materialized, are wrong. Opp. 13, 15-16, 21-22. As discussed above, VG extensively disclosed previous and "ongoing" delays and cost issues, and also said the issues "may" recur in the "future." S-1 at 44-47, 108, 194, 198. Plaintiffs' forward-looking statement cases, Opp. 13-14, miss the mark because none involved cautionary language, like VG's, that disclosed that its current estimates were the product of past, present, and possible future delays. No reasonable investor could have read VG's disclosures and concluded the opposite. *See Yaroni v. Pintec Tech. Holdings Ltd.*, 600 F. Supp. 3d 385, 396-97 (S.D.N.Y. 2022) (dismissing Section 11 claim where company disclosed material weakness that was present at the time of the IPO in its offering documents and warned it may "identify additional material weaknesses in the future"); Mot. 11 (collecting cases).

### 2. The Former Employees Do Not Salvage A Claim

The SAC's FE allegations do not save Plaintiffs' claims for several reasons, most fundamentally because the FEs do not contradict the Offering Documents. The FEs describe largely unspecified "delays," "cost overruns," and "equipment problems" at either VG's Calcasieu or Plaquemines Project. Opp. 8-11. But the Offering Documents already disclosed these issues, along with their associated financial impacts—so the FE allegations add nothing. *See, supra*, § I.A.1.

Unable to cite a case on point, Plaintiffs make much of the fact that VG cited *Marquez v. Bright Health Grp., Inc.*, 755 F. Supp. 3d 266 (E.D.N.Y. 2024), which was reversed in a summary, unpublished opinion *sub nom. Van v. Bright Health Grp., Inc.*, 2025 WL 3171688 (2d Cir. Nov.

13, 2025) (cited in Opp. 9-11) ("*Bright Health*").  But *Bright Health* did not change the law in any respect and, in any case, was not VG's sole authority for any point.  To the contrary, the fact-specific nature of that reversal only highlights the inadequacy of Plaintiffs' FE allegations here.  In finding claims based on an undisclosed "massive backlog" of claims adequately alleged, *Bright Health* focused on the "detailed" description from a former employee, who was alleged to have been employed at the company throughout the class period and "personally attended ... 'all hands' meetings [with] … executive leadership" in which the backlog was discussed.  *Id.* at *1, *3-4.  The court further relied on corroborating facts regarding a "widely distributed" email with company-wide backlog data and a "war room … to address the claims backlog problem."  *Id*. at *4.

Plaintiffs here allege nothing of the sort.  For starters, unlike the undisclosed backlog in *Bright Health*, VG repeatedly disclosed that its projects had been impacted by cost overruns and delays, *see* S-1 at 44-47, and none of the FEs say anything contrary to VG's disclosures, ¶¶ 99-122.  Further, here there is no corroboration of the FEs and, as discussed, 10 of the 12 FEs were not employed at the relevant time and none of them (including the other two, FE-5 and FE-7) are alleged to have ever spoken with VG's management, let alone received company-wide data *on anything*.  ¶¶ 116-17; 126-27.  The FE allegations here bear almost no resemblance to those in *Bright Health*.  The Opposition tacitly acknowledges this deficiency by mischaracterizing the SAC's FE allegations and stretching the law.  For example, the Opposition cites the SAC's FE allegations for the proposition that members of VG's C-Suite "attended daily status meetings" at which alleged delays and cost overruns were discussed.  Opp. 5.  But the SAC does not actually allege this.  Rather, while the FEs describe executives receiving unspecified "updates in meetings held at least once a month" and sometimes attending or "calling into" "daily meetings"—the FEs

5

did not say that ongoing delays and cost overruns were discussed at these meetings or, even if they were, whether the ongoing delays and cost overruns discussed were different from the ones detailed in the Offering Documents.  ¶¶ 159-163.  And contrary to Plaintiffs' assertion, they need to allege more than merely "job title, office location, duration of employment, and specific responsibilities," Opp. 8 (quotation omitted)—the FEs must be described in a way that "'support[s] the probability that a person in the position occupied by the source would possess the information alleged.'"  *Sherman v. Abengoa, S.A.*, 156 F.4th 152, 164 (2d Cir. 2025) (dismissing Section 11 claims and quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).  Even collectively, the various FE allegations establish no such thing.

Ultimately the FE allegations are no different from countless others that courts have found insufficient to support a claim.  *See* Mot. 13-14 (collecting cases)[2]; *see also Hubiack v. Li-Cycle Holdings Corp.*, 2024 WL 2943959, at *6 (S.D.N.Y. June 10, 2024) (Rakoff, J.) (on appeal) (declining to find falsity based on CW allegations that "provide[] no details about the source of [employee's] beliefs, how he communicated his 'warn[ing]' to two of the defendants, what information [employee] relied on, or how widely, consistently, or precisely he shared that information with others at [the company]").

### B.    No Category 2 Statement Supports A Claim

The Category 2 Statements relate to (i) the actual and projected costs of the Plaquemines Project, (ii) VG's 2025 EBITDA forecast, and (iii) the projected costs of CP2.  The Opposition confirms that Plaintiffs state no claim on any of these topics.

**Plaquemines:**  Plaintiffs now concede that Regulation S-X did not require VG to include

---

[2] Plaintiffs complain that Defendants cite to certain Exchange Act cases, *see* Opp. 11 n.3, but those decisions do not turn on the relevant pleading standard and merely reiterate the basic principle that allegations from CWs not knowledgeable on a topic support no claim.

its 4Q24 financial statements in the Offering Documents. Opp. 17. They nevertheless argue that VG should have included those financial statements (with $2.1 billion spent that quarter on Plaquemines) because VG included "favorable" 4Q24 data. *Id.* 17-21. This argument has three fatal flaws.

*First*, the SAC does not actually allege that the $2.1 billion spent on Plaquemines in 4Q24 was somehow "unfavorable," or represented a deviation from trends disclosed in the Offering Documents. Nor do Plaintiffs allege that costs for the quarter were excessive or inconsistent with the costs disclosed for the overall project. Opp. 25-26. Plaintiffs instead argue these costs reflected what they characterize as "ongoing, systemic conditions that persisted for months before the IPO." Opp. 26. However, these are just different words describing the costs and delays that VG disclosed in the Offering Documents. S-1 at 44-47; *see Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 397-98 (S.D.N.Y. 2014) (dismissing Section 11 claim based on alleged failure to disclose that inventory was "excessive" when increased inventory was disclosed in registration statement), *aff'd*, 605 F. App'x 52 (2d Cir. 2015). In any case, the $2.1 billion spent on Plaquemines during 4Q24, ¶ 10, is consistent with the $17.7 billion disclosed spend for the prior 28 months, *see* S-1 at 193-94.[3] Likewise, the total amount spent on Plaquemines through 4Q24 was $19.8 billion ($17.7 + $2.1 billion), which was well within the total $22.5 to $23.5 billion range that VG disclosed in its Offering Documents. ¶¶ 128, 189, 194, 230. Plaintiffs' repeated invocation of a $2.1 billion expenditure states no claim. *See Gen. Motors Co.*, 46 F. Supp. 3d at 395 (dismissing Section 11 claim where inventory levels adhered to company's disclosures); Mot. 18-20 (citing additional

---

[3] This reflects an average of roughly $1.9 billion per quarter, even without accounting for lower costs during the first 10 months when only one of the two project phases was active. *See* S-1 at 193 (noting the first phase of construction began in May 2022 and the second phase began in March 2023).

cases).  The Ninth Circuit's decision in *Sodha v. Golubowski*, 154 F.4th 1019 (9th Cir. 2025) (certiorari requested), Opp. 18-19, which Plaintiffs rely on, is starkly different.  In *Sodha*, the court held an issuer may be required to disclose in-process financial data if the data materially contradicted the company's disclosures, and it remanded to the district court to perform the analysis.  *Id*. at 1036-37 n.6.  That is simply not the case here.[4]

*Second*, Plaintiffs' argument that VG highlighted positive operational data (and thus needed to disclose allegedly negative unaudited financial 4Q24 data) mixes apples and oranges.  Plaintiffs point to disclosures that VG placed pipeline connections for the Gator Express, placed a purchase order for CP2, and had an initial consultation with regulators for CP3.  Opp. 18.  These disclosures do not address, reference, or imply *anything* about VG's 4Q24 financial results, and thus create no obligation to disclose those results.  *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 365-66 (2d Cir. 2010) (one statement about a topic "did not trigger a generalized duty requiring defendants to disclose the entire corpus of their knowledge regarding" that topic); *In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d 169, 188 (W.D.N.Y. 2022) (no duty to disclose where there is "no [] connection" between statements and purported omission).  Plaintiffs cite no case holding that discussion of a handful of operational milestones somehow requires disclosure of non-final, unaudited cost data for the quarter.

*Third*, simply because VG's estimate of total costs for Plaquemines later increased by 1.2% after the IPO—from an estimated range of $22.5-$23.5 billion in the Offering Documents to the $23.3-$23.8 billion later disclosed—does not show the earlier estimate was false.  Plaintiffs'

---

[4] For the same reason, *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, which Plaintiffs cite, Opp. 17, is inapposite.  There, plaintiffs alleged Facebook "significantly cut their revenue figures" in the middle of the roadshow for the IPO, which it disclosed only to certain investors.  986 F. Supp. 2d 487, 500-05 (S.D.N.Y. 2013).

conclusory assertions about what VG "knew" or that certain data "was known," Opp. 17, do not state a claim. *Gen. Motors Co.*, 46 F. Supp. 3d at 395-96 (conclusory assertions insufficient to support Section 11 claim); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 300-01 (S.D.N.Y. 2021) (pleading by "hindsight" not allowed). In any event, Plaintiffs have not alleged the new estimate was materially different from the original estimate. This Court reached a similar conclusion in *In re Duke Energy Corp. Sec. Litig.*, dismissing claims because 0.3% difference in revenue was an "immaterial percentage as a matter of law." 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003) (Rakoff, J.) (collecting cases where 2-9% differences were deemed immaterial), *aff'd*, 113 F. App'x 427 (2d Cir. 2004); *see also* Mot. 19 (similar).

**2025 EBITDA Forecast:** Plaintiffs concede the Offering Documents did not contain an EBITDA forecast and that VG had no "specific obligation to publish" such a forecast. Opp. 21. Plaintiffs nonetheless argue that a forecast was required because VG supposedly knew that it would be "significantly below public expectations" that were somehow "shaped by … the Offering Documents." *Id.* Plaintiffs do not explain how the expectations were "shaped" by the Offering Documents or point to anything in the Offering Documents that allegedly gave rise to such expectations—and, again, offer no case law requiring a public company to make disclosures to correct third-party "expectations." The sole case Plaintiffs offer—*In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016)—has nothing to do with this question. It involved a company that *did* disclose a forecast (VG did not) while concealing more pessimistic internal forecasts. *See also* Mot. 21 (collecting cases dismissing Section 11 claims based on later-issued forecasts). The EBITDA theory supports no claim.

**CP2:** Plaintiffs appear to abandon their allegations that VG's CP2 cost estimates were misleading. Opp. 20 (noting their claims "focus primarily on Plaquemines," not CP2). They

9

nevertheless assert Defendants have "not establish[ed] that the original estimates [for CP2] were accurate." *Id.* This inappropriately inverts the burden: it is Plaintiffs who must plead that VG's original estimate was false when made. *See Morgan Stanley*, 592 F.3d at 358-59. Merely noting that the estimate changed eight months later, Opp. 20, is classic pleading by "hindsight" and states no claim. *See HEXO*, 524 F. Supp. 3d at 300-01; *Li-Cycle*, 2024 WL 2943959, at *5-6.

### C.     No Category 3 Statement Supports A Claim

The Opposition asserts that general statements—none of which are quoted—about VG's ability to generate revenue and cash flow from long-term contracts were misleading because VG did not disclose Plaintiffs' unsupported theory that VG's business was impacted by so-called "reputational harm" from certain customer disputes. Opp. 22-25. This argument fails.

It was no secret that VG had disputes with certain customers. The Offering Documents contained 12-plus pages of disclosures about those disputes, including that seven had evolved into formal arbitration proceedings. *See* S-1 at 13, 28, 44-45, 78-80, 97-98, 228-29, F-10, F-19, F-44, F-58. Such customer claims, without more, do not establish a widespread "reputational issue." *See In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 120 (S.D.N.Y. 2010) (customer complaints fail to support "assertion that widespread dissatisfaction was doing damage to [company's] business" where for "most companies ... some level of customer discontent is a fact of life"); *In re Vroom, Inc. Sec. Litig.*, 2025 WL 862125, at *26 (S.D.N.Y. Mar. 18, 2025) (similar). More fundamentally, the reason Plaintiffs know about these disputes at all is because VG disclosed them. Plaintiffs cite no case holding that a claim has been pled where a company disclosed customer disputes but did not also self-flagellate about supposed reputational harm from those disputes. The law is contrary. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (holding that "[d]isclosure is not a rite of confession," and there

is no duty "to disclose uncharged, unadjudicated wrongdoing") (quotations omitted).[5]

Plaintiffs do not plausibly allege reputational harm in any event. None of the FEs are alleged to have interacted with a single VG customer, so their allegations say nothing about how any customer viewed VG. *FuboTV Inc. Sec. Litig.*, 2023 WL 2711826, at *11 (S.D.N.Y. Mar. 30, 2023) (rejecting claims from CW who was not "in a position" to "possess … information about [company's] advertising practices"); *Qudian*, 2019 WL 4735376, at *6 (rejecting claims from CW who did not allege "facts that might corroborate" complaint) (quotations omitted). Plaintiffs' other support for "reputational harm" is the quote from TotalEnergies' CEO that it would not be a long-term VG customer. But, as Plaintiffs concede, Opp. 23, the only references to TotalEnergies in the Offering Documents is as a *competitor*—not a potential long-term customer. That a competitor made a negative comment about VG is hardly remarkable (and does not establish any false statement). *See Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*, 704 F. Supp. 3d 429, 439 (S.D.N.Y. 2023) (Rakoff, J.) (allegations of "one customer" leaving defendant's platform did not mean "the disclosed risk of losing customers to internal solutions had meaningfully materialized by" time of disclosure). Finally, Plaintiffs admit that speculation in an analyst report "does not provide the foundation" for their claim. Opp. 24-25. Alone or together, these assertions support no claim.

### D.    Item 303/105 Claims Fail

As to Item 303, Plaintiffs apparently concede their claim is not based on the theory that the Offering Documents were required to include 4Q24 financial statements, but have shifted their

---

[5] Of the three arbitrations where decisions have been issued, VG has prevailed in two and lost in the liability phase of one. ¶¶ 236-37; Ex. 5 to Hegt Decl., ECF No. 119-5. Regardless, the outcome of these disputes says nothing one way or the other about whether "reputational issue[s]" were impacting VG's business more than a year earlier.

11

argument to the notion that VG should have disclosed "ongoing, systemic [cost overruns and construction delays] that persisted for months before the IPO." Opp. 26. This argument fails for the same reason the Category 1 Statements are not actionable—VG disclosed those very issues in detail. *See supra* § I.A. Similarly, as to the Category 2 Statements, Plaintiffs do not (and cannot) allege the unaudited financial data not disclosed was in any way inconsistent with trends already disclosed. *See supra* § I.B.

Plaintiffs' Item 105 claim rests on (i) the same allegations regarding allegedly undisclosed construction delays and (ii) the purported "reputational damage" that was not disclosed. Opp. 26-27. Disclosures satisfy Item 105 where, as here, the Offering Documents "addressed every single potential cause of the company's subsequent [negative outcome] identified in the amended complaint." *Missfresh*, 701 F. Supp. 3d at 257; *see supra* §§ I.A, I.C (discussing extensive disclosures on same topics).

## II.    AN ABSENCE OF CAUSATION IS APPARENT ON THE FACE OF THE SAC

Plaintiffs acknowledge that dismissal is required where the defendant shows "that all or an identified portion of plaintiff's loss was caused by [some] other factor." Opp. 28. Here, that is plain because Plaintiffs themselves pled (and now reaffirmed) what they allege caused the stock price decline: (i) TotalEnergies CEO's February 5, 2025 criticisms of VG and (ii) VG's March 6, 2025 disclosure of its 4Q24 financial statements. Neither statement was corrective of any statement in the Offering Documents. *See* Mot. 29-30 (citing cases).[6]

## III.    PLAINTIFFS SHOULD NOT BE PERMITTED LEAVE TO AMEND

Plaintiffs' footnote request for leave to amend, Opp. 30 n.5, should be denied. Before the

---

[6] The SAC fails to plead a primary violation, so the Section 15 claims must be dismissed. Mot. 30.

case was assigned to this Court, Judge Rochon warned that if "at the end of the decision on the motion to dismiss, there's reason to deny future amendments, such as [] futility grounds or otherwise, the Court will do so." Ex. 1 to Opp. 19:12-14. This is Plaintiffs' third complaint (and the fourth in this action), and despite this warning, Plaintiffs failed to include any amendment with their opposition or otherwise explain how they would address the SAC's deficiencies. This is ample basis to deny further leave. *See Zappia v. Myovant Sciences Ltd.*, 708 F. Supp. 3d 486, 495 (S.D.N.Y. 2023) (Rakoff, J.), *aff'd*, 2025 WL 338351, at *4 (2d Cir. Jan. 30, 2025) (affirming dismissal with prejudice of first motion to dismiss where plaintiff offered no additional facts to support a claim).

## CONCLUSION

The SAC should be dismissed with prejudice.

Dated: April 22, 2026
     New York, New York

Respectfully submitted,

**LATHAM & WATKINS LLP**

*/s/ Jeff G. Hammel*
Jeff G. Hammel
Jason C. Hegt
Corey A. Calabrese
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
jeff.hammel@lw.com
jason.hegt@lw.com
corey.calabrese@lw.com

*Attorneys for Venture Global, Inc., Michael Sabel, Robert Pender, Jonathan Thayer, Sarah Blake, Sari Granat, Andrew Orekar, Thomas J. Reid, Jimmy Staton, Roderick Christie, and Venture Global Partners, II, LLC*

**GIBSON, DUNN & CRUTCHER LLP**

*/s/ Lissa M. Percopo*
Robert F. Serio[7]
Mary Beth Maloney
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
rserio@gibsondunn.com
mmaloney@gibsondunn.com

Lissa M. Percopo (admitted *pro hac vice*)
1700 M Street, N.W.
Washington, D.C. 20036-4504
Telephone: (202) 955-8500
lpercopo@gibsondunn.com

*Attorneys for Defendants Goldman Sachs & Co.*
*LLC, J.P. Morgan Securities LLC, BofA Securities,*
*Inc., ING Financial Markets LLC, RBC Capital*
*Markets, LLC, Scotia Capital (USA) Inc., Mizuho*
*Securities USA LLC, Santander US Capital*
*Markets LLC, SMBC Nikko Securities America,*
*Inc., MUFG Securities Americas Inc., BBVA*
*Securities Inc., Loop Capital Markets LLC, Natixis*
*Securities Americas LLC, Deutsche Bank*
*Securities Inc., Wells Fargo Securities, LLC, Truist*
*Securities, Inc., National Bank of Canada*
*Financial Inc., Raymond James & Associates, Inc.,*
*Regions Securities LLC, Guggenheim Securities,*
*LLC, and Tuohy Brothers Investment Research,*
*Inc.*

---

[7] Electronic signatures are used with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

14

**CERTIFICATION OF WORD COUNT**

I, Jeff G. Hammel, an attorney duly admitted to practice before this Court hereby certify that pursuant to Local Rules 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York, the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 4,000 words, which accords with the Scheduling Order entered on December 23, 2025 (ECF No. 113) under which the parties stipulated to, and Judge Rochon approved, a word count of 4,000 words.  In making this calculation, I have relied on the word and page counts of the word-processing system used to prepare the document.

Dated: April 22, 2026                                    */s/ Jeff G. Hammel*
                                                          Jeff G. Hammel