UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FIRSTFIRE GLOBAL OPPORTUNITIES FUND LLC, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

-v-

VENTURE GLOBAL, Inc., et al.,

Defendants.

25-cv-4642 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.:

Plaintiff's Second Amended Complaint ("SAC") brought three claims against various defendants for violations of sections 11, 12(a)(2), and 15 of the Securities Act stemming from Venture Global's initial public offering ("IPO") in January 2025. Defendants moved to dismiss, see ECF No. 116, and the Court granted the motion by bottom-line order on June 15, 2026, see ECF No. 125. This Opinion and Order explains the reasons for granting the motion to dismiss and directs the entry of final judgment dismissing the complaint with prejudice.

## I. Background

### A. Factual Background

Venture Global was founded in 2013 by defendants Michael Sabel and Robert Pender to innovate the production and distribution of liquefied natural gas (LNG). SAC ¶ 80. The process of "liquefaction" involves supercooling natural gas, which reduces its volume significantly and makes its transportation more economic and

efficient. Id. ¶ 82. The LNG market has grown dramatically in the past half-decade as companies have capitalized on LNG as an affordable means of supplying natural gas to regions without access to a pipeline. Id.

LNG plants principally consist of one or more LNG "trains" and connected pipes which are used for gas liquefactions and purification. Id. ¶ 83. Traditionally, LNG plants are constructed by assembling two or three large trains on site. Id. Venture Global's innovation was to streamline the construction of LNG plants by manufacturing individual, modular elements offsite for a larger number of medium-sized trains and then shipping them to its LNG project sites in assembled form. Id. ¶¶ 83, 90-91. Venture Global called this the "design one, build many" approach. Id. ¶ 93.

Setting up an LNG plant involves two phases. First, the construction phase just described. Once construction is complete, the second, commissioning phase begins. At that point, a commissioning team works with the Federal Energy Registration Commission to commission the facility by undergoing certain testing. A project reaches its commercial operations date ("COD") when both the construction and commissioning phases are complete. Id. ¶ 83.

On January 24, 2025, Venture Global conducted its IPO, selling 70,000,000 shares of class A common stock at $25.00 per share and raising approximately $1.75 billion. Id. ¶¶ 26, 167. Goldman Sachs, J.P. Morgan, BofA Securities, and eighteen other investment banks underwrote the IPO. Id. ¶¶ 42-70. Sabel, Pender, and Venture Global's

other officers and board members participated in the preparation and signing of the Registration Statement and in preparing and conducting a roadshow presentation for potential investors (collectively, the "Offering Documents"). See id. ¶¶ 28-40.[1] Among other things, the Offering Documents touted the advantages of Venture Global's "design one, build many" approach, including accelerated construction timelines, reduced costs, expanded production, reduced construction risks, and the ability to begin LNG production while offsite construction of additional trains was still ongoing. Id. ¶¶ 93-94. This last factor meant that Venture Global could begin selling LNG even before construction was complete, allowing Venture Global to use LNG sales to finance continued construction. Id. ¶ 95.

At the time of the IPO, Venture Global had five LNG projects in various stages of development: Calcasieu Pass ("Calcasieu"), Plaquemines, CP2, CP3, and Delta. Id. ¶ 84. None was fully operational. Id. Calcasieu had been producing some LNG since early 2022 but still had not achieved its COD because of ongoing "significant work related to commissioning, carryover completions, rectification, and certain other items being completed." Id. ¶ 87, 193-95.

The Plaquemines project was also experiencing substantial delays. Prefabricated modules were arriving unfinished or with missing pieces. Id. ¶¶ 9, 97, 103-04. Venture Global was allegedly copying and pasting

[1] The SAC also names as a defendant Venture Global Partners II, LLC, a partnership managed by defendants Sabel and Pender and the controlling stockholder in Venture Global. SAC ¶¶ 71-79.

designs from Calcasieu to Plaquemines without accounting for significant differences in geological conditions, gas intake quality and soil consumption. Id. ¶¶ 101, 109, 120. Delays in the arrival of the prefabricated modules created a "domino effect" of additional delays at the plant. Id. ¶¶ 104, 117. Similar delays were taking place at the CP2 project as well. Id. ¶¶ 118-122.

As a result, Venture Global was experiencing costly delays and operational failures requiring "overwhelming remediation costs." Id. ¶ 96. Plaintiff alleges that many of these delays and problems resulted from Venture Global's "design one, build many" approach. Id. ¶ 97. The SAC includes statements attributed to anonymous former employees of Venture Global and its third-party contractors to corroborate the existence of widespread operational problems and delays. See, e.g., id. ¶¶ 99-123.

At the same time, the SAC alleges, Venture Global was raising the ire of its business counterparties. Venture Global had entered into long-term contacts for the sale of LNG to major counterparties like Shell and BP. Id. ¶¶ 87, 130. Those contracts, which guaranteed stable income over long periods of time, kicked in when a project achieved COD. Because none of Venture Global's projects had reached COD by the time of the IPO, Venture Global was not selling any LNG pursuant to its long-term contracts. Id. ¶ 87. Instead, it was selling LNG on the spot market. Id. ¶ 130. Sales on the spot market can garner much higher prices than long-term contract sales. However, they do not provide the reliable, stable cash flows that long-term agreements do. Id. ¶¶ 88,

131-33. Plaintiff alleges that Venture Global was deliberately and systematically delaying obtaining its COD in order to continue selling LNG on the spot market, rather than under its long-term contracts in order to maximize short term revenue. Id. ¶¶ 130, 136-38, 140, 144.

By the time of Venture Global's IPO, this strategy had led to three arbitration proceedings with Venture Global's long-term contract counterparties and had, allegedly, inflicted substantial reputational damage on the company. Id. ¶¶ 133, 157. The Offering Documents did not disclose any existing reputational damage from these contract disputes or that, as a result, Venture Global's ability to enter into future long-term contracts with other customers was impaired. Id. ¶ 158.

Nine days after the IPO, on February 5, 2025, the CEO of TotalEnergies publicly stated that he had been approached by Venture Global to enter into a long-term contract but rejected the offer because of how Venture Global had been dealing with its other long-term contract counterparties. Id. ¶ 218. Following the news, Venture Global's Class A common stock fell 11.2%. Id. ¶ 221. Allegedly a February 13, 2025, Morningstar analyst report and a February 18, 2025, Citibank analyst report also noted Venture Global's reputational harm. Id. ¶ 223-24.[2]

[2] Neither report is included with the SAC as an exhibit. Defendants attached a Morningstar report including the statements quoted in the SAC to their motion to dismiss, but that report was published on March 6, 2025. See ECF No 119-12. In its opposition to the motion to dismiss, plaintiff does not contend that it is relying on a different Morningstar report.

On March 6, 2025, Venture Global filed a Form 10-K with the SEC, which detailed Venture Global's earnings for the fourth quarter of 2024 and the full year. The Form 10-K revealed that Venture Global's net income for FY 2024 was $1.7 billion, a $1.9 billion decline from FY 2023. In an accompanying press release, Venture Global attributed the decline, in part, to "higher costs to remediate and commission the Calcasieu Project and to develop the CP2 Project." Id. ¶ 227. Venture Global also revealed a lower revised EBITDA guidance for 2025. Id. It also updated its estimated cost for the Plaquemines project to $23.3-23.8 billion from the $22.5-23.5 billion stated in the Offering Documents. Id. ¶ 230. Following the March 6, 2026 announcements, Venture Global's Class A common stock fell 36.05%. Id. ¶ 231. By that point, the stock had fallen 62% from its IPO price. Id. ¶ 235.

In October 2025, BP won its arbitration against Venture Global. Id. ¶ 236. The award found that Venture Global had breached its obligation to declare the COD of the Calcasieu Project in a timely manner and to act as a "reasonable and prudent operator" pursuant to its long-term contract. Id. BP was awarded more than $1 billion in damages. Id. Venture Global's shares lost an additional 13%. Id.

However, Shell and Repsol LNG Holdings, S.A. lost their arbitrations against Venture Global based on the same alleged breach of contract in August 2025 and January 2026 respectively. Id. ¶ 237; Jan. 21, 2026 8-K at 2, ECF No. 119-5. In the Repsol LNG Holdings case, the Internation Court of Arbitration found that Venture Global "had acted as a 'Reasonable and Prudent Operator' in accordance with

the SPA in declaring COD on April 15, 2025," and not earlier. Jan. 21, 2026 8-K at 2, ECF No. 119-5.

**B. Procedural History**

On April 15, 2025, FirstFire Global Opportunities Fund LLC filed this action on behalf of itself and all others similarly situated against defendants Venture Global, Inc. ("Venture Global"); certain of its officers, including Michael Sabel and Robert Pender, (the "Individual Defendants"); and the entities that served as underwriters for Venture Global's IPO (the "Underwriter Defendants"). See ECF No. 1. The complaint alleged violations of sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), as amended by the Private Securities Litigation Reform Act of 1995. The complaint was initially filed in the Eastern District of Virginia but was ordered transferred to the Southern District of New York on June 3, 2025 pursuant to 28 U.S.C. § 1404(a). See ECF No. 55.[3]

[3] When this action was transferred to the Southern District of New York, it was designated as related to Bowes v. Venture Global, Inc., No. 25-cv-1364, an action that had been voluntarily dismissed and was already closed at the time of the transfer. See ECF No. 73 at 3. Bowes was a securities class action that involved substantially the same allegations against Venture Global. See id. at 1-2. The plaintiff in Bowes voluntarily dismissed the action before the District Court had the opportunity to rule on the lead plaintiff motions. Id. at 2. In addition, two shareholder derivative suits against Venture Global's officers involving similar facts are also pending in this District and have been designated as related actions. See Posey v. Sabel, 25-cv-4892; White v. Sabel, 25-cv-4414. With the parties' agreement, the Court stayed both the shareholder actions pending resolution of the motion to dismiss in this action. See Posey v. Sabel, 25-cv-4892, ECF No. 23; White v. Sabel, 25-cv-4414, ECF No. 23.

On July 25, 2025, the Court granted the unopposed motion of Illinois Municipal Retirement Fund ("IMRF") to serve as lead plaintiff. See ECF No. 72. IMRF is a public pension fund that administers retirements, disability, and death benefits for employees of local government in Illinois. SAC ¶ 23. As part of Venture Global's IPO, IMRF purchased 1,927,399 shares of Venture Global's Class A common stock from defendant Golman Sachs & Co., LLC. Id. The Court also approved the selection of Labaton Keller Sucharow LLP to serve as lead counsel and Cohen Milstein Sellers & Toll PLLC as liaison counsel for the class. See ECF No. 72.

On September 15, 2025, IMRF and additional plaintiff Pompano Beach filed their first amended complaint. See ECF No. 77. Defendants moved to dismiss, see ECF Nos. 94-97, but this Court held that the motion was mooted when plaintiff's filed the SAC on December 5, 2025, see ECF Nos. 101, 110.

The SAC asserts three claims:

(1) That Venture Global, the Individual Defendants, and the Underwriter Defendants violated section 11 of the Securities Act by filing or causing to be filed a Registration Statement that was materially inaccurate;

(2) That Venture Global, the Individual Defendants, and the Underwriter Defendants violated section 12(a)(2) of the Securities Act by preparing or causing to be prepared a false and misleading prospectus;

(3) That the Individual Defendants and VG Partners, Venture Global's controlling stockholder, violated section 15 of the Securities Act because they were directly responsible for Venture Global as its controlling persons, and Venture Global violated sections 11 and 12(a)(2) of the Securities Act.

Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) on January 18, 2026. See ECF No. 116. Briefing on the motion was completed on April 22, 2026. See ECF No. 122. The Court granted the motion to dismiss by bottom-line order on June 15, 2026. See ECF No. 125.

## II. Legal Standard

On a Rule 12(b)(6) motion to dismiss, the Court "review[s] the complaint['s] sufficiency under the notice-pleading standard, which requires [p]laintiff[] to assert enough facts to state a claim to relief that is plausible on its face." Hutchison v. Deutsche Bank, 647 F.3d 479, 484 (2d Cir. 2011) (quoting In re Lehman Bros., 650 F.3d 167, 174 (2d Cir. 2011)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Court accepts as true all factual allegations and draws all reasonable inferences in favor the plaintiff. Hutchinson, 657 F.3d at 483-84.[4]

[4] Defendants do not argue that the SAC is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b) or other

## III. Discussion

Defendants argue that plaintiff fails to state a plausible claim for relief under sections 11, 12(a)(2), or 15 of the Securities Act. For the reasons explained below, this Court agrees.

"Sections 11, 12(a)(2), and 15 of the Securities Act impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions." In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010). "Section 11 applies to registration statements, and section 12(a)(2) applies to prospectuses and oral communications." Id. (citing 15 U.S.C. §§ 77k(a), 77l(a)(2)). "The liability of an issuer under Section 11 for material misstatements is 'virtually absolute,' and attaches without regard to scienter." Chen v. Missfresh Ltd., 701 F. Supp. 3d 236, 246 (S.D.N.Y. 2023) (quoting Morgan Stanley, 592 F.3d at 358-59).

"[T]wo issues are central to claims under sections 11 and 12(a)(2)." Morgan Stanley, 592 F.3d at 360. First, "the existence of either a misstatement or an unlawful omission," id. which requires the plaintiff to prove that the defendant made:

(i) a misrepresentation, see 15 U.S.C. §§ 77k(a), 77l(a)(2) ("an untrue statement of a material fact");

---

such requirements. Cf. Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004) (Securities Act Section 11 and 12(a)(2) claims are subject to Rule 9(b)'s heightened pleading standard where the claims are "premised on allegations of fraud").

(ii) "an omission in contravention of an affirmative legal disclosure obligation," Morgan Stanley, 592 F.3d at 360; or

(iii) "an omission of information that is necessary to prevent existing disclosures from being misleading," id.

The second central issue in section 11 and 12(a)(2) cases is "materiality." Id. A misrepresentation or omission is material where "defendants' representations, taken together and in context, would have misled a reasonable investor." Id. (quoting Rombach v. Chang, 355 F.3d 164, 172, n.7 (2d Cir. 2004)).

"When analyzing offering materials for compliance with the securities laws, we review the documents holistically and in their entirety." Id. at 365-66; see also In re ProShares Trust Sec. Litig., 728 F.3d 96, 103 (2d Cir. 2013) ("In evaluating a prospectus, we read it as a whole.").

The SAC's sections 11 and 12(a)(2) claims are based on the allegation that "the Offering Documents misrepresented and failed to disclose the truth about: (i) operational issues and delays at [Venture Global's] operating plants that were caused in part by [Venture Global's] poor construction management and reliance on a flawed approach that involved duplicated plans and prefabricated parts; (ii) Venture Global's expenditures, costs, and financial results for Q4 2024; and (iii) Venture Global's evasion of contractual counter-party expectations and the resulting harm to the Company's business and reputation." SAC ¶ 170. Elsewhere, the SAC implies that Items 105

and 303 of SEC Regulation S-K required Venture Global to disclose the allegedly omitted information. The Court considers each category and Items 105 and 303 in turn.

**A. Operational Issues and Delays**

The first category of allegedly omitted statements are related to operational issues and delays at Venture Global's LNG plants. Plaintiff argues that statements in the Offering Documents touting the benefits of the "design one, build many" approach were misleading because the Offering Documents failed to disclose that at the time of the IPO, the "design one, build many" approach was allegedly "producing the opposite of what was promised: systemic delays, operational failures, and massive cost overruns." Opp. at 12; see also SAC ¶¶ 178, 180, 182.

Plaintiff fails to state a claim. First, even assuming that plaintiff is correct that some delays and cost overruns were caused by the "design one, build many" approach, none of the statements in the Offering Documents was misleading. The Offering Documents stated that Venture Global's approach had competitive advantages over the traditional approach:

> **In contrast [to the traditional approach],** our project development and construction approach utilizes proven liquefaction system technology and equipment in a unique mid-scale, factory-fabricated configuration that we developed. . . . **We believe our innovative . . . approach significantly reduces construction and installation costs, as well as construction time and schedule risk,** thereby allowing us to be more cost-competitive in the LNG market. . . . While traditional LNG projects often rely on bespoke designs and configurations, our approach . . . with our "design one, building many" method, allows us to apply the

> lessons we learn at each project to our subsequent projects, with the goal of continuously improving our execution, accelerating construction timelines, reducing costs, and expanding production.

S-1 at 2, ECF No. 119-1 (emphasis added). Thus, the Offering Document claimed only that Venture Global believed its innovative approach reduced construction and installation costs and reduced the risk of delays and scheduling issues. Those representations about the competitive advantage of Venture Global's approach are not misleading even assuming that Venture Global's innovative approach still produced some unquantified amount of delays and cost overruns.

Plaintiff's argument that the Offering Documents were misleading assumes that a reasonable investor understood Venture Global's Offering Documents to claim that the "design one, build many" approach would "eliminate" "delays and equipment problems." Opp. at 14 (emphasis added). But that assumption is wholly unsupported by what the Offering Documents actually said about the approach. Plaintiff points to no statements in the Offering Documents stating that Venture Global's approach "eliminate[d]," Opp. at 14, all risks of delays and cost increases. In fact, the SAC alleges that Venture Global's Offering Documents disclosed the advantages of the "design one, build many" approach "as compared with the traditional made-to-fit approach." SAC ¶ 93 (emphasis added). Because no reasonable investor would have thought Venture Global's novel approach is perfect, there is nothing misleading about omitting the alleged fact that Venture Global's unique

construction approach had caused some of the delays and cost overruns, even assuming that is true.

Second, to the extent plaintiff alleges that the Offering Documents' disclosures were misleading because they did not adequately disclose that Venture Global was already experiencing delays and cost overruns at the time of the IPO, that theory is contradicted by the Offering Documents themselves.

A "[c]omplaint [is] insufficient as a matter of law" where the challenged filings include the "disclosure of information alleged in the [c]omplaint to have been withheld." Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc., 2010 WL 148617, at *8 (S.D.N.Y. Jan. 14, 2010); see also In re ProShares Tr. Sec. Litig., 728 F.3d at 102 ("When a registration statement warns of the exact risk that later materialized, a [s]ection 11 claim will not lie as a matter of law."; id. at 105 (affirming dismissal where prospectus disclosed allegedly omitted information); Olkey v. Hyperion 1999 Term Tr., Inc., 98 F.3d 2, 6-7 (2d Cir. 1996) (affirming dismissal where "the prospectuses implicitly and clearly communicated" the allegedly undisclosed risk).

That is the case here. The offering Documents repeatedly disclosed operational delays and cost increases at Venture Global's projects:

- "**Our cost estimates for LNG facilities**, related equipment and components, natural gas pipelines, LNG tankers, and other natural gas liquefaction and export facilities **have been, and continue to be, subject to change due to many factors outside of our control.** Such factors include, among other things, (i) inflationary factors, (ii) changes in commodity prices (particularly nickel and steel), (iii) escalating labor costs, **(iv) supply chain availability**, including the availability of critical components and

increased costs to locate and procure alternatives, **(v) labor disputes**, (vi) tariffs, **(vii) unexpected delays in construction or commissioning**, and **(viii) unexpected repair, replacement, rectification, or warranty work. Such factors have in the past resulted in, and may in the future result in, among other things, delays in construction or commissioning, repair or warranty work, cost overruns, and/or change orders under or amendments to existing or future construction contracts.**" S-1 at 44-45, ECF No. 119-1 (emphasis added).

- "**Significant work** related to commissioning, carryover completions, rectification, including **remedying unexpected challenges with equipment reliability identified during the first-time implementation of our innovative design and configuration, and reliability testing [at the Calcasieu Project], is ongoing** and we believe will need to be completed before certain components operate as intended." S-1 at 108, ECF No. 119-1.

- **Venture Global contributed "an aggregate amount equal to $2.35 billion to address [] increases in estimated total project costs**, and we may be required to make additional incremental equity contributions." S-1 at 45, ECF No. 119-1.

- "**[T]he anticipated costs to achieve completion of the CP2 Project have increased in the past, and may increase further in the future**, potentially materially, compared to our current estimates as a result of many factors, including delays in construction or commissioning of the project or the execution of any repair or warranty work . . . ." S-1 at 198, ECF No. 119-1.

In addition to the statements above, the Offering Documents also repeatedly disclosed that such cost increases and delays may happen again in the future:

- "We may also decide or be forced to expend additional funds in order to maintain construction schedules, complete construction and commissioning, or comply with existing or future environmental or other regulations." S-1 at 45, ECF No. 119-1.

- "As a result, costs to achieve completion of LNG facilities, related equipment and components, natural gas pipelines, LNG tankers, and other natural gas liquefaction and export

facilities may be higher, potentially materially, than our cost estimates. In the event we experience any such increases in estimated costs, delays or both . . . ." S-1 at 45, ECF No. 119-1.

- "The costs to achieve completion of the Plaquemines Project may be subject to further increases, which could be material, as a result of many factors outside of our control as described above." S-1 at 47, ECF No. 119-1.

In other words, reading the Offering Documents as a whole, they disclosed what plaintiff alleges Venture Global was required to add: that there had already been delays and cost overruns at Venture Global's plants at the time of the IPO, and that there was a risk of more such delays and cost overruns in the future. Thus, Venture Global's Offering Documents "adequately warned the reasonable investor of the allegedly omitted risks." In re ProShares Tr. Sec. Litig., 728 F.3d at 102.

**B. Q4 2024 Financial Results**

Plaintiff acknowledges that Venture Global had no free-standing legal obligation to include financial information from Q4 2024 or Venture Global's 2025 EBITDA forecast in its Offering Documents. See 17 C.F.R. § 210.3-12(a), (b), (g); Opp. at 17. Rather, plaintiff argues that Venture Global "ha[d] a duty to disclose that information" because omitting it "render[ed]" the financial information disclosed in the Offering Documents "misleading." Opp. at 17; see In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993) ("A duty to disclose arises whenever [non-public] information renders prior . . . statements materially misleading.").

Specifically, according to plaintiff, Q4 2024 financial information showed that Venture Global "had incurred approximately $2.1 billion in additional Plaquemines expenditures during Q4 2024, bringing total costs paid to approximately $19.8 billion." Opp. at 18. That expenditure resulted in a "dramatically deteriorated financial position," Opp. at 18, reducing Venture Global's "remaining borrowing capacity," Opp. at 20, and requiring a revision of Venture Global's 2025 EBITDA forecast to "significantly below public expectations," Opp. at 21.

Plaintiff fails to state a claim as to the Q4 2024 financial information. Plaintiff argues that defendants were required to disclose all the available Q4 2024 financial information because defendants "happily disclosed" some Q4 2024 financial information. Opp. at 18. That is not the law. Defendants must disclose material omitted information only if defendants had a legal duty to do so, or if failure to do so renders what was disclosed materially misleading. Plaintiffs concede defendants had no legal duty to disclose the Q4 2024 financial information. The omitted Q4 2024 financial information was not necessary to prevent the Offering Documents from being misleading, and, in any case, was not material, for the following reasons:

First, plaintiff fails to identify specific statements in the Offering Documents that were misleading in light of the Q4 2024 financial information. Plaintiff alleges that the additional Q4 2024 spend resulted in a "dramatically deteriorated financial position" as

compared to what was disclosed in the Offering Documents. But that allegation is conclusory and unsupported by any other factual allegations. In fact, Venture Global's continued accumulation of construction costs on the Plaquemines project in Q4 2024 and the corresponding drawing down on loans was both unremarkable and foreseeable based on the information provided in the Offering Documents. The Offering Documents disclosed:

> We currently estimate that the total project costs for the Plaquemines Project will be approximately $22.5 billion to $23.5 billion . . . of which approximately $17.7 billion had been paid for as of September 30, 2024. . . . The costs to achieve completion of the Plaquemines Project may be subject to further increases, which could be material, as a result of many factors outside of our control as described above.

S-1 at 45, ECF No. 119-1. The additional $2.1 billion spend in Q4 thus kept the total costs on the Plaquemines project well within the total estimated cost. Moreover, the $2.1 billion in Q4 was consistent with the on average $1.9 billion spent on the project each quarter before. See S-1 at 193. Therefore, the Q4 2024 financial information was consistent with the financial information disclosed in the Offering Documents, and thus the Offering Documents were not misleading. Plaintiff has not identified anything in the Offering Documents that was misleading in light of the Q4 financial information.

Second, even assuming arguendo that some statements in the Offering Documents could be construed as misleading in light of the Q4 2024 financial information, plaintiff fails to demonstrate that the omission was material. Although materiality is usually not "dispositive in a motion to dismiss," Morgan Stanley, 592 F.3d at 360,

it "remains a meaningful pleading obstacle" and dismissal is appropriate "where the alleged omission was so obviously unimportant to a reasonable investor that reasonable minds would agree on that omission's unimportance," In re ProShares Tr. Sec. Litig., 728 F.3d at 102. Omitted information is material only if "there is a *substantial* likelihood that the disclosure of the omitted material would have been viewed by the *reasonable* investor as having *significantly* altered the total mix of information already made available." Id. (citation modified, emphasis original). The mere fact that investors (like plaintiff) would have liked to see the Q4 2024 financial results does not suffice because "there is no requirement to disclose information just because investors 'would have been interested in knowing about [it], and perhaps would have acted otherwise had [it] been disclosed.'" Merritt v. Molecular Partners AG, No. 22-cv-5925, 2024 U.S. Dist. LEXIS 22586, at *23-24 (S.D.N.Y. Feb. 5, 2024) (quoting Gen. Partner Glenn Tongue v. Sanofi, 816 F.3d 199, 212 (2d Cir. 2016)); see also Morgan Stanley, 592 F.3d at 366 ("A corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." (citation modified)).

The Q4 2024 financial information is not "a change substantially likely to be viewed by a reasonable investor as having significantly altered the import of the total mix of information" in the Offering Document. In re ProShares Trust Sec. Litig., 728 F.3d at 104. Although Venture Global revised its total cost estimate for the Plaquemines project on March 6, 2025 from $22.5 - $23.5 billion to $23.3 – 23.8

billion based on the Q4 2024 expenditures, that revision does not demonstrate that the expenditures in Q4 were material. The increase to the total cost estimate was just 1.2% and any reasonable investor would have understood, based on the disclosures, that total cost estimates may increase. See Tabak v. Canadian Solar Inc., 549 F. App'x 24, 27 (2d Cir. 2013) (overreporting of quarterly revenue by 2.7% and annual revenue by 0.9% was "immaterial as a matter of law"); ECA & Local 134 IBEW Joint Pension Tr. of Chcaigo v. JP Morgan Chase Co., 553 F.3d 187, 204 (2d Cir. 2009) (revision in accounting treatment of $2 billion from trades to loans "would not have been material to investors" because it represented just 0.3% of total assets); In re Duke Energy Corp. Sec. Litig., 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003) (0.3% change in total revenue was "immaterial . . . as a matter of law" based on cases where 2-9% differences were deemed immaterial), aff'd, 113 F. App'x 427 (2d Cir. 2004). Plaintiff's failure to demonstrate materiality is an independent reason for finding that plaintiff fails to state a plausible claim that the omission of Q4 2024 financial information violated sections 11 and 12(a)(2).

Plaintiff also fails to state a claim based on Venture Global's omission of the 2025 EBITDA forecast. The only case plaintiff cites, In re Vivendi, S.A. Sec. Litig, 838 F.3d 223 (2d Cir. 2016), is inapposite. There, the Second Circuit concluded that a jury could reasonably find that a company's public statements about debt and cash flow "conflicted with internal forecasts of debt and free cash flow and thus was misleading." Id. at 249. In this case, the Offering

Documents never provided a 2025 EBITDA forecast and plaintiff fails to identify any statement made by Venture Global that the 2025 EBITDA forecast conflicted with, or any statement that was misleading in light of the revised 2025 EBITDA forecast. Instead, plaintiff asserts that disclosure was required because the forecast was "significantly below public expectations, which were shaped by the Defendants' representations." Opp. at 21. Plaintiff does not, however, identify what representations defendants made to shape those expectations or explain why Venture Global had an obligation to correct public expectations.

**C. Reputational Harm**

The SAC also alleges that statements in Venture Global's Offering Documents about the importance and benefits of long-term contracts were misleading because the Offering Documents did not disclose that Venture Global had "substantially damage[d] Venture Global's goodwill in the industry," impairing its ability to enter such long-term contracts. SAC ¶ 133. Specifically, plaintiff argues that Venture Global was not "honoring commitments to major customers" by "purposefully avoiding its contractual obligations to maximize short-term profits from the spot-market at the expense of long-term stability." Opp. at 22 (citing SAC ¶¶ 143-46, 206).

In support of this theory, Venture Global relies on (1) Venture Global's "loss in the BP arbitration," which allegedly "showed that VG purposefully breached its obligations to declare the COD of the Calcasieu Project and did not act as a 'Reasonable and Prudent

Operator.'" Opp. at 23 (citing SAC ¶¶ 236-37); (2) statements by former employees allegedly corroborating that Venture Global was intentionally shirking its contractual obligations and had suffered reputational harm; (3) a Morningstar report from March 2025 that mentions reputational harm; and (4) the stock market reaction to a statement made by TotalEnergies' CEO nine days after the IPO that TotalEnergies would not enter a long-term contract with Venture Global, which was followed by an 11.2% decline in the stock price.

Plaintiff fails to state a plausible claim. The Offering Documents extensively disclosed arbitrations arising from Venture Global's disputes with its counterparties in long-term contracts concerning the delay to COD:

- "We have also notified all of our customers under the Calcasieu Foundation SPAs of the anticipated delay to COD, indicating that such delay is due to a force majeure event. As a result of such designation, the deadline for COD in such post-COD SPAs would be extended and such customers will not be entitled to terminate their respective post-COD SPAs as a result of failure to designate COD until June 2025. **All of such customers have questioned (including, as applicable, in the post-COD SPA arbitration proceedings described above) whether the delay constitutes a force majeure event and they could assert that, notwithstanding our declaration of force majeure, they are entitled to terminate their post-COD SPAs.**" S-1 at 80, ECF No. 119-1; see also id. at 28.

- **"We are involved and may in the future become involved in disputes and arbitration proceedings with the customers under our SPAs.** For example, in December 2022, **a long-term customer of the Calcasieu Project submitted a request for arbitration . . . asserting that we** had failed to provide sufficient information or access to the Calcasieu Project and **are delayed in achieving COD** under the post-COD SPA. The remedies sought by the long-term customer are contract damages in excess of $1 billion (which is potentially subject to increase with the passage of time until COD occurs),

rather than the termination of the post-COD SPA." S-1 at 78-79, ECF No. 119-1.

- The Offering Documents also disclosed "two additional long-term customers of the Calcasieu Project" that submitted their own arbitration requests, also "asserting, among other claims, that we are delayed in achieving COD under the post-COD SPA," and seeking billions in damages. S-1 at 79, ECF No. 119-1.

The Offering Document also disclosed the potential consequences of these arbitrations, including potential reputational harm:

- "[W]e may not be successful in defending against such claims. If legal proceedings are resolved against us or if we make out-of-court settlements, we may be obliged to make substantial payments to other parties. Even if we are ultimately successful in the legal proceedings, such proceedings may distract our management team and **we may also face harm to our reputation from case-related publicity**." S-1 at 78, ECF No. 119-1.

- **"If we are unsuccessful in defending ourselves against any of the claims mentioned above, the amounts we could be required to pay could be substantial**, which could have a material adverse effect on our business, contracts, financial condition, operating results, cash flow, liquidity and prospects." S-1 at 80, ECF No. 119-1; see also id. at 13, 229.

- "If any of our customers were to successfully terminate their post-COD SPAs with us for the Calcasieu Project, we would need to replace those customers and/or amend our existing post-COD SPAs, which could take time and **there can be no assurance we would be able to enter into new post-COD SPAs on a timely basis and on comparable or better terms.**" S-1 at 80, ECF No. 119-1.

Plaintiff argues that these disclosures were not enough because Venture Global should also have disclosed (1) that Venture Global had intentionally delayed COD in violation of its long-term contractual obligations and (2) this had already, at the time of the IPO, resulted in reputational harm. The Court is not persuaded.

First, whether Venture Global intentionally delayed COD and thus violated its contractual obligations was precisely the question at issue in the three pending arbitrations. None of those arbitrations had been decided at the time of the IPO, and Venture Global was not required to disclose "unadjudicated wrongdoing," City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 184 (2d Cir. 2014), or "suggest" that Venture Global "may have engaged in activities that might later be determined to" have violated its contractual obligations, Morgan Stanley, 592 F.3d at 365 (citation modified). City of Pontiac is squarely on point:

> "As [the Second Circuit has] explained, disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing. By disclosing its involvement in multiple legal proceedings and government investigations and indicating that its involvement could expose [Venture Global] to substantial monetary damages and legal defense costs, as well as injunctive relief, criminal and civil penalties, and the potential for regulatory restrictions, [Venture Global] complied with its disclosure obligations under our case law."

City of Pontiac, 752 F.3d at 184 (citation modified). Similarly, in Morgan Stanley the Second Circuit reasoned that because "disclosure is not a rite of confession or exercise of common law pleading," a company is not required "to suggest" that it or entities it is affiliated with "may have engaged in activities that might later be determined to" have violated the law. Morgan Stanley, 592 F.3d at 365 (citation modified).

Here, Venture Global disclosed the contract disputes, the arbitrations concerning whether Venture Global breached its contracts

by delaying the COD (whether intentionally or not), and the resulting exposure to damages and other forms of harm. It was not required to also disclose, as a fact, the position of its contractual counterparties that Venture Global intentionally delayed COD, a position Venture Global disputed in arbitrations that were, at the time of the IPO, ongoing.

Moreover, although plaintiff makes much of the fact that one of the three relevant arbitrations resulted in a judgment against Venture Global, which found that Venture Global did not act as "reasonable and prudent operator," the two other arbitrations came out the other way, finding that Venture Global "had acted as a 'Reasonable and Prudent Operator' in accordance with the SPA in declaring COD on April 15, 2025," and not earlier. Jan. 21, 2026 8-K at 2, ECF No. 119-5. Thus, even with the benefit of hindsight, it is far from a clear fact that Venture Global delayed COD to maximize short-term profits.

Second, plaintiff's allegation that Venture Global was intentionally delaying the COD to maximize short term profits is conclusory. There are no contemporaneous facts at the time of the IPO that supports plaintiff's allegation. The only support plaintiff has is the testimony of former employees, but they do not have the relevant knowledge to know whether Venture Global was intentionally delaying COD. Instead, the former employees only support what the Offering Documents already disclosed: namely, that COD had not been reached, and that Venture Global was selling LNG on the spot-market.

Third, the SAC's allegations that Venture Global was "experiencing undisclosed damage to its goodwill, reputation, and business" and "experiencing diminished ability" to enter into long term contracts, SAC ¶ 201, are also conclusory. The former employees have no relevant experience with Venture Global's contractual counterparties and other relevant entities in the industry to testify about Venture Global's reputation either. Nor do the Morningstar analysts report and statement by TotalEnergies' CEO suffice.

The Morningstar report is dated March 6, 2025, and thus post-dates the IPO. Plaintiff quotes the report to assert that Venture Global had suffered reputational damage, but in fact the quotes are from a brief section of the report describing what "Bears Say" about Venture Global. See Morningstar Report at 2, ECF No. 119-12. More importantly, the report provides no factual foundation for these opinions. Thus, the report provides no basis for establishing, or even inferring, the contemporaneous falsity of any statements in the Offering Documents. See FuBoTV Inc. Sec. Litig., 2024 WL 1330001, at *6 (S.D.N.Y. Mar. 28, 2024) (analyst report that merely represents the opinion of the analyst without any additional factual support or any cited source fails to adequately plead that defendants' statements were misleading).

Nor does the fact that nine days after the IPO one of Venture Global's competitors publicly stated that they would not enter a long-term contract with Venture Global suffice to state a plausible claim. Without more, this statement does not adequately allege that Venture

Global had a general reputation problem in the market at the time of the IPO. And the fact that a single competitor did not want to enter a long-term contract does not make Venture Global's statements about the importance of entering long-term contracts misleading: Venture Global never guaranteed that it would be able to enter more long-term contracts and never represented that entering a long-term contract with TotalEnergies specifically was important. The Offering Documents merely noted that such contracts are important to the financial stability of the company. Indeed, the Offering Documents reference TotalEnergies just once, stating they were constructing competing LNG facilities. S-1 at 166-68. See e.g. Steinberg v. PRT Grp., Inc., 88 F. Supp. 2d 294, 308-19 (S.D.N.Y. 2000) (finding that statements in prospectus regarding companies' ability to generate business were adequately tempered by caution and variables that may affect company's ability to do so, and so were not misleading in light of the fact that one client was in the process of withdrawing and several recent bids by the company were unsuccessful).

Thus, plaintiff has not alleged sufficient specific facts for this Court to conclude that plaintiff has an adequate basis for believing that defendants' statements in the Offering Documents were misleading because the contractual disputes had, by the time of the IPO, led to significant reputational harm. See IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d at 591-92 ("the Class Complaint does not provide specific facts concerning the majority of the alleged bad business practices for the Court to ascertain whether plaintiff has

an adequate basis for alleging that 'IAC's relationship with its hotel suppliers -- and thus its ability to secure a supply of hotel rooms to sell -- completely fell apart before and during the Class Period."). There is nothing misleading about a company's failure to disclose an entirely speculative fact or outcome. See Lipow v. Net1 UEPS Technologies, Inc., 131 F. Supp. 3d 144, 170 (S.D.N.Y. 2015) ("where an outcome is merely speculative, the duty to disclose does not attach.") (citing cases).

**D. Items 105 and 303**

The SAC also alleges that the Offering Documents violated Items 105 and 303 of SEC Regulation S-K. Item 105 requires a "discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a). Item 303 requires registrants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Hutchison, 647 F.3d at 485 (quoting 17 C.F.R. § 229.303(a)(3)(ii)).

Plaintiff did not bring a standalone cause of action for violation of Items 105 or 303 of SEC Regulation S-K. However, "[t]he failure to disclose information required under Items 105 and 303 can serve as the basis of claims under Section 11." Garnett v. RLX Tech. Inc., 632 F. Supp. 3d 574, 598 (S.D.N.Y. 2022) (citing cases). Plaintiff's theory as to why the Offering Documents violated Items 105 and 303 are the same as the three categories of statements

underlying plaintiff's section 11 and 12(a)(2) claims discussed above, see SAC ¶¶ 214-17, and fail for the same reasons.

**E. Plaintiff's Section 15 Claim**

Finally, since plaintiff fails to state a claim for relief under sections 11 and 12(a)(2) of the Securities Act, plaintiff necessarily also fails to state a claim under Section 15. "To establish [section] 15 liability, a plaintiff must [first] show a 'primary violation' of [section] 11." In re ProShares Tr. Sec. Litig., 728 F.3d at 109; see also Morgan Stanley, 592 F.3d at 358 (Section 15 "creates liability for individuals or entities that 'control[] any person liable' under Section 11 or 12").

## IV. Conclusion

For the reasons set forth above, the motion to dismiss was granted. Because, moreover, the SAC claims failed after the defendants had moved to dismiss the original complaint and had therefore put plaintiff on notice of the shortcomings that were being raised, there is no reason to give plaintiff another "bite at the apple" by allowing a further amendment. Accordingly, plaintiff's complaint is dismissed with prejudice. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

New York, NY
October 13, 2026

JED S. RAKOFF, U.S.D.J.